1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
2                     COLUMBIA DIVISION


3

SUSAN BOYKIN, INDIVIDUALLY  )
4  AND AS PERSONAL            )
REPRESENTATIVE OF THE ESTATE)
5  OF PHILIP BOYKIN,          )
                             )
6              PLAINTIFF,     )
                             )
7          -VERSUS-          )    3:13-CV-00417
                             )    JULY 29, 2015
8  SPECTRUM LUBRICANTS CORP,  )    COLUMBIA, SC
ET AL,                      )    VOLUME I OF II
9                            )
              DEFENDANTS.    )
10  _____)


11


12          BEFORE THE HONORABLE SHIVA V. HODGES
          UNITED STATES MAGISTRATE JUDGE, PRESIDING
13                    MOTION HEARING


14  A P P E A R A N C E S:


15  FOR THE PLAINTIFF:      STEVE JENSEN, ESQ.
                           ALLEN STEWART PC
16                         325 N. SAINT PAUL STREET
                           SUITE 4000
17                         DALLAS, TX  75201
                           PRO HAC VICE

18
                           FREDERICK J. JEKEL, ESQ.
19                         JEKEL DOOLITTLE
                           PO BOX 2579
20                         MT. PLEASANT, SC  29465

21  FOR THE DEFENDANT:      LEWIS WALTER TOLLISON, ESQ.
ACUITY                     TOLLISON LAW FIRM
22                         24 VARDRY STREET, SUITE 203
                           GREENVILLE, SC  29601

23
                           JENNIFER B. BONNEVILLE, ESQ.
24                         STEPTOE AND JOHNSON
                           633 W. FIFTH STREET, SUITE 700
25                         LOS ANGELES, CA  90071
                           PRO HAC VICE

2

```
 1        FOR THE DEFENDANT:        MICHAEL J. BOGLE, ESQ.
          SAFETY KLEEN             WOMBLE CARLYLE SANDRIDGE
 2                                 AND RICE
                                   PO BOX 10208
 3                                 GREENVILLE, SC  29603

 4                                 AMANDA M. KOCH, ESQ.
                                   JAMES J. MCGOLDRICK, ESQ.
 5                                 WESLEY S. ALOST, ESQ.
                                   JONES CARR MCGOLDRICK
 6                                 5910 N. CENTRAL EXPRESSWAY
                                   SUITE 1700
 7                                 DALLAS, TX  75206
                                   PRO HAC VICE
 8
          FOR THE DEFENDANT:       MORRIS DAWES COOK, JR., ESQ.
 9        BEL-RAY                  BARBARA J. WAGNER, ESQ.
                                   BARNWELL WHALEY PATTERSON AND
10                                 HELMS
                                   PO DRAWER H
11                                 CHARLESTON, SC  29402

12        COURT REPORTER:          KATHLEEN RICHARDSON, RMR, CRR
                                   UNITED STATES COURT REPORTER
13                                 901 RICHLAND STREET
                                   COLUMBIA, SC 29201
14

15            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

16                   ***  ***  ***  ***

17

18

19

20

21

22

23

24

25
```

1          *THE COURT:*  GOOD MORNING.  HOPE EVERYONE HAD A SAFE

2     FLIGHT IN AND GOOD EVENING LAST NIGHT HERE IN OUR LOVELY

3     CITY.  WE ARE ON THE RECORD IN THE CASE OF BOYKIN VERSUS

4     SPECTRUM LUBRICANTS, ET AL.  THAT IS CIVIL NUMBER 3:13-417.

5     WE ARE HERE BEFORE THE COURT ON SEVERAL MOTIONS TO STRIKE AND

6     MOTIONS TO EXCLUDE TESTIMONY RENDERED BY THE TWO EXPERTS IN

7     THIS CASE, DRS. HARRISON AND STEWART.

8          I HAVE SPOKEN WITH COUNSEL IN ADVANCE OF THIS HEARING TO

9     DETERMINE THE MOST EFFICIENT WAY FOR US TO PROCEED ON THE

10    PENDING MOTIONS.  AND WHAT I'D LIKE TO DO IS TO TAKE UP THE

11    MOTIONS CONCERNING THE TIMELINESS OR UNTIMELINESS OF THE

12    AFFIDAVITS OF DRS. HARRISON AND STEWART, AND THOSE ARE

13    REFLECTED IN THE DOCKET AT MOTION NUMBER 356 AND 374.

14         JUST FOR THE RECORD, I HAVE REVIEWED ALL OF THE PENDING

15    MOTIONS IN THIS CASE AND I'M FAMILIAR WITH THE FACTS AND THE

16    ISSUES, ARGUMENTS THAT HAVE BEEN MADE IN THE MOTION.  THE

17    PLAINTIFF HERE IS MRS. SUSAN BOYKIN.

18         MRS. BOYKIN, WELCOME.  WELCOME.  YOU'RE HERE

19    INDIVIDUALLY AND AS A PERSONAL REPRESENTATIVE OF THE ESTATE

20    OF YOUR LATE HUSBAND, PHILIP BOYKIN.  THANK YOU.  AND YOU

21    BRING THIS LAWSUIT FOR PERSONAL INJURIES THAT YOU ALLEGE

22    ARISE OUT OF MR. BOYKIN'S EXPOSURE TO BENZENE-CONTAINING

23    SOLVENTS IN PRODUCTS THAT WERE PRODUCED BY THE DEFENDANTS'

24    VARIOUS COMPANIES AND THAT YOU ALLEGE HE USED WHILE HE WAS A

25    MOTORCYCLE MECHANIC IN VARIOUS MOTORCYCLE DEALERSHIPS FOR

4

```
 1    SOME THIRTY YEARS OR SO, AND YOU ALLEGE, AS I UNDERSTAND,

 2    THAT MR. BOYKIN CONTRACTED NON-HODGKIN'S LYMPHOMA THROUGH HIS

 3    EXPOSURE TO THE BENZENE IN THE SOLVENTS AND THAT THOSE --

 4    THAT NON-HODGKIN'S LYMPHOMA RESULTED IN THE DEVELOPMENT OF

 5    PULMONARY EMBOLI OR BLOOD CLOTS THAT EVENTUALLY LED TO HIS

 6    DEATH FROM CARDIAC ARREST.

 7        SO, THAT'S WHAT I UNDERSTAND THE FACTS TO BE.  AS YOU

 8    KNOW, WE ARE HERE TODAY TO DETERMINE WHETHER THE EXPERT

 9    WITNESSES THAT YOU AND YOUR COUNSEL HAVE HIRED SHOULD BE

10    PERMITTED TO TESTIFY ON THE SCOPE OF THE OPINIONS THAT THEY

11    HAVE RENDERED IN THE REPORTS AS WELL AS AT THEIR DEPOSITION

12    OR WHETHER THE SCOPE OF THEIR TESTIMONY SHOULD BE SOMEWHAT

13    LIMITED UNDER THE LAWS THAT ARE REQUIRED FOR US TO APPLY AND

14    THE VARIOUS CASE LAW AND THE RULES OF CIVIL PROCEDURE AND THE

15    RULES OF EVIDENCE.

16        SO, I HAVE SPOKEN TO THE ATTORNEYS AND I HAVE INDICATED

17    TO THEM THAT I HOPE TO GO UNTIL ABOUT LUNCH TIME BEFORE WE

18    TAKE A BREAK AND THEN WE WILL RESUME THIS AFTERNOON AND

19    PROBABLY TAKE A BREAK IN THE MID-AFTERNOON.  BUT IF YOU OR

20    ANYONE HERE IN THE COURTROOM WOULD LIKE TO TAKE A BREAK, A

21    COMFORT BREAK, THEN CERTAINLY LET US KNOW AND WE'LL

22    ACCOMMODATE YOU.  BUT WELCOME TO COLUMBIA, SOUTH CAROLINA AND

23    THE DISTRICT OF SOUTH CAROLINA.

24        SO, I SUPPOSE FOR THE RECORD THE REMAINING DEFENDANTS IN

25    THIS CASE -- THIS CASE STARTED OUT WITH MANY DEFENDANTS.  BUT
```

1    THE REMAINING DEFENDANTS THAT I SEE ON THE DOCKET ARE ACUITY

2    SPECIALTY PRODUCTS, INC, WHICH I'LL REFER TO AS ACUITY, AND

3    SAFETY KLEEN SYSTEMS, INC, AND I'LL REFER TO IT AS SAFETY

4    KLEEN, AND THEN BEL-RAY COMPANY, INC, WHICH I WILL REFER TO

5    AS BEL-RAY.

6        THERE ARE -- THE MOTIONS ARE VARIOUSLY STYLED.  SOME ARE

7    MOTIONS TO STRIKE AND OTHERS ARE MOTIONS TO EXCLUDE.

8    TYPICALLY MOTIONS TO STRIKE ARE GOVERNED BY FEDERAL CIVIL

9    PROCEDURE 12(F) WHICH ALLOWS THE COURT TO STRIKE FROM A

10   PLEADING AN INSUFFICIENT DEFENSE OR ANY REDUNDANT,

11   IMMATERIAL, IMPERTINENT OR SCANDALOUS MATTER.  SO I THINK

12   TECHNICALLY, ALTHOUGH THEY ARE STYLED AS MOTIONS TO STRIKE,

13   REALLY WHAT WAS INTENDED AND HOW I WILL INTERPRET THOSE

14   MOTIONS IS TO CHALLENGE THE AFFIDAVITS ON THE ADMISSIBILITY

15   OF THE EVIDENCE CONTAINED THEREIN.

16       AND SO -- SO, WITH THAT, I'M HAPPY TO HEAR THE ARGUMENTS

17   ON THE UNTIMELINESS WHICH ARE REFLECTED IN DOCUMENTS NUMBER

18   356 AND 374.  I BELIEVE THERE IS ONE SET OF ARGUMENTS

19   CONCERNING THE SPECIFIC CAUSATION AND ANOTHER ON GENERAL

20   CAUSATION, AND DIFFERENT DEFENDANTS ARE GOING TO BE ARGUING

21   THOSE AS TO THE SUBSTANCE OF THE -- OF THE OPINION.

22       THE UNTIMELINESS MOTIONS WERE FILED BY ACUITY AND SAFETY

23   KLEEN, I BELIEVE, AND SO WHICH -- WHICH DEFENDANT WOULD

24   PREFER TO GO FIRST ON THE UNTIMELINESS MOTION?  SAFETY KLEEN?

25   ACUITY?  OKAY.

1       SO, IF YOU WOULD, AS YOU SPEAK, PLEASE INDICATE YOUR

2  APPEARANCE ON THE RECORD SO THAT THE COURT REPORTER CAN BE

3  SURE TO GET YOUR NAME, YOUR NAME CORRECT.  THANK YOU, SIR.

4       *MR. TOLLISON:*  THANK YOU, YOUR HONOR.  WALT

5  TOLLISON WITH THE TOLLISON LAW FIRM, AND I'M HERE WITH

6  JENNIFER BONNEVILLE WITH STEPTOE AND JOHNSON OUT OF

7  CALIFORNIA, AND WE BOTH REPRESENT ACUITY AS IT RELATES TO ALL

8  OF THE MOTIONS WHERE ACUITY IS A MOVING PARTY.

9       AT THIS POINT I'M GOING TO TAKE UP THE MOTION TO STRIKE

10  AS FILED BY ACUITY REGARDING THE -- NOT NECESSARILY THE

11  ENTIRE AFFIDAVIT.  SAFETY KLEEN WILL ADDRESS MORE IN THEIR

12  MOTION FOR PURPOSES OF EFFICIENCY.  I THINK THEIR MOTION WENT

13  MORE TO THE TOTALITY OF THE AFFIDAVIT.

14       *THE COURT:*  RIGHT.

15       *MR. TOLLISON:*  MY MOTION WENT TO SOME EXACTNESS

16  WITHIN THE AFFIDAVITS THAT WE WOULD LIKE STRICKEN OR HOWEVER

17  THE COURT MAY WANT TO TERM IT.  I APPRECIATE THE COURT HAVING

18  TO GO THROUGH WHAT WE SHOULD HAVE CALLED IT BECAUSE WE

19  ACTUALLY WENT THROUGH THE SAME PROCESS AS TO WHAT--

20       *THE COURT:*  WELL, I MIGHT BE WRONG.  YOU MIGHT

21  STILL BE RIGHT.

22       *MR. TOLLISON:*  WELL, I DON'T HOLD ANY WISDOM IN

23  THAT REGARD.  LET ME, THOUGH, FOR THE RECORD, YOUR HONOR,

24  FIRST AND FOREMOST, I JUST WANT TO PERSONALLY AS LOCAL

25  COUNSEL THANK THE COURT AND THANK PARTICULARLY YOUR STAFF AND

1    AS WELL AS JUDGE LEWIS' STAFF FOR BEING AS ACCOMMODATING AND

2    WORKING WITH THE PARTIES WITH RESPECT TO COORDINATION AND

3    WITH RESPECT TO THE INTRUSION, IF YOU WILL, BY ALL THE

4    DOCUMENTS AND THE ELECTRONIC USE AND ALL THAT IN A RELATIVELY

5    SHORT PERIOD OF TIME.  SO WE THANK YOU AND YOUR STAFF.

6    YOU'RE ONLY AS -- WE ALWAYS KNOW WE ARE ONLY AS TALENTED AS

7    THE TALENT AROUND US, AND I THINK YOU HAVE BEEN BLESSED IN

8    THAT REGARD.  SO...

9         *THE COURT:*  WELL, THANK YOU.  I AGREE.  I

10   APPRECIATE THE KIND WORDS.

11        *MR. TOLLISON:*  AND TO ALL OF THEM AS WELL.  YOUR

12   HONOR, I GUESS WHAT I WANTED TO DO WAS TO ESSENTIALLY KIND OF

13   CAPTURE AS IT RELATES TO THIS KIND OF WHERE WE ARE.  I THINK

14   THE COURT PROBABLY SAYS I HAVE READ THE BRIEFS, I UNDERSTAND

15   WHERE WE ARE.  BUT I WANTED TO KIND OF ADD TO, IF I COULD,

16   JUST KIND OF HOW WE GOT HERE, AND THEN MAYBE ON THE BACK END

17   WITH A LITTLE BIT MORE OF WHAT I FEEL LIKE SHOULD HAPPEN WITH

18   GREAT DEGREE OF RESPECT AND HOW WE SHOULD PROCEED FORWARD

19   DEPENDING UPON WHATEVER FORK IN THE ROAD THE COURT, YOU KNOW,

20   MAY CHOOSE IN THAT REGARD.

21       AND WE ARE HERE BECAUSE FOR THE FIRST TIME IN MY

22   RESPECTFUL OPINION AND THIS ENTIRE CASE, THROUGH NUMEROUS

23   AMENDED SCHEDULING ORDERS AND THROUGH NUMEROUS MONTHS OF

24   DISCOVERY, FACT DISCOVERY AND EXPERT DISCOVERY AND KIND OF

25   THE CLOSE OF THE CASE, IF YOU WILL, YOU KNOW, THE -- IF

1    DISCOVERY AND PRETRIAL IS A BOXING MATCH, IT ENDED.  AND POST

2    THE BOXING MATCH, YOU KNOW, WE GOT HIT WITH A LEFT JAB BY

3    PLAINTIFFS WITH RESPECT TO ACUITY FOR THE FIRST TIME BEING

4    ADDED INTO THE MIX OF PRODUCTS WITH RESPECT TO A PARTS

5    WASHING FLUID.

6        AND IF YOUR HONOR HAS READ ENOUGH, IT MIGHT SAY I

7    UNDERSTAND THE PARTS WASHER.  I MIGHT EVEN HAVE GOOGLED WHAT

8    IT WAS, BUT IT'S -- ESSENTIALLY IT'S A MACHINE OR AN

9    APPARATUS THAT HAS A SINK BASIN.  IT'S NOT THAT

10   SOPHISTICATED.  UNDERNEATH IT SITS A DRUM THAT WOULD HAVE

11   CLEAN, DEGREASING OR CLEAN MATERIAL IN IT, MINERAL SPIRITS OR

12   SOME TYPE OF THING WHERE YOU WOULD ESSENTIALLY PUMP THIS

13   FLUID INTO A SINK BASIN, CLEAN THE PARTS AS KIND OF A

14   DEGREASING TYPE OF OPERATION.

15       AND SO, COLUMBIA YAMAHA SPORTS, WHERE MR. BOYKIN WORKED,

16   HAD A PARTS WASHER AND -- BUT FOR THE FIRST TIME WE HAVE KIND

17   OF BEEN HIT WITH AN ALLEGED OR GENERAL VAGUE PARTS WASHING

18   FLUID LINKED TO ACUITY FOR THE YEARS 2008 2009, AND THAT'S

19   THE FIRST TIME WE HAVE SEEN THAT, FIRST TIME WE HAVE HEARD

20   THAT, FIRST TIME WE HAVE BEEN TOLD AT THE BACK END OF THE DAY

21   AFTER THE MATCH IS OVER, OH BY THE WAY, YOU KNOW, WE ARE

22   GOING TO NOW INTRODUCE A NEW PARTS WASHING FLUID INTO THIS.

23       BUT IT CAME US TO, YOUR HONOR, AND I THINK IT'S

24   IMPORTANT KIND OF IN A DIFFERENT FIELD OF PLAY.  I MEAN,

25   TYPICALLY IF THE EXPERT WANTED TO AMEND HIS OR HER RESPECTIVE

1    REPORT AND THEY WANTED TO DO SO BASED UPON AN INACCURACY OR

2    BASED UPON A LACK OF COMPLETENESS, YOU WOULD SERVE US WITH A

3    RULE 26(E) RESPONSE, A PLEADING.  PURSUANT TO RULE 26(E), WE

4    ARE AMENDING, WE ARE SUPPLEMENTING, BUT THAT DIDN'T HAPPEN.

5        SO, SO IT DIDN'T COME TO US BY VIRTUE OF RULE 26(E) EVEN

6    THOUGH THAT THE PLAINTIFFS WANT TO ARGUE THIS IS A

7    SUPPLEMENTATION ISSUE AND IT'S PROPER AND TIMELY, BUT THEY

8    NEVER DID THAT.  SO WHAT HAPPENED TO US WAS, AS YOU KNOW, WAS

9    EMBEDDED IN THESE AFFIDAVITS, THESE NEW AFFIDAVITS.  WHAT

10   HAPPENED WAS WE MOVED TO EXCLUDE.  PLAINTIFFS FILED A

11   RESPONSE BRIEF.  THEY ATTACHED TO THIS THESE TWO NEW

12   AFFIDAVITS THAT FOR THE FIRST TIME KIND OF EMBEDDED IN THERE

13   WAS SOME REFERENCE TO ACUITY.

14       AND IT DOESN'T SPEAK TO HOW IT GOT THERE, WHY IT GOT

15   THERE, WHAT WAS DIFFERENT, WHAT WAS THE RECALCULATION OF

16   THE -- OF THE EVIDENCE BEFORE IT.  IT JUST -- IT JUST

17   APPEARED.  AND FOR STEWART IT APPEARED IN A DANGLING

18   FOOTNOTE.  BY THE WAY, ACUITY'S PARTS WASHING FLUID 08 09.

19   AND THEN HARRISON IN HIS AFFIDAVIT, AS YOU CAN SEE IN THE

20   RECORD, IS KIND OF, BY THE WAY, THROUGH HYPHENS, ACUITY NOW

21   HAS A PARTS WASHER FLUID AND ONLY REALLY A PARTS WASHER FLUID

22   THAT'S NOW IN THE CASE.

23       AND SO -- SO WE FELT IT WAS APPROPRIATE TO MOVE TO

24   STRIKE ANY REFERENCE TO THE ACUITY PARTS WASHER FLUID IN THE

25   AFFIDAVIT AND THAT SAFETY KLEEN WILL SPEAK TO THE

1    APPROPRIATENESS OR LACK THEREOF I GUESS FROM THE PLAINTIFFS'

2    OPPOSITION TO THE TOTALITY OF THE AFFIDAVITS AS A WHOLE, TO

3    WHICH I AGREE WITH, BUT WE JUST SIMPLY MOVED -- WE HAVE GOT

4    TO TAKE THIS NEW PRODUCT, THIS NEW DAY, THIS NEW EXPOSURE TO

5    ACUITY OUT OF THE PICTURE.

6         THE COURT: MR. TOLLISON, WHAT -- THE CLAIMS THAT

7    YOU WERE AWARE OF AGAINST ACUITY, WHAT TYPES OF PRODUCTS--

8         MR. TOLLISON: AEROSOL SPRAY LIKE A -- LIKE BRAKE

9    CLEANER, CARBURETOR CLEANER.

10        THE COURT: SO THOSE WERE ALL AEROSOL SPRAYS, AND

11   SO THIS IS -- THIS COMES IN A DIFFERENT FORM AND WASN'T

12   RELATED TO ANY OF THOSE.

13        MR. TOLLISON: RIGHT. AND IT MIGHT HAVE BEEN --

14   MAY HAVE MADE SOME REFERENCE TO A LIQUID, BUT IT WASN'T A

15   PARTS WASHER FLUID. AND WHAT I WANTED TO DO, IF I COULD, WAS

16   KIND OF TAKE YOU REAL QUICKLY HOW WE GOT HERE BECAUSE THIS

17   PARTS WASHER PART OF THE CASE HAS HAD ALMOST A LIFE OF ITS

18   OWN, AND IT'S A DIFFERENT ENTITY. I MEAN, IT'S A MATERIAL

19   THAT COMES IN A DRUM. SO IT DOESN'T COME OFF A SHELF LIKE IN

20   AN AEROSOL CAN OR A LITTLE SMALL CONTAINER THAT MIGHT HAVE A

21   LITTLE LIQUID IN IT THAT YOU WOULD USE AS PART OF BEING A

22   MECHANIC.

23        SO HERETOFORE, WE HAVE BEEN IN IT FOR THAT TYPE OF

24   PRODUCT. WE HAD NOT BEEN IN THE CASE AT ALL FOR A PARTS

25   WASHING FLUID. AND IMPORTANT TO NOTE, THE EXPERTS WHEN

1    ASKED -- WHEN THESE TWO AFFIDAVITS CAME IN WITH JUST THIS

2    REFERENCE, A SINGLE SOLITARY REFERENCE, WHEN YOU READ ALL OF

3    THE REST OF STEWART'S AFFIDAVIT, HE DOESN'T EVEN TALK ABOUT

4    US ANY MORE.  HE GOES THROUGH I THINK PARAGRAPHS -- I THINK

5    IN STEWART PARAGRAPHS 45 THROUGH 63 DEALT WITH -- AND AS YOU

6    KNOW, THE AFFIDAVITS WERE TO REBUT OUR ARGUMENT, WHY HIS

7    METHODOLOGY IS CORRECT, WHY HE SHOULD NOT BE EXCLUDED, WHY

8    HIS OPINION SHOULDN'T BE INCLUDED.  BUT FOR 45 THROUGH 63 IS

9    ALL ABOUT SAFETY KLEEN.

10       THERE'S NO REFERENCE IN THAT AFFIDAVIT AT ALL TO ACUITY.

11   SO, HERE'S THE -- WE DIDN'T MAKE A PART -- THE PRODUCT IS A

12   ZEP PRODUCT.  SO YOU THINK AN EXPERT'S GOING TO AMEND HIS

13   REPORT IN THE SENSE OF WHICH HE SHOULD AND THE SENSE OF WHICH

14   WOULD BE APPROPRIATE, HE WOULD REFER TO THE -- A ZEP PRODUCT

15   X OR A ZEP PRODUCT Y.  ACUITY DIDN'T HAVE A PARTS WASHER

16   FLUID.  AND IT OWNED COMPANIES THAT THROUGH BRANDED NAMES HAD

17   PARTS WASHER FLUID, BUT IT WOULD HAVE BEEN A ZEP PARTS

18   WASHER.  THEY DON'T EVEN REFER TO THE ZEP PARTS WASHER FLUID

19   IN THE EXPERT AFFIDAVIT.  THEY JUST REFER TO ACUITY'S PARTS

20   WASHER FLUID.

21       SO IF I COULD REAL QUICK, I WANT TO KIND OF TAKE YOU

22   THROUGH A TIMELINE ON THIS THING, AND I WILL TRY TO MAKE --

23   BE AS BRIEF AND SUCCINCT AS I CAN.  THIS ORIGINAL CASE

24   STARTED IN STATE COURT.  AND IT STARTED THERE BECAUSE THEY

25   NAMED A DEFENDANT THAT WAS A -- A SOUTH CAROLINA RESIDENT

1    NAMED PROVIDENCE ENVIRONMENTAL.  AND IT WAS THE LONE STATE

2    DEFENDANT AND DOMICILE DEFENDANT, AND AS A RESULT OF THAT

3    THERE WAS NO DIVERSITY.

4         SO, AS THE CASE PROCEEDED, WE ALL BEGAN TO WONDER

5    WHAT -- WHAT WE -- PROVIDENCE HASN'T MADE AN APPEARANCE,

6    THERE HASN'T BEEN ANYTHING ON DEFAULT, WE DIDN'T KNOW WHAT

7    WAS GOING ON WITH PROVIDENCE, AND SO WE DELVED INTO WHO

8    PROVIDENCE WAS AND WHAT THEY DID.  AND FROM SOME AFFIDAVITS

9    THAT WE PROCURED, WE REMOVED THE CASE TO FEDERAL COURT ON THE

10   BASIS THAT PROVIDENCE ENVIRONMENTAL DID NOT SUPPLY A CHEMICAL

11   OR HAVE A CHEMICAL PER SE THAT WAS AT ISSUE IN THIS

12   PARTICULAR CASE; THAT ALL THEY DID WAS SERVICE THE PARTS

13   WASHER BY REMOVING WASTE OR REMOVING TIRES OR OLD RAGS BUT

14   NOT NECESSARILY BEING A SUPPLIER OF A SOLVENT OR A CHEMICAL.

15         AND SO THAT WAS UNCHALLENGED BY THE PLAINTIFF, AND SO

16   THE CASE WAS REMOVED, AND THEN THE PLAINTIFF DISMISSED

17   PROVIDENCE ENVIRONMENTAL FROM THE CASE.  AND SO WE THEN WERE

18   IN FEDERAL COURT.  WE STARTED OFF WITH JUDGE ANDERSON, THEN

19   WE ENDED UP HAVING JUDGE SEYMOUR, AND NOW JUDGE LEWIS, AND --

20   BUT DURING THE 2013 TIMEFRAME, YOUR HONOR, WE BEGAN TO DO

21   DISCOVERY.

22         SO WE STARTED TAKING CO-WORKER DEPOSITIONS.  AND WE TOOK

23   MRS. BUSSEY -- I MEAN MRS. BOYKIN'S DEPOSITION.  BUT WE TOOK

24   ALL OF THE CO-WORKERS -- IT'S AS MANY AS EVERYBODY NOTICED.

25   AND BY THE FALL OF 2013 WE HAD PRETTY MUCH COMPLETED THE

1    FACTUAL RECORD.  WE STILL HAD ONE PERSON TO DEPOSE AND HIS

2    NAME WAS CAJUN CAVALIER.  I WANT TO SPEAK TO WHY HE ENDED

3    UP -- WHY HE HAD NOT BEEN BUT ULTIMATELY WAS.

4        IN NOVEMBER OF 2013 AS A RESULT OF ALL OF THESE

5    DEPOSITIONS, THE PLAINTIFFS MOVED TO AMEND THE COMPLAINT TO

6    ADD PROVIDENCE BACK IN AGAIN.  THE PLAINTIFFS' POSITION WAS

7    THAT IN LIGHT OF ALL OF THE TESTIMONY THAT HAD TRANSPIRED IN

8    THE DEPOSITIONS, PROVIDENCE DID IN FACT SUPPLY CHEMICAL AND

9    DID IN FACT SUPPLY SOLVENT THAT WENT INTO THE PARTS WASHER

10   BASIN, AND THEY SHOULD THEREFORE BE NOW A DEFENDANT.

11       SO, YOU KNOW, WE HAD TO THEN GO THROUGH -- THEN WE HAD

12   TO THEN GO THROUGH, YOU KNOW, ESSENTIALLY THE TESTS THAT THE

13   COURT WOULD UTILIZE AS TO WHETHER IT WAS -- SHOULD BE A

14   PROPER JOINDER OR AN IMPROPER JOINDER.  SO THE BRIEFING ALL

15   TOOK PLACE IN 2013, ROUGHLY DECEMBER, NOVEMBER AND DECEMBER,

16   AND THE HEARING WAS IN FEBRUARY OF '14, AND THEN JUDGE

17   SEYMOUR DENIED THEIR MOTION I THINK IN MARCH OF 2014.

18       NOW, THIS IS WHY THAT'S IMPORTANT.  BY THE TIME THIS HAD

19   ALL HAPPENED, OUR FACTUAL RECORD FOR THE MOST PART WAS

20   COMPLETE.  NOTHING HAS CHANGED SINCE THEN.  THERE HAS BEEN NO

21   MORE WRITTEN DISCOVERY.  THERE'S BEEN NO MORE DOCUMENT

22   PRODUCTIONS.  THERE HAS BEEN NO MORE DEPOSITIONS OF LAY

23   PEOPLE.  WE THEN JUST PROCEEDED TO TAKE THE EXPERTS ALL KIND

24   OF THROUGH 2014.

25       AND AT THIS POINT IT APPEARED TO BE -- THE RECORD WAS --

1    FOR THE MOST PART WAS THAT FROM LET'S JUST SAY DAY ONE UNTIL

2    2003 OR 2004 SAFETY KLEEN WAS THE SUPPLIER OF THE PRODUCT

3    THAT WAS USED IN THE PARTS WASHER MACHINE.  THEN FROM 2003 OR

4    2004 -- THERE'S NO EXACTNESS, THERE WAS A LITTLE BIT OF

5    TESTIMONY ON BOTH SIDES OF THAT, THE DOCUMENTS I THINK MAY

6    TAKE IT TO A DIFFERENT POINT.  I'LL LET SAFETY KLEEN SPEAK TO

7    WHERE THEY ARE MORE COMFORTABLE WITH THE EXACTNESS OF THEIR

8    PERIOD OF TIME AT COLUMBIA YAMAHA -- BUT '03 TO '04

9    PROVIDENCE WAS THERE AND PROVIDENCE STAYED THERE UNTIL

10   ROUGHLY 2007, 2008.

11       THEN THE RECORD FROM MY UNDERSTANDING WAS FAIRLY -- THE

12   BEST CLARITY OF THE RECORD WAS FROM 2008 FORWARD THAT

13   DIVERSIFIED, WHICH IS A COMPANY OUT OF ROCK HILL -- I'M STILL

14   NOT SURE WHY THE PLAINTIFFS NEVER SUED THEM, BUT THAT'S NOT

15   FOR ME TO DISCERN -- BUT THEY WERE THE SUPPLIER OF THE PARTS

16   WASHER FLUID IN 2007, 2008 KIND OF GOING FORWARD UNTIL

17   MR. BOYKIN'S DEATH, SO THROUGH 2009.

18       NOW, WHY IS THAT IMPORTANT?  WELL, WHEN STEWART AND

19   HARRISON DID THEIR RULE 26 REPORTS IN DECEMBER OF 2013 AS IT

20   RELATES TO THE PARTS WASHER FLUID FROM 2003 FORWARD, IT WAS

21   PRETTY CLEAR THAT BOTH OF THEM SAID THE FOLLOWING.  DR.

22   STEWART IN HIS -- IN HIS DECEMBER 13 -- I MEAN STEWART SAID

23   IN HIS REPORT THAT THEY COULD NOT -- IF I CAN READ IT TO YOUR

24   HONOR SPECIFICALLY -- THEY SAID -- STEWART SAID ON PAGE 10 OF

25   HIS ORIGINAL REPORT, HE SAID THE FOLLOWING:  BASED ON THE

1    TESTIMONY AVAILABLE, I DETERMINED TO A REASONABLE DEGREE -- I

2    MEAN A REASONABLE SCIENTIFIC PROBABILITY FOR PURPOSES OF THIS

3    EXPOSURE ASSESSMENT THAT IN THE PERIOD FROM LATE 1987 WHEN

4    MR. BOYKIN STARTED TO 2003 SAFETY KLEEN SUPPLIED THE SOLVENT.

5    DURING THE PERIOD FROM 2003 TO 2009, ALTHOUGH THE PARTS

6    WASHER WAS STILL IN USE, THE SUPPLIER OF THE SOLVENT CANNOT

7    BE CONCLUSIVELY IDENTIFIED FROM THE INFORMATION AVAILABLE AT

8    THE TIME OF THIS REPORT.

9        NOW, DR. STEWART HAD ALL OF THE DEPOSITIONS.  AND DR.

10   STEWART HAD -- AS WELL AS THAT, HE HAD MRS. BUSSEY'S JULY --

11   I MEAN MRS. BUSSEY'S JULY DEPOSITION AND HE ALSO HAD

12   MRS. BUSSEY'S AUGUST DEPOSITION AS WELL AS EVERYBODY ELSE.

13   DR. STEWART'S TESTIMONY, YOUR HONOR, IS ACCURATE.  YOU CANNOT

14   DISCERN OR ESTABLISH WITH ANY DEGREE OF SCIENTIFIC CERTAINTY,

15   WITH ANY DEGREE OF FOUNDATION AS TO WHO WAS REALLY THERE FROM

16   2003 TO 2009 SUPPLYING THE SOLVENT.

17       DR. HARRISON IN HIS REPORT ON PAGE EIGHT OF HIS ORIGINAL

18   REPORT HE SAYS -- HE SAYS, FROM 1998 TO 2003 THE PARTS WASHER

19   WAS SUPPLIED BY SAFETY KLEEN.  ALTHOUGH THE PARTS WASHER WAS

20   STILL IN USE FROM 2003 TO 2009, THE SUPPLIER OF THE SOLVENT

21   COULD NOT BE CONCLUSIVELY DEMONSTRATED.

22       NOW, AT THE DEPOSITIONS OF DR. STEWART HE DIDN'T CHANGE

23   ANYTHING HE HAD PUT IN THAT REPORT ABOUT THAT PARTICULAR

24   REFERENCE.  DR. HARRISON IN HIS DEPOSITION, YOUR HONOR, ON

25   PAGE 216 OF HIS FEBRUARY 7 -- I MEAN IN HIS JUNE 30TH, 2014

1    DEPOSITION SAID THE FOLLOWING.  AND THE QUESTION.  THE

2    QUESTION:  AND YOU ALSO NOTE THAT THE SUPPLIER OF THE PARTS

3    WASHER SOLVENT FROM '03 TO '09 WITHIN QUOTE COULD NOT BE

4    CONCLUSIVELY DEMONSTRATED, CLOSED QUOTE, CORRECT.  QUESTION

5    MARK.  AND THE ANSWER IS CORRECT.

6        AND THEN THE QUESTION.  IS IT STILL YOUR UNDERSTANDING

7    THAT THIS SUPPLIER CANNOT BE CONCLUSIVELY DEMONSTRATED?  AND

8    THE ANSWER IS:  THAT'S MY UNDERSTANDING.  AT LEAST THERE

9    HASN'T BEEN ANYTHING GIVEN TO ME.  I WAS SUMMARIZING WHAT DR.

10   STEWART HAD DERIVED AND WRITTEN IN HIS REPORT.  HAVE NOT SEEN

11   ANY OTHER INFORMATION ABOUT THE SUPPLIER OF THAT SOLVENT.

12       SO, AT THAT POINT THE RECORD WAS COMPLETE, THE RECORD

13   WAS FIXED, THERE HAVE BEEN NO NEW DEPOSITIONS, NO NEW

14   DOCUMENTS, NO NEW DISCOVERY, AND ALL OF A SUDDEN IN FEBRUARY

15   WE GET A REFERENCE TO A PARTS -- BUT HERE'S THE PROBLEM.

16   NOWHERE DO THEY -- THEY DON'T SERVE IT UNDER RULE 26(E), SO

17   THEY LOSE THE TIMELINESS -- IT STILL HASN'T HAPPENED UNDER

18   RULE 26(E).  IT JUST WAS OFFERED AS PART OF AN AFFIDAVIT TO

19   REBUT THE MOTIONS TO EXCLUDE.

20       BUT THERE WAS NOTHING INACCURATE IN STEWART'S REPORT.

21   THERE WAS NOTHING INCOMPLETE OR -- AND HARRISON'S.  THERE WAS

22   NOTHING INCOMPLETE IN STEWART OR HARRISON'S REPORT OR

23   INACCURATE.  BUT THEY DON'T MAKE A REFERENCE AS TO WHAT THEY

24   ARE CLARIFYING IF THEY WERE OR WHAT THEY ARE AMENDING THAT

25   WAS HERETOFORE WRONG OR WHAT WAS INCOMPLETE OR INACCURATE

1    ABOUT THE FIRST REPORT.  IT JUST COMES IN THERE OUT OF

2    NOWHERE.

3         NOW THE PLAINTIFFS TAKE THE POSITION -- AND OF COURSE,

4    THEN THE -- THEN YOU HAVE TO MOVE TO, AS YOU KNOW, THE

5    SUBSTANTIAL JUSTIFICATION AND THE HARMLESS ARGUMENT, AND I

6    WANT TO TOUCH ON THAT.  THE SURPRISE PIECE OF THE FIVE

7    ELEMENTS THAT SOUTHERN STATES LAYS OUT FOR US, THE SURPRISE

8    ELEMENT TO ME I -- I THINK IS SO TELLING; THAT BECAUSE THE

9    PLAINTIFF WANTS TO ARGUE IN THE BRIEF THAT YOU HAVE THAT IT

10   WAS THE JULY, 2013 DEPOSITION OF MRS. BUSSEY THAT GIVES

11   CREDENCE TO THIS ARGUMENT WE WERE ON NOTICE, IT WAS QUITE

12   CLEAR THAT THE ACUITY'S -- I DON'T KNOW WHERE THEY GET THE

13   ACUITY FROM, BUT LET'S JUST GIVE THEM SOME CREDIT THERE --

14   THAT THE ACUITY SLASH ZEP PARTS WASHER FLUID WAS IN USE IN

15   2008, 2009 AND THAT GIVES THE SUBSTANTIAL JUSTIFICATION FOR

16   US BEING ON NOTICE THAT WE SHOULDN'T CRY FOUL NOW.

17        BUT THE PROBLEM WITH THE -- THE BRIEF IS IT MAKES NO

18   REFERENCE TO THE AUGUST DEPOSITION THAT WAS THE CONTINUATION

19   OF MRS. BUSSEY'S DEPOSITION AND THE FINAL PIECE TO

20   MRS. BUSSEY'S DEPOSITION.  AND IF I COULD, I JUST WANT THE

21   COURT -- IN MRS. BUSSEY'S SECOND DEPOSITION MR. FRIELING, WHO

22   IS PLAINTIFFS' COUNSEL, AT THE VERY END OF THE DEPOSITION --

23   SO STARTING ON PAGE 269, YOUR HONOR, AND RUNNING THROUGH PAGE

24   277 HE GOES THROUGH AND TRIES TO OBTAIN FROM MRS. BUSSEY SOME

25   CLARITY ON THE -- ON THE WHO SUPPLIED THE PARTS WASHER

1   SOLVENT AFTER 2003.

2       AND IF YOU GO TO PAGE 276, HE SAYS AT THE BOTTOM OF --

3   ON LINE 19, I SEE, OKAY.  THIS IS MR. FRIELING TALKING.  SO

4   THE ZEP MATERIAL, DO YOU KNOW IF THE ZEP MATERIAL WAS USED IN

5   THE PARTS WASHER?  AND MRS. BUSSEY SAID, NOT FOR SURE.  THE

6   NEXT QUESTION.  ALL RIGHT.  DO YOU KNOW WHO CAN ANSWER THAT

7   QUESTION?  SHE SAID, I THINK -- I WOULD THINK JAMES.  THAT'S

8   THE GUY NAMED -- HER HUSBAND JAMES BUSSEY WHO GOES BY BUCK

9   WHO IS A -- EXCUSE ME -- WHO WAS A CO-WORKER OF MRS. BOYKIN,

10  MR. BOYKIN FOR ALL THE YEARS.

11      NOW, JUST LET ME STOP A MINUTE.  BUCK WAS DEPOSED TWICE.

12  HE DIDN'T KNOW WHO SUPPLIED THE PARTS WASHER.  NOTHING CAME

13  OUT OF HIS DEPOSITION.  SO THE NEXT QUESTION MR. FRIELING

14  ASKED WAS, OKAY, WE'LL ASK HIM OR I'LL ASK HIM.  OKAY.

15  ANYBODY ELSE WHO IS AROUND THAT -- DURING THAT PERIOD OF

16  TIME?  AND SHE SAYS, I BELIEVE NATE WAS THERE.  THAT WAS NATE

17  CULLER.

18      WE TOOK HIS DEPOSITION.  THERE'S NO REFERENCE TO -- BY

19  THE PLAINTIFFS TO NATE CULLER'S DEPOSITION.  THEN HE FINALLY

20  SAYS, OKAY, TERRIFIC.  SO I GUESS THE BOTTOM LINE IS AFTER

21  2003 WE STILL REALLY DON'T KNOW WHO OR WE DON'T KNOW WHO

22  MANUFACTURED THE SOLVENT THAT WAS USED IN THE PARTS WASHER.

23  AND MRS. BUSSEY SAYS, NO.  NEXT QUESTION, WE DON'T KNOW THE

24  ANSWER TO THAT QUESTION.  AND THE ANSWER IS, I DO NOT.

25      NOW, THAT'S WHY STEWART'S ORIGINAL REPORT WAS ACCURATE.

1    THAT'S WHY HARRISON'S ORIGINAL REPORT WAS ACCURATE.  WHEN YOU

2    READ ALL OF THE DEPOSITIONS, THE RECORD WAS CLEAR.  WE JUST

3    DON'T KNOW.  SO -- SO HERE IS ONE THING I WANT TO SHOW YOUR

4    HONOR AS WELL, IS THAT IN 2013, IN JULY -- I WOULD LIKE TO

5    HAND THESE UP FOR YOUR HONOR JUST SO YOU CAN SEE THE -- SO

6    MRS. BUSSEY WAS DEPOSED IN JULY AND IN AUGUST.  BUT THE END

7    OF JULY -- IF I COULD APPROACH, YOUR HONOR.

8              THE COURT:  PLEASE.  YOU DON'T NEED TO ASK

9    PERMISSION TO APPROACH.  WHENEVER YOU WANT TO, PLEASE FEEL

10   FREE.

11             MR. TOLLISON:  WHAT I WANTED TO -- AND I HAVE

12   GOT -- IT'S PLAINTIFFS' -- WHAT HAPPENED WAS IN JULY, AT THE

13   END OF JULY THEY SERVED US, THE PLAINTIFFS SERVED US, WITH

14   DISCOVERY, WRITTEN DISCOVERY.  AND THEY SERVED US WITH A SET

15   OF REQUEST TO PRODUCE AND THEY SERVED US WITH AN

16   INTERROGATORY, SO LET ME SHOW YOU THE BOTH OF THESE AND THAT

17   WAY YOU WILL BE COMPLETE.

18       THEY SERVED US WITH A SET OF SUPPLEMENTAL

19   INTERROGATORIES AND A SET OF REQUESTS TO PRODUCE.  NOW, WHY

20   IS THIS IMPORTANT?  IF THE PLAINTIFF WANTS TO MAINTAIN THE

21   POSITION NOW, YOUR HONOR, THAT THE JULY 2013 DEPOSITION OF

22   MRS. BUSSEY WAS SO CLEAR AND SO EXACT WITH RESPECT TO ACUITY

23   BEING THE PARTS WASHER SUPPLIER FOR 2008 AND 2009, THEY

24   DIDN'T ASK US A SINGLE QUESTION ABOUT THE PARTS WASHER FLUID.

25       SO IF YOU -- IF YOU NOTICED ON THE REQUEST TO PRODUCE

1    AND THE INTERROGATORIES, THEY ASKED US ABOUT CHOKING

2    CARBURETOR CLEANER, THEY ASKED US ABOUT CLEAN BRAKE, WHICH

3    WAS AN AEROSOL, AND THEY ASKED US ABOUT RAPID SOL, WHICH IS

4    AN AEROSOL.

5         NOW, IF THE JULY DEPOSITION WAS SO CLEAR AS THEY WANT

6    YOU TO MAKE IT SEEM TODAY THAT WE WERE ON NOTICE THAT THE

7    ACUITY PARTS WASHER FLUID WAS IN THE GAME AND WAS ON THE

8    TABLE AND WE WERE EXPOSED TO IT, THEY DIDN'T ASK US A SINGLE

9    QUESTION FROM THAT JULY.  WHY?  BECAUSE IT WASN'T CLEAR FROM

10   THE JULY DEPOSITION THAT WE WERE IN THE GAME.  AND IT BECAME

11   ABSOLUTELY ESTABLISHED AFTER THE AUGUST DEPOSITION THAT WE

12   WEREN'T IN THE GAME.

13        NOW LET ME MAKE ONE OTHER -- I WANT TO INTRODUCE ONE

14   OTHER EXHIBIT FOR YOUR HONOR AND THEN THAT WILL BE THE LAST

15   THING I THINK I WILL HAND UP.  BACK IN -- SO I WANT TO GO

16   FORWARD THEN AGAIN, AND THIS IS I THINK AGAIN SPEAKS TO THE

17   FACT THAT THE PLAINTIFFS HAVE PULLED THIS OUT OF THIN AIR.

18        IN NOVEMBER OF 2013 WHEN I WAS SPEAKING EARLIER AS TO

19   THE HISTORY OF THE PLEADINGS, WHEN THEY SOUGHT TO AMEND TO

20   ADD PROVIDENCE BACK IN THE CASE, THAT THEY WERE ULTIMATELY

21   UNSUCCESSFUL, I HAVE HANDED UP TO YOU THEIR MOTION TO AMEND.

22   I'M SORRY.  YOU WANT ME TO...

23        THE COURT:  YOU'RE FINE.

24        MR. TOLLISON:  I'VE HANDED UP TO YOU THE MOTION TO

25   AMEND THAT THEY HAVE FILED.  IT WAS ECF NUMBER 115 AND IT WAS

1   FILED ON NOVEMBER 20TH OF 2013.  NOW, ALL OF THE DEPOSITIONS

2   HAD TAKEN PLACE AT THIS TIME OTHER THAN MR. CAVALIER, AND

3   MRS. BUSSEY'S DEPOSITION TWICE HAD OCCURRED.  AND I WANT YOU

4   TO, IF YOU COULD, REFER TO PARAGRAPH SEVEN WHICH IS ON PAGE

5   FOUR, AND THIS IS WHAT THE PLAINTIFF CITED IN THEIR BRIEF IN

6   THE SECOND SENTENCE.  COUNSEL FOR -- WELL, LET ME GO -- JUST

7   START AT PARAGRAPH SEVEN.

8       BEGINNING IN THE JULY DEPOSITION OF MR. BOYKIN'S

9   CO-WORKERS AT COLUMBIA YAMAHA AND COLUMBIA -- AND SAYS IT

10  TWICE -- AND OTHER PERSONNEL WERE TAKEN.  INCLUDED IN THESE

11  DEPS WAS KEREN BUSSEY WHO WAS DEPOSED IN JULY OF '13 AND

12  FINALIZED IN AUGUST OF '13.  COUNSEL FOR THE PLAINTIFFS AFTER

13  THE DEPOSITIONS IN JULY OF '13 WAS PROVIDED THE OPPORTUNITY

14  TO INSPECT AND VIEW THE COLUMBIA YAMAHA FACILITY.  DURING

15  THIS INSPECTION PLAINTIFFS' COUNSEL DISCOVERED A PARTS

16  WASHER.

17      AND THEN IT GOES ON FOR A LITTLE BIT.  AND THEN IF I

18  COULD REFER YOU TO WHERE THE, HOWEVER, SENTENCE AT THE

19  BOTTOM.  THIS IS WHAT PLAINTIFFS' COUNSEL WROTE.  HOWEVER, AT

20  HER AUGUST DEPOSITION -- NOW HE'S GIVING CREDIBILITY TO THE

21  AUGUST DEPOSITION IN THIS BRIEF BUT MAKES NO REFERENCE TO IT

22  IN THE BRIEF BEFORE YOUR HONOR ON THE MOTION TO STRIKE.

23      HE SAYS, HOWEVER, AT HER AUGUST DEPOSITION THAT SHE HAD

24  HAD THE OPPORTUNITY TO SPEAK WITH SOME OF THE MECHANICS ABOUT

25  THE PARTS WASHER AND HOW IT WAS SERVICED OVER THE YEARS.  SHE

1    EXPLAINED THAT PRIOR TO 2003, SAFETY KLEEN SERVICED AND

2    SUPPLIED THE SOLVENT FOR THE PARTS WASHER, THAT BETWEEN

3    2008 -- I MEAN STRIKE -- EXCUSE ME -- AND BETWEEN 2003 AND

4    2008 PROVIDENCE ENVIRONMENTAL SERVICED THE PARTS WASHER.

5        NOW, HERE'S THE KICKER. IT GOES ON TO SAY, AND AFTER

6    2008 DIVERSIFIED SERVICED THE PARTS WASHER. SO, IN 2013 THE

7    VERY PLEADING THAT WAS OFFERED TO THIS COURT AFTER THE VERY

8    DEPOSITIONS WE'RE REFERRING TO NOW, THE PLAINTIFF TOOK THE

9    POSITION THAT IN 2008 DIVERSIFIED SUPPLIED THE PARTS WASHER,

10   NOT ACUITY, NOT ZEP. IT TOOK A FORMAL POSITION WITH THE

11   COURT THAT IT WAS DIVERSIFIED, WHICH I THINK IS MORE

12   ACCURATE.

13       THEN IF YOU LOOK AT PARAGRAPH -- IF YOU LOOK AT

14   PARAGRAPH 10, IT SAYS, PLAINTIFFS' COUNSEL CONTACTED

15   MR. CAVALIER AND HE CONFIRMED THAT PROVIDENCE ENVIRONMENTAL

16   DID IN FACT PROVIDE REPLACEMENT BARRELS OF SOLVENT FOR USE IN

17   COLUMBIA PARTS WASHER FROM 2003 TO 2008.

18       I WILL JUST FLAG FOR THE COURT THAT IN PAGE EIGHT

19   THERE'S TWO REFERENCES TO -- IN THE SUPPORT THEY ARE OFFERING

20   FOR THIS MOTION. THERE'S TWO REFERENCES ON PAGE EIGHT, ONE

21   REFERENCE ON PAGE NINE. MULTIPLE TIMES THEY REFER TO

22   MRS. BUSSEY -- IN SUPPORT OF THEIR ARGUMENT, THEY REFER TO

23   MRS. BUSSEY'S AUGUST DEPOSITION. IN HER AUGUST DEPOSITION WE

24   LEARNED THAT. IN HER AUGUST DEPOSITION WE CONCLUDED THAT.

25   BUT THERE'S NO REFERENCE HERE IN ANYTHING BY THE PLAINTIFF TO

1    THE AUGUST DEPOSITION WHICH IS THE VERY CLARITY THAT WAS

2    GIVEN TO THE PARTS WASHER HISTORY THAT WAS DIVERSIFIED IN

3    2008, NOT ACUITY.

4        THE REST OF THE FACTORS, YOUR HONOR, ARE LAID OUT IN THE

5    BRIEF.  THEY ARGUE WE HAD THE ABILITY TO CURE.  I JUST -- I

6    DON'T KNOW HOW I WOULD HAVE THE ABILITY TO CURE THAT WHICH I

7    DID NOT KNOW ABOUT.  HOW WOULD I HAVE CURED THE ACUITY PARTS

8    WASHER ISSUE IN DR. STEWART'S DEPOSITION OR DR. HARRISON'S

9    DEPOSITION WHEN THEY SAID, WE DON'T -- WE ARE NOT SAYING

10   ACUITY WAS IN THE GAME IN 2008 AND 2009.

11       THE EXTENT OF DISRUPTION IS A FACTOR, YOUR HONOR, AND I

12   WOULD JUST LEAVE IT TO YOU TO SURMISE HOW GREAT THAT COULD

13   BE.  I THINK IF YOUR HONOR SAID, STOP, WE ARE GOING TO REOPEN

14   THE CASE, LET'S GO DO FACT DISCOVERY BECAUSE SEE THE -- THE

15   PLAINTIFF HAS NEVER DONE -- I'M NOT SAYING THEY HAD TO -- BUT

16   IF THIS ISSUE IS THAT IMPORTANT, THEY HAVE NEVER DONE

17   DISCOVERY OF THE EMPLOYER FORMALLY.  THEY HAVE NOT TAKEN THE

18   30(B)(6) OF THE EMPLOYER.  THEY DID NOT ISSUE A SUBPOENA

19   DUCES TECUM.  I THINK THEY ORIGINALLY ACQUIRED RECORDS

20   THROUGH THE RIGHT TO KNOW ACT, BUT THEY'VE NEVER FORMALLY DID

21   DISCOVERY OF THE EMPLOYER.

22       THEY HAVE HAD THE ABILITY TO DO THIS.  IF THEY WANTED TO

23   MAKE AN ISSUE ABOUT THE ACUITY PARTS WASHER, THEY HAD THE

24   ENTIRE TIME TO DO THAT.  BUT YOU CAN'T HIT US IN THE BACK OF

25   THE HEAD IN 2015 FOR THE FIRST TIME WITH, OH, BY THE WAY,

1    WITHOUT ANY EXPLANATION.  AND AS YOU NOTICED IN THE FACTORS

2    THEY LEFT -- THEY LEFT THE FIFTH ONE ALONE, THE EXPLANATION

3    FOR WHY IT'S TAKEN THIS LONG, AND THEY DON'T -- THEY CANNOT

4    OFFER ONE.

5         AND IF I KNEW IN JULY OF '13 THAT WHICH I COULD NOT HAVE

6    KNOWN, BUT IF I -- IF THEY TAKE THE POSITION THAT I DID KNOW

7    IN JULY, WELL THEN SO DID THEY, AND THEY COULD HAVE -- THEY

8    COULD HAVE HAD STEWART AMEND THEIR REPORT, THEY COULD HAVE

9    HAD STEWART SPEAK TO IT IN THE DEPOSITION, AND LIKEWISE THE

10   SAME FOR HARRISON.

11        SO IN SUMMARY, YOUR HONOR, I APPRECIATE YOUR INDULGENCE.

12   I JUST WANTED TO GO THROUGH A LITTLE -- THIS PARTS WASHER HAS

13   MORE OF A HISTORY THEN PROBABLY JUST GET TEED UP NECESSARILY

14   IN THE MOTIONS.  WE HAVE BEEN TALKING ABOUT THE PARTS WASHER

15   FOR QUITE SOME TIME.  IT COMES UP IN EVERY DEPOSITION.  AND

16   THERE HAS BEEN NO EVIDENCE, NO PART OF THE RECORD, NO

17   DISCERNMENT BY THE EXPERTS, NO OPINION BY THE EXPERTS UNTIL

18   THIS AFFIDAVIT THAT ACUITY'S PARTS WASHER FLUID WAS IN THE

19   GAME.

20        AND I WOULD JUST RESPECTFULLY ASK THAT YOUR HONOR STRIKE

21   OUR -- WELL, I'LL LET THEM SPEAK TO THE ENTIRE AFFIDAVIT, BUT

22   IF YOU'RE GOING TO KEEP ANY PARTS OF THE AFFIDAVIT IN OR

23   ALLOW ANY PARTS OF IT TO SURVIVE, JUST MOST RESPECTFULLY

24   WOULD STRIKE THE REFERENCES TO ACUITY.  THANK YOU, YOUR

25   HONOR.

1           THE COURT:  THANK YOU VERY MUCH, MR. TOLLISON.  WHO

2    IS GOING TO SPEAK ON BEHALF OF SAFETY KLEEN?

3           MR. ALOST:  YOUR HONOR, MY NAME IS WES ALOST.

4    WOULD YOU LIKE TO HEAR PLAINTIFFS' RESPONSE NOW OR HEAR OUR

5    ARGUMENT AND THEN--

6           THE COURT:  WHAT MAKES SENSE?  DO YOU WANT TO SPEAK

7    SPECIFICALLY IN RESPONSE OR YOU WANT TO WAIT AND ADDRESS ALL

8    THE ISSUES?

9           MR. JENSEN:  I'M HAPPY TO DO IT EITHER WAY, YOUR

10   HONOR.  I WILL SAY IN RELATION TO THAT ISSUE, I DO REGARD

11   ACUITY'S MOTION WITH RESPECT TO THE AFFIDAVIT TO BE DIFFERENT

12   IN CHARACTER FROM SAFETY KLEEN'S.  IT MIGHT MAKE MORE SENSE

13   FOR ME TO ADDRESS THAT NOW IN LIGHT OF THAT.

14          THE COURT:  SURE.  YOU MIND, MR. ALOST?

15          MR. ALOST:  NO, YOUR HONOR.  I WANT TO BE COURTEOUS

16   TO COUNSEL AND ALLOW HIM AN OPPORTUNITY TO DO WHAT HE NEEDED

17   TO DO.

18          THE COURT:  WELL, THANK YOU VERY MUCH.  IF YOU WILL

19   PLEASE STATE YOUR NAME FOR THE RECORD.

20          MR. JENSEN:  STEVE JENSEN FOR THE PLAINTIFF, YOUR

21   HONOR.  AND MAY IT PLEASE THE COURT.  SO, THIS ISSUE IS A

22   VERY DISCREET ISSUE.  AND YOU KNOW, THERE'S AN OBVIOUS WAY IN

23   WHICH IT IS QUITE DIFFERENT THAN MOST OF THE OTHER ISSUES

24   THAT ARE BEFORE THE COURT TODAY AND IN THE -- THE WAY IN

25   WHICH I THINK THAT IS OBVIOUS IS THAT IT IS WHAT I WOULD CALL

1   A FAIRLY PURE FACTUAL ISSUE.

2       IN OTHER WORDS, IS THERE ANY EVIDENCE FROM THE DISCOVERY

3   MATERIALS THAT HAVE BEEN REVIEWED BY THE EXPERTS AND ARE NOW

4   BEFORE THE COURT ON THIS RECORD, IS THERE ANY EVIDENCE THAT

5   IN FACT IN THE 2008, 2009 TIME PERIOD ZEP WAS THE

6   MANUFACTURER, SUPPLIER OF THE SOLVENT THAT WAS BEING USED IN

7   THE PARTS WASHING MACHINE AT THE COLUMBIA POWER SPORTS

8   LOCATION.

9       AND THE ANSWER TO THAT, YOUR HONOR, I BELIEVE IS YES,

10  THERE IS SOME EVIDENCE THAT AT LEAST THAT SUPPORTS THAT

11  INFERENCE THAT A JURY SHOULD BE ENTITLED TO MAKE, NUMBER ONE.

12  AND NUMBER TWO, BECAUSE THIS IS REALLY WHAT AGAIN I WOULD

13  DESCRIBE AS A PURE FACTUAL ISSUE, IT'S NOT ABOUT SO MUCH I

14  DON'T THINK THE EXPERT'S OPINIONS ESPECIALLY IN LIGHT OF THE

15  FACT -- AND THIS MAY OR MAY NOT BE CLEAR TO THE COURT AT THIS

16  POINT -- DR. STEWART DID NOT ATTEMPT IN HIS ANALYSES TO

17  CONDUCT A DEFENDANT-SPECIFIC DOSE OF BENZENE FOR EACH

18  DEFENDANT.

19      WHAT HE DID INSTEAD WAS HE DID SPECIFIC ANALYSES BY TIME

20  PERIOD AND BY JOB TASK INCLUDING USE OF THE PARTS WASHING

21  MACHINE.  AND SO, YOU CAN DERIVE OR YOU CAN -- BY LOOKING AT

22  DR. STEWART'S RESULTS OF HIS MODELING OF EXPOSURES TO

23  BENZENE, YOU KNOW, TAKE OUT THE EXPOSURES FROM 2008, 2009

24  BASED ON PARTS WASHING, USE OF THE PARTS WASHER AND

25  ACTIVITIES RELATED TO PARTS WASHING FOR MR. BOYKIN.  AND YOU

1    CAN DO THAT AND HE -- HE'S GOT THAT DATA, THEY HAVE GOT THAT

2    DATA.

3        BUT WHAT HE SAYS IN HIS REPORT -- AND I THINK THAT MR.

4    TOLLISON HAS ACCURATELY DESCRIBED HIS REPORT, ALTHOUGH I MAY

5    WANT TO GO UP TO THE ELMO AND GO OVER IT IN A LITTLE MORE

6    DETAIL IN A MOMENT IS, YOU KNOW, IT'S NOT -- YOU CANNOT

7    CONCLUSIVELY DETERMINE FROM THE PERIOD 2003 THROUGH 2009 WHO

8    THE SUPPLIER OF THE SOLVENT WAS.

9        AND MR. TOLLISON HAS ALSO ACCURATELY DESCRIBED FOR YOU

10   AFTER SAFETY KLEEN STOPPED BEING THE ENTITY THAT BOTH

11   SUPPLIED THE SOLVENT AND SERVICED THE PARTS WASHER -- AND

12   THOSE ARE TWO SEPARATE JOBS, RIGHT?  I MEAN, THERE'S A

13   COMPANY THAT COMES OUT, TAKES THE DIRTY SOLVENT THAT HAS BEEN

14   USED IN THAT BARREL THAT IS THE PARTS WASHING MACHINE, TAKES

15   IT BACK AND REPLACES IT WITH NEW SOLVENT.

16       WHETHER THAT COMPANY IS ALSO THE MANUFACTURER AND SELLER

17   OF THAT SOLVENT IS A SEPARATE ISSUE.  SAFETY KLEEN DID BOTH

18   THINGS.  IN OTHER WORDS, IT WAS THEIR SOLVENT AND THEY WERE

19   THE ONES WHO CAME OUT THERE AND SERVICED THE MACHINE.

20       DURING LATER TIMEFRAMES, AS MR. TOLLISON HAS ALREADY

21   SPOKE TO, AFTER SAFETY KLEEN IS OUT OF THE PICTURE, YOU HAVE

22   GOT FIRST PROVIDENCE FROM 2003 TILL ABOUT 2007 OR 2008 IS OUT

23   THERE, BUT YOU KNOW, THE TESTIMONY WAS, AS I UNDERSTAND IT,

24   AND MR. TOLLISON WILL CORRECT ME IF I'M WRONG ABOUT THIS, BUT

25   AS I UNDERSTAND IT FROM PROVIDENCE, YES, WE WENT OUT THERE,

1    WE SERVICED THE MACHINE, WE TAKE AWAY THE SOLVENT, BRING NEW

2    SOLVENT, BUT WE WERE NOT -- WE WERE NOT THE ENTITY THAT WAS

3    THE SOLVENT SELLER.

4        AND I'M LESS CLEAR FRANKLY FROM THE RECORD -- I DON'T

5    THINK THE RECORD CLEARLY REFLECTS EXACTLY WHAT HAPPENS TODAY

6    AT COLUMBIA POWER SPORTS WITH RESPECT TO DIVERSIFIED.  TODAY

7    MRS. BUSSEY'S TESTIMONY IS FAIRLY CLEAR THAT DIVERSIFIED IS

8    THE ENTITY THAT SERVICES THE PARTS WASHER AT THE WORK SITE.

9        IT'S LESS CLEAR WHETHER TODAY DIVERSIFIED IS THE -- IS

10   THE ENTITY THAT IS THE PRODUCER OF THE SOLVENT ITSELF.  IT

11   DOESN'T APPEAR TO BE SO.  SHE NEVER INDICATES THAT AND IN

12   FACT, AS BOTH MR. TOLLISON SAID AND IN DR. STEWART'S REPORT

13   REFLECTS, IT'S NOT CLEAR WHO THE SOLVENT MANUFACTURER IS

14   AFTER 2003.

15        THE COURT:  WELL, DOES IT MATTER WHAT THE

16   MANUFACTURER OF THE SOLVENT IS TODAY?  IS IT THE RELEVANT

17   TIME PERIOD?

18        MR. JENSEN:  WELL, NOT DIRECTLY RELEVANT, YOUR

19   HONOR.  THERE'S -- I THINK THERE'S A VALID QUESTION, AND I'M

20   ABOUT TO GET TO THIS.  IF I MIGHT --

21        THE COURT:  SURE.

22        MR. JENSEN:  -- USE THE ELMO.

23        THE COURT:  SURE.

24        MR. JENSEN:  WHAT I'M ABOUT TO GET TO, YOUR HONOR,

25   IS THAT THERE IS TESTIMONY FROM MRS. BUSSEY'S AUGUST 2013

1    DEPOSITION.  AND I WILL SEE IF I CAN ZOOM IN HERE.  THIS IS

2    DR. STEWART'S REPORT.  IT IS THE PAGE -- PAGE 10 OF HIS

3    REPORT THAT MR. TOLLISON WAS READING FROM EARLIER.  AND IT

4    PROVIDES THE BACKGROUND FOR WHAT -- OR THE SUMMARY BY DR.

5    STEWART OF WHAT'S KNOWN FROM THE CO-WORKER TESTIMONY, AND I

6    DON'T -- I DON'T DISAGREE THIS -- THESE FACTS HAVE NOT

7    CHANGED.  THERE'S NOT BEEN ANY FURTHER DISCOVERY ABOUT THIS

8    ISSUE.

9         BUT WHAT HE SAYS IS THAT MRS. BUSSEY STATED THAT

10   DIVERSIFIED IS THE COMPANY THAT CURRENTLY SERVICES THE PARTS

11   WASHER AND THAT SHE BELIEVES THEY STARTED AFTER MR. BOYKIN'S

12   DEATH AND THAT ZEP MANUFACTURED THE SOLVENT IN THE PARTS

13   WASHER IN 2010.

14        SO HERE WE ARE ONE YEAR AFTER MR. BOYKIN'S DEATH AND

15   THERE IS TESTIMONY FROM THE AUGUST 2013 DEPOSITION OF

16   MRS. BUSSEY THAT IS CITED RIGHT HERE IN DR. STEWART'S REPORT

17   THAT AT LEAST AS OF 2010 SHE BELIEVES -- AND THAT'S THE WORD

18   THAT SHE USES AT PAGE 270 OF HER DEPOSITION -- SHE BELIEVES

19   THAT IN 2010 ZEP WAS THE MANUFACTURER OF THE SOLVENT THAT

20   DIVERSIFIED WAS BRINGING OUT TO THE PARTS WASHER.

21        NOW, THAT DOESN'T RESOLVE THE QUESTION DIRECTLY OF WHAT

22   HAPPENED OR WHO MANUFACTURED THE SOLVENT IN 2008, 2009.  AND

23   IT'S NOT STATED IN TERMS OF, I'M SURE THAT THAT'S TRUE, I'M

24   CERTAIN THAT IT'S TRUE, IT'S CONCLUSIVELY TRUE.  AND I THINK

25   THAT THE REST OF DR. STEWART'S STATEMENTS ABOUT THIS REFLECT

1    THAT.  I MEAN, HE'S SAYING, LOOK, SHE SAYS SHE THINKS IN 2010

2    THAT IT WAS ZEP, SHE DOESN'T KNOW WITH CERTAINTY WHO IT WAS

3    FROM 2003 TO 2008, SO WE CAN'T CONCLUSIVELY DETERMINE THAT.

4            THE COURT:  WELL, ISN'T -- IF INSTEAD YOU COULD --

5    INSTEAD OF DR. STEWART'S REPRESENTATION OF WHAT--

6            MR. JENSEN:  YEAH.  CAN WE POINT TO THE ACTUAL

7    TESTIMONY.

8            THE COURT:  YES, FROM MRS. BUSSEY'S DEPOSITION.

9    AND IF IT'S THAT PART REGARDING SHE RECALLED RECEIVING AND

10   PAYING BILLS FOR THE SOLVENT FOR THE PARTS WASHER FLUID FROM

11   ZEP, I THINK THAT WAS THE JULY TESTIMONY.  IS THAT WHAT

12   YOU'RE REFERRING TO?

13           MR. JENSEN:  NO.  I'M REFERRING INSTEAD TO THE

14   AUGUST TESTIMONY WHICH IS WHAT IS CITED IN DR. STEWART'S

15   REPORT THERE.  IF I COULD NOW GO TO THE PROJECTOR, PLEASE.

16   PARTS WASHER.  COMPUTER I GUESS.  OKAY.

17           THE COURT:  I GUESS WHAT I'M LOOKING AT IS VOLUME

18   TWO OF THE--

19           MR. JENSEN:  YEAH.  IF YOU TURN TO -- DO YOU HAVE

20   THE DEPOSITION IN FRONT OF YOU, YOUR HONOR?

21           THE COURT:  I HAVE MY NOTES FROM THE DEPOSITION.

22   I'M AT 277 AT EIGHT THROUGH 15 WHICH SAYS, OKAY, TERRIFIC, SO

23   I GUESS THE BOTTOM LINE IS AFTER '03 WE STILL DON'T KNOW,

24   REALLY KNOW, WHO OR WE DON'T KNOW WHO MANUFACTURED THE

25   SOLVENT THAT WAS USED IN THE PARTS WASHER.  AND THE ANSWER

1    IS, NO.

2         AND THEN THE QUESTION, WE DON'T KNOW THE ANSWER TO THAT

3    QUESTION.  AND SHE SAYS, I DO NOT.  SO I GUESS IF THERE'S

4    SOMETHING --

5              MR. JENSEN:  YES.

6              THE COURT:  -- THAT CLARIFIES HER TESTIMONY--

7              MR. JENSEN:  WELL, THERE'S SOMETHING THAT'S

8    ARGUABLY IN CONTRADICTION WITH THAT A FEW PAGES EARLIER IN

9    HER DEPOSITION.  SO PAGE 270 OF THE SAME DEPOSITION LINES

10   SEVEN THROUGH 10.  AND WHAT THOSE READ IS, QUESTION, SO 2010

11   THE SOLVENT WAS MANUFACTURED BY ZEP; IS THAT CORRECT?

12   THERE'S AN OBJECTION.  AND THEN THE WITNESS ANSWERS, I

13   BELIEVE SO.

14        AND SO, SHE LATER GOES ON IN THE TESTIMONY OF BOTH

15   LEADING UP TO WHAT YOUR NOTES REFLECT AND THEN IN THAT

16   TESTIMONY ON PAGE 277 THAT YOU JUST DISCUSSED, YOUR HONOR,

17   SHE SAYS, I'M NOT SURE, BUT -- BUT SHE SAYS -- CLEARLY SHE

18   SAYS, I BELIEVE IT WAS ZEP IN 2010.  AND I -- I BELIEVE, YOUR

19   HONOR, THAT IN LIGHT OF THE WAY THIS TIMELINE PLAYS OUT WHERE

20   FROM 2003 TO 2008 SHE -- THE TESTIMONY OR THE RECORD REFLECTS

21   THAT PROVIDENCE WAS SERVICING, AND SHE MAKES IT QUITE CLEAR

22   AT ONE POINT IN HER DEPOSITION SHE DID NOT THINK IT WAS ZEP

23   DURING THAT PROVIDENCE TIMEFRAME.

24        THEN IN 2008 WE START HAVING DIVERSIFIED COME ON THE

25   SCENE AND DIVERSIFIED IS STILL ON THE SCENE TODAY.  AND HER

1    TESTIMONY IS -- EQUIVOCAL THOUGH IT IS -- IT IS ENOUGH TO

2    SUPPORT AN INFERENCE THAT AT LEAST AS OF 2010 IT WAS ZEP, SHE

3    BELIEVES IT WAS ZEP.  GIVEN THAT THERE WAS THAT CHANGE IN

4    SERVICER IN 2008, IT IS FAIR INFERENCE I BELIEVE FOR THE JURY

5    TO MAKE THAT THE MOST LIKELY SUPPLIER OF THE SOLVENT, THE

6    MANUFACTURER OF THE SOLVENT THAT DIVERSIFIED WAS COMING OUT

7    AND PROVIDING TO COLUMBIA POWER SPORTS WAS IN FACT ZEP SLASH

8    ACUITY.

9             THE COURT:  SO YOUR ARGUMENT IS THAT HER TESTIMONY

10   A FEW PAGES EARLIER STATES THAT SHE BELIEVES THAT IN 2010

11   AFTER THE DECEDENT'S DEATH THAT THE SOLVENT WAS MANUFACTURED

12   BY ZEP.  BUT WHEN SHE A FEW PAGES LATER IS DIRECTLY ASKED, SO

13   WE DON'T KNOW WHO THE MANUFACTURER WAS AFTER 2003, AND SHE

14   SAYS, NO, THAT THOSE ARE COMPATIBLE BECAUSE SHE'S

15   EQUIVOCATING OR -- I THINK THAT WHAT THE DEFENDANTS WOULD

16   ARGUE IS THAT SHE'S CLARIFIED THE LATER -- YOU KNOW, WE ALL

17   DO THIS IN DEPOSITIONS, YOU KNOW, YOU START ASKING QUESTIONS

18   AND THEN THE PERSON SAID, YEAH, I THINK SO, OH, AND THEN

19   LATER ON IT'S, OH NO, YEAH, I DON'T KNOW, I DON'T KNOW.

20        SO, THERE'S A DISCREPANCY BUT THE LATER TESTIMONY IS

21   ACTUALLY THE MOST CLARIFYING OR ACCURATE.  BUT YOU'RE SAYING

22   THAT THAT SHOULDN'T BE THE INTERPRETATION OF MRS. BUSSEY'S

23   DEPOSITION.

24             MR. JENSEN:  I THINK IT'S ONE INTERPRETATION, YOUR

25   HONOR.  I THINK ANOTHER FAIR INTERPRETATION THAT A JURY

1    SHOULD BE ENTITLED TO MAKE IS THAT WHAT SHE WAS DOING WITH

2    HER LATER TESTIMONY A FEW PAGES DOWN THE ROAD WAS SAYING,

3    WELL, I CAN'T SAY FOR SURE, I'M NOT SURE.  THAT'S NOT THE

4    STANDARD, THOUGH.  THE STANDARD IS MORE LIKELY THAN NOT FOR

5    PURPOSES OF PROVING THIS FACT -- FACTUAL ISSUE IN THE CASE.

6         *THE COURT:*  WELL, DID SHE SAY I'M NOT SURE OR DID

7    SHE SAY I DON'T KNOW?

8         *MR. JENSEN:*  WELL, SHE SAID SHE -- I DON'T KNOW.

9    WELL, LET'S SEE WHAT SHE SAID.  I DON'T WANT TO... OKAY.  SO

10   ON 277 -- I THINK THIS IS WHAT YOU WERE REFERENCING JUST A

11   MOMENT AGO FROM YOUR NOTES, YOUR HONOR -- SAYS, SO I GUESS

12   THE BOTTOM LINE IS AFTER '03 -- THIS IS THE QUESTION -- SO

13   THE BOTTOM LINE IS AFTER '03 WE STILL DON'T REALLY KNOW WHO

14   OR WE DON'T KNOW WHO MANUFACTURED THE SOLVENT THAT WAS USED

15   IN THE PARTS WASHER.  ANSWER:  NO.  QUESTION:  WE DON'T KNOW

16   THE ANSWER TO THAT QUESTION.  I DON'T -- I DO NOT.

17       AND SO SHE'S SAYING, I DON'T KNOW.  WE DON'T KNOW,

18   HOWEVER, FROM THAT TESTIMONY WHAT LEVEL OF CERTAINTY SHE WAS

19   ATTACHING TO THAT ISSUE AT THAT POINT.  WE DO KNOW THAT SIX

20   PAGES EARLIER IN THE DEPOSITION OR SEVEN PAGES EARLIER IN THE

21   DEPOSITION THAT SHE SAID SHE BELIEVED BUT ACKNOWLEDGED SOME

22   UNCERTAINTY ASSOCIATED WITH IT THAT AT LEAST AS OF 2010 THE

23   MANUFACTURER WAS ZEP.

24       THIS IS NOT NECESSARILY INCONSISTENT WITH THAT, AND IN

25   FACT IN THE FULL CONTEXT OF THAT WHOLE DISCUSSION, YOUR

1    HONOR, WHERE IN ANOTHER POINT ON PAGE 276 -- I THINK IT'S

2    276, LET ME MAKE SURE OF THAT -- WELL, I THINK IF WE -- TO

3    GET FULL CONTEXT, YOUR HONOR, I WOULD START AT THE BOTTOM OF

4    PAGE 273 AT LINE 24.  AND THERE MR. FRIELING, MY PARTNER,

5    ASKED MRS. BUSSEY, AND DURING THAT PERIOD OF TIME THAT

6    PROVIDENCE SERVICED THAT PIECE OF EQUIPMENT -- REFERRING TO

7    THE PARTS WASHER -- DO YOU RECALL ANY OTHER SOLVENTS USED

8    OTHER THAN ZEP?  AND THE WITNESS ANSWERS, CAN I ASK A

9    QUESTION?  OF COURSE.  ANSWER, IF I HAVE ASKED SOMEBODY ELSE

10   THAT SAME QUESTION AND THAT INFORMED ME THAT, YES, WE USED

11   SOMETHING OTHER THAN ZEP -- THAT WAS HER QUESTION TO COUNSEL.

12       QUESTION -- AND THEN COUNSEL RESPONDS, YOU CAN TELL.

13   AND THEN HER ANSWER IS, AS FAR AS I KNOW THERE WAS WHOEVER

14   WAS -- WHENEVER WAS WHEN PROVIDENCE WAS SERVICING, THERE WAS

15   A SWITCH-OUT OF THE CHEMICAL, LIKE THEY WOULD TAKE IT OUT,

16   THE WHOLE BARREL, AND PUT ANOTHER BARREL, BUT I DON'T KNOW

17   WHAT, I DON'T KNOW WHEN THEY DID IT IF WHO ALL DID IT.  I

18   JUST KNOW THAT IT WAS DONE.

19       SO, IN THAT CONTEXT SHE HAD THE OPPORTUNITY TO GO BACK

20   AND SAY, WELL, I DIDN'T MEAN TO SAY THAT ZEP WAS THE

21   SUPPLIER.  BUT LATER ON IN FAIRNESS, YOUR HONOR, AT 276 LINES

22   19 THROUGH 22 SHE GETS ASKED AGAIN DIRECTLY, SO THE ZEP

23   MATERIAL, DO YOU KNOW IF THE ZEP MATERIAL WAS USED IN THE

24   PARTS WASHER?  AND HER ANSWER IS, NOT FOR SURE.  OKAY.  SO

25   THAT'S 276, LINES 19 THROUGH 22.

1          *THE COURT:* AND SHE FOLLOWS UP AND SAYS, BUT GO ASK

2     MY HUSBAND AND GO ASK NATE.  AND THEN I THINK THE DEFENDANTS

3     ARE ARGUING THAT THEY DID AND THEY DIDN'T KNOW.  AND SO, I

4     GUESS YOUR ARGUMENT IS THAT HER--

5          *MR. JENSEN:* HER EQUIVOCAL STATEMENT ABOUT 2010 IS

6     NOT MUCH BUT ENOUGH FOR A JURY TO GET THERE ABOUT 2008 AND

7     2009 WHEN YOU PUT THAT STATEMENT IN THE FULL CONTEXT OF THE

8     TIMELINE OF -- SO AFTER 2003 FROM 2003 TO '07 IT WAS

9     PROVIDENCE, FROM 2008 TO THE PRESENT IT'S DIVERSIFIED.  AT

10    SOME POINT IN TIME DIVERSIFIED WAS PUTTING ZEP, SHE BELIEVES,

11    PARTS WASHER SOLVENT INTO THE PARTS WASHER.  IT'S A FAIR

12    INFERENCE THAT THAT ZEP PARTS WASHER SOLVENT WAS GOING IN AT

13    AN EARLIER TIMEFRAME AS WELL.  THAT'S WHERE WE ARE.

14         *THE COURT:* DID YOU TAKE A 30(B)(6) WITNESS

15    DEPOSITION OF YAMAHA, OF THE EMPLOYER ON THIS ISSUE?

16         *MR. JENSEN:* I DON'T KNOW IF WE FORMALLY TOOK A

17    30(B)(6) DEPOSITION ON THAT ISSUE OR NOT, YOUR HONOR.  WHAT I

18    DO KNOW IS WE BELIEVED MRS. BUSSEY, AS THE PERSON IN CHARGE

19    OF PARTS ACQUISITION, WAS THE PERSON WITH MOST KNOWLEDGE.  I

20    THINK IT WAS PROBABLY A 30(B)(6) NOTICE THAT HER -- THAT

21    APPLIED TO HER, BUT I DON'T KNOW THAT WITH CERTAINTY.

22         *THE COURT:* BUT THERE WAS NO OTHER INDIVIDUAL WHO

23    COULD BIND THE COMPANY ON THE ISSUE OF THE MANUFACTURER OF

24    THE SOLVENT PRIOR TO THE DECEDENT'S DEATH THAT -- FROM 2003

25    FORWARD.

1          *MR. JENSEN:* NOT TO MY KNOWLEDGE.

2          *THE COURT:* OKAY. ALL RIGHT. YOU MAY PROCEED. IS

3   THAT IT?

4          *MR. JENSEN:* UNLESS YOU HAVE ANY ADDITIONAL

5   QUESTIONS, YOUR HONOR, I THINK ON THAT ISSUE THAT'S ALL I

6   HAVE GOT TO SAY.

7          *THE COURT:* WELL, CAN I ASK YOU, MR. JENSEN, DO YOU

8   CONCEDE THAT THE INFORMATION CONTAINED IN THE AFFIDAVIT IS

9   NEW INFORMATION OR A SUPPLEMENTATION RENDERING A NEW OPINION?

10          *MR. JENSEN:* WELL, I THINK EVEN CALLING IT AN

11  OPINION IS SOMETHING OF A STRETCH BECAUSE IT'S REALLY A

12  PURELY FACTUAL ISSUE, YOUR HONOR. AND SO, NO, I DON'T

13  CONCEDE IT'S NEW BECAUSE IT REALLY COMES OUT OF EXACTLY THE

14  SAME TESTIMONY THAT IS REFERENCED IN DR. STEWART'S ORIGINAL

15  REPORT AT PAGE 10 THAT WE JUST WENT OVER.

16          *THE COURT:* SO, AS A SUPPLEMENTATION UNDER 26(E)

17  WOULD YOU SAY THAT'S WHAT--

18          *MR. JENSEN:* THAT'S A CLARIFICATION I THINK PROP --

19  THAT'S A PROPER CLARIFICATION I THINK UNDER 26(E).

20          *THE COURT:* WELL, CLARIFICATION INSINUATES THAT

21  THERE WAS SOMETHING INCORRECT THAT'S NOW BEING CORRECTED.

22  SO--

23          *MR. JENSEN:* SO SUPPLEMENTATION IS PROBABLY THE

24  BETTER WORD, YOUR HONOR. BUT YOU KNOW, IT'S -- IT'S NOT NEW

25  IN THE SENSE THAT THE UNDERLYING DATA OR EVIDENCE THAT

1    SUPPORTS IT WAS REFERENCED IN THE ORIGINAL REPORT.

2            *THE COURT:* OKAY. NOW, I GUESS IF IT WERE A

3    SUPPLEMENTATION UNDER 26(E), THEN YOU HAVE GOT THE DIFFICULTY

4    OF HAVING IT BE NOT ONLY UNTIMELY UNDER THE EXPERT WITNESS

5    DEADLINE IF IT DOESN'T BECOME A SUPPLEMENTATION, BUT AT ANY

6    RATE IF IT WERE A SUPPLEMENTATION, IT COMES AFTER THE

7    PRETRIAL DISCLOSURE DEADLINE; RIGHT?

8            *MR. JENSEN:* WELL, IT -- I...

9            *THE COURT:* UNDER 26B(B)(2).

10           *MR. JENSEN:* I THINK THAT'S RIGHT, YOUR HONOR. TO

11   THE EXTENT THAT YOU CONSIDER IT A SUPPLEMENTATION, THEN I

12   THINK THAT'S RIGHT. AND THEN, YOU KNOW, THE EXTENT OF THE

13   PREJUDICE THAT ARISES FROM THAT AND ALL THE FACTORS THAT --

14           *THE COURT:* SURE.

15           *MR. JENSEN:* -- GO INTO THAT HAVE TO THEN BE TAKEN

16   INTO ACCOUNT. TO ME THIS IS SOMETHING OF A TEMPEST IN A

17   TEAPOT JUST BECAUSE, YOU KNOW, IT EITHER IS ENOUGH EVIDENCE

18   TO GET TO A JURY ON THAT ISSUE OR IT ISN'T. I DON'T EVEN

19   THINK YOU NEED EXPERT TESTIMONY FRANKLY FOR THE JURY TO, YOU

20   KNOW, INFER THAT THE PARTS WASHING SOLVENT SUPPLIED BY ZEP

21   FROM THAT TESTIMONY BY MRS. BUSSEY -- AND WHO KNOWS EXACTLY

22   HOW THAT -- ALL THAT TESTIMONY PLAYS OUT AT TRIAL -- BUT

23   ASSUMING IT PLAYS OUT SIMILARLY, THAT THE, YOU KNOW, THAT'S

24   ENOUGH FOR THE JURY TO INFER BASED ON DR. HARRISON'S

25   TESTIMONY THAT, LOOK, HIS TOTAL BENZENE EXPOSURE CAUSED HIS

1    CANCER AND EVERY PIECE OF THAT BENZENE EXPOSURE CONTRIBUTED,

2    THEREFORE, IF THE JURY DETERMINES THAT ZEP PARTS WASHING

3    FLUID IS A PIECE OF THAT EXPOSURE, THEN YOU KNOW, IT'S ENOUGH

4    TO GET TO THE JURY ON THAT EVEN WITHOUT SPECIFIC EXPERT

5    TESTIMONY TALKING ABOUT EXPOSURES OF MR. BOYKIN TO ZEP PARTS

6    WASHING FLUID.

7           THE COURT:  WELL, HOW IMPORTANT IS THIS INFORMATION

8    TO THE PLAINTIFFS' CASE?

9           MR. JENSEN:  WELL, I THINK IT'S IMPORTANT --

10   IMPORTANT TO THE CASE AGAINST ACUITY, YOUR HONOR, BUT I DON'T

11   KNOW WHAT TO SAY BEYOND THAT.

12          THE COURT:  OKAY.  I GUESS THERE ARE TWO SIDES OF

13   THE SAME COIN.  THE IMPORTANCE TO THE PLAINTIFF IS OFTEN THE

14   BASIS FOR THE SURPRISE OR THE PREJUDICE TO THE DEFENDANT, AND

15   SO I'M TRYING TO DETERMINE IF IT'S NOT THAT IMPORTANT TO THE

16   PLAINTIFF BUT IT'S A GREAT SURPRISE OR VERY PREJUDICIAL TO

17   THE DEFENDANT, THEN, YOU KNOW, ON THE SCALE, THEN THEY MIGHT

18   NOT BE EQUIVALENT.  BUT IF IT'S VERY IMPORTANT TO THE

19   PLAINTIFF AND NOT VERY DAMAGING TO THE DEFENDANT, THEN THAT'S

20   ANOTHER ANALYSIS.  BUT THERE'S NOTHING THAT --

21          MR. JENSEN:  RIGHT.

22          THE COURT:  -- CARE TO ADD ON THAT ISSUE.

23          MR. JENSEN:  WELL, I WILL SAY THIS.  REGARDING THE

24   CASE AGAINST ACUITY, THERE IS TESTIMONY AS MR. TOLLISON HAS

25   DESCRIBED IN THE RECORD THAT ABOUT USE BY MR. BOYKIN OF

1    AEROSOLS MADE -- AEROSOL PRODUCTS THAT CONTAIN

2    BENZENE-CONTAINING SOLVENTS MADE BY ZEP OR ACUITY.

3         THERE WILL BE AN ISSUE THAT IS NOT BEFORE YOU ABOUT THE

4    EXTENT OF THOSE EXPOSURES AND WHETHER THEY WERE SUFFICIENTLY

5    REGULAR, YOU KNOW, TO COUNT FOR PURPOSES OF CAUSATION, BEING

6    ENOUGH, SUFFICIENT EVIDENCE OF CAUSATION IN THE CONTEXT OF

7    ASBESTOS PRODUCTS LIABILITY CASES WHERE PRODUCT

8    IDENTIFICATION IS OFTEN A KEY ISSUE.

9         THERE IS A STANDARD THAT'S BEEN DEVELOPED IN THE FOURTH

10   CIRCUIT AND ADOPTED IN MANY COURTS AROUND THE COUNTRY ABOUT

11   THE FREQUENCY, REGULARITY AND PROXIMITY OF EXPOSURES TO THE

12   ASBESTOS FROM THAT PARTICULAR PRODUCT HAS TO BE SHOWN.  THERE

13   IS AN ISSUE THAT -- NOT BEFORE THIS COURT -- BUT IS BEFORE

14   JUDGE LEWIS, AS I UNDERSTAND IT, ABOUT THE FREQUENCY,

15   REGULARITY AND PROXIMITY OF THE AEROSOL EXPOSURES TO ACUITY

16   SUCH THAT IT COULD END UP BEING THAT THE ONLY BASIS FOR

17   HOLDING ACUITY IN THE CASE ARE THE EXPOSURES TO ZEP PARTS

18   WASHING SOLVENT BECAUSE IT'S VERY CLEAR THAT THE PARTS WASHER

19   WAS USED ROUTINELY EVERY DAY.

20              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU VERY MUCH.

21              MR. JENSEN:  THANK YOU.

22              THE COURT:  ANY ARGUMENT, MR. TOLLISON, IN REPLY?

23              MR. TOLLISON:  WELL, I WOULD JUST OFFER A COUPLE

24   REMARKS.  THIS WHOLE -- IT'S FUNNY.  THIS WHOLE ARGUMENT

25   TAKES ME BACK TO THE 80'S BEFORE WE HAD THE AMENDMENT TO THE

1    RULE WHERE, YOU KNOW, SOMEBODY JUST SAYS, WELL, YOU CAN JUST

2    DEAL WITH IT LATER, YOU CAN LET THE JURY DECIPHER THROUGH

3    THIS, JUST, YOU KNOW -- BUT WHEN WE DID THE AMENDMENT, HERE'S

4    THE THING.  WE ARE NOT BEHIND DOOR NUMBER ONE.

5        DOOR NUMBER ONE WOULD BE I'M MOVING FOR SUMMARY JUDGMENT

6    ON THE ACUITY PARTS WASHER FLUID BECAUSE THEY CAN'T

7    ESTABLISH, YOU KNOW, THERE'S NO FACTS UPON WHICH THE

8    PLAINTIFF COULD MOVE FORWARD ON IT.  AND THAT MIGHT BE A

9    LITTLE BIT OF A DIFFERENT, YOU KNOW -- NOW WALT, THIS -- YOU

10   MAY SAY LET THE JURY -- THAT'S NOT THE ISSUE.  THE ISSUE IS

11   THEY DID AN EXPERT REPORT AND THEY'RE REQUIRED UNDER THE NEW

12   RULES TO ESSENTIALLY DISCERN THE FACTS AND UNDERLYING BASIS

13   AND THE OPINIONS WITHIN A REASONABLE DEGREE OF SCIENTIFIC --

14   AND THEY DIDN'T MENTION US NOWHERE.

15       AND THEN OUT OF NOWHERE COMES HARRISON'S REPORT IN

16   FEBRUARY OF '15 WHERE THERE IS NO FACTS IN THE RECORD TO

17   SUPPORT THIS, BUT WE DIDN'T GET THE CHANCE TO QUESTION HIM ON

18   IT, WE DIDN'T GET TO QUESTION -- CROSS-EXAMINE HIM ON IT, WE

19   DIDN'T GET THE CHANCE TO HAVE PAMELA WILLIAMS, OUR EXPOSURE

20   PERSON, DO AN EXPOSURE ASSESSMENT ON THIS, WE DIDN'T GET A

21   CHANCE TO HAVE DR. PYATT [PH] OR ANY OF OUR EXPERTS DO A

22   MEDICAL OPINION ON ANY OF THIS.

23       JUST WHEN IT'S ALL DONE, HERE COMES THIS OPINION FROM

24   HARRISON, BASED ON MY REVIEW OF THE TESTIMONY OF MR. BOYKIN'S

25   CO-WORKERS.  WHO?  BUT LEAVE THAT -- HIS EXPOSURE TO THE

1    PRODUCT OF WURTH, BEL-RAY, ACUITY PUTS WITHIN PAREN PARTS

2    WASHER SOLVENT -- HE DOESN'T MENTION ANYTHING ABOUT

3    AEROSOLS -- AND SAFETY KLEEN EACH SATISFY THE CRITERIA OF

4    FREQUENT, PROXIMATE AND REGULAR EXPOSURES.

5        NOW, YOU CANNOT ON THE LAST DAY WHEN THIS IS ALL SAID

6    AND DONE HIT ME WITH THAT WHEN I DIDN'T HAVE A CHANCE TO

7    QUESTION HARRISON ON ANY OF THAT.  I MEAN, HE CAN ARGUE ALL

8    DAY, WELL, THERE'S ONE REFERENCE IN ONE DEPOSITION THAT

9    MAYBE, YOU KNOW, ZEP WAS THERE.  BUT YOU CAN'T -- YOU

10   CAN'T -- YOU CAN'T UNDER THE RULES HAVE A REPORT UNDER RULE

11   26 AND THEN HAVE A DEPOSITION, TWO DEPOSITIONS, THAT FOLLOW

12   THAT.

13       AND WE WERE -- OUR EXPERTS RELY ON WHAT THEIR EXPERTS

14   ARE SAYING.  THE WHOLE THING IS DONE.  AND THEN COME UP WITH

15   THAT.  IF HE'D HAVE PUT THAT IN THERE ORIGINALLY, JUDGE, WELL

16   CERTAINLY WE WOULD HAVE THEN DISSECTED THAT.  SHOW ME WHERE

17   IN THE RECORD ARE A CO-WORKER SAID THAT ZEP HAD A PRODUCT

18   THERE OR ACUITY HAD A PRODUCT.  THEN WE WOULD HAVE DISSECTED

19   THAT WITH HIM AND CROSS-EXAMINED HIM ON IT AND WE WOULD HAVE

20   BEEN WHERE WE WERE.

21       NOW, THE OTHER REMARK IS I JUST WANT TO BE CLEAR.

22   DIVERSIFIED WOULD HAVE NEVER SUPPLIED A ZEP PRODUCT.  I

23   DON'T -- I HAVE NO IDEA WHERE THAT'S COMING FROM.  THAT'S

24   NOWHERE IN THE RECORD.  IT WOULD BE FACTUALLY IMPOSSIBLE.  I

25   MEAN, DIVERSIFIED IS A COMPANY THAT GETS -- ZEP WAS A

1    SUPPLIER TO COLUMBIA YAMAHA.

2        THEY HAD TWO LOCATIONS.  THEY HAD FERNANDINA ROAD AND

3    THEY HAD TWO NOTCH ROAD.  AND SO ZEP HAD A PERSON -- I MEAN,

4    ZEP HAD A SALES AGENT THAT WOULD ASSIST -- FERNANDINA WOULD

5    BUY STUFF DIFFERENT THAN TWO NOTCH AND TWO NOTCH MIGHT HAVE

6    BOUGHT PRODUCT DIFFERENT THAN -- THAT'S PRETTY WELL IN THE

7    RECORD.  KEREN SAYS, I'D PAY INVOICES BUT I'M NOT SURE WHO

8    HAD WHAT IN WHAT SPECIFIC LOCATION, I JUST PAID THE BILLS.

9        BUT THERE IS NO CLARITY AT ALL FOR THEM TO RENDER AT

10   THIS LAST MINUTE A NEW OPINION ABOUT A NEW PRODUCT.  CLEARLY

11   IT'S A NEW OPINION.  I THINK THAT'S -- CLEARLY WOULD

12   OTHERWISE BE A SUPPLEMENTATION.  BUT WHAT KILLS ME, IT'S A

13   NEW PRODUCT AND THEY DON'T EVEN GIVE THE PRODUCT.

14       IF YOU LOOK AT STEWART'S OPINION AND HARRISON'S, ON

15   EVERYBODY ELSE'S THEY SPEAK TO SPECIFIC PRODUCTS.  YOU CAN'T

16   JUST SAY ACUITY WITHIN PAREN PARTS WASHER FLUID.  ACUITY

17   DOESN'T HAVE A PARTS WASHER FLUID.  I MEAN, IF YOU'RE GOING

18   TO DO ANYTHING, AT LEAST SAY ZEP PRODUCT X, Y, Z, ZEP PRODUCT

19   A, B, C.

20       SO THEY JUST -- YOU KNOW WHAT HAPPENED.  IN THE LAST

21   MINUTE THERE'S AN ANALYSIS AND GOES, WHOA WEE, WE'RE JUST OUT

22   THERE HOLDING ON BY A VINE TO ACUITY'S AEROSOL STUFF.  WE GOT

23   TO FIX THAT.  THAT'S WHAT HAPPENED.  AND SO AT THE END OF THE

24   DAY, YOU KNOW, THERE'S SOME THAT ARE -- MEETING OF THE MINDS

25   WHO SAY, WELL, WE'VE GOT TO ADD A LITTLE FOOTNOTE HERE, WE'VE

1   GOT TO ADD A SENTENCE HERE AND WE'VE GOT TO MAKE SOME ISSUE

2   ABOUT IT.

3        I MEAN, I WOULD HAVE APPRECIATED IT MORE IF THEY HAD

4   JUST SAID UNDER RULE 26(E) WE ARE PUTTING THIS FRONT AND

5   CENTER, WE ARE GOING TO HAVE OUR EXPERTS AMEND OUR REPORTS IN

6   THE FOLLOWING.  THEY DON'T EVEN DO THAT.  YOU HAVE TO READ

7   THE REPORT ON THE MOTION TO EXCLUDE TO EVEN FIND WHAT THE

8   HECK IS THAT COMING FROM?

9        SO JUST IN ALL DUE RESPECT, I THINK THE COURT CAN SEE

10  THROUGH THAT.  I JUST WOULD RESPECTFULLY ASK THAT THOSE TWO

11  THINGS BE STRICKEN AS RELATES TO THE PARTS WASHER FLUID.

12  THANK YOU.

13            THE COURT:  THANK YOU, MR. TOLLISON.  OKAY.  I

14  GUESS WE ARE ON TO THE NEXT MOTION TO EXCLUDE.  MR. ALOST, I

15  THINK THAT YOU WERE --

16            MR. ALOST:  THANK YOU, YOUR HONOR.

17            THE COURT:  -- HERE ON BEHALF OF SAFETY KLEEN.

18            MR. ALOST:  THANK YOU, YOUR HONOR.  WES ALOST.  I'M

19  HERE ON BEHALF OF SAFETY KLEEN.  I'M HERE WITH MY PARTNERS

20  JAMES MCGOLDRICK AND AMANDA KOCH WHO ARE GOING TO GET TO TALK

21  TO YOU A LITTLE BIT LATER TODAY.

22       YOUR HONOR, MR. TOLLISON SPENT A FAIR AMOUNT OF TIME

23  TALKING ABOUT THE HISTORY OF PARTS WASHERS AT TWO NOTCH ROAD

24  AND THE COLUMBIA POWER SPORTS FACILITY, AND I WANT TO JUST

25  ADDRESS THAT VERY QUICKLY SO THAT IT'S CLEAR WHAT SAFETY

1    KLEEN'S RECORDS SHOW IN THE CASE.

2        MR. BOYKIN WORKED AT COLUMBIA POWER SPORTS FROM 1981

3    TILL 2009.  SAFETY KLEEN'S SERVICE RECORDS WHICH DOCUMENT THE

4    MATERIALS SAFETY KLEEN PROVIDED TO THE FACILITY AND THE TIMES

5    AND THE AMOUNTS OF MATERIAL THAT IT PROVIDED SHOW THAT IT

6    PROVIDED SAFETY KLEEN 105 SOLVENT FROM 1985 ROUGHLY TILL

7    DECEMBER 20, 1995.  AND IT PROVIDED A SLIGHTLY DIFFERENT

8    PARTS WASHER MODEL AND A DIFFERENT SOLVENT, SAFETY KLEEN 150

9    SOLVENT, FROM DECEMBER 20, 1995 UNTIL MAY, 2004.  AND THAT

10   NOMENCLATURE IS VERY IMPORTANT.

11       THE 105 SOLVENT AND A 150 SOLVENT DESIGNATION HAS TO DO

12   WITH THE FLASHPOINT IN THE MATERIAL.  IN THE EARLY 90'S THERE

13   WAS THE RESERVATION -- I'M SORRY -- RESOURCES CONSERVATION

14   RECOVERY ACT WHICH IMPLEMENTED A LOT OF DEPARTMENT OF

15   TRANSPORTATION HANDLING REGULATIONS AND DOCUMENTATION

16   HANDLING -- DOCUMENTATION REGULATIONS ON THE TRANSPORTATION

17   AND DISPOSAL OF HAZARDOUS WASTE, AND SO THE 150 MATERIAL WAS

18   DEVELOPED AS A WAY TO RELIEVE CUSTOMERS OF THAT DOCUMENTATION

19   RESPONSIBILITY WHICH WAS FAIRLY ONEROUS.

20       BY ITS SPECIFICATION THE 150 MATERIAL CONTAINS LESS THAN

21   .5 -- ACTUALLY THE SPECIFICATION IS LESS THAN .4 PARTS PER

22   MILLION BENZENE, AND IT'S ALSO BECAUSE IT HAS A VERY HIGH

23   FLASHPOINT THAT IS DESIGNATION -- DESIGNATED AS NON-HAZ.  AND

24   WE ARE GOING TO TALK ABOUT THAT A LITTLE MORE TODAY, BUT

25   THOSE POINTS ARE VERY IMPORTANT WHEN WE'RE THINKING ABOUT THE

1   HISTORY OF THE PARTS WASHER AND THE HISTORY OF SOLVENT AT THE

2   FACILITY.

3       YOUR HONOR, TO ADDRESS THE AFFIDAVITS, PUT VERY SIMPLY,

4   THEY'RE VERY CLEARLY UNTIMELY.  THEY WERE PRODUCED IN THIS

5   CASE AFTER EXPERT DISCLOSURES WERE DUE, AFTER THE DISCOVERY

6   DEADLINE AND AFTER THE PRETRIAL DISCLOSURE DEADLINE IN THE

7   CASE.  IT'S IMPORTANT TO NOTE THAT THEY ARE NOT SUPPLEMENTS

8   AS THAT TERM IS USED IN RULE 26.  IF THEY WERE, EVEN IF THEY

9   WERE, THOSE MUST BE MADE BY THE PRETRIAL DISCLOSURE DEADLINE

10  IN RULE 26(E)(2).

11      IN THE CAMPBELL CASE THE FOURTH CIRCUIT ADDRESSES

12  WHETHER OR NOT A SUPPLEMENTAL REPORT WAS -- A LATE-FILED

13  SUPPLEMENTAL REPORT QUALIFIED AS A SUPPLEMENT UNDER 26 AND

14  SAID, NO, IT DIDN'T BECAUSE THE SUPPLEMENTAL REPORT DIDN'T

15  ADD NEW OR DIDN'T CORRECT INFORMATION.  BECAUSE IT DIDN'T ADD

16  ANY NEW INFORMATION, BECAUSE IT DIDN'T CORRECT INFORMATION

17  THAT WAS ALREADY THERE, IT WASN'T A SUPPLEMENT AND IT WAS

18  OBVIOUSLY AN EFFORT TO RE-CAST THE EXPERT'S OPINION AND WAS

19  IMPROPER.  THIS IS ALSO ADDRESSED IN THE EEOC DISTRICT COURT

20  OPINION THAT'S CITED IN OUR BRIEFING.

21      THERE THE DISTRICT OF MARYLAND SAYS THAT SUPPLEMENTATION

22  UNDER RULE 26 MEANS CONNECTING [SIC] INACCURACIES OR FILLING

23  THE INTERSTICES OF INCOMPLETE REPORTS BASED ON INFORMATION

24  NOT AVAILABLE AT THE TIME OF THE INITIAL DISCLOSURE.  IN THAT

25  CASE A REPORT WAS FILED WITH AN OPPOSITION TO A MOTION TO

1    PRECLUDE UNDER DAUBERT AND 702 PRECISELY LIKE THE FACTS UNDER

2    OUR CASE.

3         THE COURT HELD THAT NEW REPORTS PROVIDED UNDER THE GUISE

4    OF SUPPLEMENTATION CANNOT BE PRODUCED TO ADDRESS CRITICISMS

5    THE DEFENDANTS RAISED IN THEIR MEMORANDUM IN SUPPORT OF THE

6    MOTION FOR SUMMARY JUDGMENT.

7         WE SEE THE SAME DYNAMIC PLAY OUT IN A NUMBER OF THE

8    CASES THAT ARE CITED IN OUR BRIEFING; PARTICULARLY THE

9    COCHRAN AND THE AVANCE CASES.  REPORTS WHICH ARE SUBMITTED IN

10   OPPOSITION TO MOTIONS TO EXCLUDE EXPERTS UNDER RULE 702 AND

11   DAUBERT ARE HELD TO A VERY, VERY HIGH STANDARD, AND WHEN

12   THEY'RE NOT INTRODUCING NEW INFORMATION, THAT THEY ARE NOT

13   SUPPLEMENTS UNDER RULE 26.  AND EVEN IF THEY ARE, COURTS

14   SCRUTINIZE THEM VERY, VERY CAREFULLY AS YOU KNOW, YOUR HONOR,

15   BECAUSE OF THE MANDATE OF RULE 37.

16        THE AFFIDAVITS HERE ARE NOT BASED ON ANY INFORMATION

17   THAT WAS NOT AVAILABLE AT THE TIME OF THE INITIAL REPORTS.

18   THE AFFIDAVITS EVEN SAY THAT THEY ARE RESPONDING TO

19   DEFENDANTS' DAUBERT CHALLENGES IN HARRISON PARAGRAPH FOUR AND

20   STEWART PARAGRAPH SIX.  THESE AFFIDAVITS ARE CLEARLY A

21   RE-CASTING OF THEIR OPINIONS AND THAT WAS DEEMED IMPROPER BY

22   THE FOURTH CIRCUIT IN CAMPBELL.

23        IT'S SAFETY KLEEN'S POSITION THAT RULE 37 IS AN ABSOLUTE

24   BAR TO THE USE OF THESE AFFIDAVITS UNLESS PLAINTIFF CAN SHOW

25   THAT LATE PRODUCTION WAS SUBSTANTIALLY JUSTIFIED OR HARMLESS.

1    IN OTHER WORDS, YOUR HONOR, SUPPLEMENTATION, AS THAT TERM IS

2    DEFINED UNDER RULE 26, IS NOT A SIDE-ROUTE AROUND 37.  RULE

3    37 IS AN ABSOLUTE BAR UNLESS THE PARTY CAN SHOW THAT THEY'RE

4    SUBSTANTIALLY JUSTIFIED OR THAT THEY ARE HARMLESS.

5        IN THIS CASE, YOUR HONOR, THEY ARE NOT SUBSTANTIALLY

6    JUSTIFIED BECAUSE THEY ARE NOT BASED ON ANY INFORMATION THAT

7    WAS UNAVAILABLE AT THE TIME OF THE INITIAL REPORTS.  AND THEY

8    ARE NOT HARMLESS BECAUSE THERE'S NO OPPORTUNITY FOR OUR

9    CLIENT TO EVALUATE THOSE OPINIONS OR TO HAVE OUR EXPERTS

10   REBUT THEM AT THIS TIME.

11        *THE COURT:*  I GUESS MY ISSUE -- EXCUSE ME FOR

12   INTERRUPTING -- WITH RULE 37 IS THAT THE LANGUAGE OF RULE 37

13   TO ME CONNOTES SOME WITHHOLDING OF INFORMATION THAT -- IT'S

14   SORT OF THE SAND-BAGGING IDEA, AND I DON'T THINK THAT WE --

15   WE HAVE A SAND-BAGGING SITUATION HERE.  UNDER RULE 37 I THINK

16   C1 SAYS IF A PARTY FAILS TO PROVIDE INFORMATION OR IDENTIFY A

17   WITNESS, THEN THAT PARTY IS NOT ALLOWED TO USE THAT

18   INFORMATION OR WITNESS TO SUPPLY EVIDENCE DOWN THE ROAD

19   UNLESS THE FAILURE WAS SUBSTANTIALLY JUSTIFIED OR HARMLESS.

20        HERE I DON'T KNOW THAT THERE WAS A FAILURE TO PROVIDE

21   THE INFORMATION.  I THINK THAT'S WHAT THE PLAINTIFF IS GOING

22   TO ARGUE, THAT THE INFORMATION WAS THERE, IT WAS IN THESE --

23   IN THESE DEPOSITIONS.  BUT SO IT'S NOT SO MUCH A RULE 37

24   ISSUE BUT MORE OF A DEADLINE ISSUE I THINK.  I DON'T KNOW,

25   BUT CONVINCE ME.

1           *MR. ALOST:* AND RESPECTFULLY, YOUR HONOR, I DON'T

2  WANT TO PARSE SEMANTICS AT ALL. MY READING OF RULE 37 AND MY

3  READING OF THE CASES THAT ARE CITED IN OUR BRIEF INTERPRETING

4  IT MAKES ME BELIEVE THAT WHAT RULE 37 IS SAYING IS THAT IF A

5  PARTY FAILS TO -- AND THE LANGUAGE IS: FAILS TO PROVIDE

6  INFORMATION OR IDENTIFY A WITNESS AS REQUIRED BY RULE 26(A)

7  OR E.

8        WELL, 26(A) AND E TALKS ABOUT EXPERT DISCLOSURES AND

9  EXPERT REPORTS. AND SO I READ RULE 37 TO SAY IF A PARTY

10  DOESN'T DO ITS JOB BY PRODUCING EXPERT REPORTS THAT LAY OUT

11  THE OPINIONS OF AN EXPERT AND THE FACTUAL BASES THAT SUPPORT

12  THOSE, THEN THE PARTY DOESN'T GET TO USE THESE OPINIONS

13  UNLESS THE PARTY CAN SHOW THAT THEIR FAILURE TO DO SO TIMELY

14  WAS SUBSTANTIALLY JUSTIFIED OR HARMLESS. THAT'S MY

15  INTERPRETATION OF RULE 37.

16        AND IT'S ALSO THE INTERPRETATION UNDER THE COCHRAN CASE

17  AND TO SOME EXTENT THE CAMPBELL CASE. IN THE CAMPBELL CASE

18  THE FOURTH CIRCUIT FOUND THAT THE SUPPLEMENTAL REPORT WAS NOT

19  SUBSTANTIALLY JUSTIFIED OR HARMLESS USING THE SOUTHERN STATES

20  FACTORS BECAUSE THERE WAS NO OPPORTUNITY TO DEPOSE THE

21  EXPERT, IT INHIBITED THE DEFENDANTS' ABILITY TO PREPARE FOR

22  TRIAL, UNNECESSARILY PROLONG LITIGATION, AND UNDERMINES

23  COURT'S MANAGEMENT OF THE CASE, SO...

24           *THE COURT:* I THINK THAT, THOUGH, PROCEDURAL

25  POSTURE-WISE THE CAMPBELL CASE IS HELPFUL. AND EEOC, THE

1    EEOC CASE, I THINK IT WAS -- IT'S VERY -- IT'S GOT GREAT

2    LANGUAGE FOR YOU, BUT I THINK THE CONTENT OF THAT EXPERT

3    REPORT WAS FUNDAMENTALLY DIFFERENT.  THE COURT WAS CONCERNED

4    WITH I THINK THEY CALLED IT MIND-BOGGLING NUMBER OF ERRORS

5    THAT WERE IN THE REPORT, AND IT WASN'T SO MUCH THAT THE

6    NATURE OF THE REPORT WAS CHANGED IN RESPONSE TO SUMMARY

7    JUDGMENT LIKE I THINK THAT THE CAMPBELL COURT WAS CONCERNED

8    WITH.

9        WOULD YOU AGREE WITH THAT?

10           *MR. ALOST:*  YOUR HONOR, LET ME GLANCE AT THE EEOC

11   OPINION QUICKLY TO MAKE SURE THAT I HAVE THE LANGUAGE

12   CORRECT.  CERTAINLY IN THE EEOC CASE THEY WERE DEALING WITH A

13   VERY FACT-INTENSIVE REPORT WHICH THE COURT FELT WAS

14   INAPPROPRIATE UNDER A DAUBERT ANALYSIS BECAUSE OF THE ERRORS

15   IN THAT REPORT MADE IT UNRELIABLE.

16           *THE COURT:*  BUT THAT'S NOT WHAT YOU ARE -- YOU

17   MEAN--

18           *MR. ALOST:*  I AGREE, YOUR HONOR, BUT MY POINT WAS

19   THAT IN THE EEOC CASE, THE PARTY THAT EEOC PRODUCED WHAT IT

20   TITLED A SUPPLEMENTAL REPORT, AND IN THAT CASE THE DISTRICT

21   COURT SAID, YOU KNOW, THIS WAS ADDRESSED, THAT THE

22   SUPPLEMENTAL REPORT WAS DESIGNED AND CREATED TO ADDRESS

23   CRITICISMS THAT WERE RAISED IN THE BRIEFING.

24       FREEMAN, THE DEFENDANT IN THAT CASE, FILED MOTIONS TO

25   EXCLUDE THE INITIAL REPORT BECAUSE OF ITS INACCURACIES.  AND

1    THE EEOC HAD THEIR EXPERT CREATE A SUPPLEMENTAL REPORT WHICH

2    STILL HAD ERRORS.

3           THE COURT:  BUT WAS THE COURT'S FINDING THERE BASED

4    ON -- THE COURT'S DECISION TO EXCLUDE THE SUPPLEMENTAL

5    REPORT, WAS IT BASED ON THE ERRORS OR WAS IT BASED ON THE

6    LATENESS?

7           MR. ALOST:  IT WAS BASED ON THE LATENESS, YOUR

8    HONOR, ON THE SUPPLEMENTAL REPORT, ON -- IN THE -- IT'S PAGE

9    797 THROUGH 798 OF THE OPINION THERE'S THAT EXACT DISCUSSION,

10   AND THE CONCLUSION IS THAT THE SUPPLEMENTAL REPORTS WERE

11   UNTIMELY AND WOULD NOT BE CONSIDERED.

12          THE COURT:  OKAY.

13          MR. ALOST:  AND THEY CONSIDERED THAT ANALYSIS UNDER

14   RULE 37.

15          THE COURT:  OKAY.

16          MR. ALOST:  BECAUSE IT FOUND THAT THE SUPPLEMENTAL

17   REPORTS WERE NOT SUBSTANTIALLY JUSTIFIED OR WERE HARMLESS.

18          THE COURT:  YOU WOULD CONCEDE THAT THE COURT HAS

19   BROAD DISCRETION IN MAKING A DETERMINATION ABOUT --

20          MR. ALOST:  ABSOLUTELY, YOUR HONOR.

21          THE COURT:  -- WHETHER IT'S SUBSTANTIALLY JUSTIFIED

22   OR HARMLESS AND THEN--

23          MR. ALOST:  YES, YOUR HONOR.

24          THE COURT:  I THINK THAT YOUR BRIEF ADDRESSED THE

25   FACTORS THAT THE COURT IS TO CONSIDER IN DETERMINING WHETHER

1    THE LATE DISCLOSURES IS SUBSTANTIALLY JUSTIFIED OR HARMLESS.

2    I GUESS FOR YOU ALL, WHAT IS THE PRIMARY BASIS OF THAT

3    ANALYSIS?  IS IT ON THE SURPRISE OR THE INABILITY TO CURE THE

4    SURPRISE OR IMPORTANCE OF THE EVIDENCE?

5            *MR. ALOST:*  OUR POSITION IS CAUSED BY AN INABILITY

6    TO FLESH OUT AND OBTAIN DISCOVERY AND HAVE OUR EXPERTS

7    PROPERLY RESPOND TO WHAT ARE CLEARLY NEW OPINIONS.  AND THE

8    PROBLEM WITH THE AFFIDAVITS IS THERE'S SOME BLENDING.

9    THERE'S SOME PARAGRAPHS IN THE AFFIDAVITS WHICH SEEM TO

10   REITERATE OR RE-HASH SOME OF THE LANGUAGE IN THERE AND THERE

11   ARE SEVERAL PARAGRAPHS AND SEVERAL PROVISIONS OF THE

12   AFFIDAVITS WHICH ARE CLEARLY NEW, THEY ARE A RE-PACKAGING,

13   THEY ARE A RE-CASTING, WHICH IS EXACTLY WHAT THE CASES THAT

14   LOOK AT THIS TYPE OF SUPPLEMENTATION OR DAUBERT CONTEXT SAY

15   YOU'RE NOT PERMITTED TO DO.  YOU KNOW, THIS IS A PARTICULARLY

16   EGREGIOUS ABUSE OF THE RULES OF PROCEDURE WHEN YOU'RE TRYING

17   TO FIX THINGS IN LIGHT OF A DAUBERT CHALLENGE.

18       DID I ANSWER YOUR QUESTION, YOUR HONOR?

19           *THE COURT:*  YES, SIR.

20           *MR. ALOST:*  OKAY.  OUR POSITION, FRANKLY, IS THAT

21   THESE LATE AFFIDAVITS THAT HAVE BEEN MADE IN RESPONSE TO THE

22   DAUBERT MOTIONS HAVE PLACED THE COURT AND THE DEFENDANTS IN A

23   POSITION OF HAVING TO DETERMINE WHAT IS AN IMPROPER

24   RE-CASTING AND WHAT IS A REGURGITATION OF TIMELY OPINIONS.

25       OUR POSITION IS THAT THE EASIEST AND CLEANEST WAY FOR

1    THIS COURT AND THE DISTRICT COURT TO ADDRESS THIS ISSUE IS TO

2    EXCLUDE THE AFFIDAVITS IN THEIR ENTIRETY AND TO CONSIDER THE

3    MERITS OF THE DAUBERT MOTIONS THAT ARE BEFORE THIS COURT BY

4    LOOKING TO THE TIMELY REPORTS AND THE DEPOSITION TESTIMONY OF

5    THESE GENTLEMEN BECAUSE BY LOOKING AT THE AFFIDAVITS AND THE

6    LANGUAGE IN THE AFFIDAVITS, IT IS PLACING THE COURT AND THE

7    PARTIES IN THE UNCOMFORTABLE POSITION OF OPENING PANDORA'S

8    BOX OF INTERPRETATION TRYING TO FIGURE OUT WHAT IS THE

9    MEANING HERE, WHAT -- IS THE EXPERT CHANGING HIS PHRASING, IS

10   HE CHANGING HIS THOUGHT PROCESS, IS HE CHANGING HIS OPINION,

11   AND IT BECOMES VERY DIFFICULT TO DO.  AND IT'S PARTICULARLY

12   DIFFICULT TO DO WHEN THE AFFIDAVITS CONTAIN NO CITES TO THE

13   DEPOSITION TESTIMONY OR THE REPORTS OR THE UNDERLYING DATA.

14        AND SO OUR POSITION, YOUR HONOR, IS THAT THE AFFIDAVITS

15   SHOULD BE EXCLUDED IN THEIR ENTIRETY BECAUSE IT'S THE BEST

16   WAY TO PROTECT THE RECORD OF THE CASE.

17            THE COURT:  OKAY.  VERY GOOD.  THANK YOU.

18            MR. ALOST:  THANK YOU, YOUR HONOR.

19            THE COURT:  MR. JENSEN?

20            MR. JENSEN:  YES, YOUR HONOR.  AND I HAVE A

21   POWERPOINT ABOUT THIS ISSUE, BUT I'M NOT AT ALL CONFIDENT I'M

22   ABLE TO GET IT.  ACTUALLY CONNECTING WITH THE COURT'S SYSTEM,

23   BUT I'M GOING TO TRY ONE MORE TIME.

24            THE COURT:  SURE.

25            MR. JENSEN:  JUST NOT GETTING ANY SIGNAL FROM ME AT

1    ALL; ARE YOU?  OKAY.   WELL, I WILL DISPENSE WITH THAT, YOUR

2    HONOR.

3              THE COURT:  DO YOU HAVE A PRINTOUT?

4              MR. JENSEN:  I DO.

5              THE COURT:  OR AN EXTRA ONE?

6              MR. JENSEN:  I HAVE ONE COPY.

7              THE COURT:  WE ARE HAPPY TO MAKE COPIES.

8              MR. JENSEN:  AND YEAH, WHY DON'T I LOOK AT MY

9    COMPUTER SCREEN AND YOU CAN FOLLOW ALONG.  I WOULDN'T HAVE A

10   COPY AVAILABLE FOR COUNSEL OR...

11             THE COURT:  WELL, IT WON'T TAKE -- WE'VE GOT A

12   QUICK COPIER.  WE WILL MAKE SEVERAL COPIES FOR COUNSEL.

13             MR. JENSEN:  MY FAULT.

14             THE COURT:  NO PROBLEM.

15             MR. JENSEN:  WHEN I CAME BACK FROM THE VISIT, IT

16   WAS...  I CLOSED THE COMPUTER AND I THINK IT DEFAULTS TO

17   DISPLAYING JUST MY SCREEN INSTEAD OF GOING THROUGH THE

18   PROJECTOR, AND I'M TRYING TO GET IT TO -- I THOUGHT I HAD

19   DONE THE SAME THING THAT I HAD JUST DONE, BUT I DON'T --

20   DOESN'T APPEAR TO WORK.

21             MR. MCGOLDRICK:  JOHN, OUR TECHNICIAN, DOESN'T KNOW

22   MCINTOSH, SO...

23             MR. JENSEN:  WELL, THANK YOU FOR OFFERING.

24             MR. TOLLISON:  CAN WE TAKE A QUICK BREAK, YOUR

25   HONOR?

1          *THE COURT:* WHY DON'T WE TAKE A FIVE-MINUTE BREAK

2     AND LET YOU ALL KIND OF ADDRESS THIS. MAYBE WE CAN TAKE A

3     COMFORT BREAK FOR THE STAFF AS WELL, THEN WE WILL RE-GROUP.

4     AND MR. JENSEN, HOW LONG DO YOU THINK THAT YOUR ARGUMENT

5     MIGHT TAKE ON THIS ISSUE?

6          *MR. JENSEN:* ON THIS ISSUE? FIFTEEN MINUTES, YOUR

7     HONOR.

8          *THE COURT:* OKAY. AND THEN WE WILL HEAR A LITTLE

9     BIT ON REDIRECT. MY GOAL IS TO EXCUSE EVERYONE FOR LUNCH AT

10    AROUND NOON OR A FEW MINUTES AFTER, AND THEN WE CAN MAYBE

11    TAKE AN HOUR AND A HALF FOR LUNCH AND THEN COME BACK HERE

12    ABOUT 1:30 OR SO. BUT LET'S STAND DOWN FOR A FEW MINUTES AND

13    SEE IF WE CAN'T GET THE COMPUTER GOING. AND IF NOT, WE WILL

14    HAVE THE COPIES READY FOR YOU IN JUST A FEW MINUTES. ALL

15    RIGHT? WE WILL BE IN RECESS.

16       (WHEREUPON, A BRIEF RECESS WAS HELD.)

17         *THE COURT:* OKAY. WE ARE BACK ON THE RECORD. AND

18    MR. JENSEN, I THINK THAT IT APPEARS THAT THE COMPUTER IS

19    COOPERATING NOW?

20         *MR. JENSEN:* WELL, IT'S BECAUSE OF THE COOPERATION

21    OF DEFENSE COUNSEL, YOUR HONOR.

22         *THE COURT:* OH, I LIKE --

23         *MR. JENSEN:* THEIR COMPUTER--

24         *THE COURT:* WELL, THAT'S--

25         *MR. JENSEN:* THANK YOU.

1          *THE COURT:* I THINK THAT THAT'S WONDERFUL. WE

2   MIGHT SING KUMBAYA LATER. PLEASE PROCEED.

3          *MR. JENSEN:* OKAY. I WANT TO TAKE A LITTLE

4   DIFFERENT TACK, YOUR HONOR, IN ADDRESSING THIS ISSUE WITH

5   RESPECT TO THE AFFIDAVITS. AND I THINK THAT WHAT I'M ABOUT

6   TO SAY APPLIES EQUALLY TO BOTH DR. STEWART'S AFFIDAVIT AND

7   DR. HARRISON'S AFFIDAVIT, AND THAT IS THAT I THINK THAT --

8   NOT I THINK -- THESE AFFIDAVITS WERE BOTH FILED IN THE

9   CONTEXT OF A CHALLENGE UNDER RULE 702 TO ADMISSIBILITY AND

10  THIS COURT'S INQUIRY UNDER DAUBERT AND RULE 702 AS TO THE

11  RELIABILITY OF THE UNDERLYING METHODOLOGY THAT WAS USED BY

12  EACH OF THESE EXPERTS.

13         AND IN THAT CONTEXT, I WOULD SUBMIT TO THIS COURT, THE

14  INQUIRY AS TO WHAT IS PERMISSIBLY PART OF THE MATERIALS THAT

15  THIS COURT CAN AND SHOULD RELY UPON IN MAKING THE RELIABILITY

16  ASSESSMENT IS A QUITE DIFFERENT INQUIRY THAN WHAT IS

17  ULTIMATELY GOING TO BE ADMISSIBLE IN FRONT OF THE JURY AND --

18  AND IS ADMISSIBLE UNDER ALL OF OUR DISCOVERY RULES, AND SO...

19  AND I HAVE SPENT MY ENTIRE CAREER FOR 20-PLUS YEARS DOING

20  TOXIC TORT CASES FOR PLAINTIFFS. AND BECAUSE THAT'S THE PATH

21  THAT I HAVE CHOSEN, ROUTINELY IN ALMOST EVERY ONE OF MY CASES

22  I FACE, WHETHER I'M IN STATE COURT OR IN FEDERAL COURT, A

23  SIMILAR MOTION TO EXCLUDE THE TESTIMONY OF SOME OR ALL OF MY

24  EXPERT WITNESSES ON CAUSATION ON, YOU KNOW, ISSUES SIMILAR TO

25  THE ONES THAT HAVE BEEN RAISED HERE, SO I HAVE DONE THIS A

1    LOT.  AND I HAVE DONE IT A LOT IN FEDERAL COURT.  I HAVE DONE

2    IT A LOT IN STATE COURTS AROUND THE COUNTRY.

3         IT HAS ROUTINELY BEEN MY PRACTICE TO ASK EXPERTS TO

4    SUBMIT AFFIDAVITS AS PART OF THE DAUBERT RECORD FOR LACK OF A

5    BETTER WORD THAT ARE RESPONSIVE TO THE CRITIQUES TO THEIR

6    METHODOLOGY THAT, YOU KNOW, HAVE BEEN MADE IN THE CONTEXT OF

7    THE MOTIONS.  AND FRANKLY, THIS IS THE FIRST TIME IN 20-PLUS

8    YEARS OF PRACTICE THAT I HAVE FACED A MOTION THAT IS

9    COMPARABLE TO THE MOTION THAT IS -- OR MOTIONS THAT ARE NOW

10   BEFORE THE COURT TO SAY, WELL, THESE ARE UNTIMELY OPINIONS

11   THAT WERE, YOU KNOW, NEW OPINIONS OR IMPROPER

12   SUPPLEMENTATION, OUTSIDE THE SCOPE OF THE CASE MANAGEMENT

13   ORDER AND THEREFORE SHOULD BE EXCLUDED BY THE COURT.

14        WELL, WHETHER OR NOT ANY OF THOSE OPINIONS IN THESE TWO

15   AFFIDAVITS ULTIMATELY SHOULD SEE THE LIGHT OF DAY IN FRONT OF

16   THE JURY, THOSE CONCERNS, ARGUMENTS, QUESTIONS I THINK WOULD

17   BE PROPERLY ADDRESSED IN THE CONTEXT OF THAT DISCUSSION.  BUT

18   WHETHER OR NOT THIS COURT SHOULD IN THE CONTEXT OF ITS

19   RESPONSIBILITY UNDER RULE 702 TO ESSENTIALLY CHECK UNDER THE

20   HOOD OR TO USE A DIFFERENT METAPHOR, WITH THE COURT'S

21   INDULGENCE, YOU KNOW, THE JURY WITH RESPECT TO EXPERT

22   TESTIMONY IS GOING TO BE SERVED THE SAUSAGE OF THE EXPERT'S

23   OPINIONS AND CONCLUSIONS AND THEY ARE GOING TO GET A LIST OF

24   INGREDIENTS IN THE SAUSAGE IN BROAD FORM OF, YOU KNOW, HERE'S

25   WHAT I RELIED ON, HERE'S WHAT I RELIED ON AND HERE'S WHAT MY

1  REASONING WAS.

2      BUT THIS COURT'S RESPONSIBILITY UNDER RULE 702 IS TO ACT

3  MORE LIKE THE HEALTH INSPECTOR AND GO BEYOND THAT AND SAY,

4  OKAY, WELL, EXACTLY HOW DID THIS SAUSAGE REALLY GET MADE?

5  AND IN THE COURSE OF DOING THAT, I THINK THIS COURT HAS THE

6  RESPONSIBILITY UNDER DAUBERT AND RULE 702 TO LOOK AT THINGS

7  THAT THE JURY IS PROBABLY NOT GOING TO HEAR ABOUT AT ALL --

8  NOW, EXCEPT IN VERY BROAD STROKES.

9      AND SO, THESE ISSUES, YOU KNOW, THERE MAY BE SOME

10  SPECIFIC THINGS IN THE AFFIDAVITS THAT THEY ARE GOING TO

11  COMPLAIN ABOUT OR HAVE COMPLAINED ABOUT THAT WE WOULD WANT TO

12  PUT IT IN FRONT OF THE JURY.  BUT I THINK THAT UNDER RULE

13  104(A), IN ADDRESSING THE PRELIMINARY QUESTION OF

14  ADMISSIBILITY, WHICH A DAUBERT QUESTION UNDER THE RULE 702 IS

15  SUCH A PRELIMINARY QUESTION, THIS COURT'S NOT BOUND BY THE

16  RULES OF EVIDENCE, AND IT IS ROUTINE, NOT JUST IN MY

17  PRACTICE, BUT IF YOU LOOK AT THE CASE LAW AROUND THE FEDERAL

18  COURT SYSTEM, IT IS ROUTINE FOR PARTIES TO SUBMIT IN

19  RESPONSE, DIRECT RESPONSE AND DIRECT REBUTTAL TO ARGUMENTS

20  MADE AND MOTIONS MADE TO STRIKE EXPERT TESTIMONY PURSUANT TO

21  DAUBERT FOR EXPERTS TO SUBMIT AFFIDAVITS THAT -- THAT PROVIDE

22  CLARIFYING SLASH SUPPLEMENTAL DISCUSSION OF THEIR METHODOLOGY

23  THAT ARE SPECIFICALLY ADDRESSING THE CRITIQUES THAT HAVE BEEN

24  OFFERED, AND THAT'S WHAT WE--

25          *THE COURT:*  CLARIFYING OR SUPPLEMENTAL AFFIDAVITS.

1    BUT YOU DON'T MEAN TO ARGUE DIFFERENT OPINIONS IN THE

2    AFFIDAVIT IN RESPONSE TO SUMMARY JUDGMENT FROM THAT WHICH WAS

3    DISCLOSED WITHIN THE EXPERT REPORTS.

4         MR. JENSEN:  I'M SORRY.  WHAT'S THE COURT'S

5    QUESTION?

6         THE COURT:  YOUR SUGGESTION IS THAT IT'S COMMON FOR

7    AND ROUTINE FOR PLAINTIFFS TO RESPOND THROUGH SUPPLEMENTAL

8    AFFIDAVITS IN RESPONSE TO SUMMARY JUDGMENT PROVIDING

9    CLARIFYING OR SUPPLEMENTAL ANALYSIS OR OPINION FROM THE

10   EXPERT.

11        BUT MY QUESTION IS, CAN THAT CLARIFYING OR SUPPLEMENTAL

12   INFORMATION ALSO BE DIFFERENT THAN THE OPINION THAT WAS

13   CONTAINED IN THE DISCLOSURES UNDER THE EXPERT?

14        MR. JENSEN:  IN OTHER WORDS, YOU'RE SAYING IF

15   THE -- IF THE EXPERT HAS SUBSTANTIVELY CHANGED HIS OR HER

16   OPINION, CAN THEY DO THAT IN THE CONTEXT OF THIS AFFIDAVIT

17   THAT THEY HAVE SUBMITTED IN RESPONSE TO A DAUBERT MOTION.

18   AND I THINK THE ANSWER TO THAT IS MAYBE AND MAYBE NOT.  I

19   THINK THAT THAT -- THAT PRESENTS A TOUGHER QUESTION TO THE

20   EXTENT THAT THAT IS WHAT HAS HAPPENED.

21        I DON'T THINK THAT'S A PROPER CHARACTERIZATION OF WHAT

22   HAS HAPPENED WITH RESPECT TO EITHER DR. STEWART OR DR.

23   HARRISON.

24        THE COURT:  WELL, IF IT'S NOT CHANGING, THEN IF

25   THERE IS AN OPINION PROVIDED WHERE THERE WAS SILENCE BEFORE,

1    WOULD YOU CONCEDE THAT THAT IS DIFFERENT?

2         *MR. JENSEN:*  WELL, YOU KNOW, IT'S ALL GOING TO BE

3    CONTEXT-DRIVEN, YOUR HONOR, AND THE DEVIL'S IN THE DETAILS,

4    BUT IN GENERAL MY ANSWER WOULD BE NO.  I MEAN, WHAT THEY ARE

5    DOING HERE IS PROVIDING SOME DETAILED EXPLANATION AS TO

6    UNDERLYING THOUGHT PROCESSES, METHODS, DISCUSSIONS THAT GOES

7    BEYOND WHAT IS IN THEIR ALREADY FAIRLY -- NOT FAIRLY,

8    HIGHLY-DETAILED REPORTS AND SUPPLEMENTAL OR SUPPORTING

9    MATERIALS, AND THAT'S ROUTINE.

10        AND I THINK THAT IF YOU LOOK AT NOT JUST 104(A) BUT

11   IN -- AND I APOLOGIZE -- I HAVE THREE OR -- EXCUSE ME -- FOUR

12   CASES THAT I'D LIKE TO BRING TO THE COURT'S ATTENTION THAT

13   ARE NOT CITED IN OUR BRIEF, AND SO I KNOW THAT'S AN ISSUE OF

14   ITSELF, BUT I'D STILL LIKE TO ARGUE THEM.  AND IF COUNSEL

15   WANTS TO ARGUE THAT THEY SHOULD NOT BE CONSIDERED, THEN THEY

16   CAN DO SO.

17        BUT THE FIRST IS A THIRD CIRCUIT DECISION IN A CASE

18   CALLED ODDI OR ODDI -- I DON'T KNOW HOW TO PRONOUNCE IT --

19   VERSUS FORD MOTOR FROM THE YEAR 2000.  AND AS YOU CAN SEE ON

20   THE SCREEN, IN GENERAL IN DISCUSSING THE PROCEDURAL NECESSITY

21   OF WHAT SHOULD HAPPEN IN A DAUBERT HEARING, AND IN THAT CASE

22   SPECIFICALLY, YOUR HONOR, THERE WAS A QUESTION AS TO WHETHER

23   OR NOT THERE NEEDED TO BE A DAUBERT HEARING THAT INCLUDED

24   LIVE TESTIMONY FROM THE EXPERTS WHOSE OPINIONS WERE BEING

25   CHALLENGED.  THE COURT ULTIMATELY CONCLUDED, WHICH IS

1    CERTAINLY THE MAJORITY VIEW, THAT THERE NEED NOT BE SUCH A

2    HEARING.

3        BUT THE COURT SAID THE PLAINTIFF NEEDS AN OPPORTUNITY TO

4    BE HEARD ON THE CRITICAL ISSUES OF SCIENTIFIC RELIABILITY AND

5    VALIDITY.  THE OPPORTUNITY TO BE HEARD IS IMPORTANT BECAUSE

6    IT ALLOWS A PLAINTIFF A CHANCE TO HAVE HIS OR HER EXPERT

7    DEMONSTRATE AND EXPLAIN THE GOOD GROUNDS UPON WHICH THE

8    EXPERT EVIDENCE RESTS.

9        AND THEN IN THE OPINION THE COURT GOES ON TO CONCLUDE

10   THAT BECAUSE THE RECORD IN THAT PARTICULAR CASE INCLUDED

11   SUPPLEMENTAL DECLARATIONS OR AFFIDAVITS FROM THE EXPERTS

12   THAT, YOU KNOW, PURPORTED TO EXPLAIN THEIR GROUNDS FOR THEIR

13   OPINIONS, THAT THE DISTRICT COURT, YOU KNOW, HAD NOT ABUSED

14   ITS DISCRETION BY FAILING TO HOLD A TESTIMONY -- A HEARING

15   THAT INCLUDED LIVE TESTIMONY.

16       BUT, IF YOU LOOK AT THE OVERLYING OR THE OVERALL CONTEXT

17   OF THIS COURT'S ROLE AND RESPONSIBILITY UNDER DAUBERT,

18   CLEARLY YOU HAVE DISCRETION IN THAT ROLE TO BRING EXPERTS

19   HERE, TO REQUIRE THEM TO SHOW UP AND GIVE LIVE TESTIMONY.

20   AND I WOULD SUBMIT THAT THE KIND OF TESTIMONY THAT THEY WOULD

21   GIVE IF THEY WERE HERE WOULD BE IDENTICAL WITH OR QUITE

22   SIMILAR TO THE TESTIMONY THAT THEY HAVE GIVEN IN THE FORM OF

23   THE AFFIDAVITS THAT WE HAVE SUBMITTED.  AND THE AFFIDAVIT

24   PROCESS IS A WAY OF SHORT-CUTTING THAT, YOU KNOW, AND DOING

25   AWAY WITH THE NEED FOR LIVE TESTIMONY, AND IN LIEU OF THAT,

1    YOU KNOW, ALLOWING AFFIDAVITS TO BE FILED THAT, YOU KNOW,

2    GIVE THE EXPERT THE OPPORTUNITY TO DEMONSTRATE AND EXPLAIN

3    THE GOOD GROUNDS UPON WHICH THEIR EVIDENCE RESTS.

4         AND IN THE FOUR CASES THAT I HAVE PUT UP OR GIVEN --

5    PROVIDED TO YOU THAT WERE NOT CITED ARE THAT ODDI CASE.  THEN

6    THERE'S A CASE CALLED PRITCHARD VERSUS DOW AGRO SCIENCES, AND

7    THAT'S 263 FRD 277 FROM A WESTERN DISTRICT OF PENNSYLVANIA IN

8    2009.  AND IN THAT CASE THERE WAS A SIMILAR MOTION TO STRIKE

9    A SUPPLEMENTAL DECLARATION SUBMITTED BY AN EXPERT IN RESPONSE

10   TO SUMMARY JUDGMENT AND DAUBERT MOTIONS TO EXCLUDE THEIR

11   OPINIONS, AND THE COURT DENIED THAT AND, YOU KNOW, SAID THAT

12   THE EXPERT SHOULD BE PERMITTED TO DO THAT IN THE CONTEXT OF

13   EXPLAINING THEMSELVES AND PROVIDING MATERIAL FOR THE COURT TO

14   CONSIDER UNDER RULE 104, RULE OF EVIDENCE 104, IN THE DAUBERT

15   INQUIRY.

16        SIMILARLY, THE SOUTHERN DISTRICT OF CALIFORNIA CASE, THE

17   350 WA LLC VERSUS CHUBB GROUP IS A SIMILAR DENIAL OF A MOTION

18   TO STRIKE AN EXPERT DECLARATION SUBMITTED IN RESPONSE TO A

19   DAUBERT MOTION.  AND THEN FINALLY THE PUGH VERSUS LOUISVILLE

20   LADDER CASE IS A FOURTH CIRCUIT DECISION AND IT DOES NOT

21   ADDRESS DIRECTLY THE ISSUE OF WHETHER OR NOT SUCH

22   SUPPLEMENTAL DECLARATIONS OR CLARIFYING DECLARATIONS SHOULD

23   BE PERMITTED.  BUT WHAT IT DOES DO IN A NOTE, NOTE THREE TO

24   THE COURT'S DECISION, IS POINT OUT THAT THE COURT DID HAVE

25   AVAILABLE TO IT AND CONSIDERED ON THE RECORD A SUPPLEMENT --

1   SUCH A SUPPLEMENTAL DECLARATION THAT HAD BEEN JOINTLY

2   SUBMITTED BY TWO OF THE PLAINTIFFS' EXPERTS WHOSE OPINIONS

3   WERE BEING CHALLENGED.

4       AND SO THAT'S JUST AN EXAMPLE OF A DECISION IN THIS

5   CIRCUIT WHERE A DISTRICT COURT HAD TAKEN THAT INTO ACCOUNT

6   AND THE FOURTH CIRCUIT POINTED IT OUT AS SOMETHING THAT, YOU

7   KNOW, WAS FURTHER BASES FOR THE DISTRICT COURT'S DECISION.

8           *THE COURT:* HOW DO WE SQUARE THAT WITH THE LANGUAGE

9   OF THE RULE ITSELF AND THE ADVISORY COMMITTEE NOTES TO RULE

10  26 THAT REQUIRE I THINK OR ADDRESS THE ISSUE THAT

11  MR. TOLLISON RAISED THAT WE HAD BACK IN THE 80'S WHERE YOU

12  JUST -- IT WAS GAMESMANSHIP OF PROVIDING MAYBE A VAGUE IDEA

13  OF WHAT THE OPINION WAS GOING TO BE AND THEN WHEN IT WAS

14  CHALLENGED, THEN THE OPINION WAS MODIFIED, AND IT SORT OF

15  WENT BACK AND FORTH.

16      AND I THINK THAT THE RULES NOW ARE INTENDED TO ESTABLISH

17  A DEADLINE BY WHICH THE DEFENDANTS ARE ENTITLED TO BE

18  PROVIDED THE COMPLETE STATEMENT OF ALL OPINIONS AND THE BASIS

19  FOR THE REASONS THEREFORE UNDER THE RULE.  AND I THINK THE

20  ADVISORY COMMITTEE NOTES THEMSELVES SAY THAT THE EXPERT

21  REPORT IS INTENDED TO SET FORTH THE SUBSTANCE OF THE DIRECT

22  EXAMINATION OF THE EXPERT WITNESS MUST BE DETAILED AND

23  COMPLETE AND MUST STATE THE TESTIMONY THE WITNESS IS EXPECTED

24  TO PRESENT DURING DIRECT EXAMINATION TOGETHER WITH THE

25  REASONS THEREFORE.

1      SO, CAN YOU RECONCILE THE SERIES OF CASES THAT YOU HAVE

2   PRESENTED WITH THOSE ADVISORY COMMITTEE NOTES AND THE TEXT OF

3   THE RULE ITSELF?

4      *MR. JENSEN:* YES, YOUR HONOR, AND I WOULD DO THAT

5   BY GOING BACK TO WHAT I STATED WHEN I WAS STARTING OUT THIS

6   DISCUSSION WHICH IS THIS COURT'S INQUIRY UNDER RULE 702 INTO

7   RELIABILITY AND UNDER THE DAUBERT STANDARD IS A DIFFERENT --

8   IS GOING TO INVOLVE A LOT OF CONSIDERATION OF DETAILS,

9   FACT -- FACTUAL AND SCIENTIFIC DETAILS ABOUT METHODOLOGICAL

10  ISSUES THAT WHILE WILL BE TOUCHED UPON IN BROAD STROKES IN

11  FRONT OF THE JURY, THE NITTY GRITTY OF THOSE DETAILS IS

12  PROBABLY NOT EVER GOING TO BE HEARD BY THE JURY.

13     AND WHAT THAT BRINGS US TO IS -- IN THIS CONTEXT, THE

14  REPORT, ALTHOUGH HIGHLY-DETAILED AND LENGTHY REPORTS,

15  HIGHLY-DETAILED AND LENGTHY DOESN'T INCLUDE ALL OF THE

16  METHODOLOGICAL DETAIL THAT IS DESCRIBED AND LAID OUT MORE-SO

17  IN THE AFFIDAVITS.

18     THE QUESTION OF WHETHER THE AFFIDAVIT TESTIMONY AND

19  THOSE PORTIONS THAT ARE ARGUABLY NOT REFLECTED BY PRIOR

20  DEPOSITION OR REPORTS OF THOSE EXPERTS SHOULD GET IN FRONT OF

21  THE JURY I THINK IS WHAT RULE 26 AND EVERYTHING THAT -- ALL

22  THE LAW THAT SURROUNDS IT ADDRESSES.  I DON'T THINK RULE 26

23  WAS INTENDED TO LIMIT THIS COURT'S -- THE SCOPE OF WHAT THIS

24  COURT SHOULD BE LOOKING AT IN THE CONTEXT OF A DAUBERT

25  INQUIRY.  AND IF IT DID, THEN AGAIN THIS ROUTINE PRACTICE --

1    AND AGAIN, I -- I DO NOT BELIEVE THAT MY EXPERIENCE IS IN ANY

2    WAY UNIQUE OR IN ANY WAY NOT REFLECTED OF WHAT IS THE TYPICAL

3    EXPERIENCE ACROSS FEDERAL COURT PRACTICE, WHICH IS THESE

4    KINDS OF AFFIDAVITS ARE ROUTINELY CONSIDERED AND SUBMITTED IN

5    RESPONSE TO THESE, THESE MOTIONS.

6         AND AGAIN, WHETHER OR NOT THE STUFF THAT'S IN THOSE

7    AFFIDAVITS THAT'S NEW OR DIFFERENT OR IN ADDITION TO WHAT HAD

8    BEEN PREVIOUSLY IN THE REPORTS AND OR THE DEPOSITION

9    TESTIMONY SHOULD GET IN FRONT OF THE JURY, THAT'S FOR RULE

10   26.  BUT FOR RULE 702 THIS COURT CAN AND SHOULD TAKE INTO

11   ACCOUNT THOSE AFFIDAVITS.

12         THE COURT:  IT SEEMS LIKE IT'S -- THAT ARGUMENT

13   KIND OF DOES AN END-AROUND TO THE RULE 26 ISSUES.  IT'S

14   BASICALLY, I THINK WHAT YOU'RE SAYING IS, ALL RIGHT, YOU

15   DON'T HAVE TO ADDRESS THE ADMISSIBILITY ISSUE OR THE

16   SUPPLEMENTATION ISSUE, BUT I'M GOING TO SHOW YOU THE DEFECTS

17   IN THE DEFENDANTS' ARGUMENTS IN CHALLENGING MY EXPERT, AND

18   THEN ONCE I CONVINCE YOU, WE CAN PRETEND THAT THAT NEVER

19   HAPPENED AND THAT WASN'T BEFORE THE COURT BECAUSE WE'LL BE

20   ABLE TO RELY ON THE LESS-SPECIFIC EXPERT OPINION THAT'S

21   BASICALLY DIRECTLY RELEVANT TO CAUSATION, BUT USE AS -- I

22   THINK THE COURT'S IMPRIMATUR TO SAY WE'RE OKAY WITH THE

23   SUFFICIENCY OF THIS EXPERT, AND I'M NOT SURE THAT'S WHAT THE

24   RULES INTENDED.

25         MR. JENSEN:  WELL, I DON'T DISAGREE WITH YOUR

1    CHARACTERIZATION FACTUALLY OF WHAT'S HAPPENING.  I DO

2    DISAGREE THAT THEIR CHARACTERIZATION OF LEGALLY THAT'S AN END

3    AROUND RULE 26 BECAUSE, AGAIN, I THINK RULE 26 IS INTENDED TO

4    AVOID SITUATIONS WHERE THE DEFENDANTS OR WHICHEVER PARTY IS

5    BEING PREJUDICED BY MODIFICATION OF OPINIONS THAT ARE GOING

6    TO ULTIMATELY SEE THE LIGHT OF THE DAY FOR -- IN FRONT OF THE

7    JURY AND NOT ABOUT, YOU KNOW, THIS COURT CAN AND SHOULD IN MY

8    VIEW TAKE INTO ACCOUNT LOTS OF HEARSAY MATERIALS AND OTHER

9    KINDS OF NITTY GRITTY, YOU KNOW, MATERIALS GET INTO THE HEART

10   OF PUBLISHED STUDIES, FOR EXAMPLE, THAT THE JURY MAY HEAR

11   SNIPPETS OF OR SUMMARIES OF, BUT THEY'RE CERTAINLY NOT GOING

12   TO GET ADMITTED IN EVIDENCE AND THEY ARE NOT GOING TO GO BACK

13   AT THE END OF THE DAY INTO THE JURY ROOM TO DELIBERATIONS AND

14   IF THEY ARE GOING TO BE PART OF THIS COURT'S RECORD AND A

15   CRITICAL PART OF THIS COURT'S RECORD FOR PURPOSES OF RULE

16   702.

17        AND SO I JUST THINK RULE 26 AND RULE 702 ARE LOOKING AT

18   DIFFERENT ISSUES, AND THAT'S THE WAY FEDERAL PRACTICE HAS

19   DEVELOPED IN THIS CONTEXT OF THESE DAUBERT INQUIRIES.  I JUST

20   DON'T THINK THAT THERE IS AN INCONSISTENCY THERE.  NOW AGAIN,

21   IF YOU GOT A CHANGE IN OPINION, IF YOU HAVE GOT THAT, YOU

22   KNOW, IS GOING TO GO IN FRONT OF THE JURY OR THE PLAINTIFF

23   WANTS IT TO GET IN FRONT OF THE JURY, THEN, YOU KNOW,

24   THOSE -- THOSE THINGS, THOSE RULE 26 ISSUES I THINK COME MORE

25   DIRECTLY IMPLICATED.

1          *THE COURT:*  OKAY.

2          *MR. JENSEN:*  AND THIS IS JUST, YOU KNOW, RULE 104

3    WHICH PROVIDES EXPLICITLY THE COURT IS NOT BOUND BY EVIDENCE

4    RULES EXCEPT THOSE ON PRIVILEGE.

5          AND YOU KNOW, AND BUT NOW GOING TO THE ISSUE THAT, THAT,

6    YOU KNOW, IS SET OUT IN OUR BRIEFS, WHEN YOU CUT TO THE CHASE

7    OF WHAT THE COMPLAINTS ARE ABOUT WHAT IS NEW OR DIFFERENT IN

8    THE AFFIDAVITS THAT HAVE BEEN PRESENTED HERE, THEY ARE NOT

9    REALLY NEW.  THEY SEEK TO ELABORATE UPON -- ELABORATE UPON

10   AND EXPLAIN THE REPORTS OF THESE TWO EXPERTS, AND THAT'S THE

11   STANDARD THAT IS PERMISSIBLE AS ARTICULATED IN THIS MULDROW

12   CASE FROM THE DC CIRCUIT WHICH IS IN OUR BRIEF.

13         AND YOU KNOW, I DON'T THINK SAFETY KLEEN WENT IN DEPTH

14   AND MR. ALOST WENT INTO DEPTH WITH RESPECT TO THE SPECIFIC

15   PROBLEMS.  HE JUST SAYS WE SHOULD -- YOU SHOULD STRIKE THE

16   AFFIDAVIT IN ITS ENTIRETY.  WELL, THAT SEEMS BOTH TO BE

17   UNNECESSARY IN LIGHT OF ALTERNATIVES THAT THIS COURT

18   UNDERTAKE THAT ARE LESSER -- LESS DRAMATIC COURSES OF RELIEF

19   LIKE ALLOWING THEM TO TAKE ANOTHER DEPOSITION, FOR EXAMPLE.

20         *THE COURT:*  I DON'T THINK THAT DOG IS GOING TO HUNT

21   WITH JUDGE LEWIS.  I--

22         *MR. JENSEN:*  THAT DOG IS NOT GOING TO HUNT WITH

23   RESPECT TO...

24         *THE COURT:*  ADDITIONAL DISCOVERY.  THAT'S JUST

25   MY -- THAT'S MY HUMBLE OPINION.  I COULD BE WRONG, BUT I

1    THINK SHE'S READY TO TEE THIS UP FOR TRIAL.

2            MR. JENSEN:  ALL RIGHT.

3            THE COURT:  SO I DON'T REALLY SEE THAT AS A VIABLE

4    ALTERNATIVE IN LIGHT OF DISCOVERY HAVING CLOSED I THINK

5    DECEMBER OR SO.  SO, I THINK THAT THAT, YOU KNOW, THEN THE

6    QUESTION BECOMES--

7            MR. JENSEN:  HOW PREJUDICIAL IS IT.

8            THE COURT:  WELL, HOW -- YOU DO THE WHOLE ANALYSIS.

9    I SUPPOSE THAT THERE'S SOMETHING THAT IS UNCOMFORTABLE IN THE

10   TIMING OF THESE OPINIONS.  YOU KNOW, MY TIMELINE, AND I THINK

11   A LITTLE BIT CHRONOLOGICALLY I THINK THAT THE EXPERT REPORTS

12   WERE DUE AND SUBMITTED IN DECEMBER OF 2013, DOCTORS HARRISON

13   AND STEWART WERE DEPOSED MAY, JUNE, OCTOBER, EACH TWICE --

14   WHICH I THINK IS SIGNIFICANT, THAT THAT WAS A SIGNIFICANT

15   EXPENSE AND OPPORTUNITY THAT THEIR OPINIONS COULD BE VETTED

16   OUT AND THEN AFTER THE CLOSE OF DISCOVERY A FULL YEAR.  SAY

17   DISCOVERY WAS DECEMBER OF 2014; RIGHT?

18       THEN AFTER THE PRETRIAL DISCLOSURES DEADLINE OF

19   FEBRUARY 1ST, THEN THE DAUBERT MOTIONS WERE FILED

20   FEBRUARY 13TH IDENTIFYING THE DEFICIENCIES OR THE ALLEGED

21   DEFICIENCIES IN THE EXPERT REPORTS.  AND IT WAS -- REALLY IT

22   APPEARS ONLY IN RESPONSE TO THE MOTIONS FOR SUMMARY JUDGMENT

23   CHALLENGES THAT THE AFFIDAVIT, AFFIDAVITS, WERE PRODUCED AND

24   ADDRESSING I THINK SOME OF THE CHALLENGES THAT THE DEFENDANTS

25   PRESENTED.  THAT MAKES ME FEEL UNCOMFORTABLE OR A LITTLE --

1              MR. JENSEN: WELL...

2              THE COURT: -- IT'S COINCIDENTAL.

3              MR. JENSEN: IT'S NOT COINCIDENTAL, YOUR HONOR.

4    IT'S NOT COINCIDENTAL. AS AN OFFICER OF THIS COURT I'M NOT

5    GOING TO TELL YOU THAT THOSE AFFIDAVITS WERE DONE FOR ANY

6    REASON OTHER THAN -- AND IN THE AFFIDAVITS THEMSELVES, AS

7    COUNSEL POINTED OUT, SAY THEY ARE IN RESPONSE TO --

8    SPECIFICALLY TO THE CHALLENGES TO THESE FOLKS' TESTIMONY.

9    I'M NOT TRYING TO HIDE THAT AT ALL.

10             THE COURT: WELL, AND I SUPPOSE THAT'S THE ISSUE

11   FOR ME IF THE -- IF REALLY THOSE OPINIONS WERE FORMULATED IN

12   THE AFFIDAVITS FOR THE PURPOSE OF THIS LITIGATION IN ORDER TO

13   AVOID SUMMARY JUDGMENT CHALLENGES, THEN THE QUESTION BECOMES

14   WHAT IS THE RELIABILITY OF THE OPINIONS WHEN IT IS FOR A

15   PARTICULAR LITIGATION AS OPPOSED TO, HEY, WE ARE GOING TO GET

16   THE BEST PERSON, THE EXPERT IN THE FIELD, AND I THINK THAT'S

17   HOW IT --

18             MR. JENSEN: OKAY. YOU--

19             THE COURT: -- THE RULES ARE SET UP TO INTEND TO

20   UTILIZE EXPERT WITNESSES IN ORDER TO EXPLAIN SCIENTIFIC OR

21   TECHNOLOGICAL OR PARTICULARIZED TESTIMONY THAT IS OUTSIDE OF

22   THE REACH OF LAY PEOPLE, NOT DESIGNED TO ALLOW PARTIES TO GET

23   THE HIRED GUN TO COME IN TO SAY WHATEVER THE PARTIES WANT,

24   AND SO THAT'S -- THAT'S WHERE THE ISSUE IS FOR ME.

25             MR. JENSEN: WELL, AND I APOLOGIZE, YOUR HONOR.

1    WHAT I WAS SAYING IS THAT THE EXISTENCE OF THE AFFIDAVITS,

2    THE PREPARATION OF THE AFFIDAVITS, WAS DIRECTLY IN RESPONSE

3    TO DAUBERT, AND NO DOUBT ABOUT THAT.  THE OPINIONS REFLECTED

4    IN THOSE AFFIDAVITS ARE A EFFORT BY BOTH OF THESE TWO

5    WITNESSES TO DESCRIBE IN FURTHER DETAIL IN LIGHT OF THE

6    SPECIFIC CRITIQUES TO THEIR METHODOLOGIES THAT WERE DESCRIBED

7    AND ARTICULATED TO GIVE THIS COURT FURTHER INFORMATION ABOUT

8    THE METHODOLOGIES USED TO REACH THE CONCLUSIONS AND NOT TO

9    CHANGE THEIR OPINIONS AT ALL.  OKAY.

10        SO THAT'S WHERE, YOU KNOW, TO DESCRIBE THOSE AFFIDAVITS

11    AS NEW OPINIONS REACHED TO KEEP THE PLAINTIFFS' CASE ALIVE I

12    THINK IS ENTIRELY UNFAIR.  EVEN THOUGH I ACKNOWLEDGE FULLY

13    THAT THE AFFIDAVITS WERE PREPARED IN DIRECT RESPONSE TO THE

14    CRITIQUES UNDER DAUBERT AND THE MOTIONS FILED UNDER DAUBERT,

15    THEY WERE -- THEY WERE PREPARED SO THAT THIS COURT IN LIEU OF

16    LIVE EXPERT TESTIMONY AT A HEARING COULD SEE EXACTLY WHAT WAS

17    GOING ON UNDER THE HOOD SO TO SPEAK METHODOLOGICALLY WITH

18    RESPECT TO WHAT THESE EXPERTS DID IN REACHING THEIR OPINIONS

19    AND ADDRESSING IN SOME DETAIL THE CRITIQUES ABOUT ALL OF THE

20    ISSUES THAT ARE RAISED.  AND THAT, AGAIN, PROCEDURALLY THAT

21    PRACTICE HAPPENS ALL THE TIME.

22        *THE COURT:*  THAT DOESN'T MAKE IT RIGHT, YOU KNOW.

23    I THINK THAT THERE'S ALWAYS THIS ARGUMENT THAT, YOU KNOW,

24    THIS IS THE WAY WE DO IT IN THE OTHER COURTS OR THIS IS THE

25    WAY -- BUT IF YOU CAN -- WHAT I SWORE WAS TO UPHOLD MY --

1  UPHOLD THE LAW.  I TOOK AN OATH TO DO THAT.  AND THE CASE LAW

2  THAT I NEED TO RELY ON IS SUPREME COURT OR PUBLISHED FOURTH

3  CIRCUIT OPINION THAT CAN GUIDE ME ALONG WITH THE RULES AND

4  INTERPRETATION OF THE RULES.

5       AND SO, WHILE MANY COURTS IN CALIFORNIA MAY HAVE

6  ADDRESSED SOME ISSUES, WE IN THE FOURTH CIRCUIT ARE LOATHE TO

7  CITE THE NINTH CIRCUIT CASES.  THAT'S JUST AS A PRACTICE.

8  AND SO, WE DON'T REALLY LOOK TO SEE WHAT EVERYBODY ELSE DOES,

9  BUT WE LOOK TO SEE WHAT DOES THE LAW PROVIDE AND WHAT DOES

10  THE LAW COMMAND, AND SO THERE ARE -- THAT'S WHERE MY

11  INTERESTS LIES IN SEEING WHAT THE RULE SAYS, SEEING IF IT'S

12  CLEAR, AND IF IT NEEDS INTERPRETATION, THEN GOING TO THE

13  BINDING AUTHORITY.  AND IF THE BINDING AUTHORITY ISN'T THERE,

14  THEN TO CONSIDER ANY PERSUASIVE AUTHORITY THAT CAN BE MADE.

15  AND SO, THAT FOR ME IS THE CHALLENGE ON THIS CASE.

16       MR. JENSEN:  WELL IF YOU LOOK, YOUR HONOR, AT THE

17  LAST CASE, THE 350 WA LLC CASE, AND THAT THE -- YES, THAT'S

18  A -- THE DISTRICT COURT IN CALIFORNIA, SO FALLS IN THE NINTH

19  CIRCUIT CATEGORY.  BUT WHAT I WANT TO POINT YOU TO--

20       THE COURT:  THEY DO GET IT RIGHT SOMETIMES.

21       MR. JENSEN:  THERE'S QUOTES IN THAT CASE THAT I

22  WANT TO POINT YOU TO FROM BOTH THIRD CIRCUIT'S DECISION IN

23  ODDI AND THE SUPREME COURT'S DECISION IN KUMHO TIRE ABOUT

24  THIS CONSIDER -- WHAT THE COURT CAN AND SHOULD CONSIDER.  AND

25  IF YOU LOOK AT THE BOTTOM OF PAGE 21 OF THE WESTLAW PRINTOUT

1    HERE.  IF YOU'RE WITH ME, I THINK I TABBED IT FOR YOU.

2            *THE COURT:*  YES, SIR.

3            *MR. JENSEN:*  IF THE -- THE PARAGRAPH THAT STARTS

4    WITH STAR 30.  THE LAST FULL SENTENCE OF THAT PARAGRAPH

5    BEGINS, IN DETERMINING WHETHER AN EXPERT'S PROPOSED TESTIMONY

6    IS RELEVANT AND RELIABLE, THE TRIAL COURT MAY CONSIDER OFFERS

7    OF PROOF, AFFIDAVITS, STIPULATIONS OR LEARNED TREATISES IN

8    ADDITION TO TESTIMONIAL OR OTHER DOCUMENTARY EVIDENCE AND OF

9    COURSE LEGAL ARGUMENT.  AND THERE'S THE CITATION TO ODDI.

10        AND THEN IF YOU GO UP TO THE NEXT PAGE -- OR EXCUSE

11   ME -- THE NEXT COLUMN, THE TOP OF THE NEXT COLUMN IT SAYS,

12   THE DISTRICT COURT HAS BROAD AUTHORITY TO CONSIDER

13   DECLARATIONS AND OTHER DOCUMENTARY EVIDENCE IN ASSESSING THE

14   RELEVANCE AND RELIABILITY OF AN EXPERT'S PROPOSED TESTIMONY,

15   AND THEN THERE'S A CITATION TO THE SUPREME COURT'S DECISION

16   IN KUMHO TIRE.

17        AND SO, YOU KNOW, I DON'T THINK THAT THIS IS -- THIS

18   PROCEDURE THAT I'M -- I HAVE USED HERE, THAT THE PLAINTIFF

19   HAS USED TO SUPPLEMENT THE DISCUSSION OF THE METHODOLOGIES

20   APPLIED BY THE EXPERTS WITH A AFFIDAVIT SUBMITTED DIRECTLY IN

21   RESPONSE TO A MOTION IS SOMETHING THAT IS -- IS EITHER NEW TO

22   THE FEDERAL COURTS OR, YOU KNOW, IT'S -- IT'S BEEN EXPRESSLY

23   CONTEMPLATED AND APPROVED BY OUR SUPREME COURT.

24        AND SO, AND IF AGAIN IF THIS COURT HAD EXERCISED ITS

25   DISCRETION TO ASK DR. STEWART AND DR. HARRISON TO BE HERE, I

1    KNOW WE WOULD BE PUTTING ON A DIRECT EXAMINATION THAT, YOU

2    KNOW, SAID THE SAME THINGS THAT ARE IN THOSE AFFIDAVITS. SO,

3    IF THE COURT HAS DISCRETION TO HEAR THAT AND CONSIDER THAT,

4    WHY ARE THESE AFFIDAVITS OUT OF BOUNDS?

5         THE COURT: BECAUSE I THINK THAT THE OPPORTUNITY

6    FOR CROSS-EXAMINATION IS LOST. SO, HERE WHEN YOU PROVIDE AN

7    AFFIDAVIT, THEN YOU HOLD THE CARDS AND YOU HOLD ALL THE

8    QUESTIONS AND ALL THE ANSWERS IN YOUR HAND. AND WHEN THE

9    WITNESS IS ON THE STAND, THEY ARE SUBJECTED TO

10   CROSS-EXAMINATION IN DETAIL AND THERE'S AN OPPORTUNITY TO

11   HAVE THEM CLARIFY AND TO BACK-TRACK AND TO REVISE.

12       THAT IS A MORE ROBUST ENVIRONMENT FOR PROVIDING EVIDENCE

13   OR TESTIMONY OR ARGUMENT THAN IN DRAFTING AN AFFIDAVIT OR

14   HAVING COUNSEL DRAFT AN AFFIDAVIT AND HAVE THEM SIGN, YOU

15   KNOW, AND SO THAT'S THE DIFFERENCE. I MEAN, I THINK THERE'S

16   A SIGNIFICANT DIFFERENCE--

17       MR. JENSEN: WELL, I DON'T DISAGREE WITH ANYTHING

18   YOU JUST SAID EXCEPT FOR THE LEGAL IMPACT OF THAT IF THE

19   COURTS -- FEDERAL COURTS -- BROADLY WERE TO TAKE THE POSITION

20   THAT THE DEFENDANTS ARE TAKING HERE WOULD MEAN THAT IF THE

21   PLAINTIFFS WANTED IT OR THE -- FRANKLY IF EITHER SIDE WANTED

22   IT, THAT IT WOULD BE -- IT WOULD FOLLOW FROM WHAT THE COURT

23   JUST SAID; THAT LIVE TESTIMONY NEEDS TO HAPPEN IN THIS

24   CONTEXT.

25       THE COURT: I DON'T KNOW THAT THAT'S THE NECESSARY

1    COROLLARY.  I THINK THE TAKE-HOME LESSON IS TO PROVIDE A FULL

2    AND COMPLETE EXPERT OPINION THAT DOES NOT REQUIRE

3    SUPPLEMENTATION OR DOES NOT REQUIRE SO MUCH SUPPLEMENTATION

4    TO CREATE SOME QUESTIONS OF INCONSISTENCY DOWN THE ROAD.

5    HAVING SAID THAT, I'M NOT -- I'M NOT MAKING A DECISION ON

6    THAT ISSUE.

7        I THINK THAT THE REAL RUBBER IS GOING TO HIT THE ROAD ON

8    THE SUBSTANTIVE DAUBERT MOTIONS THIS AFTERNOON AND TOMORROW

9    WHERE WE CAN SEE WHETHER IT REALLY EVEN MAKES A DIFFERENCE,

10   YOU KNOW, THE NEW OPINIONS, IF THEY ARE NEW, OR THE

11   CLARIFICATION OF THE METHODOLOGY, WHETHER THAT HAS AN IMPACT

12   ON THE DAUBERT ANALYSIS.

13        *MR. JENSEN:*  WELL, YOUR HONOR, IN THE CONTEXT OF

14   CASES LIKE ODDI IN THE THIRD CIRCUIT WHERE ONE PARTY IS

15   SAYING THE DISTRICT COURT SHOULD HAVE HAD A HEARING WHERE

16   THERE WAS LIVE TESTIMONY AND THE ULTIMATE RESOLUTION OF THAT

17   BY THE COURT OF APPEALS IS TO SAY, NO, THAT WASN'T NECESSARY

18   FOR THE COURT TO DO, AND ONE OF THE PRIMARY REASONS WHY IT

19   WAS NOT NECESSARY WAS THE COURT HAD BENEFIT OF THE SAME TYPE

20   OF, YOU KNOW, WHETHER YOU WANT TO CALL THEM SUPPLEMENTAL OR

21   REBUTTAL AFFIDAVITS OR WHATEVER YOU WANT TO CALL THEM, THE

22   SAME TYPE OF AFFIDAVITS OR DECLARATIONS THAT HAVE BEEN

23   SUBMITTED IN THIS CASE I THINK DOES SUGGEST THAT, YOU KNOW,

24   THIS ISSUE ABOUT BEING TIED UP WITH THE REQUIREMENTS OF RULE

25   26 AND THE EFFECTS OF THAT UNDER RULE 37 IN THE CONTEXT OF

1    THE RULE 702 INQUIRY ARE NOT APPROPRIATE.

2         *THE COURT:*  OKAY.  VERY GOOD.  DID YOU GET THROUGH

3    YOUR POWERPOINT OR IS THERE MORE TO SAY HERE?

4         *MR. JENSEN:*  WELL, I WOULD JUST SAY AND WITH

5    RESPECT TO THIS SLIDE, YOUR HONOR, YOU KNOW, THIS -- THE

6    SPECIFIC COMPLAINTS ABOUT WHAT IS NEW IS NOT REALLY NEW.  NOW

7    AGAIN, THERE'S FAR MORE DETAIL THAN THERE WAS, BUT DR.

8    STEWART'S REPORT DISCUSSES SPECIFICALLY AND EXPRESSLY THE

9    SHEEHAN ARTICLE THAT DESCRIBES MUCH OF THE TESTING DATA THAT

10   WAS THE TESTING DONE FOR BENZENE BY SAFETY KLEEN, THE

11   AFFIDAVIT PROVIDES DETAILED REASONS THAT ARE NOT IN THE

12   REPORT ABOUT WHY DR. STEWART DID NOT INCORPORATE ALL OF THAT

13   TESTING DATA INTO HIS MODELING, BUT IT WAS CLEAR FROM THE

14   OUTSET THAT HE DID NOT DO THAT, THAT HE HAD CHOSEN NOT TO DO

15   THAT.

16       HIS DEPOSITION GOES INTO SOME DETAIL ABOUT, I WOULD NEED

17   X, Y AND Z BEFORE I WOULD BE ABLE TO DO THAT AND I DON'T HAVE

18   THAT INFORMATION WITH RESPECT TO THE TESTING THAT YOU HAVE

19   PROVIDED AND THAT YOU CONDUCTED.

20       AND FURTHERMORE, ON THE SPECIFIC ISSUE OF A PRIMARY

21   PROBLEM THAT'S LAID OUT IN DETAIL IN THE AFFIDAVIT, WHICH IS

22   BECAUSE SAFETY KLEEN'S TESTING OF ITS SOLVENTS FOR BENZENE

23   CONTENT WAS DONE THROUGH THE USE OF COMPOSITE SAMPLING THAT

24   RESULTED IN VOLATILIZATION OF BENZENE, AND THEREFORE, YOU

25   KNOW, BY THE TIME THE ACTUAL TEST GETS CONDUCTED, THE

1   MATERIAL -- THE AMOUNT OF BENZENE THAT'S LEFT IN THAT

2   MATERIAL IS NOT REPRESENTATIVE OF WHAT WAS ORIGINALLY IN THE

3   MATERIAL.  WHILE THAT ISSUE WAS NOT LAID OUT IN DETAIL IN THE

4   DEPOSITION OF DR. STEWART, HE DID DISCUSS THE FACT THAT IN

5   FACT IT WAS COMPOSITE SAMPLING.

6        SO, AND GENERALLY SAID THAT THERE WAS LACK OF QUALITY

7   CONTROL INFORMATION AVAILABLE TO HIM REGARDING SAFETY KLEEN'S

8   BENZENE TESTING DATA.  SO ALL OF THAT WAS NOT NEW OPINIONS,

9   BUT AGAIN, AS JUST FURTHER EXPLANATION OF THE OPINIONS HE

10  HAD.

11       MOVING ON, THAT AGAIN THERE'S A DIFFERENCE BETWEEN

12  PROVIDING FURTHER FACTUAL SUPPORT FOR THE OPINIONS AND

13  PROVIDING A DIFFERENT OPINION.  AND THAT'S WHAT PARAGRAPHS 48

14  AND 49 DO OF DR. STEWART'S AFFIDAVIT.  AND SIMILARLY, THE

15  COMPARISON OF HIS MODELING RESULTS TO THE AIRBORNE EXPOSURES

16  MEASURED AND RECORDED IN A PUBLISHED ARTICLE AND IN THE 1990

17  NATLSCO STUDY THAT WAS PRODUCED BY SAFETY KLEEN WERE NOT A

18  CHANGE OF HIS OPINIONS BUT JUST REINFORCE WHAT HE HAD ALREADY

19  EXPRESSED.

20       I DON'T KNOW IF YOU WANT ME TO TALK ABOUT DR. HARRISON'S

21  AFFIDAVIT WITH RESPECT TO THAT BUT, YOU KNOW, SIMILARLY

22  THERE'S REALLY NOTHING NEW IN DR. HARRISON'S AFFIDAVIT THAT

23  HAD NOT BEEN PREVIOUSLY DESCRIBED.

24            *THE COURT:*  ALL RIGHT.  VERY GOOD.  ANYTHING

25  FURTHER, MR. JENSEN, ON THIS ISSUE?

1        ANY REPLY?

2            *MR. ALOST:*  YOUR HONOR, EXTREMELY BRIEFLY, I WANT

3    TO KEEP THIS ON TRACK TODAY AND I KNOW YOU DO AS WELL.  IN

4    ITS MOST SIMPLISTIC FASHION TO ME, RULE 26 SAYS WHAT SHOULD

5    BE DISCLOSED AND WHEN.  RULE 37 SAYS WHAT HAPPENS WHEN YOU

6    DON'T.  RULE 37 IS THE TEETH BEHIND RULE 26.  AND RULE 37

7    SAYS IF YOU DON'T PRODUCE TIMELY BY RULE 26(A) OR E, THE

8    PARTY WHO FAILS TO DISCLOSE IS NOT ALLOWED TO USE THAT

9    INFORMATION OR WITNESS TO SUPPLY EVIDENCE ON A MOTION AT A

10   HEARING OR AT TRIAL.

11       I CAN'T WRAP MY BRAIN AROUND THE IDEA OF SOMETIMES IT'S

12   OKAY AND SOMETIMES IT'S NOT.  TO ME RULE 37 IS EVIDENT.  IF A

13   DISCLOSURE ISN'T TIMELY AND IF THERE'S NOT A SHOWING OF

14   SUBSTANTIAL JUSTIFICATION OR HARMLESSNESS, THAT OPINION OR

15   THAT NEW INFORMATION OR THAT NEW DISCLOSURE IS OUT FOR ALL

16   PURPOSES.

17       ALSO, YOUR HONOR, I -- I HAVE BEEN HANDED THESE CASES

18   JUST A FEW SECONDS AGO.  I DON'T WANT TO GET DOWN IN THE

19   WEEDS ON THEM.  WHAT I WOULD SAY IS THAT OF THE ODDI AND PUGH

20   CASES THAT COUNSEL JUST REFERRED TO FOR THE FIRST TIME TODAY,

21   I DON'T FIND ANY DISCUSSION OF TIMELINESS.  I JUST COULDN'T

22   FIND A DISCUSSION OF USING AFFIDAVITS IN LIEU OF LIVE

23   TESTIMONY.

24       IN THE PRITCHARD CASE THERE WAS AN OBJECTION AS TO

25   TIMELINESS AND APPARENTLY THE COURT EVALUATED THE NEW

1    OPINIONS OR THE CHALLENGED OPINIONS IN A SUPPLEMENTAL REPORT,

2    AND ON -- I'M LOOKING FOR A PAGE NUMBER, YOUR HONOR -- ON

3    PAGE 287 OF THE OPINION SAID, AFTER CONSIDERING THE

4    SUBMISSIONS, IT'S CLEAR THAT DR. OMALU'S STATEMENT IN THE

5    CHALLENGED DECLARATION ARE CONSISTENT WITH THE OPINIONS SET

6    FORTH IN HIS EXPERT REPORT AND DURING HIS DEPOSITION.

7         SO WHETHER WE QUIBBLE WITH IT OR NOT, AT LEAST IN THAT

8    CASE THE AFFIDAVIT WAS EVALUATED FOR TIMELINESS AND THE COURT

9    DETERMINED THAT IT WAS CONSISTENT WITH PRIOR OPINIONS.

10        AS FOR THE 350 WA LLC OPINION, YOUR HONOR, I CAN'T

11   SQUARE THAT FINDING AND THAT RESULT WITH THE SOUTHERN STATES

12   CASE, WITH CAMPBELL, OR WITH THE OTHER CASES THAT WE HAVE

13   CITED AND TALKED ABOUT TODAY FROM THE DISTRICT COURTS IN THE

14   FOURTH CIRCUIT.

15        YOUR HONOR, UNLESS YOU HAVE ANY QUESTIONS, I'M GOING TO

16   STOP TALKING.

17            THE COURT:  VERY GOOD.  THANK YOU.

18            MR. ALOST:  THANK YOU, YOUR HONOR.

19            THE COURT:  WE'RE A LITTLE BEHIND SCHEDULE.  I

20   APOLOGIZE FOR THAT.  BUT --

21            MR. JENSEN:  MY FAULT.

22            THE COURT:  -- NO, NO, NOT AT ALL.  BUT I THINK

23   THAT WE STILL CAN -- CAN GET A LOT DONE TODAY.  SO, IT'S

24   ABOUT 12:30, 12:33.  SO, WHY DON'T WE TAKE -- IS AN

25   HOUR-AND-A-HALF BREAK OKAY WITH EVERYONE?  GIVE YOU

```
1    SUFFICIENT TIME TO GO AND GET SOMETHING TO EAT AND COME BACK?

2            MR. TOLLISON:  IT'S UP TO YOU, YOUR HONOR.

3            MR. JECKEL:  THAT'S FINE.

4            MR. ALOST:  CERTAINLY, YOUR HONOR.

5            THE COURT:  OKAY.  LET'S GO DO THAT.  AND SO, LET'S

6    TRY TO BE BACK HERE AT 2:00.  THAT GIVES EVERYBODY AN HOUR

7    AND A HALF.  AND SO, LET'S GET READY BACK TO GO AT 2:00 AND

8    WE'LL PROBABLY GO UNTIL ABOUT 3:30 OR SO TO TAKE A BREAK AND

9    TRY TO WRAP UP BY 5:30 SO WE CAN LET THE STAFF GO.  OKAY?

10   ALL RIGHT.

11           MR. TOLLISON:  WE ARE OKAY TO LEAVE EVERYTHING

12   HERE, YOUR HONOR; RIGHT?

13           THE COURT:  YES.  WE WILL LOCK THE COURTROOM SO

14   EVERYTHING IS SECURE.

15           MR. TOLLISON:  THANK YOU.

16           THE COURT:  OKAY?  THANK YOU.

17      (WHEREUPON, COURT WAS IN RECESS FOR LUNCH.)

18           THE COURT:  ALL RIGHT.  WE ARE BACK ON THE RECORD

19   IN THIS CASE.  DID EVERYONE HAVE A GOOD LUNCH?  GOOD.  GOOD.

20   THE COURTROOM DEPUTY MARY TELLS ME THAT Y'ALL MIGHT BE

21   WANTING TO SWITCH AROUND FOR ARGUMENTS?

22           MR. MCGOLDRICK:  YES, YOUR HONOR, JUST BECAUSE

23   THERE'S NO MONITOR AND THAT'S WHERE I WAS SITTING, SO I WAS

24   JUST GOING--

25           THE COURT:  OH, I SEE.  YOU HAVE SWITCHED ALREADY.
```

1    OKAY.

2            MR. MCGOLDRICK:  IS THAT ALL RIGHT?

3            THE COURT:  I'M GOOD.  LET ME JUST GET SETTLED HERE

4    AND THEN...  I WAS AFRAID YOU WERE GOING TO SAY YOU SWITCHED

5    THE MOTIONS THAT WE ARE GOING TO ARGUE AND I WAS GOING TO

6    HAVE TO GO LUG ANOTHER SET OF -- BUT YOU WERE JUST TALKING

7    ABOUT IN THE COURTROOM, SO VERY GOOD.  VERY GOOD.

8        SO I BELIEVE THAT WE ARE GOING TO TAKE UP DR. HARRISON'S

9    MOTION, SET OF MOTIONS TO EXCLUDE THE OPINION OF DR.

10   HARRISON; IS THAT CORRECT?

11           MR. MCGOLDRICK:  YES, YOUR HONOR, THAT'S CORRECT.

12           THE COURT:  OKAY.  VERY GOOD.  SO, THERE ARE A

13   COUPLE OF DIFFERENT SETS OF MOTIONS AND I'M GOING TO LET YOU

14   ALL DECIDE AND TELL ME WHO IS GOING TO ARGUE ON THE BASIS OF

15   WHICH MOTION.

16           MR. MCGOLDRICK:  THANK YOU, YOUR HONOR.  JAMES

17   MCGOLDRICK ON BEHALF OF SAFETY KLEEN.  BECAUSE WE ARE THE

18   ONLY PARTY THAT FILED A MOTION BASED ON GENERAL CAUSATION AND

19   GENERAL CAUSATIONS, THE QUESTION ANSWER BEFORE YOU GET TO THE

20   SPECIFIC WORK, WE ARE GOING TO GO FIRST IF THAT'S ALL RIGHT.

21           THE COURT:  ALL RIGHT.  VERY WELL.

22           MR. MCGOLDRICK:  YOUR HONOR, BENZENE IS FOUND

23   EVERYWHERE.  THE COURT'S AWARE OF THAT AT THIS POINT.  BUT

24   IT'S AN IMPORTANT CONCEPT GIVEN HARRISON'S METHODOLOGIES AND

25   SOME OF HIS VIEWS SUCH AS NO SAFE THRESHOLD.  THERE'S BENZENE

```
 1    IN AUTOMOBILE EXHAUST.  THAT'S PROBABLY THE BIGGEST

 2    CONTRIBUTOR ALONG WITH FOREST FIRES TO WHY WE ARE BREATHING

 3    IT RIGHT NOW IN AMBIENT AIR.  GASOLINE HAS BENZENE.  DRINKING

 4    WATER, FOODS.  JUST ABOUT EVERY COMMON HOUSEHOLD PRODUCT

 5    THAT'S PETROLEUM-DERIVED INCLUDING VASELINE, SCENTED CANDLES

 6    AND SUCH.

 7         BENZENE ITSELF IS A COLORLESS LIQUID WITH A SWEET ODOR.

 8    IT'S MADE BOTH FROM NATURAL PROCESSES AND HUMAN ACTIVITY, AND

 9    AGAIN IT'S IN ALL KINDS OF THINGS FROM CRUDE OIL TO PENS,

10    TAPES, TOBACCO SMOKE, ET CETERA, AND OF COURSE IT'S ALSO IN

11    MINERAL SPIRITS.

12         CAN YOU ACTUALLY GO TO STEWART SLIDE THREE AND FOUR,

13    PLEASE?  THREE FIRST, PLEASE.  THANKS.  THREE.  THANKS.

14    BEFORE WE GET INTO BENZENE CONTENT IN TERMS OF PARTS PER

15    MILLION, I THINK IT'S IMPORTANT JUST TO BRIEFLY GO OVER WHAT

16    A PART PER MILLION IS.  IT REFERS TO TINY, TINY AMOUNTS THAT

17    ARE REALLY HARD TO EXPRESS AS A PERCENTAGE BECAUSE YOU HAVE A

18    LOT OF LEADING ZEROS.  AND BY WAY OF EXAMPLE, 1 PERCENT IS

19    10,000 PARTS PER MILLION.  GASOLINE, FOR EXAMPLE, IF IT'S

20    THREE OR 4 PERCENT IS 30 TO 40,000 PARTS PER MILLION.

21    .1 PERCENT IS A THOUSAND.

22         NEXT SLIDE.  THANK YOU.  TO PUT THAT IN CONTEXT, ONE

23    PART PER MILLION WOULD BE THE EQUIVALENT OF ONE PERSON IN

24    OVER 12 WILLIAMS BRICE STADIUMS.

25              THE COURT:  OKAY.  NOW, I CAN UNDERSTAND THAT
```

1    BECAUSE I HAVE BEEN THERE A LOT, SO OKAY.  VERY GOOD.

2              MR. TOLLISON:  WHEN IT'S FILLED I PRESUME.

3              THE COURT:  THAT'S ALMOST ANY HOME GAME.

4              MR. MCGOLDRICK:  THE LAST ONE ON STEWART.  THE NEXT

5    SLIDE.  THE NEXT SLIDE ON STEWART.  AND YOUR HONOR, JUST

6    TO -- BY WAY OF BACKGROUND AND VERY, VERY BRIEFLY, THIS IS A

7    CUT-A-WAY PICTURE OF A SAFETY KLEEN PARTS WASHER.  SO IMAGINE

8    IT'S SLICED DOWN THE MIDDLE AND YOU'RE LOOKING AT IT FROM THE

9    FRONT.  YOU'VE GOT A SINK ON A DRUM, YOU HAVE GOT A FLEXIBLE

10   HOSE THAT'S A LOW-FLOW HOSE SO THE SOLVENT IS PUMPED FROM THE

11   CONTAINER IN THE BOTTOM AT -- THROUGH THE LOW-FLOW HOSE INTO

12   A DRAIN OR A SINK THAT HAS A DRAIN IN IT.  THE SOLVENT NEVER

13   FILLS UP.  IT'S GOT A FILTER IN IT.  THE SOLVENT DRAINS

14   DOWN -- BACK DOWN TO THE BOTTOM AND IT RECIRCULATES.

15        WHENEVER THE CUSTOMER HAS DECIDED THAT IT NEEDS SERVICE

16   REPLACEMENT, USUALLY IT'S ON AN EIGHT-WEEK OR SOMETIMES IT'S

17   A 12-WEEK SCHEDULE, ONE OF OUR SERVICE REPS WILL GO OUT, PICK

18   UP THE DIRTY SOLVENT, REPLACE IT WITH FRESHLY-RECYCLED

19   SOLVENT OR VIRGIN SOLVENT AND TAKE OFF WITH THE USED MINERAL

20   SPIRITS WHICH IS THEN RECYCLED.

21        WE HAVE SEVERAL TYPES OF MINERAL SPIRITS.  AND THE TWO

22   AT ISSUE IN THIS CASE ARE SAFETY KLEEN 105 MINERAL SPIRITS

23   AND SAFETY KLEEN 150.  YOU HEARD MR. ALOST TALK ABOUT 150 A

24   LITTLE BIT EARLIER.  IT'S TYPICALLY .4 PARTS PER MILLION OR

25   LESS.  ALL RIGHT.  IF YOU COULD GO BACK TO SLIDE NUMBER

1    THREE.

2              THE COURT:  CAN I YOU ASK ABOUT THE FLASHPOINT?  I

3    UNDERSTAND THERE'S A DIFFERENT FLASHPOINT.  COULD YOU EXPLAIN

4    THAT TO ME A LITTLE BIT MORE?

5              MR. MCGOLDRICK:  YES, YOUR HONOR.  THE WAY SAFETY

6    KLEEN FIRST CAME ABOUT WAS BACK IN THE OLD DAYS PEOPLE USED

7    TO USE GASOLINE IN A BUCKET TO WASH PARTS.  AND THE NUMBER

8    ONE HAZARD WAS FIRE.  AND SO, IN ORDER TO GET AWAY FROM THAT,

9    THE GENTLEMAN, BEN PALMER, WHO INVENTED THE PARTS WASHER

10   CREATED A SINK ON A DRUM, HAS A FUSIBLE LID.  SO IF THERE'S

11   FIRE, THAT LID SLAMS SHUT, AND HE DESIGNED IT TO USE

12   SOMETHING OTHER THAN GASOLINE.

13       GASOLINE HAS A LOW FLASHPOINT WHICH MEANS IT CATCHES

14   FIRE VERY EASILY.  105 ORIGINALLY GOT ITS NAME BECAUSE IT HAD

15   A 105-DEGREE FLASHPOINT, ALTHOUGH IT'S ACTUALLY HIGHER THAN

16   THAT.  I CAN GO INTO DETAILS ON THAT.  150 HAS A AT LEAST

17   150-DEGREE FLASHPOINT.

18              THE COURT:  VERY GOOD.

19              MR. MCGOLDRICK:  IN TERMS OF THE BENZENE CONTENT OF

20   DIFFERENT SUBSTANCES, WHEN YOU HEAR OR READ DR. HARRISON

21   TALKING ABOUT BENZENE OR YOU SEE STUDIES ABOUT BENZENE IN

22   NHL, I MEAN, THAT INCLUDES PURE BENZENE.  PURE BENZENE HAS

23   OBVIOUSLY A MILLION PARTS PER MILLION.  GASOLINE

24   HISTORICALLY, YOU KNOW, TODAY IT'S PROBABLY CLOSER TO

25   1 PERCENT, BUT HISTORICALLY IT'S AS HIGH AS 4.9 PERCENT.  SO

1    YOU HAVE A RANGE THERE, BUT IT'S A LOT; 10,000 TO 49,000

2    PARTS PER MILLION CERTAINLY AS COMPARED TO THE MINERAL

3    SPIRITS SOLVENT.

4        TYPICALLY -- WELL, ACTUALLY WITH ALL THESE SOLVENTS, YOU

5    KNOW, VARIOUS SOLVENTS PRIOR TO AND SOME SOLVENTS AFTER, WHAT

6    THAT REFERS TO IS OVER TIME THE BENZENE CONTENT IN THESE

7    SOLVENTS HAS GONE DOWN.  AND THAT'S PRETTY MUCH ACROSS THE

8    BOARD OF VARIOUS PRODUCTS.

9        SAFETY KLEEN 105.  THAT, FOR PURPOSES OF THIS CASE, THE

10    ACTUAL TESTING DATA IN THIS CASE FOR THE ACTUAL RELEVANT TIME

11    PERIODS RANGED BETWEEN 11 PARTS PER MILLION AND 36-AND-A-HALF

12    PARTS PER MILLION.  AGAIN, I CAN -- YOU SEE THE PERCENTAGE

13    EQUIVALENTS RIGHT THERE.

14        SAFETY KLEEN 150, AGAIN, IS LESS THAN TYPICALLY .4 PARTS

15    PER MILLION OR DOWN AS LITTLE AS .1 PART PER MILLION.  IF YOU

16    LOOK AT THAT SLIDE, THE DIFFERENCE BETWEEN GASOLINE AND ITS

17    BENZENE CONTENT VERSUS 105 AND THE DIFFERENCE BETWEEN SAFETY

18    KLEEN 105 AND PAN-FRIED BEEF IS FAIRLY STRIKING.  PAN-FRIED

19    BEEF HAS FOUR TIMES MORE BENZENE IN IT THAN 150 SOLVENT.  BY

20    COMPARISON, SIMILARLY 105 SOLVENT HAS ABOUT 50 TIMES MORE

21    BENZENE IN IT THAN PAN-FRIED BEEF.

22        SO THE DIFFERENCE BETWEEN OUR SOLVENT AND SOME OF THESE

23    FOOD ITEMS IS MUCH SMALLER THAN THE DIFFERENCE BETWEEN

24    GASOLINE AND OUR PRODUCT.

25        DOSE RESPONSE IS AN IMPORTANT CONCEPT ESPECIALLY IN THIS

1    CASE.  DR. HARRISON BELIEVES, FOR EXAMPLE, THAT THERE IS NO

2    SAFE THRESHOLD; ANY AMOUNT IS ENOUGH.  WELL, THE SINGLE MOST

3    IMPORTANT CONCEPT IN TOXICOLOGY IS DOSE RESPONSE.  EVERYTHING

4    IN TOO HIGH OF A QUANTITY IS TOXIC.  EVEN WATER.  AND BY THE

5    SAME TOKEN, SUBSTANCES THAT AREN'T TOXIC OR EVEN

6    CARCINOGENIC, IF THEY ARE NOT ABSORBED OR YOU DON'T HAVE AN

7    EXPOSURE THAT'S HIGH ENOUGH, IT'S STILL SAFE, IT'S STILL

8    DOSE-RESPONSE NO MATTER WHAT YOU'RE TALKING ABOUT.

9        NEXT SLIDE.  NOW MINERAL SPIRITS HAVE BEEN AROUND

10   FOREVER, DECADES.  MILLIONS OF WORKERS WORK WITH THEM.

11   THERE'S NO EPIDEMIC OF CANCER LET ALONE NHL.  IN FACT,

12   MINERAL SPIRITS HAVE BEEN USED SO WIDELY FOR SO LONG THAT

13   SCIENTIFIC AGENCIES LIKE IARC, ATSDR, NIOSH, ET CETERA

14   SPECIFICALLY STUDIED MINERAL SPIRITS JUST LIKE THEY DID

15   GASOLINE.

16       AND ACCORDING TO ACGIH, MILLIONS OF WORKERS HAVE BEEN

17   EXPOSED TO STODDARD SOLVENT WITH MINIMAL EFFECTS, AND YOU CAN

18   SEE THAT ON A DAILY BASIS ABOUT 75,000 WORKERS USE MINERAL

19   SPIRITS.  MINERAL SPIRITS IS A CATEGORY OF DIFFERENT TYPES OF

20   MINERAL SPIRITS.  TYPICALLY THEY'VE ALL CONTAINED LESS THAN A

21   THOUSAND PARTS PER MILLION.  SAFETY KLEEN'S MINERAL SPIRITS

22   SOLVENTS HAVE QUITE A BIT LESS THAN THAT AS THE COURT HAS

23   SEEN.

24       IN TERMS OF DAUBERT AND THE COURT'S ROLE AS A

25   GATEKEEPER, THERE ARE ADDITIONAL CONSIDERATIONS THAT ARE IN

1    THE CASE LAW OTHER THAN THE STANDARD ONES THAT YOU SEE.  AND

2    IN TERMS OF WHETHER OR NOT THE OPINION WAS DEVELOPED

3    EXPRESSLY FOR LITIGATION, AS A SIDE-NOTE IN THIS CASE, DR.

4    HARRISON FIRST FORMED HIS OPINION THAT BENZENE CAUSES NHL

5    WHEN A PLAINTIFF'S LAWYER ASKED HIM TO DO IT IN A CASE

6    CALLED -- IT WAS AN IBM LITIGATION CASE.  THAT CASE WAS FILED

7    IN 2001.  IT CONCLUDED IN 2004.  SO SOMETIME IN THERE, DR.

8    HARRISON FIRST FORMED THE OPINION THAT BENZENE CAUSES NHL.

9    AND SEVERAL YEARS AFTER THAT HE AUTHORED THE GARCIA

10   DECLARATION FROM ANOTHER CASE WE WILL TALK ABOUT LATER.

11        ANOTHER FACTOR THAT DAUBERT'S PROGENY LOOKS AT IS

12   WHETHER OR NOT THE EXPERT EMPLOYED THE ANTITHESIS OF THE

13   SCIENTIFIC METHOD.  AND THAT'S A LOT OF WHAT WE WERE TALKING

14   ABOUT EARLIER TODAY.  YOU COME UP WITH YOUR OPINIONS, YOU GET

15   CHALLENGED ON THEM AND THEN YOU DO YOUR HOMEWORK LATER.

16        IN TERMS OF WHETHER OR NOT AN EXPERT HAS ADEQUATELY

17   ACCOUNTED FOR ALTERNATE EXPLANATIONS, THAT'S AN IMPORTANT

18   DAUBERT CONSIDERATION AND CERTAINLY AN IMPORTANT

19   CONSIDERATION IN THIS CASE BECAUSE THERE ARE MANY THINGS DR.

20   HARRISON HASN'T RULED OUT AND HE ADMITS THAT.  HE JUST RULES

21   EVERYTHING IN.  AND SOME OF THE THINGS HE'S UNABLE TO RULE

22   OUT ARE SOLE CAUSES.

23        AND IMPORTANTLY, THE CASE LAW TALKS ABOUT EPIDEMIOLOGY

24   AS BEING THE GOLD STANDARD.  AND I KNOW PLAINTIFFS' COUNSEL

25   CITED SOME CASES, AND WE WILL TALK ABOUT THOSE, TO SUGGEST

1    THAT YOU DON'T NEED EPIDEMIOLOGY, YOU DON'T HAVE TO LOOK AT

2    IT.  WELL, THAT'S NOT TRUE.  THE CASE LAW IS CONSISTENT AND

3    IT'S CLEAR.  IF IT EXISTS, YOU'VE GOT TO LOOK AT IT.  YOU'VE

4    GOT TO ACCOUNT FOR IT.  YOU CAN'T JUST IGNORE IT.

5         CERTAIN SITUATIONS WHERE IT DOESN'T EXIST AND THERE'S

6    OTHER FACTORS -- AND WE WILL TALK ABOUT THAT IN CONNECTION

7    WITH BENEDI AND WESTBERRY.  THAT'S A DIFFERENT SCENARIO AND

8    WE WILL TALK ABOUT THAT LATER.

9         THIS IS JUST BASICALLY OUR THREE POINTS.  WE ARE

10   CONTENDING HARRISON'S GENERAL CAUSATION OPINION IS

11   UNRELIABLE, HIS SPECIFIC CAUSATION OPINION IS UNRELIABLE, AND

12   HE ALSO RELIES ON STEWART WHOM WE ALSO BELIEVE IS UNRELIABLE

13   AND SHOULD BE STRICKEN.

14        GENERAL CAUSATION.  YOUR HONOR IS ALREADY FAMILIAR WITH

15   WHAT THAT IS.  BUT LOOKING AT THE CASE LAW AS WELL, IT'S NOT

16   ONLY -- IT'S THE SPECIFIED SUBSTANCE.  IT'S NOT WHAT HARRISON

17   IS DOING IN TERMS OF LOOKING AT BENZENE AS A COMPONENT.  YOU

18   HAVE GOT TO LOOK AT THE SPECIFIC SUBSTANCE.  AND IN THIS CASE

19   DR. HARRISON FOCUSED ON THE WRONG SUBSTANCE.  HE LOOKED ONLY

20   AT WHETHER OR NOT BENZENE CAN CAUSE NHL.  HE DID NOT EVEN

21   LOOK AT THE ISSUE OF WHETHER OR NOT MINERAL SPIRITS CAN, AND

22   THAT'S WHAT WE PROVIDE IN THIS CASE OR PROVIDED IN THIS CASE.

23   NEXT SLIDE.

24             THE COURT:  WELL, IS THAT A DISTINCTION WITHOUT A

25   DIFFERENCE IN THE SENSE THAT THE MINERAL SPIRITS ANALYSIS

1    WOULD HAVE TO INCLUDE THE BENZENE EXPOSURE OR CAUSATION?  I

2    MEAN, THERE'S NO SUGGESTION THAT THERE'S ANY OTHER COMPONENT

3    OF MINERAL SPIRITS THAT WOULD CAUSE THE HODGKIN'S,

4    NON-HODGKIN'S LYMPHOMA; IS THERE?

5          MR. MCGOLDRICK:  YES, YOUR HONOR.  I UNDERSTAND

6    YOUR QUESTION.  ACTUALLY THERE IS.  FOR EXAMPLE, IARC.  TAKE

7    IARC.  THEY'VE CONCLUDED THAT BENZENE CAUSES AML.  THAT'S THE

8    ONE DISEASE WE ALL AGREE ON.  IN FACT, WE WILL TALK ABOUT

9    THIS FIRST CASE HERE IN A MOMENT INVOLVED AML.

10          IN THOSE CASES YOU NEVER DISPUTE GENERAL CAUSATION WHEN

11    IT COMES TO BENZENE AND AML.  BUT IARC HAS LOOKED AT, FOR

12    EXAMPLE, MINERAL SPIRITS AND FOUND THAT THERE IS NO EVIDENCE

13    THAT MINERAL SPIRITS CAUSE ANY CANCER INCLUDING AML.  SAME

14    THING WITH GASOLINE.  SO THEY DO BELIEVE THAT THE BEN -- YOU

15    HAVE TO PROVE AND LOOK AT LITERATURE THAT EXAMINES BENZENE AS

16    A COMPONENT OF THAT SUBSTANCE BECAUSE BENZENE IN A MIXTURE

17    WITH OTHER CHEMICAL CONSTITUENTS ACTS DIFFERENTLY.

18          THE COURT:  SO DOES IT HAVE A STABILIZING FORCE?

19    IS IT -- IS THE COMPOUND OF BENZENE MORE STABLE WHEN IT'S IN

20    MINERAL SPIRITS AS OPPOSED TO BEING IN ANOTHER FORM?

21          MR. MCGOLDRICK:  THAT'S AN EXCELLENT QUESTION.  IF

22    WE HAD THIS GLASS OF WATER HERE AND WE SPIKED IT WITH SOME

23    PURE BENZENE AND GOT IT TO LET'S SAY A HUNDRED PARTS PER

24    MILLION AND THEN I HAD MINERAL SPIRITS, LET'S SAY IT HAD A

25    HUNDRED PARTS PER MILLION AS WELL.  WELL, THE BENZENE TENDS

1    TO WANT TO STAY IN SUBSTANCES THAT ARE SIMILAR.

2        SO, MINERAL SPIRITS HAVE OTHER CHEMICAL CONSTITUENTS

3    FROM THE CHAIN, THE --

4            THE COURT:  RIGHT.

5            MR. MCGOLDRICK:  -- DERIVED CHAIN THAT ARE LIKE IT,

6    AND SO BENZENE IS LESS LIKELY TO LEAVE A SOLVENT BECAUSE IT'S

7    REALLY VOLATILE.  BUT IN WATER OR SOMETHING THAT IT'S VERY

8    DIFFERENT FROM, IT TENDS TO WANT TO ESCAPE MORE QUICKLY.

9            THE COURT:  RIGHT.

10           MR. MCGOLDRICK:  AND THEN THERE'S OTHER ASPECTS OF

11   WHAT BENZENE IS IN A MIXTURE WITH.  FOR EXAMPLE, SOME

12   CHEMICAL CONSTITUENTS OUTCOMPETE BENZENE IN TERMS OF BEING

13   METABOLIZED.  SO, IF IT'S IN A MIXTURE WITH LET'S SAY TOLUENE

14   AND XYLENE, IT MIGHT BE OUTCOMPETED BY THOSE AS OPPOSED TO

15   WHETHER OR NOT IT WAS IN WATER, FOR EXAMPLE.

16           THE COURT:  OKAY.  SO THE VOLATILITY ARGUMENT,

17   THOUGH, AS REFERENCED EARLIER ABOUT TESTING THE CONCENTRATION

18   OF BENZENE AT A SPECIFIC POINT IN TIME AS OPPOSED TO THE

19   EVAPORATION OR THE -- NOT REALLY EVAPORATION, BUT THE

20   LESS-CONCENTRATED AMOUNT, DOES THAT HAVE TO DO -- COULD THAT

21   ANALYSIS CHANGE DEPENDING ON THE SOLUTION IN WHICH THE

22   BENZENE WERE LOCATED?

23           MR. MCGOLDRICK:  EARLIER COUNSEL WAS REFERRING TO

24   A -- JUST A BASELESS STATEMENT FROM DR. STEWART.  HE DIDN'T

25   CITE ANYTHING.  HE JUST MADE THAT COMMENT THAT HE THINKS WHEN

1    THE VIALS ARE COLLECTED, IF THERE'S A TINY LITTLE BIT OF

2    HEAD-SPACE THAT SOMEHOW THE BENZENE ESCAPES AND IT

3    VOLATILIZES OUT.  THAT'S A DIFFERENT SITUATION BECAUSE IT'S

4    CONTAINED.

5        AND BY THE WAY, IT'S IN A MINERAL SPIRIT, SO IT'S IN

6    THERE LIKE CONSTITUENTS.  BUT IN TERMS OF WHY IT'S IMPORTANT

7    IN THIS CASE, IT'S VERY, VERY IMPORTANT BECAUSE THE DATA IS

8    PRETTY CLEAR IF I DROP OFF OR WE DROP OFF A DRUM OF SOLVENT

9    AT A PLACE OF EMPLOYMENT AND AN INDIVIDUAL STARTS WORKING

10   WITH IT, LET'S JUST SAY ONE INDIVIDUAL TO START WITH, AFTER

11   FIVE HOURS OF USE HALF THE BENZENE IS GONE.

12       AND IMAGINE IF YOU'RE ON AN EIGHT-WEEK SERVICE PERIOD.

13   I MEAN, I DROP OFF A DRUM, SERVICE -- I'M A SERVICE REP.  I

14   LEAVE.  PLAINTIFF STARTS WORKING WITH IT.  LET'S SAY HE DOES

15   30 MINUTES A DAY, JUST THAT PLAINTIFF.  YOU KNOW, BY MIDDLE

16   OF THE NEXT WEEK ALL THE BENZENE IS GONE OR MOST OF IT'S GONE

17   AND YOU HAVE ANOTHER SEVEN WEEKS IN THE SERVICE PERIOD WITH

18   NO BENZENE.

19       THE COURT:  WELL, IS THAT BECAUSE OF THE

20   INTRODUCTION OF OXYGEN INTO THE FLOW OF BENZENE?  IS IT JUST

21   BEING AERATED OR IS IT--

22       MR. MCGOLDRICK:  BENZENE IS VOLATILE, WANT TO

23   ESCAPE.  AND WHEN YOU'RE CLEANING, YOU KNOW, WE HAVE A LOW

24   FLOW HOSE TO KEEP DOWN, YOU KNOW, VAPORS AND SUCH, BUT IT

25   JUST COMES OUT OF THE PARTS WASHER.  IF YOU HAVE TWO PEOPLE

1    WORKING ON IT, IT COMES OUT TWICE AS FAST ASSUMING THEY ARE

2    WORKING WITH IT THE SAME AMOUNT OF TIME.

3        SO THAT CONCEPT IS IMPORTANT ALSO WITH RESPECT TO

4    STEWART.  I MEAN, WE ARE NOT ARGUING HIM RIGHT NOW, BUT WHEN

5    HE ASSUMES LET'S SAY SOLVENT GOES ON ITS SKIN OR THE PERSON'S

6    SKIN, HE ASSUMES THAT BENZENE REMAINS CONSTANT FOR EITHER THE

7    ENTIRE TIME OR A LONG PERIOD OF TIME.  HE DOESN'T ACCOUNT FOR

8    IT RAPIDLY EVAPORATING, VOLATILIZING.

9        *THE COURT:*  RIGHT.  NOW, DOES THE -- IS THE

10   BENZENE'S MOLECULAR WEIGHT HEAVIER SUCH THAT WHERE IT SITS IN

11   THE DRUM MAY BE AFFECTED BY THE LENGTH OF TIME THAT THE DRUM

12   STAYS THERE?

13       *MR. MCGOLDRICK:*  IT'S AN EXCELLENT QUESTION.  IN

14   TERMS OF LET'S SAY THE SINK, WE SAW THE CUT-A-WAY.  THE

15   BENZENE VAPOR -- WELL, THE MINERAL SPIRITS VAPORS THAT

16   CONTAIN TINY AMOUNTS OF BENZENE ARE HEAVIER THAN AIR AND THEY

17   TEND TO STAY LOW IN THE SINK.  SO, YEAH, THOSE VAPORS ARE

18   TYPICALLY HEAVIER THAN AIR.  AND THAT'S WHY THE SINK IS

19   DESIGNED WITH CERTAIN DEPTH.  BUT I'M NOT SURE IF THAT

20   ANSWERS...

21       *THE COURT:*  WELL, I GUESS THE DRUM, GOING BACK TO

22   THE PICTURE, IS THE DRUM AT THE BOTTOM AND THEN THE HOSE

23   SUCKS FROM THE TOP OR THE BOTTOM OF THAT DRUM OR DOES THE

24   DEVICE THAT'S UP THE TOP HAVE A HOSE THAT COMES OUT FROM THE

25   BOTTOM?

```
1              MR. MCGOLDRICK:  THERE'S A PUMP AT THE BOTTOM --

2              THE COURT:  OKAY.

3              MR. MCGOLDRICK:  -- THAT WHEN YOU TURN ON THE PUMP

4    THE SAFETY KLEEN PARTS WASHER OR ANY PARTS WASHER, THE PUMP,

5    CIRCULATING PUMP DOWN HERE AT THE BOTTOM -- I DON'T KNOW IF I

6    CAN... DOWN HERE IS WHAT PUMPS IT UP INTO THE LOW FLOW HOSE,

7    IT COMES OUT, AND THEN IT DRAINS BACK DOWN TO THE SINK.  IT

8    NEVER BUILDS UP IN THE SINK IN HERE.  CERTAINLY THERE'S NO

9    EVIDENCE THAT ANYONE MISUSED THIS PARTS WASHER AND BLOCKED IT

10   UP.  BUT THAT'S HOW IT WORKS.  AND THEN THE DRUM IS NOT FULL

11   UP TO THE TOP.  USUALLY IT'S RIGHT ABOUT HERE.

12          SO -- AND THIS WILL BE MORE IMPORTANT WHEN YOU SEE

13   STEWART, BUT IT'S AN IMPORTANT CONCEPT.  FOR EXAMPLE, SOME

14   STUDIES INVOLVE VATS OF SOLVENT.  SO IF YOU'RE STANDING IN

15   FRONT OF AN OPEN VAT WITH A LARGE SURFACE AREA OF SOLVENT,

16   THE EXPOSURE IS -- I MEAN, IT'S BASIC 101 IH, INDUSTRIAL

17   HYGIENE --

18              THE COURT:  SURE.

19              MR. MCGOLDRICK:  -- YOU'RE GOING TO HAVE MORE

20   EXPOSURE.  HERE YOU NEVER GET A BUILD-UP OF SOLVENT.  IT'S A

21   LOW FLOW HOSE AND YOU'RE SEPARATING THE USER FROM THE SOLVENT

22   IN TERMS OF, YOU KNOW, KEEPING IT IN THE DRUM.

23              THE COURT:  OKAY.  SO, THE FLOW FROM THE DRUM

24   THROUGH THE CIRCULATING PUMP, DOES THE PUMP HAVE CIRCULATION

25   WITHIN THE DRUM OR CIRCULATION JUST FROM SOME POINT IN THE
```

1    DRUM UP TO THE HOSE?  I GUESS IF YOU THINK ABOUT IT LIKE IF I

2    HAVE A -- IF I MIX SOME KOOL-AID OR SOMETHING AND THEN THE

3    KOOL-AID GETS DARKER AT THE BOTTOM IF I LET IT SIT FOR A

4    WHILE IF IT SETTLES, AND IF I HAVE A STRAW THAT DRINKS FROM

5    THE BOTTOM AS OPPOSED TO DRINKING FROM THE TOP, WILL IT BE --

6    THE BENZENE IN THERE, THE KOOL-AID, WILL IT SETTLE OR DOES

7    THE PUMP ACT TO REDISTRIBUTE AND MAKE MORE UNIFORM THE

8    CONTENTS OF THE DRUM?

9        MR. MCGOLDRICK:  I UNDERSTAND YOUR QUESTION NOW.

10   YEAH.  NO, THE -- IT'S NOT AS THOUGH ANY CONSTITUENT

11   INCLUDING THE TINY AMOUNTS OF BENZENE SETTLE TO THE BOTTOM.

12   THEY, YOU KNOW--

13       THE COURT:  OR FLOAT TO THE TOP.  THEY ARE JUST

14   THROUGHOUT.

15       MR. MCGOLDRICK:  EXACTLY.  NOW, THE ONLY THINGS

16   THAT MIGHT -- IF THERE'S BEEN, YOU KNOW, GRIT OR WHATEVER

17   THAT MANAGED TO MAKE IT THROUGH, YOU WILL SEE THAT THERE'S A

18   REMOVABLE DRAIN BASKET HERE AND THERE'S ALSO A SINK FILTER.

19   SO IT GOES THROUGH A BASKET, THEN A FILTER.  I SUPPOSE LITTLE

20   BITS COULD GET THROUGH THERE AND THOSE COULD SETTLE AT THE

21   BOTTOM.

22       THE COURT:  WHAT IS THE THEORY OF HAVING THE AIR,

23   THE VOLUME OF THE DRUM NOT FILLED TO CAPACITY?  IS THAT A

24   STABILIZING ELEMENT AS WELL?

25       MR. MCGOLDRICK:  I KNOW THAT THAT'S HOW IT IS DONE

1   HISTORICALLY.  I'M NOT SURE EXACTLY WHAT THE REASON FOR THAT

2   IS.  I DO KNOW THAT THE DRUMS ARE MADE BIGGER THAN THE VOLUME

3   THAT'S ASSIGNED TO THAT PARTICULAR PARTS WASHER.  SO IF IT'S

4   A 16-GALLON PARTS WASHER, IT'S ALWAYS GOING TO HAVE 16

5   GALLONS, BUT THEY ALWAYS HAVE EXTRA ROOM IN THERE.  IT'S TO,

6   I SUPPOSE, FURTHER SEPARATE THE USER FROM THE SOLVENT AND

7   PERHAPS MAKES THE PUMP WORK BETTER.  BUT OTHER THAN THAT, I

8   DON'T KNOW WHY.

9          THE COURT:  OKAY.  THANK YOU.  I'M SORRY FOR

10  INTERRUPTING.

11         MR. MCGOLDRICK:  NOT AT ALL.  GO BACK TO SLIDE I

12  THINK IT'S EIGHT.  THERE IT IS.

13      YOUR HONOR, RECENTLY OUT OF THE FIFTH CIRCUIT --

14  OBVIOUSLY NOT THE FOURTH CIRCUIT, IT'S THE FIFTH CIRCUIT --

15  IN MAY THIS ORDER CAME DOWN OR THIS OPINION CAME DOWN IN THE

16  BURST CASE.  AND WE BELIEVE IT'S PARTICULARLY PERSUASIVE EVEN

17  THOUGH IT IS A FIFTH CIRCUIT CASE BECAUSE IT INVOLVES DR.

18  HARRISON AND SPECIFICALLY IT INVOLVES DR. HARRISON DOING THE

19  SAME THING HE DID IN THIS CASE.

20      BUT THERE IS A BIG DISTINCTION BETWEEN OUR CASE AND THE

21  BURST CASE.  IN BURST IT INVOLVED AML.  AND NONE OF THE

22  PARTIES DISPUTED GENERAL CAUSATION WITH RESPECT TO BENZENE

23  AND NHL.  AND IN BURST HIS OPINION WAS BENZENE COMPONENT OF

24  GASOLINE IS WHAT CAUSED THE AML.  THE GENTLEMAN WAS EXPOSED

25  TO GAS.  AND HIS THEORY WAS STILL BENZENE CAUSES AML, BUT HE

1    SPECIFICALLY TALKED ABOUT THE BENZENE COMPONENT OF GASOLINE.

2         HOWEVER, HIS PROBLEM WAS HE WAS ASKED IN DEPOSITION

3    WHAT, FOR EXAMPLE, IARC FOUND WITH RESPECT TO GASOLINE

4    BECAUSE DR. HARRISON IN THAT SAME CASE AND THE SAME OPINION,

5    YOU WILL SEE HOW THEY LIST -- HE WAS CITING IARC, EPA, ATSDR,

6    ALL THOSE AGENCIES REFERRING TO THEM AS AUTHORITATIVE FOR THE

7    PROPOSITION THAT BENZENE CAUSES AML.  BUT WHEN ASKED ABOUT

8    GASOLINE, HE DIDN'T KNOW.  HE SAID, I DIDN'T LOOK AT THAT,

9    SORT OF LIKE THIS CASE WASN'T PART OF MY HOMEWORK.  SAME

10   THING WITH STUDIES.  HE COULDN'T IDENTIFY ANY STATISTICALLY

11   SIGNIFICANT STUDIES THAT ASSOCIATED GASOLINE EXPOSURE WITH

12   AML.  THE COURT STRUCK IT.  AND THEY STRUCK HIM ONLY ON THE

13   BASIS OF GENERAL CAUSATION.  THEY NEVER EVEN GOT TO THE

14   QUESTION OF SPECIFIC CAUSATION.

15        AND THE COURT IMPORTANTLY HELD THAT WITHOUT

16   DEMONSTRATING HOW THE BENZENE LITERATURE APPLIES TO GASOLINE

17   EXPOSURE, DR. HARRISON'S METHODOLOGY LEAVES, QUOTE, TOO GREAT

18   AN ANALYTICAL GAP BETWEEN THE DATA AND THE OPINION PROFFERED.

19        AND WE'LL SEE IT ON ANOTHER SLIDE.  BUT THE COURT

20   SPECIFICALLY FOUND THAT SIMPLY SAYING BENZENE IS A COMPONENT

21   AND WE KNOW BENZENE CAUSES AML IS NOT ENOUGH TO DEMONSTRATE

22   HOW IT IS THAT THE BENZENE LITERATURE APPLIES TO THAT

23   PARTICULAR SUBSTANCE AT ISSUE.

24        AND AS YOU WILL SEE ON PAGE FOUR OF THE OPINION, THE

25   COURT IMPORTANTLY NOTED THAT MULTIPLE AGENCIES INCLUDING

1   IARC, ATSDR, HAVE CONCLUDED THAT BENZENE IS CARCINOGENIC BUT

2   HAVE NOT REACHED THE SAME CONCLUSION REGARDING GASOLINE EVEN

3   THOUGH ALL GASOLINE CONTAINS BENZENE.

4        AS NOTED EARLIER, IT CAN CONTAIN UP TO LET'S SAY

5   APPROXIMATELY 50,000 PARTS PER MILLION.  HARRISON WAS ASKED,

6   HOW MUCH BENZENE IS IN GASOLINE?  HE SAID, WELL, I REALLY

7   DON'T KNOW, BUT IT ONLY CONTAINS, QUOTE, VERY SMALL AMOUNTS

8   OF BENZENE.  HARRISON IN THIS CASE, HE DIDN'T KNOW -- HE

9   DIDN'T INDEPENDENTLY TRY TO VERIFY WHAT STEWART ASSUMED FOR

10  BENZENE CONTENT ON SOLVENT.

11       HE DIDN'T KNOW THE BENZENE CONTENT.  AND HE IN FACT

12  DIDN'T KNOW WHAT TYPE OF SOLVENT WE DELIVERED.  HE DIDN'T

13  KNOW IF IT WAS 150, 105.  AND EVEN THOUGH BOTH OF THEM HAVE

14  VERY LOW CONTENTS, HE STILL DOESN'T KNOW.  HE DIDN'T KNOW

15  WHAT WE HAD SUPPLIED, AND IT'S HIS OBLIGATION TO FOCUS ON THE

16  SPECIFIED AND CORRECT SUBSTANCE.

17       HE WAS EVEN ASKED -- I ASKED HIM, CAN YOU AT LEAST POINT

18  TO ANY STUDIES THAT HAVE LOOKED AT OTHER SUBSTANCES THAT HAVE

19  SIMILAR BENZENE CONTENTS AS SAFETY KLEEN MINERAL SPIRITS, AND

20  HE COULDN'T DO THAT.  IMPORTANTLY -- AND THERE'S A SLIDE ON

21  THIS LATER -- HE IN FACT WENT SO FAR AS TO SAY, WELL LOOK,

22  LET ME LOOK AT DR. STEWART'S REPORT, WHO IS AN INDUSTRIAL

23  HYGIENIST, TO SEE WHETHER OR NOT HE HAS ANY STUDIES ABOUT

24  MINERAL SPIRITS OR SIMILAR BENZENE CONTENT SUBSTANCES AND NHL

25  AND HE COULDN'T FIND ANY.

1    SO HE HAD NOTHING AT HIS DEPOSITION. AND IN HIS REPORT

2  IN THIS CASE HE DOESN'T CITE ANY SPECIFIC STUDIES. HE ONLY

3  GENERALLY REFERS TO THE GARCIA DECLARATION WHICH AGAIN WAS A

4  DECLARATION HE DRAFTED FOR A DIFFERENT CASE EIGHT YEARS AGO.

5    *THE COURT:* NOW, WAS THAT GARCIA CASE A MINERAL

6  SPIRITS CASE OR WAS IT A DIFFERENT COMPOUND?

7    *MR. MCGOLDRICK:* IT WAS TOTALLY DIFFERENT. IT

8  INVOLVED THE PRINTING INDUSTRY. AND MR. BOYKIN'S

9  OCCUPATIONAL EXPOSURE IS VERY RELEVANT THERE BECAUSE HE

10  WORKED AS A PRINTER AS WELL. DR. HARRISON HAS TESTIFIED IN

11  DEPOSITION, HAS WRITTEN REPORTS, TESTIFIED AT TRIAL, THAT THE

12  PRINTING INDUSTRY IS CARCINOGENIC AND IT CAUSES EVEN NHL.

13    THOSE CASES INVOLVE LOTS OF DIFFERENT CHEMICALS. THERE

14  MAY HAVE BEEN SOME SOLVENTS. BUT AS A WHOLE, THERE ARE --

15  YOU CAN'T COMPARE. IT'S APPLES AND ORANGES. AND WE KNOW

16  JUST FROM A BENZENE STANDPOINT, IF YOU JUST WANT TO LOOK AT

17  BENZENE, OBVIOUSLY THE EXPOSURES ARE FAR GREATER. IN THIS

18  CASE AS MUCH AS 83 OR MORE PERCENT OF MR. BOYKIN'S EXPOSURE

19  DR. STEWART ATTRIBUTED TO HIS WORK AS A PRINTER BACK IN THE

20  70'S.

21    IN THIS CASE DR. HARRISON AGREED THAT IARC AND THE US

22  EPA AND THE NATIONAL TOXICOLOGY PROGRAM ARE AUTHORITATIVE

23  BODIES, AND THAT'S WHAT HE CALLED THEM. THEY ARE

24  AUTHORITATIVE. BUT AGAIN, WHEN IT DOESN'T SUIT HIM, IF IT

25  INVOLVES A DISEASE PROCESS THAT'S NOT LINKED LET'S SAY LIKE

```
 1   NHL OR IT INVOLVES A SUBSTANCE LIKE MINERAL SPIRITS THAT

 2   HASN'T BEEN FOUND TO CAUSE CANCER, HE DOESN'T CITE THEM AND

 3   HE TRIES TO IGNORE THEM.

 4        AND THESE SAME BODIES THAT HE DIDN'T KNOW HOW THEY

 5   CLASSIFIED MINERAL SPIRITS IN THIS CASE ARE THE VERY ONES

 6   THAT HE RELIED ON BACK IN THE BURST CASE.

 7        NEXT SLIDE, PLEASE.  THANKS, JOHN.  WHEN HE WAS ASKED --

 8   THE SPECIFIC QUESTION WAS:  DR. HARRISON, HOW DOES IARC

 9   CLASSIFY MINERAL SPIRITS IN TERMS OF ITS CARCINOGENICITY IN

10   FUMES?  THAT SHOULD HAVE SAID CARCINOGENIC -- HOW DOES --

11   I'LL FIGURE OUT WHAT THAT MEANS.  I WOULD HAVE TO LOOK THAT

12   UP WAS HIS ANSWER.  IARC HAS A HUNDRED PLUS VOLUMES AND I

13   BELIEVE THEY HAVE REVIEWED MINERAL SPIRITS, BUT I DON'T KNOW

14   WHAT THE CLASS IS OR WHAT CLASS THEY PUT IT IN.

15        SO, HE ACKNOWLEDGED THAT, YEAH, I THINK THEY'VE LOOKED

16   AT MINERAL SPIRITS.  BUT IN A CASE INVOLVING A DEFENDANT WHO

17   SUPPLIED MINERAL SPIRITS, HE DIDN'T EVEN LOOK TO SEE HOW THEY

18   CLASSIFIED IT IN TERMS OF ITS CARCINOGENICITY.

19        AND IF YOU COMPARE -- COMPARE THAT TO IARC'S OFFICIAL

20   STATEMENT ON MINERAL SPIRITS, IARC HAS STUDIED MINERAL

21   SPIRITS AND CONCLUDED, QUOTE, INADEQUATE EVIDENCE FOR THE

22   CARCINOGENICITY OF MINERAL SPIRITS IN HUMANS.  OH, THAT FUMES

23   WORD, YOUR HONOR, THAT SHOULD HAVE BEEN HUMANS.

24             THE COURT:  SHOULD HAVE BEEN WHAT?

25             MR. MCGOLDRICK:  HUMANS.
```

1          *THE COURT:* HUMANS.

2          *MR. MCGOLDRICK:* NEXT SLIDE, PLEASE. HERE ARE HOW

3     THE AGENCIES -- OR THE AGENCIES THAT HAVE SPECIFICALLY LOOKED

4     AT MINERAL SPIRITS. YOU'VE GOT THE WHO IARC'S OR PART OF THE

5     WHO, THE INTERNATIONAL ASSOCIATION FOR RESEARCH ON CANCER

6     EPA, ATSDR AND ACGIH.

7          *COURT REPORTER:* CAN YOU SLOW DOWN?

8          *MR. MCGOLDRICK:* SORRY. EPA, ATSDR AND ACGIH.

9     NONE OF THEM HAVE DETERMINED THAT MINERAL SPIRITS CAUSE NHL

10    OR CANCER. NONE OF THEM REGULATES MINERAL SPIRITS AS A

11    CARCINOGEN. AND AGAIN, THESE ARE THE SAME AUTHORITATIVE

12    BODIES HARRISON OFTEN CITES.

13         PUTTING ASIDE THAT HE LOOKED AT THE WRONG SUBSTANCE AND

14    PUTTING ASIDE WHAT EVERYONE HAS FOUND WITH RESPECT TO MINERAL

15    SPIRITS, LET'S JUST LOOK AT BENZENE AND NHL. IT'S DIFFERENT

16    FROM AML IN THE FOLLOWING RESPECTS. IARC HAS CONCLUDED AGAIN

17    BENZENE CAUSES AML. THERE'S NO DISPUTE. THE ONLY DISPUTE

18    THERE IS HOW MUCH.

19         AND IN TERMS OF NON-HODGKIN'S LYMPHOMA, IARC HAS

20    CONCLUDED LIMITED EVIDENCE OF CARCINOGENICITY. SO EVEN IN

21    PUTTING ASIDE THAT HE LOOKED AT THE WRONG SUBSTANCE AND MADE

22    THE WRONG INQUIRY, NHL IS VERY MUCH DISPUTED WHETHER OR NOT

23    BENZENE, EVEN PURE BENZENE AT ANY LEVEL, CAN CAUSE IT. IN

24    FACT, MOST OF THE STUDIES OUT THERE THAT HAVE LOOKED AT

25    BENZENE AND NHL HAVE FOUND THAT THERE IS NO ASSOCIATION.

1       AND IF YOU LOOK AT THE NATIONAL TOXICOLOGY PROGRAM, THEY

2    CONCLUDED LITTLE EVIDENCE WAS FOUND FOR AN ASSOCIATION

3    BETWEEN BENZENE EXPOSURE AND MULTIPLE MYELOMA OR

4    NON-HODGKIN'S LYMPHOMA.  NEXT SLIDE.

5       YOU WILL SEE THE BOTTOM OF THIS SLIDE, YOUR HONOR, IS

6    WHAT I MENTIONED EARLIER FROM THE BURST CASE.  THE COURT

7    SAID, QUOTE, THE SIMPLE EXPLANATION THAT MINERAL SPIRITS --

8    IN THAT CASE THEY WERE TALKING ABOUT GASOLINE -- CONTAINS

9    BENZENE AND BENZENE IS A KNOWN CARCINOGEN CANNOT BE

10   JUSTIFICATION FOR SUCH EXTRAPOLATION.

11      HERE ARE SOME OF THE CASES WE CITED IN OUR BRIEF.

12   BASICALLY THE PROPOSITION IS WHERE YOU HAVE EPIDEMIOLOGY,

13   WHICH IS CONSIDERED THE BEST EVIDENCE ON CAUSATION, AND IT

14   EXISTS AND IT'S RELEVANT, YOU'VE GOT TO LOOK AT IT AND YOU

15   HAVE GOT TO DEAL WITH IT.  IT CAN'T BE IGNORED.

16      PLAINTIFFS RELY HEAVILY IN THIS CASE, YOUR HONOR, ON --

17   OR IN THEIR RESPONSE ON TWO CASES.  ONE IS THE BENEDI CASE

18   AND ONE IS THE WESTBERRY CASE.  IN FACT, THOSE ARE THE TWO

19   THEY REALLY FOCUS ON IN THEIR RESPONSE.

20      IN TERMS OF THE BENEDI CASE, IT'S VERY MUCH FACTUALLY

21   DISTINGUISHABLE FROM THIS CASE.  IN BENEDI IT WAS A CASE THAT

22   INVOLVED A PLAINTIFF WHO HAD TAKEN ACETAMINOPHEN, HE GOT IT

23   FROM TYLENOL, AND WAS DRINKING ALCOHOL WITH IT.  AND

24   OBVIOUSLY TYLENOL IS NOT UBIQUITOUS, IT'S NOT EVERYWHERE.

25   BENZENE IS.

1        THE DISEASE AT ISSUE IN THAT CASE WAS LIVER DAMAGE.

2    HERE WE HAVE NON-HODGKIN'S LYMPHOMA.  IN BENEDI IT WASN'T A

3    SITUATION WHERE YOU HAD A PROBLEM WITH IDIOPATHIC DISEASE.

4    HERE OBVIOUSLY DR. HARRISON HAS TESTIFIED IN THIS CASE THAT

5    THE MAJORITY OF NON-HODGKIN'S LYMPHOMA CASES ARE IDIOPATHIC

6    OR OF NO KNOWN CAUSE.

7        IN BENEDI THE COURT REALLY -- THERE'S ALSO TEMPORALITY

8    IN BENEDI.  WITHIN FIVE DAYS OF STARTING TO TAKE THE

9    ACETAMINOPHEN AND DRINKING ALCOHOL HE WAS IN THE HOSPITAL

10   WITH LIVER DAMAGE.  IN THIS CASE BY CONTRAST DR. HARRISON HAS

11   TESTIFIED THAT WHAT HE CALLS AND WHAT IS CALLED A LATENCY

12   PERIOD IS AS MUCH AS 40 YEARS.  FORTY YEARS OF EXPOSURE IS IN

13   THE WHEELHOUSE FOR DR. HARRISON BEFORE HE DEVELOPED A

14   DISEASE.  THAT IS THE ANTITHESIS OF TEMPORAL PROXIMITY.

15       IN BENEDI THERE WAS NO EPIDEMIOLOGICAL LITERATURE.  THE

16   NORRIS CASE ACTUALLY LOOKED AT IT BECAUSE SOMEONE TRIED TO

17   MAKE THE SAME ARGUMENT AND SAID NO, NO, NO, NO, THERE'S NO

18   EPI STUDIES IN BENEDI, AND THAT'S A BIG DIFFERENCE.  IF

19   THERE'S NOT EPI STUDIES OUT THERE, DOES THAT MEAN AN EXPERT

20   CAN'T SOMEHOW RELY ON OTHER SOURCES WITH A RELIABLE

21   METHODOLOGY?  NO.  BUT WHEN THEY ARE OUT THERE, EVEN ALL

22   SCIENTISTS WOULD AGREE YOU CAN'T IGNORE THEM.

23       I MEAN, REASONABLE SCIENTISTS MIGHT DISAGREE ON A

24   PARTICULAR STUDY'S FINDINGS, BUT THEY ARE GOING TO AGREE THAT

25   YOU HAVE TO AT LEAST LOOK AT THE DATA OUT THERE IF IT'S EPI

1    LITERATURE, IARC, ET CETERA, AND IT'S ON POINT.

2         AND IMPORTANTLY EVEN IN BENEDI, THERE'S NOT A PROBLEM

3    WITH FAILURE TO RULE OUT SOLE CAUSE.  IN THIS CASE THERE IS.

4    I MEAN, THERE'S A NUMBER OF THINGS THAT DR. HARRISON CAN'T

5    RULE OUT.  BUT WITH RESPECT TO THE PRINTING INDUSTRY, HE

6    SPECIFICALLY TESTIFIED, YOU'RE RIGHT, I CAN'T RULE IT OUT AS

7    A SOLE CAUSE, A SOLE CAUSE.  NOT A CONTRIBUTING CAUSE, NOT A

8    SUBSTANTIAL CAUSE, A SOLE CAUSE.  NEXT SLIDE.

9         SO THE NORRIS CASE THAT WE JUST SAW EARLIER, IT MAKES

10   CLEAR THAT EPI DOESN'T NECESSARILY END THE INQUIRY, BUT WHERE

11   IT EXISTS, YOU CAN'T IGNORE IT.  THAT'S THE HUGE POINT HERE.

12   I MEAN, IN TERMS OF WHAT CERTAIN STUDIES SHOW AND PLAINTIFFS

13   HAVE FILED A RESPONSE ABOUT, WELL, THIS STUDY SAYS THIS, WE

14   FOUND THIS STUDY THAT SAYS THAT, AND WE CAN TALK ABOUT IT.

15        BUT THE MORE RELEVANT INQUIRY AND THE MORE IMPORTANT OR

16   BIGGER PROBLEM HERE IS NOT SO MUCH WHETHER OR NOT THAT WAS A

17   WELL-DESIGNED STUDY, NOT SO MUCH WHETHER IT WAS STATISTICALLY

18   SIGNIFICANT, BUT IT'S THE FACT THAT HE DIDN'T EVEN CHOOSE TO

19   LOOK AT THEM.  THE GOOD, THE BAD, AND THE UGLY, YOU'VE GOT TO

20   LOOK AT WHAT'S OUT THERE.  AND IN THIS CASE IMPORTANTLY,

21   UNLIKE BENEDI WHERE THERE WAS NO BODY OF EPIDEMIOLOGICAL

22   LITERATURE, HARRISON TESTIFIED THAT THERE ARE, QUOTE,

23   HUNDREDS OF EPIDEMIOLOGICAL STUDIES ON BENZENE AND NHL.

24        AND AS SET FORTH IN THE BAUSCH AND LOMB CASE CITED

25   THERE, AN EXPERT'S FAILURE TO ADDRESS IT RENDERS THEIR THEORY

1    OR HIS OR HER THEORY UNRELIABLE.  AND THAT'S ONE OF THE

2    SAME -- ONE OF THE REASONS DR. HARRISON'S METHODOLOGY IS

3    UNRELIABLE.

4        IN THIS CASE DR. HARRISON -- AND AGAIN, PUTTING ASIDE

5    MINERAL SPIRITS, LET'S JUST TALK ABOUT BENZENE LITERATURE AND

6    NHL.  WITH RESPECT TO THE LITERATURE HE DID CLAIM TO REVIEW,

7    HE APPLIED THE BRADFORD HILL CRITERIA.  THOSE ARE

8    WELL-ACCEPTED CRITERIA.  DR. HARRISON'S DECLARATION TALKS

9    ABOUT THEM.

10       BUT IMPORTANTLY AND MOST IMPORTANTLY THEY ARE HIS

11   CRITERIA.  THEY ARE THE ONES HE SAYS HE USES TO ARRIVE AT HIS

12   CONCLUSION.  AND THERE'S A BUNCH OF DIFFERENT CRITERIA.  THE

13   TWO MOST IMPORTANT ONES -- AND EVEN DR. HARRISON AGREES WITH

14   THIS -- IS CONSISTENCY OF ASSOCIATION AND THE STRENGTH OF

15   ASSOCIATION.  IT'S NOT ENOUGH TO HAVE THE MOST -- THE BEST

16   STUDY IN THE WORLD, LOTS OF STATISTICAL SIGNIFICANCE, MAYBE

17   40,000 WORKERS ARE STUDIED AND IT HAS A POSITIVE FINDING.

18   YOU'VE GOT TO SEE THAT FINDING REPRODUCED.  REPRODUCIBILITY

19   IS ANOTHER WORD FOR CONSISTENCY.  AND STRENGTH OF ASSOCIATION

20   IS ANOTHER IMPORTANT CONCEPT THERE.

21       REAL QUICK JUST DISCUSSION OF THE STATISTICS INVOLVED IN

22   THESE STUDIES.  RELATIVE RISK IS A WORD YOU WILL HEAR.  IT'S

23   BASICALLY WHAT IS YOUR RISK AS COMPARED TO THE UNEXPOSED

24   POPULATION.  SOME COURTS -- WELL, EVERY COURT REQUIRES IN

25   TERMS OF STATISTICAL SIGNIFICANCE YOU HAVE TO BE AT GREATER

1   THAN A 1.0, WHICH MEANS YOUR CHANCE OF DEVELOPING WHATEVER

2   DISEASE IS SLIGHTLY HIGHER THAN THE GENERAL POPULATION.

3       AND IF IT'S STILL STATISTICALLY SIGNIFICANT AT LET'S SAY

4   A 1.2, WELL THAT'S A WEAK FINDING, BUT IT'S STATISTICALLY

5   SIGNIFICANT.  SOME COURTS REQUIRE MORE THAN THAT INCLUDING

6   THE FEDERAL JUDICIAL CENTERS REFERENCE MANUAL ON SCIENTIFIC

7   EVIDENCE.  AND WHAT THOSE COURTS SAY IS, LOOK, WE LIKE TO GET

8   TO 2.0 BECAUSE IF YOU HAVE A DOUBLING OF THE RISK, THERE'S

9   JUST LESS CHANCE OF CONFOUNDING OR BIAS OR ERROR OR WHATEVER

10  BEING THE CAUSE OF THE FINDING.

11      AND IN TERMS OF STATISTICAL SIGNIFICANCE, AGAIN YOU HAVE

12  TO BE GREATER THAN 1.0 AND THEN YOU'LL SEE THOSE BRACKETS

13  KNOWN AS CONFIDENCE INTERVALS THAT ARE PUT BEHIND WHATEVER

14  FINDING.  IF THAT CONFIDENCE INTERVAL INCLUDES THE NUMBER

15  1.0, THEN IT'S NOT STATISTICALLY SIGNIFICANT.  SO YOU MAY SEE

16  .9 TO 3.8.  THAT'S NOT STATISTICALLY SIGNIFICANT.  EVEN IF

17  ONE IS IN THERE, 1.0 TO 3.8, IT INCLUDES ONE, YOU CAN'T RULE

18  OUT CHANCE.

19      AND HERE IS A QUOTE FROM HARRISON'S GARCIA DECLARATION

20  WHERE HE TALKS ABOUT STRENGTH OF AN OBSERVED ASSOCIATION.  HE

21  WRITES THAT FINDING OF LARGE PRECISE RISKS WHICH REFLECT

22  INCREASED CONFIDENCE THAT AN ASSOCIATION IS NOT LIKELY DUE TO

23  CHANCE, BIAS OR CONFOUNDING FACTORS.  AND AGAIN, CONSISTENCY

24  OF ASSOCIATION.  HARRISON DEFINES THAT AS PATTERN OF ELEVATED

25  RISKS OBSERVED ACROSS SEVERAL INDEPENDENT STUDIES WOULD

1   SUPPORT OR STRENGTHEN AN INFERENCE OF CAUSALITY.

2   REPRODUCIBILITY OF FINDINGS CONSTITUTES ONE OF THE STRONGEST

3   ARGUMENTS FOR CAUSALITY.  AND THOSE ARE HARRISON'S WORDS.

4        AND DR. HARRISON DIDN'T CONSIDER STRENGTH OR CONSISTENCY

5   IN THIS CASE.  HE TESTIFIED THERE'S HUNDREDS OF STUDIES YET

6   HE COULDN'T TELL ME WHAT PERCENTAGE OF THOSE SHOWED A

7   STATISTICALLY SIGNIFICANT ASSOCIATION.  WHEN ASKED IF, WELL,

8   IS IT MORE THAN HALF?  HE STILL COULDN'T ANSWER THAT -- THAT

9   QUESTION.  HE SAID, I JUST DON'T KNOW, I DIDN'T DO THAT

10  ANALYSIS.

11       HE DIDN'T EVEN KNOW IF ANY OF THE STUDIES INVOLVED

12  SUBSTANCES THAT HAD SIMILAR BENZENE CONCENTRATIONS AS MINERAL

13  SPIRITS.  AGAIN HIS ANSWER WAS, I DON'T KNOW, THAT WASN'T

14  PART OF MY HOMEWORK.  AND HE ALSO DIDN'T DO A FOREST PLOT.

15  NOT SAYING THAT THAT'S REQUIRED.  BUT WHAT A FOREST PLOT IS

16  IS IT TAKES ALL THE STUDIES WITH 1.0 BEING THE MIDLINE AND

17  YOU GET A SENSE OF HOW STRONG THEY ARE, HOW MANY ARE BELOW

18  1.0, WHERE MOST OF THEM ARE FALLING.  HE DIDN'T EVEN DO ONE

19  OF THOSE.  I MEAN, THAT WOULD GIVE YOU A SENSE AS TO WHAT

20  SORT OF CONSISTENCY IS OUT THERE WITHOUT KNOWING AN ACTUAL

21  NUMBER; OF THE 198 THIS MANY WERE POSITIVE.

22       HE WAS ALSO ASKED ABOUT IF -- WHETHER OR NOT HE COULD

23  IDENTIFY ANY STUDY INVOLVING BENZENE, FORGET ABOUT MINERAL

24  SPIRITS, AND NHL THAT HAD A 2.0 OR GREATER RELATIVE RISK.

25  AND THE QUESTION WAS:  DR. HARRISON, DO YOU KNOW WHETHER OR

1    NOT THERE ARE ANY EPIDEMIOLOGICAL STUDIES THAT SHOW A

2    STATISTICALLY SIGNIFICANT INCREASED RISK OF MORE THAN 2.0 IN

3    TERMS OF BENZENE EXPOSURE -- SHOULD HAVE SAID AND NHL?

4    ANSWER WAS:  NOT AS I SIT HERE TODAY, I HAVE NOT DONE IT AS

5    PART OF MY HOMEWORK ON THIS CASE.

6         SIMILARLY IN THE BURST CASE HE WAS ASKED THE SAME

7    QUESTION ABOUT GASOLINE EXPOSURE STUDIES AND HE RESPONDED,

8    QUOTE, I DON'T KNOW, I WOULD HAVE TO EXAMINE THE PAPERS.  I'M

9    NOT PREPARED TO ANSWER YOUR QUESTION HERE, AND HE WAS

10   ULTIMATELY EXCLUDED AS UNRELIABLE.  AND THE COURT IN THAT

11   CASE NOTED THERE WAS NOTHING IN HIS REPORT AND NOTED THAT HE

12   WAS UNABLE AT DEPOSITION TO ANSWER THAT QUESTION.

13        DR. HARRISON'S OLD GARCIA DECLARATION DOESN'T SAVE HIM

14   HERE.  I MEAN, THINK ABOUT IT FOR A SECOND.  HE HAS DRAFTED A

15   DECLARATION INVOLVING A VERY DIFFERENT CASE, DIFFERENT

16   EXPOSURES, DIFFERENT PLAINTIFF FROM EIGHT YEARS AGO.  HE

17   DOESN'T FIT THE FACTS OF THIS CASE.  HE DOESN'T EVEN FIT THE

18   STYLE OF THE CASE NAME AND FACTS OF THIS CASE.  AND IF THAT

19   WERE ENOUGH, HE COULD JUST WALK AROUND WITH THAT NEXT -- NEXT

20   TIME HE HAS A CASE, IN A MONTH WHEN HE TESTIFIES.  NEXT YEAR

21   IT WILL BE NINE YEARS OLD, BUT IT WILL STILL BE GOOD ENOUGH,

22   AND THE YEAR AFTER THAT.  HE'S GOT TO DO SOMETHING WITH IT.

23        HE DIDN'T UPDATE THE STUDIES IN THIS CASE.  HE DIDN'T GO

24   THROUGH AND SAY, OH WELL, YOU KNOW WHAT, THIS STUDY HAS BEEN

25   CRITICIZED HERE.  HE DIDN'T DO ANY UPDATES.  HE JUST REFERRED

1    TO IT IN HIS REPORT WHOLESALE.  AND NOT ONLY DID HE NOT

2    UPDATE IT BUT HE DIDN'T DO ANYTHING TO FIT IT TO THE FACTS OF

3    THIS CASE.  HE DIDN'T EVEN LOOK AT IT TO SEE IF IT HAD

4    ANYTHING TO DO WITH MINERAL SPIRITS IN THERE.

5        SPECIFIC CAUSATION IS WHETHER OR NOT A PARTICULAR

6    SUBSTANCE -- AGAIN, IF YOU LOOK AT THE CASES, IT WAS A

7    GASOLINE CASE, IT WOULD BE GAS, FOR US IT WOULD BE MINERAL

8    SPIRITS -- WHETHER OR NOT THAT CAUSED A PARTICULAR

9    INDIVIDUAL'S INJURY.  AND EVEN IF A PLAINTIFF -- A PLAINTIFF

10   EXPERT CAN ESTABLISH THAT MINERAL SPIRITS CAUSES NHL, WHICH

11   DR. HARRISON CAN'T, HE STILL COULDN'T ESTABLISH SPECIFIC

12   CAUSATION WITH RESPECT TO MR. BOYKIN.

13       AND IT'S IMPORTANT TO NOTE THERE IS NO DIAGNOSTIC TEST

14   FOR DETERMINING WHETHER OR NOT NHL WAS CAUSED BY BENZENE OR

15   ANY OTHER CHEMICAL.  IN FACT, AS WE SAW, MOST OF THE CASES

16   ARE IDIOPATHIC, SO EVEN THE BEST SCIENTISTS IN THE WORLD

17   DON'T KNOW WHAT CAUSES THEM.  BUT IT'S NOT AS THOUGH, YOU

18   KNOW, YOU HAVE ASBESTOSIS OR SOMETHING.  IT'S UBIQUITOUS

19   CHEMICAL.  AND IN TERMS OF CAUSES OF THE DISEASE AND YOU HAVE

20   GOT GENETIC FACTORS, YOU HAVE GOT FAMILY HISTORY FACTORS, YOU

21   HAVE GOT ALL KINDS OF RISK FACTORS, VIRUSES, ESPECIALLY WITH

22   NHL VIRUSES.

23       THE COURT:  SO IT WOULDN'T ARISE FROM A TOXICOLOGY

24   REPORT OR --

25       MR. MCGOLDRICK:  CORRECT.  CORRECT.

1          *THE COURT:*  -- KIND OF AUTOPSY.

2          *MR. MCGOLDRICK:*  THAT'S CORRECT.  AND DESPITE ALL

3     THAT, IT WAS DR. HARRISON THAT CHOSE TO USE A DIFFERENTIAL

4     DIAGNOSIS IN THIS CASE TO SUPPORT HIS SPECIFIC CAUSATION

5     OPINION.  DIFFERENTIAL DIAGNOSIS IS -- IT'S A STANDARD

6     SCIENTIFIC TECHNIQUE THAT DOCTORS USE ESPECIALLY WITH

7     PATIENTS, AND IT'S A PROCESS OF RULING IN A MOST LIKELY CAUSE

8     BY RULING OUT ALL THE OTHER POTENTIAL CAUSES.

9          AND NOT ONLY DO YOU HAVE TO RULE THEM OUT, BUT IF YOU

10    LOOK AT THE CASE LAW, IT REQUIRES YOU TO RULE THEM OUT WITH

11    REASONABLE MEDICAL CERTAINTY.  KIND OF -- IT'S MORE THAN

12    MORE-LIKELY-THAN-NOT.  AND IN THIS CASE, WHATEVER HARRISON

13    DID IT'S NOT A DIFFERENTIAL DIAGNOSIS THAT WE'LL SEE IN A FEW

14    SLIDES HERE.  HE RULED EVERYTHING IN AND HE BELIEVES HE HAS

15    THE RIGHT TO RULE EVERYTHING IN AND NOT RULE ANYTHING OUT.

16         WELL, YOU CAN'T RULE ANYTHING IN UNTIL YOU HAVE RULED

17    EVERYTHING OUT WITH REASONABLE PARTICULARITY.  AND HIS NOTION

18    THAT, WELL, ALL OF THESE THINGS CONTRIBUTE, THERE IS NO SAFE

19    THRESHOLD, THEY ALL JUST GET ON THE GRAVY TRAIN AND WE RULE

20    THEM IN, THAT'S NOT A DIFFERENTIAL DIAGNOSIS.  I DON'T KNOW

21    WHAT IT'S CALLED, BUT IT'S NOT A DIFFERENTIAL DIAGNOSIS.

22         AND ESPECIALLY HERE BECAUSE DR. HARRISON TESTIFIED THAT

23    MOST CASES ARE IDIOPATHIC, WHEN YOU LOOK AT THE CASE LAW,

24    THEY SAY, NO, NO, NO, YOU CAN'T USE A DIFFERENTIAL DIAGNOSIS

25    WHEN MORE THAN HALF THE CASES HAVE AN UNKNOWN CAUSE.  HOW DO

1    YOU DO THAT?  HOW DO YOU KNOW THAT THIS PATIENT ISN'T ONE OF

2    THE PEOPLE OR THIS PERSON ONE OF THE PEOPLE IN THAT

3    GREATER-THAN-50-PERCENT CATEGORY?  YOU DON'T.  SO THEY VIEW

4    WITH GREAT SUSPICION ANY EFFORTS TO USE DIFFERENTIAL

5    DIAGNOSIS WHEN YOU HAVE IDIOPATHIC CAUSE.

6        OTHER CASES TALK ABOUT A RELATED TOPIC WHICH IS THEY

7    VIEW WITH SUSPICION USE OF A DIFFERENTIAL DIAGNOSIS WHEN YOU

8    HAVE A UBIQUITOUS CHEMICAL.  WE ARE ALL BREATHING IT RIGHT

9    NOW.  AND WITH RESPECT TO DR. HARRISON, I DON'T KNOW WHO

10   WOULD BE IN THAT IDIOPATHIC CATEGORY MORE THAN 50 PERCENT

11   BECAUSE APPARENTLY, ACCORDING TO HIM, IF YOU WORK AT ANY

12   OCCUPATIONAL EXPOSURE TO ANY AMOUNT LET'S SAY OF BENZENE,

13   YOU'RE NOT IDIOPATHIC.  HE CLAIMS THAT WHEN HE RULES IN THAT

14   RISK FACTOR, IT MEANS IT'S NOT IDIOPATHIC.

15       SO ANYONE WHO HAS HAD ANY OCCUPATIONAL EXPOSURE IS NOT

16   IN THAT GREATER-THAN-50-PERCENT CATEGORY.  AND THEN AS WE

17   WILL SEE, HE WAS EVEN ASKED, WHAT ABOUT AMBIENT AIR?  CAN YOU

18   RULE THAT OUT?  HE COULDN'T.  SO UNLESS YOU'RE BREATHING IN A

19   BUBBLE, NOT WORKING, I DON'T KNOW WHO IS IN THAT

20   GREATER-THAN-50-PERCENT CATEGORY.

21       THE OTHER CASE THAT PLAINTIFFS RELY HEAVILY ON IS THE

22   WESTBERRY CASE AND THAT SIMILARLY DOES NOT SAVE DR.

23   HARRISON'S FLAWED DIFFERENTIAL DIAGNOSIS.  IN THAT CASE THE

24   SUBSTANCE AT ISSUE WAS TALC, TALCUM POWDER BASICALLY, TALC.

25   AND IT'S NOT UBIQUITOUS LIKE BENZENE.  AND THE DISEASE AT

1    ISSUE WAS SINUS PROBLEMS; WASN'T NHL.  AND WAS THERE AN ISSUE

2    WITH IDIOPATHIC DISEASE?  NO.

3        THE ONLY THING YOU HAVE SEEN IN THIS ENTIRE CASE IS THE

4    RESPONSE OF PLAINTIFFS' COUNSEL WHEREIN ON PAGE THREE, AS I

5    RECALL, THEY SAY, WITHOUT BASIS, WITHOUT CITATION, THEY JUST

6    SIMPLY AVER THAT, WELL, YOU'D BE HARD-PRESSED TO FIND A

7    DISEASE WITH MORE UNKNOWN CAUSES THAN A SINUS INFECTION.

8    WELL, THERE'S NO EVIDENCE FROM THE CASE WHATSOEVER THAT THE

9    IDIOPATHIC ISSUE WAS OF CONCERN TO THE COURT.

10        AND MOST IMPORTANTLY, THE COURT ALLOWED THIS

11    DIFFERENTIAL DIAGNOSIS FOR A NUMBER OF VERY SPECIFIC REASONS.

12    ONE WAS THE TEMPORAL PROXIMITY.  HE'D BE EXPOSED TO THE TALC

13    POWDER, HE WOULD GET WORSE SINUS SYMPTOMS.  AND YOU WILL SEE

14    THAT IN SOME OF THE CASES.  WHERE YOU HAVE CLOSE PROXIMITY,

15    THAT GIVES A LITTLE MORE CREDENCE TO THE DIFFERENTIAL

16    DIAGNOSIS IN THE ULTIMATE CONCLUSION.

17        HERE BY CONTRAST WE HAVE A 40-YEAR LATENCY PERIOD.  WE

18    WILL SEE IN A MOMENT THAT THIS LYMPHOMA WAS, ACCORDING TO

19    HARRISON, MOST LIKELY PRESENT IN 2000.  SO WE ARE GOING BACK

20    TO 1960.  SO, THAT'S THE OTHER END OF THE SPECTRUM FROM CLOSE

21    TEMPORAL PROXIMITY.  AND HERE THERE WAS NO -- IN THE

22    WESTBERRY CASE THERE WAS NO PROBLEM WITH RULING OUT A SOLE

23    CAUSE AS COMPARED TO OUR CASE WHERE THERE IS.

24        ANOTHER IMPORTANT CONSIDERATION THAT THE COURT NOTED --

25    I MEAN, THIS -- THIS GENTLEMAN WAS -- HIS WORK AREA, HE HAD

1    HAD FOOTPRINTS IN THE WHITE POWDER.  THERE WAS CLOUDS OF

2    TALCUM POWDER.  AND THE DOCTOR OFFERING THE OPINION TOOK HIM

3    OUT OF THE WORK PLACE PURPOSEFULLY TO SEE IF HIS SYMPTOMS

4    WOULD RESOLVE, AND THE COURT NOTED THAT HE DID THAT AND IN

5    FACT THEY DID RESOLVE OR GET BETTER.

6         SO, IT'S A VERY, VERY DIFFERENT SITUATION FROM THIS

7    CASE.  AND IMPORTANTLY, IT WASN'T AS THOUGH THERE WAS A BUNCH

8    OF EPIDEMIOLOGICAL LITERATURE OUT THERE.  THERE WASN'T.  SO

9    THE COURT ALLOWED IT.

10        IMPORTANTLY IN THIS CASE DR. HARRISON TESTIFIED THAT HE

11   FAILED TO RULE OUT PRINTING EXPOSURES THAT MR. BOYKIN HAD

12   WHILE WORKING AS A PRINTER AS THE SOLE CAUSE.  THE QUESTION

13   WAS:  CAN YOU RULE OUT HIS EXPOSURE TO BENZENE AS A PRINTER

14   AS BEING THE SOLE CAUSE OF HIS NON-HODGKIN'S LYMPHOMA?  DR.

15   HARRISON ANSWERED, I CAN'T RULE IT OUT COMPLETELY.  I DON'T

16   THINK IT'S LIKELY COMPARED TO THE BENZENE EXPOSURE HE HAD AT

17   YAMAHA, BUT HE DID WORK AS A PRINTER AND HE COULD HAVE HAD

18   BENZENE EXPOSURE DURING THAT TIME.  THAT WAS HIS ANSWER AT

19   DEPOSITION.

20        GO TO THE NEXT LINE.  ACTUALLY COULD YOU PLEASE GO BACK

21   TO THE PRIOR SLIDE?  SORRY.  IT'S IMPORTANT TO NOTE IN TERMS

22   OF PRINTING EXPOSURES -- OH, YEAH.  ALL RIGHT.  SO WE ARE

23   GOING TO COMING UP TO THE SLIDE.  YOU WILL SEE HERE BASED ON

24   HIS ANSWER HE TRIED TO MINIMIZE THE PRINTING ROLE AT THE TIME

25   OF HIS DEPOSITION BY SUGGESTING THAT THE EXPOSURES WERE

1    PROBABLY LESS THAN MR. BOYKIN'S EXPOSURES AT YAMAHA.  SO

2    LET'S GO FORWARD.  CAN WE GO FORWARD ONE MORE SLIDE AND WE

3    WILL GO BACK.

4        ALL RIGHT.  HERE THIS IS AN IMPORTANT POINT TO CONSIDER.

5    YOU WILL SEE AT THE TOP OF THIS SLIDE THERE'S A TABLE TWO AND

6    AT THE BOTTOM OF THE SLIDE THERE'S ANOTHER TABLE TWO.  THIS

7    IS A TABLE THAT WAS PREPARED BY DR. STEWART.  AND YOU WILL

8    SEE THE FIRST ITERATION IS THE ONE AT THE TOP.  HE'S GOT

9    NOTHING ON THE LINE FOR PRINTER WHERE IT SAYS 1973 TO 1979.

10       AND IF YOU LOOK AT THE BOTTOM YOU SEE THE TOTAL PPM

11   YEARS RANGE.  THE LOW, ACCORDING TO DR. STEWART -- OBVIOUSLY

12   WE TAKE ISSUE WITH HIS NUMBERS -- BUT IT'S -- THE LOW IS 25.2

13   PPM YEARS AND THE HIGH IS 133.8 PPM YEARS.  DR. HARRISON

14   THOUGHT WHEN HE FIRST FORMED HIS OPINION WRITING HIS REPORT

15   AND WHEN HE WAS ANSWERING OUR QUESTIONS UNDER OATH AT HIS

16   DEPOSITION -- TWO DAYS OF IT -- THAT THAT TOTAL RANGE FOR ALL

17   OF MR. BOYKIN'S CUMULATIVE EXPOSURE AS CALCULATED BY DR.

18   STEWART WAS ATTRIBUTABLE TO HIS WORK AS A MOTORCYCLE MECHANIC

19   AT COLUMBIA YAMAHA.

20       LITTLE DID DR. HARRISON KNOW -- AND WE KNEW AT HIS

21   DEPOSITION, OR AT LEAST I HAD A COPY OF THIS, SO I DON'T KNOW

22   IF HE DIDN'T GET IT OR WHAT HAPPENED.  BUT IF YOU LOOK AT THE

23   BOTTOM, DR. STEWART HAD ALREADY REVISED HIS REPORT.  AND YOU

24   WILL SEE THAT EVERYTHING JUST MOVED UP A LINE.  AND THAT

25   MASSIVE RANGE OF 9.1 ON THE BOTTOM UP TO 112 PPM YEARS IS ALL

1    ACCORDING TO DR. STEWART ATTRIBUTABLE TO MR. BOYKIN'S WORK AS

2    A PRINTER FROM 1973 TO 1979.

3         AND IN FACT, DR. HARRISON IN HIS DEPOSITION SUGGESTED

4    BECAUSE THE LINE WAS BLANK IN THE FIRST ITERATION THAT, OH, I

5    SUPPOSE DR. STEWART DIDN'T HAVE ENOUGH INFORMATION TO MAKE A

6    CALCULATION.  SO, HE'S RENDERING AN OPINION ON SPECIFIC

7    CAUSATION IN THIS CASE ERRONEOUSLY THINKING THAT EXPOSURES

8    ARE ATTRIBUTABLE TO YAMAHA THAT AREN'T.  AND THOSE EXPOSURES

9    ARE AS MUCH AS 83.7 PERCENT OF THE TOTAL.

10        GO BACK TO THE PREVIOUS SLIDE.  DR. HARRISON ALSO FAILED

11   TO RULE OUT PCB'S.  DR. HARRISON HAS TESTIFIED MANY TIMES

12   THAT PCB'S CAUSE NHL.  THERE ARE A SERIES OF PCB CASES HE'S

13   AN EXPERT IN.  AND HE WAS ASKED, HAVE YOU RULED OUT PCB'S AS

14   THE CAUSE OF MR. BOYKIN'S NON-HODGKIN'S LYMPHOMA?  HIS ANSWER

15   WAS, I WAS NOT ABLE TO.  HE ALSO FAILED TO RULE OUT GASOLINE

16   EXPOSURES.  THERE'S NO GASOLINE DEFENDANT IN THIS CASE.  NO

17   GASOLINE SUPPLIER WAS SUED.

18        AND IMPORTANTLY DR. STEWART IN HIS REPORT NOTED THAT

19   GASOLINE EXPOSURES WERE REPORTED TO BE THE MOST COMMON

20   EXPOSURE.  AND WE HAVE SEEN HOW MUCH BENZENE IS IN GASOLINE

21   AS COMPARED TO MINERAL SPIRITS.

22        HARRISON TESTIFIED, MY ONLY OPINION WOULD BE THAT

23   GASOLINE, WHICH DOES CONTAIN VERY SMALL AMOUNTS OF BENZENE

24   WOULD, COULD ALSO HAVE ADDED TO HIS CUMULATIVE EXPOSURE OVER

25   THE YEARS AS A MECHANIC.  HARRISON ALSO FAILED TO RULE OUT

1    PERSONAL HOME GARAGE EXPOSURES.  THE ENTIRE TIME MR. BOYKIN

2    WAS WORKING AT YAMAHA AS A MOTORCYCLE MECHANIC HE WAS ALSO

3    DOING HOME GARAGE WORK ON MOTORBIKES, ET CETERA, AND HE'D

4    BEEN DOING THAT FOR A WHILE.

5        DR. HARRISON TESTIFIED HE UNDOUBTEDLY HAD HOME EXPOSURE

6    DOING MOTORCYCLE WORK IN HIS HOME GARAGE.  AND HE ALSO FAILED

7    TO RULE OUT BACKGROUND EXPOSURES.  THIS IS IMPORTANT WHEN WE

8    GET TO THE NO SAFE THRESHOLD STUFF LATER.  DR. HARRISON WAS

9    ASKED IF HE -- AND IT WAS REFERRING TO MR -- IT WAS A

10   HYPOTHETICAL QUESTION ABOUT AN INDIVIDUAL.  SORRY.  NO, IT'S

11   ABOUT MR. BOYKIN.  THE QUESTION IS, IF HE CAME TO ME OR HIS

12   FAMILY CAME TO ME AND SAID, DR. HARRISON, WHAT DO YOU THINK?

13   DID MR. BOYKIN GET NHL FROM JUST ANY BACKGROUND EXPOSURE TO

14   BENZENE, I'D SAY, QUOTE, I WOULDN'T KNOW, I COULDN'T TELL

15   YOU.  YOU COULDN'T RULE IT OUT; COULD YOU?  I COULDN'T RULE

16   IT OUT.  SO EVEN THE BENZENE IN BACKGROUND AIR DR. HARRISON

17   COULDN'T RULE OUT.  TWO SLIDES FORWARD.

18       AND HERE'S THE QUESTION AND ANSWER ON HIS MAJOR ERROR IN

19   TERMS OF EXPOSURE WHILE MR. BOYKIN WAS WORKING AS A MECHANIC.

20   THE QUESTION WAS, SO IS IT YOUR UNDERSTANDING OF DR.

21   STEWART'S REPORT THAT HIS CUMULATIVE DOSE OPINION AS FAR AS

22   EXPRESSED IN TABLE TWO, PAGE 23, IS -- WHICH SAYS UNDER

23   SUMMARY OF CUMULATIVE EXPOSURES TO PHILIP BOYKIN, QUOTE,

24   TOTAL PPM YEARS RANGE LOW OF 25.2, HIGH OF 133.8, THAT

25   THIS -- THAT THIS IS HIS OPINION RELATIVE SOLELY TO HIS WORK

1    AS A MECHANIC?  AND THE ANSWER WAS, CORRECT.

2         NEXT SLIDE.  THIS SLIDE JUST SORT OF CREATES A TIMELINE

3    JUST TO SORT OF SEE WHAT WE ARE TALKING ABOUT HERE.  ONE

4    THING THAT'S MISSING ON THE SLIDE IS YOU WILL SEE THAT

5    JULY 22ND, 2009 MR. BOYKIN PASSED.  HE WAS DIAGNOSED PRIOR TO

6    THAT.  BUT IN 2000 HE HAD IMAGING DONE AT A HOSPITAL.  DR.

7    HARRISON WAS ASKED ABOUT IT.  AND DR. HARRISON TESTIFIED, AND

8    I THINK WE WILL SEE IT ON A SLIDE HERE MOMENTARILY, THAT MORE

9    LIKELY THAN NOT HIS LYMPHOMA WAS PRESENT, ALREADY THERE IN

10   2000.

11        IN FACT, HE HAD -- HE TESTIFIED THAT IT WOULD BE

12   EXTRAORDINARILY UNLIKELY TO SEE THE SAME TYPE OF UNDERLYING

13   LYMPHOMA CHARACTERISTICS IN 2000 AND THEN HAVE AN INDIVIDUAL

14   DIAGNOSED IN 2009 WITH THAT TYPE OF NON-HODGKIN'S LYMPHOMA

15   AND FOR IT TO BE TWO SEPARATE DISEASES WITH SEPARATE CAUSES.

16        SO, IF WE TAKE 2000 AND BACK-TRACK TO 1960, WHICH IS 40

17   YEARS, THAT'S -- THAT'S THE WINDOW WE ARE LOOKING AT.  AND

18   YOU WILL SEE THERE IS A REFERENCE TO DR. HARRISON TESTIFYING

19   THAT THE LATENCY PERIOD, WHICH IS HOW LONG THE EXPOSURES CAN

20   GO ON BEFORE YOU GET -- IT'S TIME FROM FIRST EXPOSURE TO

21   ONSET OF THE DISEASE COULD BE AS LONG AS 40 YEARS.  YOU WILL

22   SEE IN THAT TIME PERIOD OF 1973 TO 1979 HE'S GETTING UP TO

23   83.7 PERCENT OF HIS BENZENE EXPOSURES DURING THAT SHORT TIME

24   PERIOD WHEN MR. BOYKIN WAS A PRINTING PRESS OPERATOR.

25        FROM '81 TO 2009 MR. BOYKIN WORKED AS A MOTORCYCLE

1    MECHANIC, MOST COMMON EXPOSURE WAS GASOLINE.  WE, SAFETY

2    KLEEN, WAS INVOLVED MID-80'S TILL -- WELL, WE ARE BEING

3    GENEROUS HERE.  IT WAS PROBABLY 2003, BUT NONETHELESS, IN

4    THAT TIME PERIOD, AND THERE ARE A WHOLE HOST OF RISK FACTORS

5    THAT DR. HARRISON HAS TESTIFIED AND ADMITTED HE CAN'T RULE

6    OUT.

7        NEXT SLIDE, PLEASE.  THIS I DON'T WANT TO SPEND TOO MUCH

8    TIME ON, BUT IT'S JUST -- IT'S AN IMPORTANT CONSIDERATION

9    GIVEN DR. HARRISON'S POSITION WITH REGARDING SPECIFIC

10   CAUSATION AND GIVEN HIS LONG LATENCY TESTIMONY.  DR.

11   HARRISON'S PREVIOUSLY TESTIFIED THAT DISEASES LIKE NHL AND

12   MULTIPLE MYELOMA ARE MONOCLONAL DISEASES.  BASICALLY YOU HAVE

13   A CELL THAT GOES HAYWIRE, FLIPS, AND IT'S THE START OF THE

14   CANCER DEVELOPMENT.

15       AND HERE IS WHAT HE'S TESTIFIED TO IN THE PAST.  HE'S

16   TESTIFIED THAT NHL IS A MONOCLONAL DISEASE AND HE'S -- HE'S

17   AGREED THAT A SINGLE CELL BECOMES MALIGNANT, THEN GROWS OVER

18   TIME, AND THAT'S WHAT BASICALLY MONOCLONAL MEANS.  HE SAYS

19   CORRECT.

20       IN ANOTHER CASE, NOT THIS CASE -- ALTHOUGH HE HAD

21   TROUBLE WITH THE QUESTION IN THIS CASE -- IN ANOTHER CASE HE

22   TESTIFIED AS FOLLOWS.  THE QUESTION WAS, CAN WE AGREE THAT

23   EXPOSURES OCCURRING AFTER THAT MALIGNANT TRANSFORMATION

24   OCCURRED ARE NOT RELEVANT TO THE CAUSE OF THE DISEASE?  AND

25   HIS TESTIMONY WAS IN ABOUT -- I THINK IT'S THERE -- IT WAS IN

1    2010.  IT WASN'T THAT LONG AGO.  AND HIS ANSWER WAS,

2    PROBABLY, I WOULD AGREE.

3         NOW, IN THIS CASE HE WAS ASKED ABOUT IT ON DAY ONE OF

4    HIS DEPOSITION.  HE WAS KIND OF CAUGHT LIKE A DEER IN THE

5    HEADLIGHTS AND COUNSEL GAVE HIM A TIME-OUT ON IT.  BUT THE

6    POINT HERE IS FIRST THAT IT'S FURTHER UNDERMINING HIS

7    CREDIBILITY AND RELIABILITY.  BUT SECONDLY, WE HAVE A

8    SITUATION WHERE ACCORDING TO DR. HARRISON YOU HAVE CAUSATIVE

9    EXPOSURES AS EARLY AS 1960, YOU HAVE GOT THESE MASSIVE

10   PRISTINE EXPOSURES IN THE 1970'S, AND THEN ALL OF THE

11   DEFENDANTS IN THIS CASE DON'T EVEN GET INVOLVED UNTIL THE MID

12   TO LATE 1980'S.  AND HE'S TESTIFIED BEFORE THAT WHEN YOU HAVE

13   EXPOSURES AFTER THE MALIGNANT TRANSFORMATION, THEY ARE NOT

14   RELEVANT.  THAT'S AN IMPORTANT CONSIDERATION.

15        WE TALKED A LITTLE BIT EARLIER ABOUT DR. HARRISON'S NEW

16   AFFIDAVIT BEING A MOVING TARGET WHICH FURTHER UNDERMINES HIS

17   RELIABILITY.  FROM MY STANDPOINT IN TERMS OF THE RELIABILITY

18   QUESTION, YOU KNOW, WHETHER OR NOT THAT NEW AFFIDAVIT COMES

19   IN, ONE THING IS CLEAR UNDER EITHER SCENARIO; FURTHER

20   UNDERMINES HIS RELIABILITY.  I MEAN, THE MERE FACT THAT HE'S

21   DOING IT, AND WE HAVE SEEN THE CASE LAW THAT TALKS ABOUT THE

22   IMPROPRIETY OF DOING THAT IN RESPONSE TO AN ATTACK -- IS

23   FURTHER EVIDENCE OF HIS UNRELIABILITY.

24        AND HE -- AND COUNSEL HAS ALREADY ACKNOWLEDGED THAT THE

25   PURPOSE OF IT WAS TO RESPOND TO VARIOUS CRITICISMS.  AND WE

1    WILL SEE HERE IN THE BAUSCH AND LOMB CASE THE COURT HAS RULED

2    THAT AN EXPERT'S WILLINGNESS TO ABANDON OR QUALIFY OPINIONS

3    INCLUDING WHEN FACED WITH A DAUBERT CHALLENGE UNDERMINES THE

4    RELIABILITY OF HIS OR HER OPINIONS.  NEXT SLIDE, PLEASE.

5         ALL RIGHT.  SO, DR. HARRISON CLAIMS HE REVIEWED MANY

6    STUDIES EVALUATING THE RISK OF NHL WITH EXPOSURE TO MINERAL

7    SPIRITS.  HIS REPORT VERY CLEARLY FOCUSED ON ONE QUESTION AND

8    ONE QUESTION ALONE, AND THAT IS WHETHER OR NOT BENZENE CAN

9    CAUSE NHL.  HE DOESN'T CITE ANY STUDIES IN HIS REPORT LET

10   ALONE ANY STUDIES THAT INVOLVE MINERAL SPIRITS.  AND IN FACT,

11   EVEN WHEN FACED WITH THIS DAUBERT CHALLENGE AND EVEN IN THE

12   WAKE OF HIM CREATING A NEW AFFIDAVIT, THEY STILL ONLY COME

13   FORWARD WITH A FEW STUDIES WHICH THEY CLAIM OR WE'LL HEAR ANY

14   WAY ARE MINERAL SPIRITS.

15        WELL, THEY ARE NOT FIRST AND FOREMOST, A.  AND B, EVEN

16   IF THEY WERE, AGAIN, BEFORE WE'RE GETTING INTO SORT OF THE

17   TRUTH OF THE MATTER ASSERTED, IT'S THE FACT THAT HE DIDN'T

18   EVEN LOOK AT IT.  THAT'S THE NUMBER ONE PROBLEM.  NUMBER TWO,

19   EVEN IF THERE WERE STUDIES ABOUT MINERAL SPIRITS, WHICH THERE

20   ARE NOT -- AND THEY WERE STATISTICALLY SIGNIFICANT, FOUR,

21   FIVE, SIX OUT OF A HUNDRED?  HE'S -- THERE'S NO EVIDENCE IN

22   HERE HOW MANY STUDIES THERE ARE ON MINERAL SPIRITS.  AND HE'S

23   CLEARLY FAILED TO APPLY HIS OWN CRITERIA, THE BRADFORD HILL

24   CRITERIA.  HE HAS NO IDEA ABOUT THE REPRODUCIBILITY OF THE

25   FINDINGS.  AND WE KNOW HE DOESN'T KNOW ANYTHING ABOUT THE

1    STRENGTH OF ASSOCIATION IN ANY OF THOSE STUDIES.

2         AS MENTIONED EARLIER AND CITED IN SOME OF THIS DAUBERT

3    CASE LAW INCLUDING THIS MITCHELL VERSUS GENCORP CASE, WHEN

4    YOU FORM YOUR OPINIONS AND THEN AFTERWARDS YOU GO LOOKING FOR

5    SUPPORT, THAT'S THE ANTITHESIS OF THE SCIENTIFIC METHOD AND

6    IT'S UNRELIABLE.

7         AND ONE POINT JUST TO NOTE -- IT'S NOT ALL THAT TERRIBLY

8    IMPORTANT, BUT IT WAS INTERESTING JUST IN TERMS OF SOME OF

9    THE NEW STUFF COMING OUT IN HIS AFFIDAVIT.  FOR THE FIRST

10   TIME EVER WE SEE HIM USING A REFERENCE TO FREQUENT, REGULAR

11   AND PROXIMATE EXPOSURES TO BENZENE FROM SAFETY KLEEN

12   PRODUCTS, AND THAT'S NOT SOMETHING HE TALKED ABOUT BEFORE.

13   HE JUST TALKED ABOUT THE WEIGHT OF THE EVIDENCE BEFORE, AND

14   IN FACT THAT'S AN ASBESTOS STANDARD THAT'S NOT APPLICABLE

15   HERE.

16        SO, THE NO SAFE THRESHOLD THEORY IS ONE THAT'S BEEN

17   REJECTED BY THE COURTS.  AND HIS ENTIRE APPROACH IN THIS CASE

18   AND HIS ENTIRE APPROACH WITH RESPECT TO HIS NEW OPINIONS IN

19   HIS AFFIDAVIT, YOU KNOW, BASICALLY THE NEW OPINION ON THIS

20   FRONT IS, WELL, I DON'T HAVE TO WORRY ABOUT IDIOPATHIC

21   BECAUSE ONCE I RULE IT IN, IT DOESN'T MATTER, I'M ALLOWED TO

22   RULE EVERYTHING IN, I DON'T HAVE TO RULE ANYTHING OUT.  THOSE

23   ARE NEW OPINIONS, BUT THEY'RE PREDICATED ON THE NO SAFE

24   THRESHOLD THEORY WHICH HAS BEEN ROUNDLY REJECTED BY THE

25   COURTS THAT HAVE LOOKED AT IT AND IT'S ALSO BEEN REJECTED IN

1    CASES WHERE PEOPLE -- WHERE EXPERTS ARE TRYING TO DO OR USE A

2    DIFFERENTIAL DIAGNOSIS.

3        WE WILL SEE, FOR EXAMPLE, HERE THE HENRICKSEN VERSUS

4    CONOCOPHILLIPS CASE.  THE COURT THERE EXCLUDED TESTIMONY OF

5    AN EXPERT WHO OPINED THAT WHEN NO SAFE THRESHOLD OF EXPOSURE

6    TO A CARCINOGEN HAS BEEN ESTABLISHED, EACH AND EVERY EXPOSURE

7    WILL INCREASE THE DEVELOPMENT OF CANCER AS UNRELIABLE

8    METHODOLOGY.

9        ONE THING I WILL NOTE ON THIS LINE IS JUST THE VERY

10   BOTTOM POINT.  IT'S A CITE TO A CASE CALLED BAKER VERSUS

11   CHEVRON.  IN THAT CASE THEY ALSO ADDRESS THE ISSUE AND THEY

12   NOTED THAT, QUOTE, SINCE BENZENE IS UBIQUITOUS, CAUSATION

13   UNDER THE ONE-HIT THEORY, WHICH IS ALSO KNOWN AS THE NO

14   THRESHOLD THEORY, COULD NOT BE ESTABLISHED BECAUSE IT WOULD

15   BE JUST AS LIKELY THAT AMBIENT BENZENE WAS THE CAUSE OF

16   PLAINTIFF'S ILLNESS.

17       NEXT SLIDE.  AGAIN, IN THIS CASE, YES, IARC HAS NOT

18   CONCLUDED THAT BENZENE CAUSES NHL AND MOST OF THE STUDIES

19   HAVE BEEN NEGATIVE.  YES, OF THE RECENT META-ANALYSIS OF

20   WHICH STEINMAUS IS ONE, THEY HAVE FOUND NO STATISTICALLY

21   SIGNIFICANT ASSOCIATION.  THAT'S WITH RESPECT TO BENZENE AND

22   NHL.  BUT AGAIN, HE DIDN'T APPLY HIS OWN CRITERIA ON THAT

23   FRONT AND HE HASN'T ESTABLISHED REPRODUCIBILITY OF FINDINGS

24   AND STATISTICAL SIGNIFICANCE.

25       BACKING UP TO THE MORE IMPORTANT QUESTION, HE DIDN'T DO

1    ANYTHING WITH RESPECT TO MINERAL SPIRITS.  HE DIDN'T EVEN

2    CONSIDER THE AUTHORITATIVE AGENCIES THAT HE OFTEN RELIES ON

3    AND WHAT THEY FOUND EVEN THOUGH HE ACKNOWLEDGED THAT THEY

4    HAVE LOOKED AT IT.  HE DIDN'T CONSIDER ALL THE

5    EPIDEMIOLOGICAL LITERATURE OUT THERE.  HE'S MADE NO EFFORT IN

6    THIS CASE TO DEMONSTRATE WHY IT'S ALL RIGHT TO DO THAT AND

7    RENDER HIS OPINION WITH RESPECT TO US.  AND WE HAVE SEEN THE

8    CASE LAW MADE CLEAR THAT JUST SAYING IT CONTAINS BENZENE IS

9    NOT ENOUGH.

10        HERE'S SOME OF THE THINGS THAT HARRISON DIDN'T KNOW.

11   AGAIN, HE DIDN'T KNOW WHAT IARC SAYS OR ANY OF THE LITERATURE

12   ABOUT MINERAL SPIRITS.  HE DIDN'T KNOW WHAT PERCENTAGE OF

13   STUDIES FOR BENZENE IN NHL WERE STATISTICALLY SIGNIFICANT.

14   HE DIDN'T EVEN KNOW WHETHER OR NOT THAT WAS MORE THAN HALF.

15   HE WAS ASKED ABOUT POSITIVE FINDINGS.  SAME THING.  HE DIDN'T

16   KNOW.

17        HE DIDN'T KNOW ABOUT ANY STUDIES THAT HAD A GREATER THAN

18   2.0.  AND HE DIDN'T KNOW IF ALTERNATE EXPOSURES, OF WHICH

19   THERE ARE MANY INCLUDING SOME THAT HAVE NOTHING TO DO WITH

20   BENZENE -- PCP HAS NOTHING TO DO WITH BENZENE.  A LOT OF THE

21   EXPOSURES IN THE PRINTING INDUSTRY HAVE NOTHING TO DO WITH

22   BENZENE.  HE COULDN'T RULE THEM OUT AND HE COULDN'T EVEN RULE

23   OUT ONE OF THEM AT LEAST AS A SOLE CAUSE.

24        IN THE BURST CASE DR. HARRISON APPROACHED IT THE SAME

25   WAY CLAIMING THAT THE WEIGHT OF THE EVIDENCE SUPPORTS A

1    CAUSAL RELATIONSHIP BETWEEN AML AND BENZENE.  AGAIN, HE

2    DIDN'T LOOK AT THE RIGHT SUBSTANCE.  THE COURT KICKED HIM TO

3    THE CURB ON THAT AND SAID IT'S NOT RELEVANT, YOU FAILED THE

4    GENERAL CAUSATION TEST.

5         NEXT SLIDE, PLEASE.  HERE IS WHERE THE COURT STATES

6    THAT, QUOTE, THE SIMPLE EXPLANATION THAT GASOLINE CONTAINS

7    BENZENE AND BENZENE IS A KNOWN CARCINOGEN CANNOT BE

8    JUSTIFICATION FOR SUCH EXTRAPOLATION.  THEY NOTED WHAT THOSE

9    AGENCIES FOUND ABOUT GASOLINE.  AND IN -- JUST LIKE IN THIS

10   CASE, HARRISON MADE THE OMNIBUS STATEMENT THAT HE REVIEWED

11   THE LITERATURE BUT AT DEPOSITION COULD NOT IDENTIFY ANY

12   STUDIES SHOWING AML RISK FROM GASOLINE EXPOSURE.

13        THAT'S EXACTLY WHAT HAPPENED HERE.  HE CLAIMS TO HAVE

14   DONE THIS BUT HE COULDN'T ANSWER THE QUESTIONS.  AND HIS

15   REPORT IS NOT SPECIFIC EXCEPT FOR GENERALLY REFERENCING THAT

16   EIGHT-YEAR-OLD DECLARATION.

17        AND THE COURT IN BURST IMPORTANTLY NOTED THAT EVEN IF HE

18   HAD CITED GASOLINE SPECIFIC STUDIES, HE DIDN'T SHOW AND HIS

19   REPORT DOESN'T SHOW THAT HE APPLIED THE BRADFORD HILL

20   CRITERIA AND HIS OWN CRITERIA TO THOSE STUDIES, SO HE WOULD

21   STILL HAVE FAILED THE GENERAL CAUSATION INQUIRY.

22        YOUR HONOR, AT THIS POINT I'M GOING TO LET COUNSEL

23   SPEAK.  THANK YOU.

24             THE COURT:  THANK YOU.  OKAY.  WHO IS NEXT?  IS

25   THIS THE END OF THIS -- OF THE ARGUMENT ON THE GENERAL

1    CAUSATION?  SO, I GUESS THERE'S THE ARGUMENT BY ACUITY ON

2    SPECIFIC CAUSATION OR DOES THE PLAINTIFF WISH TO RESPOND TO

3    GENERAL CAUSATION FIRST?

4         MR. JENSEN:  I THINK THERE WERE A BUNCH OF SPECIFIC

5    CAUSATION WRAPPED UP INTO MR. MCGOLDRICK'S ARGUMENT.  SO, IF

6    SOMEBODY ELSE WANTS TO TALK ABOUT DR. HARRISON, I THINK THAT

7    MAKES SENSE BEFORE I STAND UP.

8         MR. MCGOLDRICK:  YES, YOUR HONOR.  I WENT THROUGH

9    SPECIFICS AS WELL, SO...

10        THE COURT:  SURE.  WOULD YOU LIKE TO RESPOND,

11   MRS. BONNEVILLE?

12        MRS. BONNEVILLE:  I JUST HAVE A FEW COMMENTS.  MR.

13   MCGOLDRICK DID AN EXCELLENT JOB.  I'M JENNIFER BONNEVILLE ON

14   BEHALF OF ACUITY SPECIALTY PRODUCTS.  BEL-RAY ALSO JOINED IN

15   THAT MOTION.  AND JUST FOR THE COURT'S REFERENCE, BECAUSE THE

16   MOTIONS ARE DIFFERENT, THE DOCKET NUMBER FOR OUR MOTION IS

17   286.

18        THE COURT:  SO I GUESS JUST TO CLARIFY FOR ME AND

19   FOR THE COURT STAFF, WE HAVE STILL PENDING AS A MOTION NUMBER

20   287, WHICH I THINK BEL-RAY JOINED IN.  I THINK IT WAS MAYBE

21   YAMAHA'S ORIGINALLY?  AND IT INDICATED THAT BEL-RAY JOINED

22   IN.  BUT SHOULD WE TERMINATE THAT MOTION AS--

23        MRS. BONNEVILLE:  MY UNDERSTANDING IS THAT MOTION

24   IS NO LONGER IN PLAY.

25        MRS. WAGNER:  THAT'S CORRECT.

```
1            THE COURT:  OKAY.  ANY OBJECTION FROM THE

2    PLAINTIFF?

3            MR. JENSEN:  NO, I WOULDN'T OBJECT, YOUR HONOR.

4            THE COURT:  OKAY.  WELL THEN, I WILL DEEM MOOT

5    MOTION NUMBER 287, WHICH WILL STRIKE THAT FROM THE PENDING

6    MOTIONS LIST.  OKAY.  PLEASE PROCEED.

7            MRS. BONNEVILLE:  THANK YOU, YOUR HONOR.  SO I

8    CERTAINLY DON'T WANT TO REITERATE WHAT MR. MCGOLDRICK SO

9    APTLY EXPLAINED.  I JUST WANT TO HIGHLIGHT A COUPLE OF

10   POINTS.  SO WHEN YOU TAKE A STEP BACK FROM HARRISON AND WE

11   TAKE A STEP BACK FROM STEWART AND WE LOOK AT THE ISSUE OF

12   CAUSATION, THERE'S TWO QUESTIONS THAT PLAINTIFFS HAVE THE

13   BURDEN OF ANSWERING.

14       THE FIRST IS THE GENERAL CAUSATION WHICH MR. MCGOLDRICK

15   DISCUSSED IN DETAIL.  THAT'S THE CAN-IT QUESTION.  IS IT

16   POSSIBLE.  ACUITY IS NOT, FOR THE PURPOSES OF THEIR MOTION,

17   CHALLENGING THAT.  AT THE TIME OF TRIAL SHOULD WE GET THERE,

18   IT'S A WHOLE DIFFERENT STORY.  BUT FOR THE PURPOSES OF THIS

19   MOTION, WE ARE ONLY FOCUSING ON THE SECOND PIECE.  THIS IS

20   THE SPECIFIC CAUSATION PIECE.  THIS IS THE WHO-DID-IT

21   QUESTION.  AND THAT'S THE SOLE FOCUS OF OUR MOTION.  THAT IS

22   THE QUESTION THAT WE ARE LOOKING AT.

23       NOW LET'S BE CLEAR, BECAUSE THERE'S A LOT OF THINGS IN

24   PLAINTIFF'S OPPOSITION.  WE ARE NOT QUESTIONING FOR THE

25   PURPOSE OF OUR MOTION DR. STEWART -- DR. HARRISON'S
```

1    QUALIFICATIONS.  WE ARE NOT CHALLENGING THE DIFFERENTIAL

2    ETIOLOGY OR DIFFERENTIAL DIAGNOSIS METHODOLOGY.  WHAT WE ARE

3    CHALLENGING IS HOW DR. HARRISON TOOK THAT TOOL AND MISAPPLIED

4    IT BECAUSE REALLY THAT'S WHAT WE ARE LOOKING AT.  THIS IS A

5    TOOL.

6        SO TO GIVE AN EXAMPLE THAT I HAVE SEEN IN SOME OF THE

7    CASE LAW, TOOL -- YOU KNOW, THESE TYPE OF TOOLS, THESE ARE

8    LIKE A SCALPEL.  YOU GIVE A SCALPEL TO A TRAINED SURGEON,

9    IT'S AN EFFECTIVE TOOL.  YOU GIVE A SCALPEL TO MY

10   THREE-AND-A-HALF YEAR OLD SON, IT'S A WEAPON.  IT'S A TOTALLY

11   DIFFERENT THING.  SO WE ARE NOT ARGUING THAT DIFFERENTIAL

12   DIAGNOSIS IS NOT AN APPROPRIATE METHODOLOGY IN SOME

13   SITUATIONS.

14       WHAT WE ARE SAYING IS WHEN YOU LOOK AT WHAT DR. HARRISON

15   DID, HE DIDN'T USE THE TOOL PROPERLY.  IT WAS A WEAPON, NOT A

16   TOOL.  AND WHY DO WE SAY THAT?  TWO REASONS.  THERE ARE TWO

17   STEPS INVOLVED IN DOING THE METHODOLOGY.  YOU HAVE TO RULE IT

18   IN, WHICH MEANS YOU CONSIDERED IT, AND THEN YOU HAVE TO RULE

19   IT OUT.  BUT YOU CAN'T SAY, I RULED IT OUT WHEN YOU NEVER

20   CONSIDERED IT IN THE FIRST PLACE.  AND THAT'S ONE OF THE

21   FUNDAMENTAL PROBLEMS WITH DR. HARRISON.

22       DR. HARRISON'S REPORT ON PAGE 10, IT'S NUMBER FIVE OF

23   HIS OPINION SAYS, I HAVE CONSIDERED OTHER CAUSES OF NHL, AND

24   HE GOES THROUGH A COUPLE OF THESE -- OF DIFFERENT ONES;

25   SMOKING, FAMILY HISTORY, OBESITY, RADIATION, CHEMOTHERAPY,

1    AND THEN HE COMES TO HIS CONCLUSION.

2        WE GO TO TAKE DR. HARRISON'S DEPOSITION AND DR. HARRISON

3    ADMITS TO US, YOU KNOW WHAT, I DIDN'T IDENTIFY ALL THE

4    POTENTIAL CAUSES IN MY REPORT, I DIDN'T TELL YOU THAT.  AND

5    SO HE GIVES US A DIFFERENT LIST AT THE TIME OF HIS

6    DEPOSITION.  AND WE GO THROUGH AND WE ASK HIM ABOUT THAT

7    LIST.  IS THAT ALL THERE IS?  YES.

8        WELL, THEN WE ASK HIM ABOUT PCB.  OH YEAH, YOU'RE RIGHT,

9    PCB.  THEN WE BRING THE MOTION, WE GET TO THE AFFIDAVIT, AND

10   DR. HARRISON GIVES US AN AFFIDAVIT THAT SAYS NO, IGNORE WHAT

11   I WROTE IN MY FIRST REPORT, IGNORE WHAT I SAID AT MY DEPO, I

12   CONSIDERED -- AND I THINK THE WORD HE USES -- THIS IS DOCKET

13   308-1, THIS IS HIS AFFIDAVIT AT PAGE 10 -- I HAVE CONSIDERED

14   THE EXTENT TO WHICH ANY OF THE KNOWN RISK FACTORS MAY HAVE

15   CONTRIBUTED.  WELL, THAT'S NOT WHAT YOU TOLD US BEFORE.

16       SO YOU DIDN'T RULE THEM IN, SO YOU DIDN'T CONSIDER THEM,

17   HOW CAN YOU RULE THEM OUT?  WELL, LET'S LOOK AT WHAT'S LEFT.

18   WHEN WE GET THE REPORT DR. HARRISON'S OPINION IS OCCUPATIONAL

19   BENZENE EXPOSURE IS A SUBSTANTIAL FACTOR, THAT'S IT, THAT'S

20   WHAT CAUSED IT, THIS IS MY OPINION.

21       WE GET THE AFFIDAVIT.  WELL, BENZENE IS A SUBSTANTIAL

22   FACTOR BUT SO ARE PCB'S.  OKAY.  WELL, LET'S SEE WHAT ELSE

23   ARE WE LEFT WITH?  SO WE'VE GOT BENZENE, WE'VE GOT PCB'S, WE

24   HAVE GOT IDIOPATHIC BECAUSE DR. HARRISON SAYS THAT A MAJORITY

25   OF NHL IS IDIOPATHIC, WE HAVE GOT THE PRINTING PRESS

1    EXPOSURE, WE'VE GOT THE HOME EXPOSURE, AND WE'VE GOT THE

2    BACKGROUND EXPOSURE.

3        IF IDIOPATHIC IS MORE THAN 51 PERCENT, DR. HARRISON TOLD

4    US IN HIS DEPOSITION THAT THERE'S A 25 PERCENT CHANCE THAT

5    PCB'S WERE A SUBSTANTIAL FACTOR.  WHAT'S LEFT TO GET US TO A

6    SUBSTANTIAL FACTOR?  A 10 PERCENT CHANCE?  A 5 PERCENT

7    CHANCE?

8        WHEN WESTBERRY AND ALL THE OTHER COURTS AND THE CASES

9    THAT WE CITE, WHEN THEY HAVE SAID DIFFERENTIAL DIAGNOSIS IS

10   AN APPROPRIATE TOOL, THEY WERE VERY CAREFUL IN IT'S AN

11   APPROPRIATE TOOL WHEN IT'S USED APPROPRIATELY.  SO WESTBERRY

12   TALKS ABOUT SERIOUS CONSIDERATION.  SERIOUSLY CONSIDERING.

13   SERIOUSLY CONSIDER WHEN YOU RULE IT IN AND SERIOUSLY

14   CONSIDERING WHEN YOU RULE IT OUT.  AND THAT'S WHAT WE ARE

15   LEFT WITH.

16       IT WASN'T SERIOUSLY CONSIDERED.  THE METHODOLOGY, IF

17   DONE PROPERLY, IS GREAT, BUT THAT'S NOT WHAT WAS DONE HERE AT

18   ALL.

19           THE COURT:  THANK YOU VERY MUCH.  VERY WELL.  ANY

20   FOLLOW-UP ON THE CHALLENGES TO GENERAL OR SPECIFIC CAUSATION?

21   ANYONE ELSE?  ALL RIGHT.

22           MR. JENSEN:  YOUR HONOR, MAY WE TAKE ANOTHER FIVE

23   MINUTE BREAK SO THAT I CAN--

24           THE COURT:  SURE.  IT ACTUALLY HITS US AT A GOOD

25   TIME.  WHY DON'T WE GO AHEAD AND TAKE OUR AFTERNOON BREAK

1    NOW.  WE CAN TAKE A BREAK A LITTLE BIT LONGER, MAYBE 10

2    MINUTES OR 15 MINUTES, AND THEN WE WILL RESUME BACK WITH

3    THOSE ARGUMENTS.  I THINK WE ARE MAKING GOOD TIME.  SO FAR SO

4    GOOD.  SO, VERY GOOD.  THANK YOU.  WE WILL BE IN RECESS.

5         (WHEREUPON, A BRIEF RECESS WAS HAD.)

6         *THE COURT:*  THANK YOU VERY MUCH.  I WILL CALL ON

7    MR. JENSEN TO ADDRESS THE MOTION TO STRIKE, MOTIONS TO STRIKE

8    DR. HARRISON'S OPINIONS FROM THE RECORD.

9         *MR. JENSEN:*  VERY GOOD, YOUR HONOR.  I WANT TO

10   START BY JUST DISCUSSING, TALKING WITH YOU A BIT JUST AS AN

11   OVERVIEW ABOUT THE LEGAL RESPONSIBILITIES OF THE COURT IN THE

12   CONTEXT OF DAUBERT AND RULE 702 AND WHAT THE COURT'S

13   DISCRETION EXTENDS TO DO AND WHAT THE COURT'S DISCRETION DOES

14   NOT EXTEND TO.

15        AND I THINK THAT IN TALKING ABOUT THAT, JUSTICE BREYER

16   WRITES AN INTRODUCTION THAT'S CONTAINED IN THE REFERENCE

17   MANUAL ON SCIENTIFIC EVIDENCE.  AND HE GIVES THIS -- HE MAKES

18   THIS STATEMENT.  THE SEARCH IS NOT A SEARCH FOR SCIENTIFIC

19   PRECISION.  A JUDGE IS NOT A SCIENTIST AND A COURTROOM IS NOT

20   A SCIENTIFIC LABORATORY.  BUT CONSIDER THE REMARK MADE BY THE

21   PHYSICIST WOLFGANG PAULI.  AFTER A COLLEAGUE ASKED WHETHER A

22   CERTAIN SCIENTIFIC PAPER WAS WRONG, PAULI REPLIED, THAT PAPER

23   ISN'T EVEN GOOD ENOUGH TO BE WRONG.  OUR OBJECTIVE IS TO

24   AVOID LEGAL DECISIONS THAT REFLECT THAT PAPER'S SO-CALLED

25   SCIENCE.

1          AND YOU KNOW, I THINK WHAT JUSTICE BREYER IS GETTING AT

2     HERE, YOUR HONOR, IS THAT WHEN TWO SIDES HAVE A DEBATE WHERE

3     THEY EACH PRESENT EXPERT TESTIMONY, YOU KNOW, WITH ADVOCATES

4     BEING WHO THEY ARE, THERE'S ALWAYS GOING TO BE A SIGNIFICANT

5     CONFLICT.  AND THE ROLE OF THE COURT IN ASSESSING THE

6     LIABILITY UNDER RULE 702 DOES NOT EXTEND TO MAKING A DECISION

7     TO EXCLUDE AN EXPERT BECAUSE THAT YOU DECIDED THAT THAT

8     EXPERT'S CONCLUSIONS ARE WRONG AND THAT THE OTHER SIDE'S

9     EXPERT IS RIGHT.

10         YOU'RE LOOKING AT SOMETHING QUITE DIFFERENT AND A MUCH

11    EASIER HURDLE FOR THE EXPERT TO OVERCOME, WHICH IS HAS

12    THAT -- HAS THAT EXPERT APPLIED A METHODOLOGY, WHETHER THEIR

13    CONCLUSIONS FROM THAT METHODOLOGY AND ULTIMATELY THEIR

14    INFERENCES IN THE USE OF, YOU KNOW, THE JUDGMENT CALL THAT

15    THEY HAVE MADE AFTER APPLYING THAT METHODOLOGY WITH RESPECT

16    TO THE CONCLUSION IS CORRECT OR NOT IS THE METHOD ONE THAT

17    GIVEN THE FACTS OF THE CASE AND THE CONTEXT IN WHICH THE WORK

18    WAS DONE IS ONE THAT WAS AN APPROPRIATE SCIENTIFICALLY-VALID

19    RELIABLE METHOD.

20         AND THOSE -- THAT IS A DISTINCTION WHICH, YOU KNOW, IN

21    SOME WAYS IT -- IT CAN BE DESCRIBED AS A BRIGHT LINE AND SOME

22    WAYS IT MIGHT BE EASY TO SAY.  BUT I FIND IN MY EXPERIENCE

23    ARGUING THESE TYPES OF MOTIONS THAT IT IS A DIFFICULT -- JUST

24    FROM A HUMAN NATURE STANDPOINT IT IS A VERY DIFFICULT

25    RESPONSIBILITY YOU HAVE GOT -- BEEN GIVEN UNDER THE RULES TO

1    TRY AND TREAD THAT LINE.

2        ON THE ONE HAND YOU HAVE GOT TO GO IN IN A CASE LIKE

3    THIS ONE AND LEARN A LOT OF TECHNICAL INFORMATION, TRY TO

4    ABSORB, YOU KNOW, HUNDREDS OF PAGES OF MATERIAL THAT BOTH

5    SIDES HAVE GIVEN YOU ON THESE TECHNICAL ISSUES AND GAIN AN

6    UNDERSTANDING OF MANY THINGS THAT YOU PROBABLY DON'T HAVE ANY

7    BACKGROUND IN PRIOR TO THAT AND GET DOWN TO THE NITTY GRITTY

8    OF, YOU KNOW, DOES THIS ALL MAKE SENSE OR NOT.

9        AND HAVING INVESTED ALL OF THAT TIME AND ENERGY AND

10   EFFORT TO TRY AND GET YOUR -- WRAP YOUR BRAIN AROUND ALL

11   THESE TECHNICAL ISSUES, THERE'S I THINK A NATURAL HUMAN

12   NATURE KIND OF RESPONSE TO SAY, WELL, YOU KNOW, I HAVE NOW

13   DECIDED THAT MR. X IS WRONG AND MRS. Y IS RIGHT AND RULE

14   ACCORDINGLY.

15       AND THAT -- WHEN YOU KEEP -- YOU HAVE TO KEEP THE LEGAL

16   FOREST ALWAYS IN MIND, AND THAT'S NOT YOUR JOB.  THAT'S NOT

17   WITHIN YOUR DISCRETION TO DO.  WHAT YOU HAVE GOT TO DO IS

18   LIMIT YOURSELF TO THE STUFF THAT'S REALLY OUTSIDE OF THE

19   SCIENCE, WHICH IS, WHICH IS JUSTICE BREYER'S POINT AND WHICH

20   IN THE KUMHO TIRE VERSUS CARMICHAEL CASE, WHICH IS A 1999 US

21   SUPREME COURT DECISION, THE COURT SAID TO THE -- TO THE

22   EXTENT THAT AN EXPERT'S OPINION FALLS WITHIN, QUOTE, THE

23   RANGE WHERE EXPERTS MIGHT REASONABLY DIFFER, CLOSED QUOTE, IT

24   SATISFIES RULE 702.

25       AND IN THE EEOC VERSUS FREEMAN CASE, THAT VERY RECENT

1  FOURTH CIRCUIT DECISION THAT DEFENDANTS ARE RELYING ON HERE,

2  THE FOURTH CIRCUIT ACTUALLY QUOTED THAT, THAT VERY LINE, AND

3  DECIDED IN THE CONTEXT OF THAT CASE, YOU KNOW, THAT THAT

4  EXPERT'S OPINIONS FELL OUTSIDE THAT RANGE.  BUT WHAT YOU'RE

5  LOOKING AT IS A VERY BROAD RANGE OF POTENTIAL CONCLUSIONS

6  THAT ANY EXPERT IN THIS PARTICULAR AREA IN THIS CONTEXT, AN

7  EXPERT ON THE CAUSATION OF DISEASE POTENTIALLY CAUSED BY

8  TOXIC EXPOSURES, YOU KNOW, EXPERTS CAN AND DO DISAGREE ALL

9  THE TIME JUST LIKE LAWYERS CAN AND DO DISAGREE ALL THE TIME.

10  DOESN'T MEAN EITHER ONE OF THEM ARE BEING UNREASONABLE OR

11  UNSCIENTIFIC OR, YOU KNOW, USING AN UNRELIABLE METHODOLOGY.

12      SIMILARLY, IN A FIRST CIRCUIT DECISION CALLED MILWARD

13  VERSUS ACUITY SPECIALTY PRODUCTS THE FIRST CIRCUIT SAID TRIAL

14  COURTS ARE NOT, QUOTE, EMPOWERED TO DETERMINE WHICH OF

15  SEVERAL COMPETING SCIENTIFIC THEORIES HAS THE BEST PROVINCE,

16  CLOSED QUOTE.  AND IN THE DAUBERT DECISION ITSELF THE SUPREME

17  COURT SAID THAT THE TRIAL COURT HAS TO FOCUS ON THE

18  PRINCIPLES AND METHODOLOGY EMPLOYED BY THE EXPERT, NOT ON THE

19  CONCLUSIONS REACHED.

20      AND PARTICULARLY IN THE CONTEXT OF ISSUES OF CAUSATION

21  OF CANCER, THE EXCEPTION OF ASBESTOS EXPOSURE LEADING TO

22  MESOTHELIOMA WHICH IS A SIGNAL TUMOR WHICH, YOU KNOW, THERE'S

23  VERY LITTLE EVIDENCE OF OTHER CAUSES OF MESOTHELIOMA BEYOND

24  ASBESTOS EXPOSURE, VIRTUALLY EVERY OTHER KIND OF CANCER,

25  REGARDLESS OF WHETHER IT CAN BE CAUSED BY SPECIFIC

1    CARCINOGENS, CAN HAVE LOTS OF OTHER CAUSES BESIDES THOSE

2    CARCINOGENS.

3        AND IN THAT CONTEXT THERE IS CERTAINLY ON SPECIFIC

4    CAUSATION BUT EVEN ON GENERAL CAUSATION A LOT MORE MUSHINESS,

5    FOR LACK OF A BETTER WORD, ABOUT THE LEVEL OF CERTAINTY THAT

6    SCIENCE IS GOING TO BE ABLE TO HAVE REGARDING THE CAUSAL

7    CONNECTION.

8        AND THEREFORE, THE EXPERTS WHO HAVE TO MAKE THESE

9    JUDGMENTS ABOUT CAUSATION, PEOPLE LIKE EPIDEMIOLOGISTS,

10   TOXICOLOGISTS, OCCUPATIONAL AND ENVIRONMENTAL MEDICINE

11   PHYSICIANS, THEY MUST USE A CAUSAL METHOD THAT IS BASICALLY A

12   INFERENCE TO THE BEST EXPLANATION.  THAT IS, YOU KNOW, LET'S

13   COLLECT ALL THIS EVIDENCE THAT IS RELEVANT TO THE ISSUE.

14       IF YOU'RE TALKING ABOUT GENERAL CAUSATION, CAN BENZENE

15   CAUSE NON-HODGKIN'S LYMPHOMA AS AN EXAMPLE?  LET'S COLLECT

16   ALL THE EPIDEMIOLOGY STUDIES THAT LOOK AT BENZENE-EXPOSED

17   POPULATIONS AND DETERMINE THEIR RISK OF NON-HODGKIN'S

18   LYMPHOMA.  LET'S LOOK AT WHATEVER EVIDENCE IS AVAILABLE TO US

19   ABOUT WHETHER THERE ARE BIOLOGICAL MECHANISMS AVAILABLE THAT

20   COULD EXPLAIN HOW BENZENE MIGHT LEAD TO NON-HODGKIN'S

21   LYMPHOMA IN TERMS OF MECHANISMS WITHIN THE BODY THAT BENZENE

22   CAUSES OR METABOLITES CAUSE THAT ULTIMATELY LEAD TO LYMPHOMA.

23       AND YOU TAKE ALL OF THAT DATA THAT COMES FROM

24   EPIDEMIOLOGY STUDIES AND TOXICOLOGY STUDIES AND, YOU KNOW, IN

25   VITRO STUDIES OF CELL CULTURES AND YOU TAKE ALL OF THAT AND

1    YOU COLLECT IT AND YOU MAKE THE BEST INFERENCES AND THE BEST

2    CONCLUSIONS THAT YOU CAN.  AND THAT'S THE METHOD THAT IS

3    APPLIED USING THE BRADFORD HILL FACTORS OR CRITERIA AS MR.

4    MCGOLDRICK CALLED THEM.  THAT'S THE METHOD THAT HISTORICALLY

5    HAS BEEN AND STILL IS APPLIED.  THAT'S THE SCIENTIFICALLY

6    GENERALLY ACCEPTED METHOD FOR ASSESSING CAUSATION.

7        WELL, THERE ARE LOTS OF STEPS THAT GO INTO THAT.

8    THERE'S LOTS OF EVALUATION OF BOTH INDIVIDUAL STUDIES AS TO

9    THEIR STRENGTH AND THE WEIGHT THAT SHOULD BE GIVEN THEM AND

10   TO THEIR STRENGTHS AND WEAKNESSES OF ANY INDIVIDUAL STUDY AND

11   THEN THERE'S ASSESSMENT OF THE STUDIES AS A WHOLE IN A

12   PARTICULAR AREA LIKE EPIDEMIOLOGY, STUDIES AS A WHOLE IN

13   TOXICOLOGY ON THE BIOLOGICAL MECHANISM ISSUE.

14       AND AT EVERY STEP ALONG THE WAY EXPERTS MUST AND DO

15   EXERCISE THEIR OWN INDEPENDENT SCIENTIFIC JUDGMENT OR THEY

16   RELY ON SCIENTIFIC JUDGMENT BY OTHERS IN MANY INSTANCES

17   LIKE -- GROUPS LIKE IARC AND THE NATIONAL TOXICOLOGY PROGRAM.

18   BUT IN ANY EVENT, THERE ARE MATTERS THAT GO INTO THAT THAT

19   ARE MATTERS OF SCIENTIFIC JUDGMENT.  AND REASONABLE

20   SCIENTISTS CAN AND OFTEN DO DISAGREE ON THOSE MATTERS OF

21   SCIENTIFIC JUDGMENT ROUTINELY.

22       WHEN WE HAVE GOT ISSUES THAT, AS IN THIS CASE, REQUIRE

23   THE APPLICATION OF SCIENTIFIC JUDGMENT AT MANY STEPS ALONG

24   THE WAY, IT IS NOT WITHIN THIS COURT'S DISCRETION TO SAY THAT

25   ON THAT MATTER, ON THIS PIECE OF SAYING, YOU KNOW, I THINK

1    THAT THE STUDIES ON BENZENE-EXPOSED WORKERS DEVELOPING

2    NON-HODGKIN'S LYMPHOMA BASED ON THE RISK AND THE EPIDEMIOLOGY

3    STUDIES SHOW A CONSISTENT INCREASE IN RISK, THAT'S DR.

4    HARRISON'S VIEW.

5        THE EXPERTS FOR THE DEFENDANTS DISAGREE WITH HIM ON

6    THAT.  THAT IS A MATTER OF SCIENTIFIC JUDGMENT THAT IT'S NOT

7    THIS COURT'S JOB TO DECIDE WHO IS RIGHT AND WHO IS WRONG.

8    THAT'S FOR THE JURY TO DECIDE.

9        AND YOU KNOW, I WANT TO POINT THE COURT TO A QUOTE.

10    IT'S A LENGTHY ONE HERE, A LOT OF WORDS, WAY TOO MUCH WORDS

11    THAT ARE SUPPOSED TO GO ON A SCREEN FOR A POWERPOINT

12    PRESENTATION.  I APOLOGIZE FOR THAT.  BUT THIS COMES FROM THE

13    RESTATEMENT THIRD OF TORTS SECTION 28, WHICH IS A SECTION

14    THAT DEALS WITH CAUSATION, AND COMMENT C IS A VERY LENGTHY

15    COMMENT THAT WAS DRAFTED AND INCLUDED IN THE RESTATEMENT

16    THIRD AND IT DEALS SPECIFICALLY WITH TOXIC EXPOSURES AND

17    DISEASE.

18        AND WHAT THE AMERICAN LAW INSTITUTE IN -- DECIDED TO

19    INCLUDE -- AND THE COMMENT IS CONSIDERED THE -- A PORTION OF

20    THE SUBSTANTIVE PART OF THE RESTATEMENT AS OPPOSED TO THE

21    REPORTER'S NOTES WHICH ARE NOT.

22        AND IT'S THEY WRITE, THE SCIENTIST'S REPORT THAT AN

23    EVALUATION OF DATA AND SCIENTIFIC EVIDENCE TO DETERMINE

24    WHETHER AN INFERENCE OF CAUSATION IS APPROPRIATE REQUIRES

25    JUDGMENT AND INTERPRETATION.  SCIENTISTS ARE SUBJECT TO THEIR

1    OWN VALUE JUDGMENTS AND PREEXISTING BIASES THAT MAY AFFECT

2    THEIR VIEW OF A BODY OF EVIDENCE.  THERE ARE INSTANCES IN

3    WHICH ALTHOUGH ONE SCIENTIST OR GROUP OF SCIENTISTS COMES TO

4    ONE CONCLUSION ABOUT FACTUAL CAUSATION, THEY RECOGNIZE THAT

5    ANOTHER GROUP THAT COMES TO A CONTRARY CONCLUSION MIGHT STILL

6    BE REASONABLE.

7        JUDGMENTS ABOUT CAUSATION MAY ALSO BE AFFECTED BY THE

8    COMPARATIVE COSTS OF ERRORS AS WHEN CAUTION COUNSELS IN FAVOR

9    OF DECLARING AN UNCERTAIN AGENT TOXIC BECAUSE THE POTENTIAL

10   HARM IT MAY CAUSE IF TOXIC IS SO MUCH GREATER THAN THE

11   BENEFIT FORGONE IF IT WERE PERMITTED TO BE INTRODUCED.

12       COURTS, THUS, SHOULD BE CAUTIOUS ABOUT ADOPTING SPECIFIC

13   SCIENTIFIC PRINCIPLES TAKEN OUT OF CONTEXT TO FORMULATE

14   BRIGHT LINE LEGAL RULES OR CONCLUDE THAT REASONABLE MINDS

15   CANNOT DIFFER ABOUT FACTUAL CAUSATION.  AND AGAIN, THAT

16   ENTIRE STATEMENT WAS MADE IN THE CONTEXT OF DISCUSSION ABOUT

17   CAUSATION IN THE TOXIC EXPOSURE SETTING.

18       AND IN THE -- IN THE MILWARD CASE THEY MADE THE FIRST

19   CIRCUIT PANEL THAT DECIDED MILWARD -- AND I WILL BACK UP JUST

20   A SECOND TO TELL YOU ABOUT THAT CASE.  MILWARD WAS A CASE

21   LIKE THIS ONE THAT INVOLVED A INDIVIDUAL WHO DEVELOPED CANCER

22   IN THAT INSTANCE, A SUBTYPE OF ACUTE MYELOID LEUKEMIA,

23   SUBTYPE OF AML AFTER WORKING AS A REFRIGERATION MECHANIC FOR

24   PERIOD OF SEVERAL YEARS; DECADES ACTUALLY.

25       MY LAW FIRM WAS INVOLVED IN THAT.  I ARGUED THE CASE

1  BOTH IN THE TRIAL COURT IN -- UNSUCCESSFULLY AND GOT THE

2  FIRST CIRCUIT TO CHANGE -- CHANGE THE RULING.  BUT, IN THAT

3  CASE THE ALLEGED EXPOSURE TO BENZENE, AS IN THIS CASE, CAME

4  FROM EXPOSURE TO A VARIETY OF SOLVENTS THAT THEY -- MR.

5  MILWARD HAD WORKED WITH OVER THE YEARS AS A REFRIGERATION

6  MECHANIC WHICH THESE WERE ORGANIC SOLVENTS PRODUCTS THAT WERE

7  PETROLEUM DISTILLATES INCLUDING MANY OF WHICH CONTAINED

8  MINERAL SPIRITS, THAT THE ALLEGATION WAS THESE PETROLEUM

9  DISTILLATE SOLVENTS HAVE SOME BENZENE IN THEM AND THAT

10  BENZENE EXPOSURE WAS JUST AS IT HAD BEEN IN THIS CASE,

11  QUANTIFIED BY A MODELING ESTIMATE DONE BY IN FACT DR. STEWART

12  IN THAT CASE.

13      AND BASED ON THAT QUANTIFIED ESTIMATED BENZENE EXPOSURE,

14  THE SPECIFIC CAUSATION EXPERT WAS -- WAS EXAMINING, MAKING AN

15  EVALUATION AS TO WHETHER THE BENZENE WAS A LIKELY

16  CONTRIBUTING FACTOR TO LEUKEMIA.  THE ISSUE THAT THE CASE WAS

17  DECIDED ON THAT WENT UP TO THE FIRST CIRCUIT WAS GENERAL

18  CAUSATION.  AND EVEN THOUGH -- EVEN THOSE DEFENSE EXPERTS

19  AGREE THAT BENZENE CAN CAUSE AML GENERALLY, THE ISSUE WAS

20  WAS, DOESN'T CAUSE THIS PARTICULAR KIND OF AML THAT

21  MR. MILWARD HAD.

22      AND SO WE HAD A BIG HEARING.  THERE WAS LIVE TESTIMONY

23  IN THAT HEARING.  DISTRICT COURT ENDED UP SIDING WITH THE

24  DEFENSE.  AND ON APPEAL THE FIRST CIRCUIT MADE SIGNIFICANT

25  USE AND QUOTED AT LENGTH THIS RESTATEMENT SECTION 28 COMMENT

1    C THAT I JUST QUOTED FROM IN THE LAST SLIDE, AND THEY QUOTE

2    FROM IT HERE.

3         AND IN DISCUSSING THE MODE OF REASONING THAT APPLIES IN

4    THIS GENERAL CAUSATION CONTEXT THEY SAY, IN THIS MODE OF

5    REASONING THE USE OF SCIENTIFIC JUDGMENT IS NECESSARY.  NO

6    ALGORITHM EXISTS FOR APPLYING THE HILL GUIDELINES TO

7    DETERMINE WHETHER AN ASSOCIATION TRULY REFLECTS A CAUSAL

8    RELATIONSHIP OR IS SPURIOUS.  BECAUSE NO SCIENTIFIC

9    METHODOLOGY EXISTS FOR THIS PROCESS REASONABLE SCIENTISTS MAY

10   COME TO DIFFERENT JUDGMENTS ABOUT WHETHER SUCH AN INFERENCE

11   IS APPROPRIATE.

12        AND LATER ON IN THE DECISION THE FIRST CIRCUIT ENDED UP

13   SAYING THE DISTRICT COURT OVERSTEPPED ITS BOUNDARIES AS A

14   GATEKEEPER BY MAKING A DECISION TO EXCLUDE DR. SMITH IN THAT

15   CASE WHO WAS THE EXPERT OPINING ABOUT GENERAL CAUSATION ON

16   ISSUES WHERE THE STATE OF THE SCIENCE WAS LOTS OF EXPERTS

17   DISAGREED WITH ONE ANOTHER.

18        AND THIS IS THE QUOTE OR ONE OF THE QUOTES THAT REFLECT

19   THAT.  TRIAL COURTS SHOULD NOT TAKE SIDES ON QUESTIONS THAT

20   ARE CURRENTLY THE FOCUS OF EXTENSIVE SCIENTIFIC RESEARCH AND

21   DEBATE AND ON WHICH REASONABLE SCIENTISTS CAN CLEARLY

22   DISAGREE.

23        AND BEFORE I GO ON TO THE NEXT POINT AND THE NEXT SLIDE,

24   THAT IS THIS CASE WHEN IT COMES -- ESPECIALLY TO GENERAL

25   CAUSATION, YOUR HONOR.  GENERAL CAUSATION, AT LEAST AS FRAMED

1    THE WAY WE BELIEVE IT SHOULD BE FRAMED IN THIS CASE, WHICH IS

2    CAN BENZENE, NOT MINERAL SPIRITS, BUT BENZENE, CAN BENZENE

3    CAUSE NON-HODGKIN'S LYMPHOMA.  THAT IS DEFINITELY A MATTER ON

4    WHICH THERE CAN BE AND IS ONGOING DEBATE IN THE RELEVANT

5    SCIENTIFIC COMMUNITY.

6         THE FACT THAT IARC HAS SAID THERE IS LIMITED EVIDENCE TO

7    SHOW THAT BENZENE COULD CAUSE NHL, THAT MAY SOUND LIKE THE

8    IARC IS SAYING THERE'S NOT VERY GOOD EVIDENCE.  THAT'S NOT

9    WHAT THAT MEANS.  IT MEANS THAT THERE IS STILL SOME

10   UNCERTAINTY ASSOCIATED WITH IN IARC'S -- IN THE VIEW OF THE

11   IARC INTERNATIONAL AGENCY FOR RESEARCH ON CANCER.  WE GET TOO

12   ACCUSTOMED TO THROWING AROUND ACRONYMS WITHOUT EXPLAINING

13   OURSELVES.

14        BUT THE INTERNATIONAL AGENCY FOR RESEARCH ON CANCER

15   BRINGS IN A GROUP OF EXPERTS FROM AROUND THE WORLD TO ADDRESS

16   WHETHER OR NOT PARTICULAR CHEMICALS OR GROUPS OF CHEMICALS

17   CAN CAUSE CANCER, AND THEY CALL THOSE GROUPS WORKING GROUPS.

18   AND EACH WORKING GROUP IS ASSIGNED TO A SPECIFIC CHEMICAL OR

19   A SPECIFIC SET OF CHEMICALS.  AND THEY -- THEY DID THAT A FEW

20   YEARS AGO TO UPDATE THEIR CLASSIFICATION OF THE

21   CARCINOGENICITY OF BENZENE.

22        AND THOSE EXPERTS CAN SAY -- THEY HAVE BASICALLY FOUR

23   CATEGORIES OF EVIDENCE THAT THEY CAN CLASSIFY EPIDEMIOLOGY

24   STUDIES AS A WHOLE.  THEY LOOK AT ALL THE PUBLISHED AND IN

25   SOME INSTANCES EVEN UNPUBLISHED DATA ABOUT BENZENE IN THIS

1    INSTANCE AND NON-HODGKIN'S LYMPHOMA. AND THEY CAN EITHER SAY

2    THAT THAT EVIDENCE, THE HIGHEST LEVEL OF CLASSIFICATION THEY

3    CAN APPLY IS SUFFICIENT, BUT THIS EVIDENCE IS SUFFICIENT

4    EVIDENCE IN HUMANS TO SHOW THAT BENZENE CAN CAUSE NHL.

5        THE NEXT LEVEL DOWN IS LIMITED EVIDENCE. THE THIRD

6    LEVEL DOWN IS INADEQUATE EVIDENCE. CANNOT SAY ONE WAY OR THE

7    OTHER. AND THE FOURTH AND LOWEST CATEGORY THAT IARC USES IN

8    THAT CLASSIFICATION SYSTEM IS -- I'M GOING TO SAY IT

9    INCORRECTLY -- BUT PARAPHRASING, INDICATES THAT IS UNLIKELY

10   THAT -- THE COLLECTIVE EVIDENCE INDICATES IT'S UNLIKELY THAT

11   THERE'S A CAUSAL CONNECTION.

12       SO, THE BOTTOM TWO ARE PROBABLY NOT AND WE CAN'T SAY ONE

13   WAY OR THE OTHER. THE TOP TWO ARE LIMITED EVIDENCE AND

14   SUFFICIENT EVIDENCE. AND LIMITED EVIDENCE, EVEN THOUGH THAT

15   THE -- IT CERTAINLY INVOLVES SOME LEVEL OF UNCERTAINTY ON

16   PART -- ON THE PART OF THE WORKING GROUP IS AN INDICATION

17   THAT MORE LIKELY THAN NOT THERE IS A CONNECTION.

18       I WANT TO ADDRESS SOME OF THE SPECIFIC CRITIQUES AND

19   ISSUES THAT COUNSEL RAISED. MR. MCGOLDRICK ARGUES BOTH IN

20   HIS PAPERS AND TO SOME EXTENT TODAY THAT IN THE ABSENCE OF

21   STATISTICALLY SIGNIFICANT EVIDENCE SHOWING MORE THAN A

22   DOUBLING OF RISK OF NON-HODGKIN'S LYMPHOMA, AND OF COURSE HE

23   SAYS FROM MINERAL SPIRITS, AND I'LL ADDRESS THAT IN MORE

24   DETAIL IN A MOMENT, BUT -- WHETHER WE ARE TALKING ABOUT

25   MINERAL SPIRITS OR BENZENE -- THAT IN THE ABSENCE OF HAVING

1    THOSE KINDS OF EPIDEMIOLOGY STUDIES THAT SHOW A DOUBLING OF

2    RISKS THAT'S STATISTICALLY SIGNIFICANT BASED ON THE EXPOSURES

3    THAT, YOU KNOW, WE HAVE FAILED TO SATISFY DAUBERT AND DR.

4    HARRISON'S OPINIONS HAVE TO BE THROWN OUT.  AND THAT'S

5    CLEARLY WRONG IN THE FOURTH CIRCUIT.

6        AND YOU KNOW, THE BENEDI DECISION BY JUDGE ANDERSON, YOU

7    KNOW, MAKES THAT UNEQUIVOCALLY CLEAR.  IT JUST SAYS

8    EPIDEMIOLOGICAL STUDIES ARE NOT NECESSARILY REQUIRED TO PROVE

9    CAUSATION AS LONG AS -- LONG AS THE METHODOLOGY EMPLOYED BY

10   THE EXPERT IN REACHING HIS OR HER CONCLUSION IS SOUND.

11       AND THEN IN WESTBERRY, THE FOURTH CIRCUIT REJECTED A

12   SIMILAR ARGUMENT THAT THE FAILURE TO BASE A CAUSATION OPINION

13   ON PEER REVIEWED PUBLISHED EPIDEMIOLOGICAL STUDIES OF ANY

14   TYPE, NOT -- NOT -- NOT EVEN GETTING TO THE ISSUE OF WHETHER

15   YOU HAVE TO HAVE A DOUBLING OF THE RISK OR GREATER AS MR.

16   MCGOLDRICK ARGUES HERE.

17       SO YOU DON'T HAVE TO HAVE EPIDEMIOLOGY STUDIES AT ALL

18   MUCH LESS THOSE THAT SHOW A DOUBLING OF THE RISK, AND THAT'S

19   THE LAW IN THIS CIRCUIT AND IT IS FRANKLY THE LAW IN MOST

20   CIRCUITS.  WHAT MR. MCGOLDRICK THEN GOES ON TO ARGUE IS,

21   WELL, THAT'S WHAT BENEDI AND WESTBERRY SAY IN THE CONTEXT OF

22   THOSE EXPOSURES, THOSE EXPOSURES WERE VERY DIFFERENT THAN

23   THESE EXPOSURES, AND WHAT WE ARE DEALING WITH HERE IS, YOU

24   KNOW, A KIND OF DISEASE THAT HAS MANY SO-CALLED IDIOPATHIC

25   CASES AND MANY ALTERNATIVE CAUSES, AND WHEN YOU HAVE GOT LOTS

1    OF UNKNOWN CAUSES OF THE DISEASE, THEN, YOU KNOW, YOU HAVE TO

2    HAVE THIS DOUBLING OF THE RISK AND YOU HAVE TO HAVE

3    EPIDEMIOLOGY.  AND, YOU KNOW, THAT'S JUST INCONSISTENT

4    WITH -- WITH WESTBERRY.

5         *THE COURT:*  IF I UNDERSTAND MR. MCGOLDRICK'S

6    ARGUMENT -- AND MR. MCGOLDRICK, YOU CAN PROBABLY CLARIFY FOR

7    US -- I DON'T THINK THAT -- I DIDN'T INTERPRET HIS ARGUMENT

8    AS REQUIRING THIS GREATER THAN 2.0 STATISTICAL SIGNIFICANCE

9    IN EVERY CASE.  BUT I THINK THAT WHAT HE INTIMATED WAS THAT

10   WHERE HERE DR. HARRISON HIMSELF EMPLOYED THE BRADFORD HILL

11   CRITERIA, THAT HE DID NOT PROPERLY EMPLOY THOSE FACTORS TO

12   ADDRESS THE STRENGTH OF ASSOCIATION AND THE CONSISTENCY OF

13   ASSOCIATION WHICH THIS STATISTICAL SIGNIFICANCE WOULD HAVE A

14   BEARING ON, THE 2.0 STATISTICAL SIGNIFICANCE.

15      AND SO, I'M NOT -- AND MR. MCGOLDRICK, YOU CAN CORRECT

16   ME IF THAT'S -- IF MY INTERPRETATION IS INCORRECT.

17         *MR. MCGOLDRICK:*  NO, YOUR HONOR.  THAT'S CORRECT.

18   I MEAN, STATISTICAL SIGNIFICANCE BEING ABOVE 1.0 AND HAVING A

19   CONFIDENCE INTERVAL THAT DOESN'T INCLUDE ONE, THAT'S

20   STATISTICAL SIGNIFICANCE.  BUT TO ASK HARRISON, CAN YOU

21   IDENTIFY ANY STUDIES THAT ARE STATISTICALLY SIGNIFICANT ABOVE

22   1.0, ET CETERA?  HE SAID NO.  CAN YOU IDENTIFY ANY WITH 2.0?

23   HE ALSO SAID NO.  AND THAT'S STRIKING BECAUSE AN EXPERT LIKE

24   HIM WHO TESTIFIES ALL OVER THE PLACE, IF YOU HAVE A 2.0,

25   THAT'S A BENCHMARK THAT EVERY JURISDICTION IS GOING TO SAY

1   THAT'S OKAY.

2       SO, HE DIDN'T KNOW THE ANSWER TO THAT.  AND I ALSO ASKED

3   HIM, WELL WHAT ABOUT -- FORGET ABOUT STATISTICAL

4   SIGNIFICANCE, JUST A POSITIVE ASSOCIATION EVEN IF IT'S NOT,

5   AND HE COULDN'T IDENTIFY THOSE EITHER.

6       *THE COURT:*  RIGHT.  SO THAT ARGUMENT WENT TO THE

7   RELIABILITY OF THE EXPERT TESTIMONY, NOT NECESSARILY THE

8   SCIENTIFIC JUDGMENT.  AND I THINK THAT, YOU KNOW, NOW GRANTED

9   IT'S BEEN -- I WAS A BIOLOGY MAJOR AND CHEMISTRY MINOR IN

10  COLLEGE AND IT'S BEEN YEARS SINCE I'VE CONDUCTED ANY RESEARCH

11  IN A LABORATORY MYSELF, BUT I'M SOMEWHAT FAMILIAR WITH THE

12  SCIENTIFIC PROCESS.

13      AND I DON'T WANT US TO GET TOO MAYBE LAZY IS NOT THE

14  APPROPRIATE WORD, BUT THROWING AROUND SCIENTIFIC JUDGMENT.

15  JUST BECAUSE SOMEONE IS A SCIENTIST, EVERY JUDGMENT THAT THEY

16  HAVE IS NOT NECESSARILY A SCIENTIFIC JUDGMENT IN MY OPINION.

17  THE SCIENTIFIC JUDGMENT AND REALLY ANY OPINION UNDER DAUBERT

18  AND UNDER 702 IT HAS TO INITIALLY SATISFY IS THIS AN ARENA IN

19  WHICH THE INFORMATION OR TESTIMONY WOULD BE HELPFUL TO THE

20  JURY.

21      AND SO, IT HAS TO BE SCIENTIFIC TESTIMONY OF A

22  SPECIALIZED NATURE, SOMETHING TECHNOLOGICAL THAT A LAYPERSON

23  WOULD NOT BE ABLE TO GRASP, NOT SO MUCH I CAN TELL YOU THERE

24  ARE 10 FACTORS, AND SOMETIMES IT'S ONE, SOMETIMES IT'S TWO,

25  SOMETIMES IT'S SEVERAL, MORE THAN HALF OF THE TIME WE DON'T

1    EVEN KNOW WHAT IT IS.  BUT JUST BECAUSE A SCIENTIST SAYS THAT

2    DOES NOT NECESSARILY RENDER THAT AS A SCIENTIFIC JUDGMENT I

3    THINK.  THAT'S SORT OF MY GUT FEELING.

4        MY UNDERSTANDING OF THE BRADFORD HILL FACTORS THAT THE

5    ARGUMENT THAT THE DEFENDANTS ARE MAKING IS THE CHALLENGE TO

6    DR. HARRISON'S OWN CHOSEN METHODOLOGY.  AND THEY DON'T HAVE A

7    BEEF WITH WHAT HE USED, BUT THEY HAVE A BEEF WITH HOW HE USED

8    IT AND THAT THEY DIDN'T -- THAT DR. HARRISON HIMSELF DID NOT

9    FULLY EXECUTE ON HIS CHOSEN METHODOLOGY.

10       I'M ASSUMING HE COULD HAVE CHOSEN ANOTHER METHODOLOGY.

11   HE HAS CHOSEN THE DIFFERENTIAL DIAGNOSIS ETIOLOGY PROCESS,

12   AND THAT'S FINE, BUT THEN THE QUESTION IS, HAVING CHOSEN

13   THAT, HAS -- DOES HE SATISFY THE DAUBERT REQUIREMENTS, THE

14   FOUR FACTORS ORIGINALLY UNDER DAUBERT AND THE, YOU KNOW, FOUR

15   OR FIVE OTHER FACTORS THAT HAVE BEEN DEVELOPED IN ITS PROGENY

16   AND THAT'S WHAT I'M REALLY MORE INTERESTED IN HEARING ABOUT.

17       HOW DOES DR. HARRISON'S OPINION SATISFY DAUBERT AND

18   PROGENY?  AND AS FAR AS WESTBERRY GOES -- AND I'LL STOP

19   TALKING IN JUST A SECOND.  BUT AS FAR AS WESTBERRY GOES, I

20   THINK, YOU KNOW, THE ISSUE THAT WESTBERRY POSES FOR ME IS

21   IT'S A 1999 CASE, SO YOU KNOW, 16 -- BACK WHEN I WAS IN

22   COLLEGE, AND -- OR NO, NOT EVEN.  THAT WAS BEFORE THAT.

23       AND IN WESTBERRY THEY SAY YOU CAN'T, YOU KNOW, IT'S THIS

24   TALC AND, YOU KNOW, ARE THERE ANY STUDIES, ARE THERE NONE?

25   WE ARE NOT GOING TO REJECT THE EXPERT WITNESS'S TESTIMONY

1    BECAUSE OF HIS FAILURE TO RELY ON PEER REVIEWED STUDIES WHEN

2    THEY DID NOT EXIST.  AND YOU KNOW, I THINK BACK WHEN I WAS A

3    BIOLOGY MAJOR, I THOUGHT THAT WE KNEW A LOT ABOUT THE HUMAN

4    BODY AND I THOUGHT THAT -- THAT IT TOOK ME A LONG TIME TO GO

5    THROUGH ALL THOSE BOOKS.

6         AND IN THE INTERVENING YEARS, 20 YEARS, THE HUMAN GENOME

7    HAS BEEN MAPPED.  WHEN I WAS IN BIOLOGY, WE DIDN'T KNOW THE

8    HUMAN GENOME.  SO THERE'S BEEN IN THE INTERVENING PERIOD OF

9    TIME A HUGE AMOUNT OF RESEARCH THAT HAS ALLOWED FURTHER

10   STUDIES ON THINGS THAT WE -- WE HAD NO CLUE ABOUT 15, 20

11   YEARS AGO.

12        AND SO I THINK WESTBERRY HAS THE IMPORTANCE IN 1999

13   WHERE THERE IS NO STUDY AVAILABLE.  BUT I THINK -- I THINK

14   THAT THE DEFENDANTS' ARGUMENT IS WHERE THE STUDIES ARE

15   AVAILABLE, WHERE THERE ARE EPIDEMIOLOGICAL STUDIES TO PRETEND

16   THAT THEY ARE NOT THERE OR TO IGNORE THEM WILLINGLY RAISES A

17   QUESTION ABOUT THE RELIABILITY OF THE SCIENTIFIC TESTIMONY

18   THAT IS BEING OFFERED THROUGH DR. HARRISON.  I THINK THAT

19   THAT'S WHAT I UNDERSTAND THEIR CHALLENGE TO BE.

20        SO, WHETHER WESTBERRY REQUIRED AT THE TIME AND WHETHER

21   WESTBERRY IS STILL GOOD LAW, AND YOU KNOW, I -- WE

22   SHEPHERDIZED AND IT'S BEEN CITED, IT'S BEEN -- EVEN IN THE

23   FOURTH CIRCUIT I THINK IN THE CONNOR CASE IT'S BEEN MODIFIED

24   AND SAID, YOU KNOW, YOU REALLY NEED TO DO SOME

25   EPIDEMIOLOGICAL STUDIES, BUT IT'S -- IT'S A GUIDE, IT'S NOT

1    THE RULE I THINK, AND SO THAT'S -- SO MY CONCERN IS NOT

2    WHETHER IT'S REQUIRED OR NOT BUT UNDER DAUBERT DOES IT MAKE

3    MORE RELIABLE THE -- OR AT ALL RELIABLE THE OPINION OF DR.

4    HARRISON IF HE HAS FAILED TO ADDRESS ONE OF THE FACTORS OR

5    SEVERAL OF THE FACTORS UNDER DAUBERT.

6         *MR. JENSEN:*  OKAY.  WELL, THANK YOU, YOUR HONOR.  I

7    THINK MR. MCGOLDRICK IS CLARIFYING THAT HE'S BACKING OFF THE

8    BRIGHTLINE POSITION WHICH I UNDERSTOOD AT LEAST HE -- HIS

9    CLIENT TOOK IN THE PAPERS TO SAY THAT IN THE ABSENCE OF

10   STATISTICALLY SIGNIFICANT DOUBLING OF THE RISK, YOU KNOW, YOU

11   LOSE.

12        AND RATHER WHAT HE'S SAYING IS DR. HARRISON COULDN'T

13   ANSWER MY QUESTIONS AT THE DEPOSITION ABOUT, YOU KNOW, HOW

14   MANY STUDIES WERE STATISTICALLY SIGNIFICANT, HOW MANY STUDIES

15   WERE DOUBLING OF THE RISK, HOW MANY STUDIES WERE POSITIVE

16   VERSUS NEGATIVE, AND THAT MAKES HIS OPINION UNRELIABLE WHEN

17   IT COMES TO THE GENERAL CAUSATION ISSUE CAN PC -- CAN BENZENE

18   CAUSE NHL, OR AS MR. MCGOLDRICK WOULD HAVE YOU DECIDE THE

19   CASE, CAN MINERAL SPIRITS CAUSE NON-HODGKIN'S LYMPHOMA.

20        AND AGAIN, I WANT TO PUT THAT PIECE OFF FOR A MINUTE.

21   ON THE ISSUE OF WHETHER BENZENE CAN CAUSE NON-HODGKIN'S

22   LYMPHOMA FROM A GENERAL CAUSATION STANDPOINT, YOU HAVE TO

23   LOOK NOT JUST AT DR. HARRISON'S REPORT AND DEPOSITION

24   TESTIMONY BUT WHAT HE ATTACHED WITH HIS REPORT WHICH IS THIS

25   GARCIA DECLARATION.  AND YES, IT'S EIGHT YEARS OLD, BUT, YOU

1  KNOW, THAT DATA IS A VAST AMOUNT -- DISCUSSED IN THAT

2  DECLARATION, THE STUDIES DISCUSSED IN THAT DECLARATION

3  REFLECT A VAST AMOUNT OF EPIDEMIOLOGICAL LITERATURE THAT

4  RELATES TO THE ISSUE OF WHETHER BENZENE CAN CAUSE

5  NON-HODGKIN'S LYMPHOMA, AND I WILL ADD MUCH OF THAT

6  LITERATURE DEALS WITH EXPOSURES TO BENZENE.  IN FACT, MOST OF

7  IT DEALS WITH EXPOSURES TO BENZENE COMING FROM ORGANIC

8  SOLVENTS SUCH AS AND INCLUDING MINERAL SPIRITS.

9      BUT THE FOCUS IN THAT LITERATURE IS ON BENZENE AND

10  WHETHER BENZENE CAN CAUSE NHL.  AND HE NOT ONLY REVIEWED THAT

11  LITERATURE BUT HE PAINSTAKINGLY GOES THROUGH THAT -- THOSE

12  PUBLICATIONS, DISCUSSES, SUMMARIZES THEM, AND THEN REACHES

13  CONCLUSIONS ABOUT NOT JUST THE EPIDEMIOLOGICAL STUDIES BUT

14  THE TOXICOLOGICAL STUDIES, ALL THAT STUFF THAT GOES INTO THE

15  WEIGHT OF THE EVIDENCE ANALYSIS, THIS INFERENCE TO THE BEST

16  EXPLANATION APPROACH, WHICH UNDER THE BRADFORD HILL FACTORS

17  IS THE STANDARDIZED GENERALLY-ACCEPTED APPROACH THAT

18  SCIENTISTS CAN AND DO USE.  AND--

19          THE COURT:  BUT HE DID THAT IN 2007.

20          MR. JENSEN:  YES.

21          THE COURT:  HE HAS NOT EXHAUSTIVELY RESEARCHED AND

22  REVIEWED ALL THE SUBSEQUENT, LIKE HUNDREDS I THINK IT'S

23  SUGGESTED, EPIDEMIOLOGICAL STUDIES WHICH HE KNOWS EXIST IN

24  ORDER TO SUSTAIN HIS OPINION FROM 2007 IS STILL HIS OPINION

25  IN 2012 OR '13 OR WHENEVER HE HAD HIS DEPOSITION TAKEN;

1    RIGHT?

2         MR. JENSEN:  WELL, YES AND NO.  AND THE NO PART

3    IS -- YES, DR. HARRISON HAS NOT GONE THROUGH AND UPDATED, YOU

4    KNOW, EVERYTHING THAT HE SAYS IN THE GARCIA DECLARATION.  TO

5    SAY, HOWEVER, TO SUGGEST -- AND I DON'T THINK MR. MCGOLDRICK

6    WAS SAYING THIS, BUT I THINK HE MISUNDERSTOOD, YOU KNOW.  I

7    COULD BE WRONG.  BUT I DO NOT BELIEVE THAT THERE'S ANYTHING

8    CLOSE TO HUNDREDS OF NEW STUDIES THAT HAVE COME OUT IN THE

9    INTERIM.

10        THERE ARE NEW STUDIES, THERE ARE META-ANALYSES, MORE

11   THAN ONE, AND META-ANALYSES -- AND I WILL DISCUSS THEM -- ONE

12   OF THEM AT LEAST IN A LITTLE BIT OF DETAIL IN A MOMENT -- BUT

13   ARE WHERE THE SCIENTISTS TAKE DATA FROM A NUMBER OF STUDIES

14   AND COMBINE THAT DATA MATHEMATICALLY AND DO STATISTICAL

15   ANALYSES ON THE COMBINED SET OF DATA.  AND THE REASON THAT

16   THEY DO THAT IS THAT IT'S OFTEN THE CASE THAT SMALLER STUDIES

17   WON'T HAVE STATISTICAL POWER TO FIND SIGNIFICANT ASSOCIATIONS

18   EVEN IF THERE IS A REAL CAUSAL ASSOCIATION PRESENT.

19        AND SO, THE THOUGHT IS IF YOU CAN COMBINE THE DATA FROM

20   MULTIPLE STUDIES, YOU WILL GET A BETTER SENSE BOTH OF WHETHER

21   THERE REALLY IS AN ASSOCIATION, NUMBER ONE, AND NUMBER ONE --

22   AND NUMBER TWO, WHETHER THERE IS CONSISTENCY ACROSS THE

23   STUDIES.

24        META-ANALYSIS IS A MATHEMATICAL OR STATISTICAL TOOL TO

25   QUANTITATIVELY ASSESS CONSISTENCY WHICH IS ONE OF THE

1    BRADFORD HILL GUIDELINES AND ONE OF THE GUIDELINES THAT MR.

2    MCGOLDRICK CLAIMS THAT DR. HARRISON IS NOT FOLLOWING BASED ON

3    HIS DEPOSITION TESTIMONY.

4        BUT HERE IS MY POINT. MY POINT IS THAT LITERATURE THAT

5    IS REVIEWED PAINSTAKINGLY THOROUGHLY IN THE 200-AND-SOME-ODD

6    PAGE GARCIA DECLARATION IS STILL LITERATURE THAT IS TODAY

7    QUITE RELEVANT TO THE ISSUE OF WHETHER BENZENE CAN CAUSE

8    NON-HODGKIN'S LYMPHOMA. THERE ARE ADDITIONAL STUDIES AND

9    META-ANALYSES THAT ARE ALSO RELEVANT.

10        DR. HARRISON IN HIS AFFIDAVIT DISCUSSES SOME OF THOSE

11    AND HAS MENTIONED SOME OF THEM IN -- I BELIEVE IN HIS

12    DEPOSITION TESTIMONY. BUT NO ONE, NO SCIENTIST WOULD SAY

13    THAT THE STUDIES THAT ARE DISCUSSED IN THE GARCIA DECLARATION

14    ARE SOMEHOW NOW NOT RELEVANT BECAUSE SEVEN OR EIGHT YEARS

15    HAVE PASSED BY. YOU'D HAVE TO TAKE ALL OF THOSE STUDIES INTO

16    ACCOUNT.

17        AND WHAT DR. HARRISON IS SAYING IS THAT THOSE STUDIES

18    COLLECTIVELY SHOW IN MY SCIENTIFIC JUDGMENT THAT BENZENE --

19    OCCUPATIONALLY-EXPOSED WORKERS WHO WORKED WITH BENZENE AND

20    BENZENE-CONTAINING ORGANIC SOLVENTS ARE CONSISTENTLY AT

21    INCREASED RISK OF DEVELOPING NON-HODGKIN'S LYMPHOMA, AND

22    THAT'S WHAT HE CONCLUDES AFTER EXHAUSTIVELY REVIEWING THAT --

23    REVIEWING THAT MATERIAL.

24        AND YOU CAN'T JUST IGNORE THE FACT THAT HE'S DONE THAT

25    AND GO BY THE FACT THAT HE DOESN'T KNOW OFF THE TOP OF HIS

1    HEAD IN A DEPOSITION TAKING IN 2015, 2014, YOU KNOW, HOW MANY

2    OF THOSE STUDIES SHOWED A STATISTICALLY SIGNIFICANT POSITIVE

3    ASSOCIATION OR HOW MANY OF THOSE STUDIES SHOWED A DOUBLING OF

4    THE RISK.  YOU KNOW, HE DIDN'T GO THROUGH THAT EXERCISE.

5    IT'S NOT THE CRITERIA.  THOSE TWO CRITERIA, NOT -- NOT

6    CRITERIA THAT ARE AMONG THE BRADFORD HILL LIST.  CONSISTENCY

7    IS.  STRENGTH OF ASSOCIATION IS.  BUT SPECIFICALLY DRAWING

8    THOSE KINDS OF BRIGHT LINES IS NOT.

9        AND WHAT, YOU KNOW, BRADFORD HILL HIMSELF SAID IS WE

10   CAN'T PUT TOO MUCH WEIGHT ON WHETHER ANY GIVEN STUDY IS

11   STATISTICALLY SIGNIFICANT OR NOT.  WE HAVE TO LOOK AT ALL THE

12   DATA AND COLLECTIVELY AND, YOU KNOW, OBVIOUSLY STATISTICAL

13   SIGNIFICANCE CARRIES AN IMPORTANT -- IS AN IMPORTANT

14   CONSIDERATION, BUT YOU DON'T IGNORE DATA JUST BECAUSE IT'S

15   NONSIGNIFICANT.

16       SO ANYHOW, THE ANALYSIS THAT DR. HARRISON HAS GONE

17   THROUGH AS REFLECTED IN THE GARCIA DECLARATION IS THE RIGHT

18   ANALYSIS, IT'S THE METHOD THAT IS GENERALLY ACCEPTED, THERE'S

19   NO EVEN DEBATE ABOUT THAT, AND IT IS ENOUGH IN AND OF ITSELF

20   TO SAY THAT ON THE ISSUE OF GENERAL CAUSATION, DR. HARRISON'S

21   OPINIONS THAT BENZENE CAN CAUSE NON-HODGKIN'S LYMPHOMA SHOULD

22   SURVIVE RULE 702 SCRUTINY.

23       NOW MR. MCGOLDRICK SAID, WELL, THAT AFFIDAVIT WAS

24   PREPARED IN ANOTHER CASE INVOLVING ANOTHER KIND OF EXPOSURE

25   AND IT DOESN'T -- HE HASN'T SHOWN THAT IT FITS THE FACTS OF

1    THIS CASE.  WELL, THAT'S NOT -- THAT'S NOT CORRECT.  THAT

2    DECLARATION WAS PREPARED SPECIFICALLY ON THE ISSUE OF GENERAL

3    CAUSATION.  IT WAS NOT PREPARED ON SPECIFIC CAUSATION.

4        IT WAS NOT ANALYZING THE PLAINTIFFS -- THE SPECIFIC

5    PLAINTIFF IN THAT CASE IS EXPOSURES AND WHETHER OR NOT IN THE

6    ALTERNATIVE CAUSES, POTENTIAL ALTERNATIVE CAUSES AND SPECIFIC

7    CAUSATION, NONE OF THAT IS DISCUSSED IN THE DECLARATION.  AND

8    I WOULD ADD THAT THE DECLARATION ENCOMPASSES LITERATURE AND

9    STUDIES THAT ARE DONE ACROSS A WIDE VARIETY OF DIFFERENT

10   OCCUPATIONS AND EXPOSURE SETTINGS.

11       AND SO, IT IS A GENERAL CAUSATION DECLARATION, IT

12   APPLIES WITH EQUAL FORCE IN THIS CASE AS IT DID IN THE GARCIA

13   CASE ITSELF AND IT IS ENOUGH, AS I SAID, TO GET TO GENERAL --

14   TO GET PAST RULE 702 INQUIRY WITH RESPECT TO GENERAL

15   CAUSATION.

16       THE COURT:  WELL, I THINK THE DEFENDANTS CHALLENGED

17   THAT THE STUDIES -- THAT THE MAJORITY OF THE STUDIES THAT

18   WERE CITED IN THE DECLARATION DID NOT HAVE TO DO WITH BENZENE

19   BEING ASSOCIATED WITH ANY TYPE OF BLOOD CANCER.  IS THAT NOT

20   ACCURATE?  THE OVERWHELMING MAJORITY OF THE STUDIES THAT DR.

21   HARRISON CITES WERE STUDIES THAT DID NOT INVOLVE BENZENE AND

22   A BLOOD -- HAVING A CAUSATION TO NON-HODGKIN'S LYMPHOMA; IS

23   THAT -- OR ANY BLOOD CANCER.

24       MR. JENSEN:  LIKE DR. HARRISON, I HAVEN'T TRIED TO

25   COUNT HOW MANY STUDIES SHOWED A POSITIVE ASSOCIATION VERSUS A

1  NULL ASSOCIATION, HOW MANY OF THOSE STUDIES SHOWED A POSITIVE

2  ASSOCIATION THAT WAS NOT STATISTICALLY SIGNIFICANT, HOW MANY

3  OF THOSE STUDIES SHOWED A POSITIVE ASSOCIATION THAT WAS ABOVE

4  2.0, HOW MANY OF THOSE WERE STATISTICALLY SIGNIFICANT VERSUS

5  NOT STATISTICALLY SIGNIFICANT.

6        AND JUST SO I'M SURE THE COURT UNDERSTANDS THIS, I THINK

7  YOU ALREADY DO, BUT THE ISSUE OF THE SIZE OF THAT RELATIVE

8  RISK WHERE ODDS RATIO OR STANDARDIZED MORTALITY RATIO, THE

9  SIZE OF THE ASSOCIATION IS MEASURED IN ANY GIVEN EPIDEMIOLOGY

10 STUDY THAT WHETHER IT'S OVER 2.0 OR NOT, THAT'S A SEPARATE

11 ISSUE FROM WHETHER IT'S STATISTICALLY SIGNIFICANT.

12       YOU CAN HAVE A -- AN ASSOCIATION THAT'S, YOU KNOW, 50

13 TIMES EXPECTED AND THEY MIGHT NOT BE STATISTICALLY

14 SIGNIFICANT.  SO, AND THAT JUST DEPENDS ON WHETHER THE

15 CONFIDENCE INTERVAL AT THE 95 PERCENT CONFIDENCE LEVEL AND --

16 GETTING INTO A LOT OF DETAIL HERE -- BUT DOES THAT CONFIDENCE

17 INTERVAL ENCOMPASS ONE OR NOT.

18            THE COURT:  RIGHT.

19            MR. JENSEN:  SO ANYHOW, THE DOUBLING OF -- I JUST

20 WANTED TO MAKE SURE THE COURT UNDERSTOOD THE DOUBLING OF THE

21 RISK POINT AND THE STATISTICAL SIGNIFICANCE POINTS ARE

22 INDEPENDENT OF ONE ANOTHER.  BUT I HAVE NOT COUNTED ALL THAT

23 UP JUST AS DR. HARRISON HAS NOT AND DIDN'T BELIEVE HE EVER

24 NEEDED TO DO THAT.  HE DIDN'T DO IT FOR PURPOSES OF THE

25 GARCIA DECLARATION ITSELF.

1    WHAT HE DID DO WAS EVALUATE USING AGAIN HIS SCIENTIFIC

2    JUDGMENT AT THE TIME OF THE GARCIA DECLARATION THAT THAT BODY

3    OF LITERATURE SHOWED A CONSISTENT ASSOCIATION OF INCREASED

4    RISK AMONG OCCUPATIONAL EXPOSURES TO -- PEOPLE WHO HAVE

5    OCCUPATIONAL EXPOSURE TO BENZENE GETTING NON-HODGKIN'S

6    LYMPHOMA.  AND ALL OF THOSE STUDIES I BELIEVE OR CERTAINLY

7    WITH SIGNIFICANT MAJORITY OF THEM EVALUATED THAT ASSOCIATION.

8    MANY OF THOSE STUDIES SHOW POSITIVE ASSOCIATIONS.  MANY

9    OF THOSE STUDIES SHOW STATISTICALLY SIGNIFICANT POSITIVE

10   ASSOCIATIONS.  MANY SHOW -- SOME SHOW -- I -- AGAIN, I CAN'T

11   TELL YOU THE PERCENTAGE.  SOME SHOW NO ASSOCIATION.  SOME

12   SHOW NONSIGNIFICANT ASSOCIATIONS, POSITIVE ASSOCIATION.  BUT

13   ULTIMATELY WHAT DR. HARRISON CONCLUDED WAS THAT THEY ARE IN

14   FACT CONSISTENT.

15   AND LET ME SKIP OVER A COUPLE OF THINGS THAT REALLY DEAL

16   WITH SPECIFIC CAUSATION, I'LL COME BACK TO THEM AND TALK

17   ABOUT CONSISTENCY BECAUSE THAT'S WHAT I'M TALKING ABOUT RIGHT

18   NOW.  AND I WANT TO POINT YOU TO A FEW OF THE RELEVANT

19   PARAGRAPHS FROM THE GARCIA DECLARATION WHICH ARE IN THE

20   CONCLUDING SECTIONS WHERE HE'S APPLYING THE BRADFORD HILL

21   GUIDELINES TO WHAT HE HAS SUMMARIZED IN TERMS OF THE STUDIES

22   OVER THE COURSE OF THE DECLARATION.

23   AND ON PARAGRAPH 532 AT PAGE 215 HE SAYS, AS IS SHOWN BY

24   THE MANY CASE CONTROL STUDIES OF PERSONS DIAGNOSED WITH

25   NON-HODGKIN'S LYMPHOMA OR WHO DIED FROM THIS DISEASE, AN

1    ASSOCIATION BETWEEN ORGANIC SOLVENTS AND NON-HODGKIN'S

2    LYMPHOMA IS CONSISTENTLY FOUND AMONG THE STUDIES.

3        AT PARAGRAPH 535 HE SAYS, THE EPIDEMIOLOGIC STUDIES OF

4    WORKERS EXPOSED TO ORGANIC SOLVENTS ARE ALSO QUITE CONSISTENT

5    IN REPORTING EXCESSES OF NON-HODGKIN'S LYMPHOMA.  AND YOU

6    KNOW, IN EACH OF THESE PARAGRAPHS HE GIVES MORE DETAIL ABOUT

7    THE BASES FOR SUMMARIZING THAT VIEW WHICH AGAIN IS REALLY

8    BASED ON THE 150 PAGES THAT COME BEFORE IT.

9        BUT -- AND THEN FINALLY AT PARAGRAPH 538 HE SAYS, TAKEN

10   TOGETHER ALONG WITH THE WELL-CONDUCTED CASE CONTROL STUDIES

11   THE EPIDEMIOLOGIC LITERATURE IS CONSISTENT IN REPORTING

12   SIGNIFICANTLY INCREASED RISKS OF NON-HODGKIN'S LYMPHOMA AMONG

13   BENZENE-EXPOSED WORKERS.  AND AGAIN, THAT'S ENOUGH TO GET YOU

14   THERE.

15       *THE COURT:*  I GUESS, DO YOU HAVE ANY REASON TO

16   CONTEST THE YAMAHA CHART THAT THEY -- YOU SAID THAT DR.

17   HARRISON AND YOU HAVE NOT GONE THROUGH TO SEE IF EACH OF THE

18   CASE STUDIES WAS BENZENE-SPECIFIC TO NHL OR STATISTICALLY

19   SIGNIFICANT AND -- BUT I THINK THAT YAMAHA DID DO THAT IN ITS

20   MEMORANDUM AT ENTRY NUMBER 287.  THERE WERE A COUPLE OF

21   TABLES AT THE END OF THAT WHICH WENT THROUGH EACH OF THE

22   STUDIES AND SAID THAT THE VAST MAJORITY OF THEM WERE NOT

23   BENZENE SPECIFIC AND ONLY TWO OF THE OTHER WORKER STUDIES

24   WERE CONCERNING NHL BUT STATISTICALLY INSIGNIFICANT.

25       SO, I GUESS I'M HAVING A DIFFICULT TIME RECONCILING WHAT

1    YOU JUST SAID ABOUT DR. HARRISON'S POSITION CONCERNING THE

2    CASE STUDIES AND THE CHARTS THAT ARE CONTAINED AS AN

3    ATTACHMENT TO YAMAHA'S MEMO.

4         *MR. JENSEN:*  I APOLOGIZE FOR TURNING MY BACK TO THE

5    COURT WHILE I WAS PULLING THAT UP.

6         *THE COURT:* PLEASE.  BE--

7         *MR. JENSEN:*  I THINK I FOUND THE TABLES THAT ARE --

8    ARE THEY AT PAGES 20 AND 21 --

9         *THE COURT:* YES, SIR.

10        *MR. JENSEN:*  -- OF THEIR MOTION?  OKAY.  AND, WELL,

11   IT IS TRUE, YOUR HONOR, THAT COLLECTIVELY THE STUDIES THAT

12   ARE DISCUSSED IN THE GARCIA DECLARATION INCLUDE MANY STUDIES

13   WHERE THE WORKERS WORKED WITH ORGANIC SOLVENTS MORE BROADLY

14   CATEGORIZED AND THERE WERE NOT SPECIFIC MEASUREMENTS OF

15   BENZENE DONE FOR PURPOSES OF THE STUDY.

16       HOWEVER, THE AUTHORS IN MANY OF THOSE STUDIES, I AM NOT

17   GOING TO REPRESENT THAT IT'S ALL OF THEM, BUT MANY OF THOSE

18   STUDIES IN THE DISCUSSION SECTION WHEN THE AUTHORS ARE

19   TALKING ABOUT, OKAY, THERE WAS AN ASSOCIATION BETWEEN WORKERS

20   WORKING WITH ORGANIC SOLVENTS GENERALLY AND DEVELOPING

21   NON-HODGKIN'S LYMPHOMA, HERE'S WHAT THE RELATIVE RISK OR THE

22   ODDS RATIO WAS, AND THEY WILL SAY THAT, YOU KNOW, IT'S --

23   IT'S -- BENZENE HAS BEEN ASSOCIATED WITH SOME STUDIES IN THE

24   EPIDEMIOLOGICAL LITERATURE WITH NON-HODGKIN'S LYMPHOMA IN THE

25   PAST AND THE, YOU KNOW, BENZENE HAS -- IS OFTEN A INGREDIENT

154

1    OR CONTAMINANT OF ORGANIC SOLVENTS.

2         AND SO, I TELL YOU ALL OF THAT TO SAY THAT THAT

3    LITERATURE INCLUDING THOSE KINDS OF STUDIES THAT ARE LOOKING

4    AT ORGANIC SOLVENTS BROADLY IS PART OF THE LITERATURE THAT

5    MUST BE ANALYZED OR SHOULD BE ANALYZED IN ASSESSING THE ISSUE

6    OF BENZENE AND NHL.

7         THE COURT:  BUT IT WASN'T IN DR. GARCIA'S

8    AFFIDAVIT.  I GUESS THAT'S WHAT I'M TRYING TO UNDERSTAND IS

9    THAT WE'VE GOT A CHALLENGE TO WHAT HE -- YOU ARE REPRESENTING

10   HE DID EVALUATE THE APPROPRIATE STUDIES.  AND YOU KEEP

11   REFERRING TO THE THOROUGH, LONG 200-SOME-ODD PAGE

12   DECLARATION.

13        BUT THE CHALLENGE IS TRYING TO FILTER THROUGH ALL OF THE

14   WHAT -- WHAT YAMAHA CALLS USELESS FILLER MATERIAL DESIGNED TO

15   EXPAND THE DECLARATION TO TRY TO FIND EXACTLY WHAT IT IS THAT

16   IS THE SCIENTIFIC BASIS FOR DR. HARRISON'S OPINION THAT GIVES

17   RISE TO THE GENERAL CAUSATION OPINION OR TESTIMONY THAT THE

18   BENZENE CAUSES NON-HODGKIN'S LYMPHOMA, AND I HAVEN'T HEARD

19   YOU SPECIFICALLY TIE THAT OR IDENTIFY THAT FOR ME IN THE

20   DECLARATION.  SO THAT WOULD BE HELPFUL FOR ME.

21        MR. JENSEN:  OKAY.  WELL, I CAN'T, AS I STAND HERE,

22   TELL YOU WHICH OF THE STUDIES THAT ARE DISCUSSED AND

23   REFERENCED IN THE GARCIA DECLARATION ARE SPECIFIC TO BENZENE

24   VERSUS DEALING WITH ORGANIC SOLVENTS MORE BROADLY.  I CAN'T

25   DO THAT.

1           WHAT I CAN DO IS TELL YOU THAT HE ALSO REFERENCED MORE

2     RECENTLY FOR PURPOSES OF THIS CASE THIS STEINMAUS

3     META-ANALYSIS WHICH IS SPECIFICALLY A META-ANALYSIS OF

4     BENZENE STUDIES OF OCCUPATIONAL BENZENE STUDIES.  AND YOU

5     KNOW, ONCE YOU COMBINE THAT DATA, IT SHOWS THE STATISTICALLY

6     SIGNIFICANT ELEVATED RISK FOR BENZENE-EXPOSED WORKERS

7     DEVELOPING NON-HODGKIN'S LYMPHOMA.

8           AND IN FACT, WHEN THE AUTHORS LOOKED ONLY AT THOSE

9     STUDIES, THE DATA FROM THOSE STUDIES, THAT I STATED IT WRONG

10    HERE ON THE THING.  WHEN THEY ELIMINATED -- NO, I GOT IT

11    RIGHT.  WHEN THEY ELIMINATED THE STUDIES THAT RELIED

12    EXCLUSIVELY ON SELF-REPORTED WORK HISTORIES AND SAID, WELL,

13    THAT'S NOT A VERY GOOD WAY OF EVALUATING EXPOSURE, WHEN THEY

14    ELIMINATED THOSE STUDIES AND LOOKED AT WHAT WAS REMAINING,

15    THERE WAS ACTUALLY MORE THAN A DOUBLING OF THE RISK THAT WAS

16    ALSO STATISTICALLY SIGNIFICANT ON THE META-ANALYSIS.

17          AND SO, BASED ON THAT, YOU KNOW, HERE YOU HAVE GOT

18    BENZENE SPECIFICALLY AND NOT JUST A EYEBALL ASSESSMENT OF

19    CONSISTENCY BUT AN ACTUAL QUANTITATIVE ASSESSMENT OF

20    CONSISTENCY THAT'S BEEN PEER REVIEWED AND PUBLISHED IN THE

21    LITERATURE.

22          DO YOU HAVE ANY -- BEFORE I GO ON TO SPECIFIC CAUSATION,

23    YOUR HONOR, I WANT -- WELL, I DO NEED TO ADDRESS THE ISSUE OF

24    MINERAL SPIRITS VERSUS BENZENE.

25               *THE COURT:*  SURE.

1              *MR. JENSEN:*  AND THAT IN THIS CASE -- AND I HAVE

2    READ THE BURST DECISION FROM THE EASTERN DISTRICT OF

3    LOUISIANA THAT MR. MCGOLDRICK SPOKE ABOUT AND I WAS UNABLE TO

4    SEE ANY REFERENCE IN THAT CASE TO A QUANTIFIED ESTIMATE

5    WHETHER FROM MODELING OR ANY OTHER WAY OF ESTIMATING EXPOSURE

6    THAT WAS SPECIFIC TO BENZENE WITH RESPECT TO THAT CLAIM.

7              AND IN THIS CASE BY CONTRAST, DR. STEWART HAS DONE AN

8    EXPOSURE ANALYSIS TO SAY, I AM ESTIMATING THE AMOUNT OF

9    BENZENE CUMULATIVELY THAT MR. BOYKIN WAS EXPOSED TO OVER THE

10   COURSE OF HIS WORK AS A MOTORCYCLE MECHANIC AND I'M GOING TO

11   GIVE YOU A RANGE, A QUANTITATIVE RANGE, BASED ON THE MODELING

12   THAT I HAVE DONE AND THAT REFLECTS HIS BENZENE EXPOSURES.

13             NOW, THE FACT THAT THOSE BENZENE EXPOSURES CAME FROM

14   MINERAL SPIRITS THAT CONTAINED BENZENE IS A MATTER THAT I

15   AGREE IS ABSOLUTELY RIPE FOR CROSS-EXAMINATION.  BUT TO SAY

16   THAT THAT REQUIRES AS A MATTER OF LAW THAT IN ORDER FOR DR.

17   HARRISON'S GENERAL CAUSATION TESTIMONY TO BE ADMISSIBLE, HE

18   MUST HAVE EVALUATED WHETHER MINERAL SPIRITS AND NOT BENZENE

19   CAN CAUSE NHL I THINK IT'S JUST WRONG.

20             BENZENE IS BENZENE IS BENZENE REGARDLESS OF WHERE IT

21   CAME FROM.  AND THAT'S THE VIEW THAT DR. HARRISON HAS

22   EXPRESSED, AND THE -- THERE'S NO BASIS ON THIS RECORD FOR

23   DEFENDANTS TO SHOW OTHERWISE.  SO, THE CHEMICAL AND

24   TOXICOLOGICAL CHARACTERISTICS OF THAT BENZENE DO NOT DEPEND

25   ON WHETHER IT WAS ORIGINALLY PART OF A MIXTURE -- SOLVENT

1    MIXTURE THAT WAS IN MINERAL SPIRITS.  THEY JUST DON'T.

2         SO, NOW THEIR EXPERTS WILL COME IN AND SAY IF YOU'VE GOT

3    EXPOSURES TOLUENE AND BENZENE AT THE SAME TIME, YOUR SYSTEM

4    CAN PROCESS BENZENE DIFFERENTLY AND SO FORTH AND SO ON.

5    WELL, OKAY, THEY GET TO DO THAT, BUT THAT'S AGAIN NOT A BASIS

6    THAT -- DR. HARRISON DISAGREES WITH THAT AND THAT'S NOT A

7    BASIS FOR THIS COURT TO EXCLUDE HIS OPINIONS ALTOGETHER

8    BECAUSE HE'S LOOKING AT BENZENE EXPOSURES AND FOCUSING ON

9    THAT.

10         AND THEN, YOU KNOW, THIS KIND OF TURNED -- THIS ARGUMENT

11   IN SOME SENSE TURNS ON ITS HEAD A LITTLE BIT, THE ISSUE THAT

12   YAMAHA RAISES BECAUSE YAMAHA IS SAYING, WELL, A LOT OF THESE

13   STUDIES THAT DR. HARRISON IS REVIEWING IN THE GARCIA

14   DECLARATION ARE NOT BENZENE SPECIFIC.  WELL, WHAT ARE THESE

15   STUDIES IF THEY ARE NOT BENZENE SPECIFIC?  AND THE REALITY IS

16   THEY ARE STUDIES ABOUT ORGANIC SOLVENTS, PETROLEUM

17   DISTILLATES SOLVENTS SUCH AS AND INCLUDING MINERAL SPIRITS.

18         AND DO ANY OF THOSE STUDIES SAY THAT, YOU KNOW, MINERAL

19   SPIRITS EXPOSURE IS ASSOCIATED -- SPECIFICALLY THAT MINERAL

20   SPIRITS ASSOCIATED WITH NON-HODGKIN'S LYMPHOMA?  I'M NOT

21   REPRESENTING THAT THEY DO.  I DON'T -- I DON'T KNOW THAT THEY

22   EVEN ANALYZED OR MADE THAT STATISTICAL COMPARISON IN ANY OF

23   THOSE STUDIES.  BUT WHAT I DO KNOW IS THAT MANY OF THE

24   STUDIES, WHEN THEY ARE TALKING ABOUT ORGANIC SOLVENT EXPOSURE

25   ARE TALKING ABOUT EXPOSURES TO A GROUP OF SOLVENTS THAT MOST

1    DEFINITELY INCLUDES MINERAL SPIRITS.

2         SO, YOU KNOW, YOU'RE DAMNED IF YOU DO AND YOU'RE DAMNED

3    IF YOU DON'T IS A LITTLE BIT OF WHAT I'M HEARING FROM THESE

4    TWO ARGUMENTS.  BUT YOU KNOW, WHAT DR. HARRISON'S JUDGMENT

5    WAS, THAT BECAUSE BENZENE IS CONTAINED IN ORGANIC SOLVENTS

6    THAT ARE PETROLEUM DISTILLATES GENERALLY, THAT ALL THESE

7    STUDIES THAT DEALT WITH THAT ARE RELEVANT BUT THE EXPOSURE OF

8    INTEREST THAT WE'RE TALKING ABOUT WITH RESPECT TO MR. BOYKIN

9    IS BENZENE.

10        AND I'M LOOKING AT THE STUDIES AND EVALUATING GENERAL

11   CAUSATION WITH THAT END POINT IN MIND, CAN BENZENE CAUSE

12   NON-HODGKIN'S LYMPHOMA, AND THERE'S CERTAINLY ENOUGH TO

13   SUPPORT THAT IT CAN.

14        NOW AGAIN, BEFORE I LEAVE THAT ISSUE OF GENERAL

15   CAUSATION, I WANT TO ADDRESS WHATEVER CONCERNS, ISSUES,

16   QUESTIONS THAT YOU HAVE BEFORE I GO ON TO SPECIFIC--

17        *THE COURT:*  I THINK I HAVE SUFFICIENTLY INTERRUPTED

18   YOU ALONG THE WAY.  I'M NOT SURE THAT I HAVE ANY FOLLOW-UP

19   QUESTIONS.  I MIGHT INTERRUPT YOU FURTHER IF SOMETHING COMES

20   TO MIND, BUT YOU HAVE DONE A GREAT JOB SO FAR.  PLEASE

21   PROCEED.

22        *MR. JENSEN:*  OKAY.  OKAY.  I THINK THIS IS MY FIRST

23   SORT OF INAPPROPRIATELY-ORDERED SLIDE THAT DEALS WITH ISSUES

24   THAT ARE REALLY SPECIFIC CAUSATION ISSUES.  AND YOU KNOW, IN

25   THE CONTEXT OF WESTBERRY, IN THE FOURTH CIRCUIT THAT COURT

1    HAS MADE IT CLEAR THAT PRECISE INFORMATION CONCERNING THE

2    EXPOSURE NECESSARY TO CAUSE SPECIFIC HARMS TO HUMANS AND

3    EXACT DETAILS PERTAINING TO THE PLAINTIFFS' EXPOSURE IS NOT

4    NECESSARY.

5         NOW, YOU DO NEED TO CHARACTERIZE EXPOSURE, YOU NEED TO

6    TAKE EXPOSURE INTO ACCOUNT.  AND TO BE FAIR, I'M NOT HEARING

7    THAT SPECIFIC ARGUMENT FROM THE DEFENSE TODAY AT LEAST.  BUT

8    I WANT TO MAKE IT CLEAR THAT EVEN THOUGH WE'VE GOT A

9    QUANTITATIVE ESTIMATE OF BENZENE EXPOSURE FROM DR. STEWART IN

10   THIS CASE, IT'S NOT NECESSARY UNDER THE LAW.

11        NOW, THIS ISSUE IS CERTAINLY AT THE HEART OF THIS

12   SPECIFIC CAUSATION ARGUMENT THAT DEFENDANTS ARE MAKING HERE,

13   AND BASICALLY THEY ARE SAYING THAT DR. HARRISON DID NOT DO AN

14   APPROPRIATE DIFFERENTIAL DIAGNOSIS OR DIFFERENTIAL ETIOLOGY

15   KIND OF ANALYSIS IN THIS CASE BECAUSE HE DID NOT ELIMINATE OR

16   EVEN CONSIDER THEY SAY -- EXCUSE ME -- ALL POSSIBLE

17   ALTERNATIVE CAUSES.

18        AND WHAT THE LAW SAYS ABOUT THIS IN -- UNDER WESTBERRY

19   IS THAT A MEDICAL EXPERT'S CAUSATION CONCLUSION SHOULD NOT BE

20   EXCLUDED BECAUSE HE OR SHE HAS FAILED TO RULE OUT EVERY

21   POSSIBLE ALTERNATIVE CAUSE OF A PLAINTIFF'S ILLNESS.  AND YOU

22   KNOW, AT ONE POINT AT LEAST IN THE PAPERS AND I THINK ALSO

23   TODAY, SAFETY KLEEN HAS ARGUED THAT, WELL, IN THE CONTEXT OF

24   BENZENE LITIGATION WHERE MANY CASES OF LEUKEMIA AND LYMPHOMA

25   HAVE UNKNOWN CAUSES, WE BELIEVE THAT IN THAT CIRCUMSTANCE A

1    PROPER DIFFERENTIAL DIAGNOSIS MUST EXCLUDE ALL POSSIBLE

2    CAUSES, AND THAT'S -- THAT'S NOT THE LAW IN BENZENE

3    LITIGATION EITHER.

4         AND IF I CAN POINT TO ANOTHER DECISION THAT IS A CASE

5    THAT I HAPPENED TO BE INVOLVED WITH CALLED SCHULTZ VERSUS

6    AKZO NOBEL PAINTS -- AND AGAIN, IN THAT INSTANCE THE DISTRICT

7    COURT HAD EXCLUDED THE SPECIFIC CAUSATION TESTIMONY OF AN

8    EXPERT AND ONE OF THE ARGUMENTS THAT HAD BEEN -- OR ONE OF

9    THE REASONS ARTICULATED BY THE DISTRICT COURT HAD BEEN THAT

10   THE DIFFERENTIAL DIAGNOSIS THAT THAT EXPERT HAD DONE FAILED

11   TO RULE EVERYTHING OUT, ALL POSSIBLE CAUSES OUT.  AND ON

12   APPEAL THE SEVENTH CIRCUIT SAID THAT WAS NOT NECESSARY.

13        AN EXPERT -- QUOTE, AN EXPERT SHOULD SHOW WHY A

14   PARTICULAR ALTERNATIVE EXPLANATION IS NOT IN THE EXPERT'S

15   VIEW THE SOLE CAUSE OF THE DISEASE.  AND THEN IT GIVES A

16   CITATION.  BEYOND THAT, WHILE MYERS AND THE COMMITTEE NOTES

17   SUGGEST THAT A RELIABLE EXPERT SHOULD CONSIDER ALTERNATIVE

18   CAUSES, THEY DO NOT REQUIRE AN EXPERT TO RULE OUT EVERY

19   ALTERNATIVE CAUSE.

20        AND IN THE CONTEXT OF THAT DISCUSSION, THE COURT WENT ON

21   TO DESCRIBE HOW BOTH UNDER THE SUBSTANTIVE LAW AND UNDER THE

22   RECORD OF THE SCIENTIFIC TESTIMONY OF THE EXPERT WHOSE NAME

23   WAS STEVEN GORE, DR. GORE'S TESTIMONY IN THAT CASE.  AS A

24   MATTER OF LAW, MORE THAN ONE CAUSE, YOU KNOW, SUBSTANTIVE LAW

25   OF THE STATE OF WISCONSIN, MORE THAN ONE CAUSE CAN CAUSE AN

1    INJURY AND, B, A LEGAL CAUSE FOR WHICH, YOU KNOW, LIABILITY

2    ATTACHES.

3        AND UNDER THE SCIENCE THE COURT POINTS OUT THAT, YOU

4    KNOW, DR. GORE IS SAYING EXACTLY WHAT DR. HARRISON HAS SAID

5    HERE; IS THAT MANY DISEASES AND PROBABLY EVERY CASE OF CANCER

6    HAS MULTIPLE, MULTIPLE CAUSES.  AND GIVEN THAT MULTIPLE

7    CAUSES ARE IN PLAY IN THE CASES OF MANY INSTANCES OF CANCER

8    INCLUDING LEUKEMIA, INCLUDING NON-HODGKIN'S LYMPHOMA, IT

9    MAKES NO SENSE TO SAY THAT YOU HAVE TO RULE OUT EVERY OTHER

10    POSSIBLE CAUSE BEFORE YOU CAN RULE IN THAT MORE LIKELY THAN

11    NOT BENZENE EXPOSURE IS PLAYING A ROLE.

12        *THE COURT:*  I UNDERSTAND THAT SEVENTH CIRCUIT CASE.

13    BUT THE FOURTH CIRCUIT IN COOPER PROVIDED THAT A DIFFERENTIAL

14    DIAGNOSIS THAT FAILS TO TAKE SERIOUS ACCOUNT OF OTHER

15    POTENTIAL CAUSES MAY BE SO LACKING THAT IT CANNOT PROVIDE A

16    RELIABLE BASIS FOR AN OPINION ON CAUSATION.  THUS, IF AN

17    EXPERT UTTERLY FAILS TO CONSIDER ALTERNATIVE CAUSES OR FAILS

18    TO OFFER AN EXPLANATION FOR WHY THE PROFFERED ALTERNATIVE

19    CAUSE WAS NOT THE SOLE CAUSE, A DISTRICT COURT IS JUSTIFIED

20    IN EXCLUDING THE EXPERT'S TESTIMONY.

21        SO HOW DO YOU RECONCILE THAT WITH THE ARGUMENT THAT

22    YOU'RE MAKING?

23        *MR. JENSEN:*  WELL, I THINK THAT THE STATEMENTS OF

24    LAW ARE CONSISTENT WITH ONE ANOTHER.  IN OTHER WORDS, WHAT

25    THE FOURTH CIRCUIT I THINK IS SAYING IN THE COOPER CASE THERE

1    IS THE EXPERT CAN'T DO A DIFFERENTIAL ETIOLOGY ANALYSIS

2    WITHOUT AT LEAST THINKING ABOUT THE LIKELY POSSIBLE

3    ALTERNATIVE CAUSES AND, YOU KNOW, THINKING ABOUT THEM,

4    CONSIDERING THEM AND DETERMINING WHETHER OR NOT TO RULE THEM

5    IN OR RULE THEM OUT OR DOESN'T HAVE ENOUGH INFORMATION ONE

6    WAY OR THE OTHER.

7         AND IF YOU FAIL TO DO THAT WITH, YOU KNOW, RESPECT TO

8    SOMETHING THAT IS CLEARLY OF SIGNIFICANT, POTENTIAL

9    ALTERNATIVE CAUSE OR CAUSES, THEN, YOU KNOW, YOU'RE NOT DOING

10   IT RIGHT.  AND--

11        THE COURT:  ISN'T THAT EXACTLY WHAT THE DEFENDANTS

12   ARE SUGGESTING, THAT -- THAT--

13        MR. JENSEN:  YES, THAT IS WHAT THEY ARE ARGUING.

14   THEY ARE WRONG ABOUT WHAT DR. HARRISON DID OR DIDN'T DO, BUT

15   THAT IS THEIR ARGUMENT.

16        THE COURT:  WAS THERE A SERIOUS ACCOUNT OF THE

17   POTENTIAL CAUSE OF THE NHL FROM PCB'S?

18        MR. JENSEN:  YES.

19        THE COURT:  OKAY.  AND ALL THE OTHER FACTORS, THE

20   PRINTING PRESS AND THE --

21        MR. JENSEN:  YES.

22        THE COURT:  -- AMBIENT BENZENE AND THE --

23        MR. JENSEN:  YES.

24        THE COURT:  -- AND THE IDIOPATHIC.

25        MR. JENSEN:  SO -- OKAY.  IDIOPATHIC IS VERY

1    DIFFERENT FROM ALL THE OTHERS.  IDIOPATHIC IS NOT AN

2    ALTERNATIVE CAUSE AS MUCH AS DEFENSE COUNSEL MIGHT LIKE TO

3    COUCH IT THAT WAY.  IDIOPATHIC JUST MEANS THERE IS NO CAUSE

4    IDENTIFIED.  EVERY CASE OF DISEASE, EVERY CASE OF LYMPHOMA,

5    EVERY CASE OF LEUKEMIA HAS NOT JUST ONE CAUSE BUT MANY

6    CAUSES.  BUT IT'S -- IT'S OFTEN THE CASE, IN FACT MORE OFTEN

7    THAN NOT THE CASE THAT WHEN AN INDIVIDUAL DEVELOPS

8    NON-HODGKIN'S LYMPHOMA AND GOES INTO AN ONCOLOGIST, AN

9    ONCOLOGIST GIVES THAT PERSON THE BAD NEWS AND THE PERSON THEN

10   ASKS, OKAY, WHY DID I GET IT?  WHAT CAUSED IT?

11       IT'S MORE OFTEN -- MORE THAN HALF THE CASES, IN FACT THE

12   MEDIUM, MAJORITY OF THE CASE THE ONCOLOGIST SAYS, I DON'T

13   KNOW, OKAY, AND THAT CASE THEN GOES DOWN IN THE REGISTRY AS

14   BEING AN IDIOPATHIC NON-HODGKIN'S LYMPHOMA.  THAT DOES NOT

15   MEAN THAT IT DIDN'T HAVE A CAUSE.

16       WHAT IT MEANS IS WHOEVER WAS ASSESSING THE EXTENT TO

17   WHICH THEY COULD IDENTIFY A CAUSE OR CAUSES OF THAT LYMPHOMA

18   COULDN'T DO SO BASED ON THE INFORMATION THAT THAT PERSON HAD.

19       *THE COURT:*  LET ME ASK YOU THIS.  HAS DR. HARRISON

20   EVER TESTIFIED IN A TOXIC TORT CASE THAT THE CAUSE OF

21   NON-HODGKIN'S LYMPHOMA WAS IDIOPATHIC?

22       *MR. JENSEN:*  HAS HE EVER TESTIFIED IN A SPECIFIC

23   INDIVIDUAL'S CASE...

24       *THE COURT:*  THAT HE COULDN'T IDENTIFY--

25       *MR. JENSEN:*  THAT HE COULDN'T SAY -- I DON'T KNOW

1    THE ANSWER TO THAT QUESTION.  I DON'T KNOW THE ANSWER.

2              *THE COURT:*  HAS HE EVER TESTIFIED FOR A DEFENDANT?

3              *MR. JENSEN:*  I BELIEVE SO, YOUR HONOR, BUT I...

4    AGAIN, I DON'T WANT TO MAKE A REPRESENTATION I'M NOT SURE

5    ABOUT.  I THINK HE HAS, BUT I'M NOT SURE.

6              *THE COURT:*  I GUESS MY ISSUE IS IF HE HIMSELF HAS

7    TESTIFIED THAT THE MAJORITY OF CASES WE DON'T KNOW HOW THE

8    PERSON GOT NHL AND YET EVERY TIME HE DOES TESTIFY HE CAN

9    IDENTIFY, HE'S GOT THE SECRET, SECRET RED TELEPHONE TO GOD

10   THAT TELLS HIM EXACTLY WHY THIS INDIVIDUAL WHO HAS HIRED HIM

11   GOT NON-HODGKIN'S LYMPHOMA.

12        AND SO, I GUESS THAT'S MY ISSUE.  IT JUST SO HAPPENS AT

13   THE CAUSATION ANALYSIS -- I'M NOT SURE IF THE ANALYSIS

14   CHANGES BUT THE OPINION CHANGES FROM PERSON TO PERSON JUST

15   DEPENDING ON WHAT HAPPENED IN THAT PERSON'S LIFE, NOT

16   NECESSARILY SPECIFIC TO THE FACTS GERMANE TO THE SCIENCE OR

17   THE MEDICINE BEHIND THE DISEASE.

18             *MR. JENSEN:*  OKAY.  I THINK I UNDERSTAND WHERE

19   YOU'RE COMING FROM HERE.  AND WHERE I THINK YOU'RE COMING

20   FROM IS TO SAY, LOOK, IT'S NOT CREDIBLE AND IT UNDERMINES

21   RELIABILITY IN SOME BROAD SENSE OF THAT TERM AT LEAST TO THE

22   EXTENT THAT EVEN THOUGH DR. HARRISON, YOU KNOW, MAY

23   ACKNOWLEDGE THAT MOST CASES OF NON-HODGKIN'S LYMPHOMA WE

24   CAN'T IDENTIFY WHAT THE CAUSE IS, WHENEVER I TALK ABOUT

25   NON-HODGKIN'S LYMPHOMA AND CAUSATION I CAN TELL YOU WHAT THE

1    CAUSE IS, AND THAT -- THAT'S NOT CREDIBLE.

2        WELL, I WOULD -- I WILL SAY A COUPLE OF THINGS ABOUT

3    THAT.  ON THE ISSUE OF WHETHER HE'S SO BIASED THAT EVERY TIME

4    HE SEES A CASE, HE ATTRIBUTES IT TO BENZENE OR PCB'S OR

5    WHATEVER PLAINTIFFS' LAWYER NEEDS THEM TO ATTRIBUTE IT TO,

6    WELL, THAT'S A GREAT CROSS-EXAMINATION ISSUE.  BUT BEYOND

7    THAT, I WANT TO POINT OUT THERE'S A LOT OF SELF-SELECTION

8    GOING ON BEFORE YOU GET TO THE POINT WHERE HE'S BEEN LISTED

9    AS AN EXPERT.

10        IF HE CAN'T -- IF HE'S GOING TO TELL A, YOU KNOW,

11    PLAINTIFF'S LAWYER THAT I CAN'T TELL YOU WHETHER BENZENE OR

12    ANYTHING ELSE CAUSED THIS PARTICULAR CANCER, THEN OBVIOUSLY

13    HE'S NOT GOING TO GET HIRED FOR THAT CASE AND I'M VERY

14    CONFIDENT THAT HE WOULD SAY, YEAH, THERE'S LOTS OF CASES

15    WHERE I HAVE BEEN ASKED TO REVIEW INFORMATION ABOUT A

16    PROSPECTIVE PLAINTIFF OR A CASE THAT'S ON FILE AND SAID, NO,

17    I CAN'T HELP YOU, I CAN'T IDENTIFY OR I CAN'T CONCLUDE

18    WHETHER OR NOT THE EXPOSURE CAUSED THAT PERSON'S DISEASE.

19    I'M CONFIDENT THAT HE WOULD SAY THAT.  WHETHER OR NOT HE'S

20    TESTIFIED FOR DEFENDANTS I CAN'T RECALL FOR SURE.  I THINK HE

21    HAS.

22        BUT MORE IMPORTANTLY FOR THE EXERCISE THAT YOU ARE

23    HAVING TO GO THROUGH, THAT'S -- THAT'S A JURY ISSUE, NOT A

24    RULE 702 ISSUE.  AND--

25            THE COURT:  ALL RIGHT.  I GUESS IT'S -- IT IS A

1    RULE 702 ISSUE BECAUSE UNDER -- I THINK BECAUSE UNDER THE

2    DAUBERT ADDITIONAL FACTORS, THE PROGENY, IT SAID THE

3    FOLLOWING ADDITIONAL RELIABILITY FACTORS RELEVANT HERE,

4    WHETHER THE OPINION, EXPERT OPINION, WAS DEVELOPED EXPRESSLY

5    FOR THE PURPOSE OF TESTIFYING AND THUS WAS MORE LIKELY TO BE

6    BIASED TOWARD A PARTICULAR RESULT, WHETHER THE EXPERT

7    EMPLOYED THE ANTITHESIS OF SCIENTIFIC METHODOLOGY BY COMING

8    TO A FIRM CONCLUSION FIRST AND THEN DOING RESEARCH TO SUPPORT

9    IT, WHETHER THE EXPERT HAS UNJUSTIFIABLY EXTRAPOLATED FROM AN

10   ACCEPTED PREMISE TO AN UNFOUNDED CONCLUSION, WHETHER THE

11   EXPERT ADEQUATELY ACCOUNTED FOR AND EXCLUDED ALTERNATIVE

12   EXPLANATIONS, WHETHER EPIDEMIOLOGY, CONSIDERED THE BEST

13   EVIDENCE OF GENERAL CAUSATION IN A TOXIC TORT CASE, WAS

14   AVAILABLE, WAS PROPERLY ADDRESSED BY THE EXPERT OR WAS

15   IMPROPERLY IGNORED.

16       SO, THESE -- AND THESE ARE A LOT OF FACTORS THAT WERE --

17   THE ARGUMENT THAT I'M HEARING IS, DON'T YOU WORRY ABOUT IT,

18   LET THE JURY DECIDE THE WEIGHT TO GIVE IT.  IT'S SUFFICIENT

19   FOR YOU, IT'S A JURY QUESTION.  AND I DON'T THINK THAT THAT'S

20   WHAT THE LAW REQUIRES.

21       I THINK THE LAW REQUIRES THE COURT TO SERVE IN ITS

22   GATEKEEPING FUNCTION TO DETERMINE WHETHER WE HAVE GOT A HIRED

23   GUN OR WHETHER WE HAVE GOT TRULY AN EXPERT WHO HAPPENS TO BE

24   BROUGHT IN FOR THE PURPOSE OF AIDING THE JURY IN MAKING A

25   DETERMINATION ON SCIENTIFIC MATTERS.

1    *MR. JENSEN:* IT IS TRUE THAT AT LEAST IN SOME CASES

2    COURTS HAVE SAID THAT THE ISSUES ABOUT THE EXTENT TO WHICH

3    THE OPINIONS WERE PREPARED FOR LITIGATION SPECIFICALLY IS

4    SOMETHING THAT THE COURT SHOULD TAKE INTO ACCOUNT UNDER 702

5    AND THAT, YOU KNOW, YOU CAN CHARACTERIZE THAT AS BEING A PART

6    OF THIS SO-CALLED WHETHER THEY ARE A HIRED-GUN ANALYSIS.

7        BUT TO SUGGEST AS I -- YOU KNOW, I DON'T WANT TO PUT

8    WORDS IN THE COURT'S MOUTH, BUT WHAT I JUST HEARD -- I THINK

9    I HEARD YOU SAY IS IF -- IF I LOOK AT THIS RECORD AND I

10   DETERMINE FROM A TOTALITY OF THIS RECORD THAT DR. HARRISON IS

11   A QUOTE, HIRED GUN, THEN REGARDLESS OF WHETHER HE APPLIED,

12   YOU KNOW, A SCIENTIFICALLY APPROPRIATE METHODOLOGY, BECAUSE

13   HE'S A HIRED GUN, I CAN THROW HIM OUT AND I HAVE DISCRETION

14   TO DO THAT.

15       *THE COURT:* I'M NOT SAYING THAT. I'M SAYING THAT'S

16   ONE FACTOR THAT THE COURT MUST CONSIDER. NOW, THE OTHER

17   DAUBERT FACTORS I THINK ARE ALSO RELEVANT ABOUT WHETHER THERE

18   IS SCIENTIFIC SUPPORT, IS IT A THEORY GENERALLY ACCEPTED,

19   WHAT'S THE MINIMUM RATE OF ERROR, YOU KNOW, ALL OF THE -- THE

20   HARD SCIENCE AND THE EPIDEMIOLOGICAL STUDIES, IF THAT'S THE

21   APPROPRIATE THING TO CONSIDER UNDER THE DIFFERENTIAL

22   ETIOLOGY.

23       BUT I GUESS THE ISSUE THAT I'M HAVING TO DEAL WITH IS IN

24   ANALYZING ALL OF THESE DIFFERENT FACTORS THAT GO INTO MAKING

25   A DETERMINATION UNDER 701 AS TO WHETHER THE EXPERT IS

1    RELIABLE AND WHETHER THERE'S A SCIENTIFIC BASIS FOR -- FOR

2    HIS DETERMINATION THAT WOULD ASSIST THE TRIER OF FACT WHEN

3    THERE'S CHALLENGES TO ONE AFTER ANOTHER AFTER ANOTHER AFTER

4    ANOTHER OF THOSE FACTORS THAT THE COURT MUST CONSIDER.

5         AT SOME POINT IT BECOMES A QUESTION OF WHAT'S LEFT, YOU

6    KNOW, WHAT IS NOT BEING CHALLENGED, WHAT IS OKAY?  I MEAN,

7    HE'S -- IN FACT, I THINK THAT THERE'S NO CHALLENGE TO HIS

8    QUALIFICATIONS OR THE METHODOLOGY THAT HE CHOSE, BUT I THINK

9    EVERYTHING ELSE I'M HEARING IS ALMOST FAIR GAME.  ALL THE

10   OTHER FACTORS THAT I'M TO CONSIDER THEY'RE BEING

11   CHALLENGED -- THERE ARE CHALLENGES TO.

12        AND I THINK FOR THE ALTERNATIVE CAUSES ASPECT, I HAVE

13   TRIED TO -- I TRIED TO COME UP WITH A WAY THAT I CAN

14   UNDERSTAND IT BECAUSE IT SEEMS VERY FLUID AND POTENTIALLY

15   CONFUSING, BUT I -- I WAS TALKING WITH MY LAW CLERK AND I

16   SAID, OKAY, WELL, YOU KNOW, I HAVE GOT FOUR BOYS.  I HAVE GOT

17   A DECK OUTSIDE.  IF I SEE -- IF I PLACE LET'S SAY A GLASS OF

18   MILK ON MY DECK, BACK DECK PORCH, AND THEN I COME BACK AND I

19   SEE THE GLASS IS SHATTERED AND THERE'S MILK ALL OVER MY DECK,

20   THEN I CAN IN MY MIND THINK, ALL RIGHT, I HAVE GOT FOUR BOYS,

21   ONE OF THE FOUR OF THEM PROBABLY BROKE THE GLASS --

22             *MR. JENSEN:* RIGHT.

23             *THE COURT:* -- SPILLED IT, KNOCKED IT OVER OR

24   SOMETHING.  AND I SAY, ALL RIGHT, WELL, I'M GOING TO TALK TO

25   MY OLDEST AND SEE WHAT HE SAYS.  AND I TALK TO HIM AND HE

1    SAYS, OH, IT WAS THE BABY THAT DID IT.  AND THEN I SAY, WELL,

2    I'M GOING TO ELIMINATE MY OLDEST BECAUSE HE SAID HE DIDN'T DO

3    IT AND, YOU KNOW WHAT, I'M JUST GOING TO GO WITH IT, THE BABY

4    DID IT.  AND I DON'T GO AND TALK TO MY SECOND CHILD, I DON'T

5    TALK TO MY THIRD CHILD, AND I DON'T TALK TO MY FOURTH CHILD.

6    WHEN, IF I -- AND THAT'S MY OPINION.  AND THAT'S THE OPINION

7    THAT I'M GOING TO GIVE AS THE CAUSATION FOR THE SPILL.

8        NOW, WHAT I HAVEN'T CONSIDERED BUT WHAT SOMEONE ELSE,

9    LIKE MY HUSBAND, MIGHT COME IN AND SAY IS, WELL, WHAT ABOUT

10   THE DOG OR THE OTHER DOG OR THE CAT OR, YOU KNOW, THESE

11   GLASSES THAT WE HAVE, THERE HAVE BEEN STUDIES THAT THEY

12   SPONTANEOUSLY COMBUST FOR NO REASON AT ALL, AND IN THE

13   MAJORITY OF CASES WHEN THERE IS A BREAK, IT'S BECAUSE OF NO

14   REASON AT ALL.  OKAY?

15       AND SO WHAT I'M HAVING DIFFICULTY IN TRYING TO EVALUATE

16   IS AN EXPERT OPINION OF WHO SPILLED THE GLASS, WHY, WHY THE

17   GLASS IS BROKEN AND MILK IS ALL OVER THE PLACE.  I'M TRYING

18   TO MAKE SURE THAT IN ASSESSING THAT OPINION OF CAUSATION, WE

19   FILE -- WE FOLLOW WHAT THE LAW PROVIDES IN TRYING TO EVALUATE

20   ALL POTENTIAL CAUSES --

21       MR. JENSEN:  AND YOU SHOULD.

22       THE COURT:  -- OF THAT INSTEAD OF SAYING, OKAY,

23   WELL, MY EXPERT CHOSE TO FOCUS ON THE FOUR CHILDREN.  DO YOU

24   UNDERSTAND THAT?

25       MR. JENSEN:  I THINK I DO.  I THINK IT'S A GOOD

1    ANALOGY OR AT LEAST, YOU KNOW, ALL ANALOGIES HAVE SOME

2    PROBLEM --

3              THE COURT:  YEAH.  BUT--

4         MR. JENSEN:  -- BUT I LIKE THE ANALOGY.  I THINK

5    YOU SHOULD BE DOING THAT.  AND I THINK THAT WE'RE -- YOU AND

6    I ARE ON DIFFERENT PAGES RIGHT AT THIS SECOND.  I HOPE I CAN

7    CHANGE YOUR MIND.

8              THE COURT:  WELL, I GUESS MY MAIN PROBLEM--

9         MR. JENSEN:  GET TO THE SPECIFICS OF--

10             THE COURT:  MY MAIN ISSUE IS THE SUGGESTION THAT MY

11   HUSBAND MAKES THAT IN MOST -- IN THE MAJORITY OF GLASS

12   BREAKAGE CASES WE DON'T KNOW WHAT HAPPENED, YOU KNOW, AND

13   THERE'S NO -- THERE'S NO CAUSE THAT WE CAN POINT TO.  THERE'S

14   NO CHILD AND NO ANIMAL THAT WE CAN POINT TO.

15        AND IF I DECIDED THAT MY BABY DID IT, THEN BECAUSE I

16   DECIDED THE BABY DID IT DOES NOT MAKE IT CHANGE THE

17   POSSIBILITY THAT THE GLASS SPONTANEOUSLY COMBUSTED.  BECAUSE

18   I'VE CHOSEN TO BELIEVE THE BABY DID IT IPSE DIXIT DOESN'T

19   MAKE IT THAT I CAN RULE OUT THE POSSIBILITY OF THE

20   SPONTANEOUS COMBUSTION.

21             MR. JENSEN:  WELL, I WOULD SAY THIS, YOUR HONOR.  I

22   MEAN, I THINK IT WOULD HAVE BEEN APPROPRIATE IN THAT

23   SITUATION TO CARRY THE ANALOGY OUT, YOU KNOW, FOR YOU TO TALK

24   TO ALL FOUR KIDS, NUMBER ONE.  NUMBER TWO, TO CONSIDER OTHER

25   POSSIBLE CAUSES BESIDES SPONTANEOUS BREAKAGE OF GLASS AND

1    DETERMINE THE EXTENT TO WHICH YOU CAN RULE IN, RULE OUT,

2    DON'T HAVE ENOUGH INFORMATION ONE WAY OR THE OTHER, AND

3    ASSESS WHAT'S THE MOST PROBABLE EXPLANATION IN LIGHT OF ALL

4    OF THAT INCLUDING SAYING, I CAN'T SAY.  OKAY.  I AGREE WITH

5    ALL OF THAT.  I DO THINK THAT'S WHAT DR. HARRISON HAS DONE BY

6    ANALOGY HERE.

7         NOW, THE ONE PLACE THAT I HEAR YOU HAVING TROUBLE WHERE

8    I DON'T THINK YOU SHOULD BE IS ON THIS ISSUE OF THE SO-CALLED

9    IDIOPATHIC OR IN THE ANALOGY THE SPONTANEOUS BREAKAGE.  THERE

10   IS NO SPONTANEOUS BREAKAGE WHEN IT COMES TO LYMPHOMA.  IN

11   OTHER WORDS, NO EXPERT IS GOING TO COME AND SAY ON THE

12   DEFENSE SIDE THAT, YOU KNOW, LYMPHOMA CAN HAPPEN WITHOUT A

13   CAUSE AT ALL.  THEY WILL NOT SAY THAT.

14        NOW, WHAT THEY MEAN BY IDIOPATHIC IS JUST NO CAUSE HAS

15   BEEN IDENTIFIED.  AND YOU KNOW--

16        *THE COURT:*  SO YOU ARE SAYING THERE'S ALWAYS A

17   CAUSE.  IT'S WHETHER YOU KNOW--

18        *MR. JENSEN:*  THERE'S ALWAYS A CAUSE WHETHER IT'S

19   GENETICS, A COMBINATION OF GENETICS AND ONE ENVIRONMENTAL

20   EXPOSURE, A COMBINATION OF GENETICS IN MULTIPLE ENVIRONMENTAL

21   EXPOSURE -- USING ENVIRONMENTAL IN THE BROADEST TERMS -- THAT

22   WOULD INCLUDE, YOU KNOW, THINGS LIKE SMOKING CIGARETTES OR

23   DRINKING ALCOHOL OR, YOU KNOW, AND SOME OF THOSE THINGS ARE

24   NOT RISK FACTORS FOR NON-HODGKIN'S LYMPHOMA, BUT JUST TO --

25   AS A WAY OF EXPLANATION.

1          AND YOU KNOW, RISK FACTORS MIGHT BE, YOU KNOW, YOUR BMI

2    OR SOMETHING LIKE THAT.  AND THERE'S ALWAYS CAUSES.  IT'S

3    JUST THAT IN THE MAJORITY OF CASES, WHOEVER IS -- WHOEVER IS,

4    YOU KNOW, BEING ASKED THE QUESTION WITH RESPECT TO SPECIFIC

5    CASES WHEN IT COMES TO NON-HODGKIN LYMPHOMA PATIENTS, AND

6    USUALLY THAT'S TREATING ONCOLOGISTS, DON'T KNOW.  THEY DON'T

7    KNOW WITH RESPECT TO THAT SPECIFIC PATIENT.

8          THEY GO DOWN A LIST OF ESTABLISHED RISK FACTORS.  THEY

9    DO A ORAL HISTORY OF THE PATIENT TO EVALUATE THE EXTENT TO

10   WHICH ANY OF THOSE RISK FACTORS APPLY, AND MOST OF THE TIME

11   THEY DON'T.  OKAY?  THAT'S WHAT HAPPENS.  NOW, THAT DOESN'T

12   MEAN THAT THAT -- THOSE NON-HODGKIN'S LYMPHOMA PATIENTS

13   DEVELOPED -- DEVELOPED NON-HODGKIN'S LYMPHOMA FOR NO REASON.

14   IT JUST MEANS THAT ONCOLOGIST, THOSE ONCOLOGISTS COULDN'T

15   IDENTIFY THE REASONS.

16         AND COUPLE OF THINGS.  NUMBER ONE, TREATING ONCOLOGISTS,

17   ALTHOUGH THEY ARE ALMOST ALWAYS ASKED BY THEIR PATIENTS, WHAT

18   CAUSED MY CANCER, THEY ARE NEITHER PAID NOR TRAINED TO

19   EVALUATE CAUSATION.  THAT'S NOT THEIR JOB.  THEIR JOB IS TO

20   DIAGNOSE AND TO TREAT AND MAKE PEOPLE BETTER AND THAT'S WHAT

21   THEY DO, THAT'S WHAT THEY ARE PAID FOR, THAT'S WHAT INSURANCE

22   COMPANIES REIMBURSE THEM TO DO.

23         OCCUPATIONAL AND ENVIRONMENTAL MEDICINE DOCTORS LIKE DR.

24   ROBERT HARRISON, THEIR JOB IS TO PREVENT DISEASE AND TO

25   EVALUATE AN INDIVIDUAL'S WHO HAVE DISEASE, WHAT CAUSED IT IF

1   THEY CAN.  AND THEY GO THROUGH A PROCESS THAT IS A

2   COMPREHENSIVE PROCESS FOR EVALUATING AND INVESTIGATING

3   CAUSATION THAT MOST TREATING ONCOLOGISTS DO NOT DO AND THEY

4   DON'T HAVE ANY REASON TO DO IT.  THEY ARE NOT GOING TO TREAT

5   A NON-HODGKIN'S LYMPHOMA DIFFERENTLY DEPENDING ON WHETHER

6   BENZENE CAUSED IT OR NOT.  IT DOESN'T MAKE ANY DIFFERENCE TO

7   THE TREATMENT OPTIONS AVAILABLE.

8          SO, IN LIGHT OF THAT, YOU KNOW, DR. HARRISON IS -- IS IN

9   A, YOU KNOW, VERY SPECIALIZED GROUP OF PHYSICIANS WHO DO THIS

10  FOR A LIVING.  AND MOST TIMES WHEN PEOPLE ARE TRYING TO

11  EVALUATE CAUSES, THEY DO IT IN A MUCH LESS THOROUGH FASHION

12  THAN WHAT HE'S TRAINED TO DO AND WHAT HE HAS DONE.

13         BUT EVEN MORE IMPORTANTLY, ONCE SOMEONE HAS GONE THROUGH

14  AN INVESTIGATION, HOWEVER THOROUGH OR NOT THOROUGH IT IS AND

15  THEY HAVE RULED IN THAT, YUP, HERE'S A RISK FACTOR FOR YOU,

16  YOU -- YOU WERE EXPOSED TO CHEMOTHERAPEUTIC AGENTS THAT

17  INCREASED THE RISK OF NON-HODGKIN'S LYMPHOMA BECAUSE YOU HAD

18  BREAST CANCER BEFORE AND THAT CHEMOTHERAPY MORE LIKELY THAN

19  NOT CONTRIBUTED TO YOUR NON-HODGKIN'S LYMPHOMA.

20         ONCE YOU HAVE DONE THAT AND YOU HAVE RULED SOMETHING IN

21  BECAUSE IT'S A RISK FACTOR UNDER THE LITERATURE, UNDER THE

22  GENERAL CAUSATION LITERATURE, YOU HAVE NOW ELIMINATED

23  IDIOPATHIC AS A CAUSE.  NOW, YOU COULD BE WRONG.  YOU KNOW,

24  YOU COULD BE WRONG ABOUT WHETHER THAT CHEMOTHERAPY WAS A

25  CAUSE.

1    BUT WHAT YOU HAVE DONE BY EXERCISING YOUR JUDGMENT TO

2    RULE THAT FACTOR IN IS RULE OUT THAT IDIOPATHIC IS THE CAUSE,

3    AND THAT'S WHAT HAPPENED HERE IN THE CONTEXT OF DR. HARRISON

4    SAYING, OKAY, I'VE EVALUATED THE AGGREGATE CUMULATIVE

5    EXPOSURES TO BENZENE THAT MR. BOYKIN HAD AND RULED IN THAT

6    MORE LIKELY THAN NOT TO A REASONABLE DEGREE OF MEDICAL

7    CERTAINTY THAT THOSE EXPOSURES PLAYED A ROLE IN THE

8    DEVELOPMENT OF HIS LYMPHOMA.  SUBSTANTIAL FACTOR.  SO I HAVE

9    RULED OUT IDIOPATHIC.

10   NOW LET'S TALK ABOUT THE OTHER STUFF.  THE OTHER STUFF

11   THAT MR. MCGOLDRICK RAISES TODAY IN TERMS OF POSSIBLE

12   ALTERNATIVE CAUSES DEALS WITH -- MOST OF THEM DEALT WITH

13   OTHER TYPES OF EXPOSURES OR ROUTES OF EXPOSURES TO BENZENE.

14   AND LET'S BE CLEAR.  DR. HARRISON'S OPINION IS THAT BENZENE

15   CAUSED HIS LYMPHOMA AND ALL OF HIS EXPOSURES TO BENZENE

16   PROBABLY CONTRIBUTED TO THAT.  THAT'S HIS OPINION.

17   SO, HIS EXPOSURES WHEN HE WORKED AS A PRINTER PROBABLY

18   CONTRIBUTED.  HIS EXPOSURES TO AMBIENT BENZENE, HIS EXPOSURES

19   WHILE PUMPING GAS, ALL OF THOSE PROBABLY CONTRIBUTED.  THAT'S

20   DR. HARRISON'S OPINION, BUT, YOU KNOW, THAT EACH OF THOSE

21   EXPOSURES INCLUDING THE OCCUPATIONAL EXPOSURES CONTRIBUTED,

22   AND THEREFORE HE'S NOT RULING THOSE OUT.  HE'S RULING THEM

23   ALL IN.

24   NOW, WHAT HE HAS DONE IS SAY, MORE LIKELY THAN NOT, I

25   DON'T THINK, FOR EXAMPLE, THE PRINTING EXPOSURES ARE THE SOLE

1    CAUSE.  AND THAT'S WHAT HE'S GOT TO BE ABLE TO DO.  IF THAT'S

2    AN EXPOSURE, WHICH IN THIS CASE IT IS, THAT NO LIABILITY

3    COULD EXTEND TO THE DEFENDANTS AS BEING RESPONSIBLE FOR THOSE

4    PRINTING EXPOSURES TO BENZENE, THEN HE HAS TO BE ABLE TO RULE

5    OUT THAT THOSE EXPOSURES WERE THE SOLE CAUSE.

6         THAT'S WHAT HIS LEGAL BURDEN IS.  AND HE HAS TO -- HE

7    HAS TO GIVE IT SOME THOUGHT IS THE OTHER THING THAT THE

8    COOPER CASE BRINGS UP; RIGHT?  HE CAN'T JUST NOT CONSIDER IT

9    AT ALL IF IT'S A, YOU KNOW, POSSIBLE EXPLANATION.  AND SO HE

10   HAS CONSIDERED IT.  HE SAID, I CAN'T RULE IT OUT COMPLETELY

11   WITH A HUNDRED PERCENT CERTAINTY THAT THAT WAS THE SOLE

12   CAUSE, BUT I CAN'T SAY IT'S NOT LIKELY, AND THAT'S HIS

13   THAT'S -- HIS RESPONSIBILITY, THAT'S THE BURDEN OF PROOF, AND

14   THAT'S WHAT HE HAS DONE.

15        THAT'S TRUE.  SO AGAIN, HE HAS RULED OUT -- BY RULING IN

16   HIS OCCUPATIONAL EXPOSURES TO BENZENE AS A MOTORCYCLE

17   MECHANIC HE'S RULED OUT THAT ANY OF THESE OTHER THINGS WERE

18   THE SOLE CAUSE, BUT HE'S CONSIDERED THE AMBIENT EXPOSURES TO

19   BENZENE, THE PRINTING EXPOSURES, THE GAS EXPOSURES, HE'S

20   CONSIDERED ALL THAT.  HE WOULD CONSIDER ALL OF THEM.  HE

21   WOULD RULE ALL OF THOSE IN MORE LIKELY THAN NOT AS PROBABLE

22   CONTRIBUTORS BUT SAY IT'S UNLIKELY THAT ANY ONE OF THEM OR

23   ANY OTHER GROUP OF THEM OUTSIDE OF THE MOTORCYCLE MECHANIC

24   CONTEXT WERE THE SOLE CAUSE.

25        SO THAT'S WHAT HE'D SAY ABOUT THE BENZENE EXPOSURE.  NOW

1    PCB IS THE OTHER THING THAT'S COME UP.  DR. HARRISON'S

2    OPINION IS THAT PEOPLE IN THE GENERAL POPULATION CAN AND DO

3    DEVELOP NON-HODGKIN'S LYMPHOMA AS A RESULT OF HAVING ELEVATED

4    LEVELS OF CERTAIN PCB'S IN THEIR BODY.  AND YOU KNOW, WHAT HE

5    WOULD SAY IS IN ORDER TO EVALUATE WHETHER PCB'S CONTRIBUTED

6    TO ANY GIVEN INDIVIDUALS -- AND HE SAYS THIS EXPRESSLY IN

7    BOTH HIS AFFIDAVIT AND HIS DEPOSITION TESTIMONY -- TO

8    EVALUATE THAT IN ANY GIVEN INDIVIDUAL WHO HAS NHL, WHAT YOU

9    NEED TO DO IS DRAW THEIR BLOOD, ANALYZE IT FOR PCB'S, SOME

10   SPECIFIC PCB'S THAT HAVE BEEN ASSOCIATED WITH AN NHL IN THE

11   LITERATURE AND SEE WHETHER THOSE LEVELS ARE, YOU KNOW,

12   CONSISTENT OR NOT WITH THEM BEING AT HIGHER RISK OF

13   DEVELOPING NON-HODGKIN'S LYMPHOMA FROM THOSE BLOOD LINES.

14       AND IN THE ABSENCE OF THOSE BLOOD ANALYSES YOU CAN'T SAY

15   ONE WAY OR THE OTHER BECAUSE SOME PEOPLE IN THE GENERAL

16   POPULATION, EVEN WITHOUT OCCUPATIONAL EXPOSURES TO PCB'S IN

17   DR. HARRISON'S OPINION BASED ON THE LITERATURE ARE DEVELOPING

18   NHL'S AS A RESULT.

19       WITH RESPECT TO MR. BOYKIN, BY THE TIME WE CONTACT DR.

20   HARRISON TO ASK HIM TO EVALUATE WHETHER BENZENE PLAYED A ROLE

21   IN MR. BOYKIN'S DEATH AND HIS DEVELOPMENT OF NHL, HE WAS

22   ALREADY GONE, SO YOU CAN'T DRAW HIS BLOOD AT THAT POINT, AND

23   SO THAT'S ALL -- THAT'S ALL HE'S SAYING ABOUT PCB'S.  YES,

24   IT'S A POSSIBLE CONTRIBUTOR.  I CAN'T COMPLETELY RULE IT OUT

25   BECAUSE I DIDN'T HAVE ANY BLOOD AVAILABLE.  I WILL TELL YOU,

1   HOWEVER -- AND THIS IS IN HIS AFFIDAVIT -- THAT EVEN IF HIS

2   LEVELS WERE ANALYZED AND WERE FOUND TO BE ELEVATED, THAT

3   WOULD NOT CHANGE MY OPINION THAT BENZENE ALSO PLAYED A ROLE.

4   AT THAT POINT I'D BE SAYING IT WAS BOTH BENZENE AND PCB.

5          *THE COURT:*  OKAY.

6          *MR. JENSEN:*  SO, YOU KNOW, THAT'S WHAT HE DID.  HE

7   DID IT WITH RESPECT TO ALL OF THE RISK FACTORS THAT HE

8   BELIEVES ARE STRONGLY ASSOCIATED WITH NON-HODGKIN'S LYMPHOMA.

9   HE CONSIDERED THEM.  HE ANALYZED THEM.  AND HE RULED OUT WITH

10  RESPECT TO ALL OF THEM THAT ANY OF THEM WERE LIKELY TO BE THE

11  SOLE CAUSE OF MR. BOYKIN'S NON-HODGKIN'S LYMPHOMA, AND THAT'S

12  ALL HE WAS REQUIRED TO DO UNDER THE LAW.

13    WE HAVE BEEN OVER THIS.  WE HAVE BEEN OVER THAT.  OKAY.

14  THE LAST THING I WANT TO TALK ABOUT, YOUR HONOR, IS MR.

15  MCGOLDRICK WANTED TO SAY OR ARGUED THAT BECAUSE DR.

16  HARRISON'S OPINION IS THAT THERE IS NO SAFE THRESHOLD OF

17  EXPOSURE TO BENZENE CANNOT CAUSE CANCER.  AND THAT IS HIS

18  OPINION.  THAT'S NOT AN INACCURATE CHARACTERIZATION OF HIS

19  OPINION.

20    THAT BECAUSE THAT'S TRUE, YOU KNOW, HE SHOULD RULE IN

21  EVERYTHING IN THAT KIND OF ANALYSIS OR HE CAN RULE IN

22  EVERYTHING AND THAT'S WHAT HE'S DEPENDED UPON, THAT KIND OF

23  LINEAR, NO THRESHOLD EXPOSURE, ANY EXPOSURE IS GOOD ENOUGH,

24  THEREFORE THIS DISEASE MUST BE CONNECTED TO BENZENE IS

25  SOMETHING THAT HAS BEEN REJECTED BY FEDERAL COURTS AND HE

```
 1    CITES THOSE CASES AND YOU SHOULD REJECT HIS OPINION FOR THE

 2    SAME REASONS.

 3         EVEN -- AND WHAT I'D HAVE TO SAY TO YOU -- EVEN THOUGH

 4    IT IS TRUE THAT IT IS -- HIS OPINION THERE'S NO SAFE

 5    THRESHOLD, HE DID NOT RELY ON THE NO SAFE THRESHOLD PORTION

 6    OF HIS OPINION TO REACH A SPECIFIC CAUSATION ANALYSIS OR

 7    JUDGMENT WITH RESPECT TO MR. BOYKIN.  RATHER, WHAT HE DID WAS

 8    LOOK AT THE EPIDEMIOLOGICAL LITERATURE THAT HAS STUDIED THE

 9    RELATIONSHIP BETWEEN BENZENE AND OTHER ORGANIC SOLVENTS

10    EXPOSURES AND THE RISK OF NON-HODGKIN'S LYMPHOMA AND COMPARE

11    THAT EXPERIENCE BOTH IN TERMS OF WHERE IT WAS AVAILABLE

12    QUANTITATIVE EXPOSURES AND WHERE IT WASN'T JUST DESCRIPTIVE

13    CHARACTERIZATIONS OF THE KINDS OF EXPOSURE CONDITIONS THAT

14    THOSE PEOPLE HAD IN THE WORK PLACE AND COMPARED THAT WITH

15    WHAT MR. BOYKIN DID.

16         AND WHAT HE DETERMINED WAS THAT BASED ON THE LITERATURE,

17    MR. BOYKIN'S WORK EXPERIENCE WITH BENZENE WAS ENOUGH TO PUT

18    HIM AT INCREASED RISK OF NON-HODGKIN'S LYMPHOMA AND THEREFORE

19    I THINK IT PLAYED A ROLE IN HIS PARTICULAR CASE.  AND THAT'S

20    VERY DIFFERENT FROM SAYING BECAUSE HE HAD ANY EXPOSURE AT

21    ALL, I -- AND THERE'S NO SAFE THRESHOLD, THAT BENZENE CAUSED

22    IT.  DOES THAT MAKE SENSE?

23              THE COURT:  YEAH.

24              MR. JENSEN:  OKAY.  THAT'S ALL I HAVE GOT TO SAY.

25              THE COURT:  ALL RIGHT.  VERY GOOD.  ANY REDIRECT?
```

1          *MRS. BONNEVILLE:* CAN I JUST RAISE TWO QUICK POINTS

2     JUST ON THE SPECIFIC CAUSATION ISSUE?

3          *THE COURT:* SURE.

4          *MRS. BONNEVILLE:* ANY GENERAL CAUSATION I WILL

5     LEAVE THAT TO MY COLLEAGUES. ONE OF THE THINGS I HEARD MANY

6     TIMES FROM PLAINTIFFS' COUNSEL IS HOW THOROUGH A JOB DR.

7     HARRISON DID, WHAT A COMPREHENSIVE EVALUATION HE DID. AND MY

8     QUESTION, RESPONSE IS, WHERE IS THAT? IT'S NOT IN THE

9     265-PAGE REPORT THAT WE HAVE OUT OF GARCIA. IT'S NOT IN HIS

10    EXPERT REPORT IN THIS CASE. IT'S NOT IN HIS DEPOSITION.

11         THE FIRST TIME WE SEE ANY EVALUATION -- AND I WOULD NOT

12    CHARACTERIZE IT AS COMPREHENSIVE -- BUT THE FIRST TIME WE SEE

13    ANY REAL SERIOUS CONSIDERATION OF ANY OF THE FACTORS IS IN

14    THE AFFIDAVIT IN OPPOSITION TO OUR MOTION. AND AS PART OF

15    ACUITY'S MOTION AT LEAST, AND I'M CERTAINLY NOT AS FAMILIAR

16    WITH SAFETY KLEEN'S MOTION AS THEY ARE, THAT'S PART OF OUR

17    CHALLENGE AND THAT LEAVES US BACK TO WHERE WE WERE THIS

18    MORNING. I DON'T WANT TO REVISIT ANY OF THAT.

19         BUT WHAT WE HAVE HERE IS A CIRCULAR ARGUMENT.

20    PLAINTIFFS CITE TO THEIR AFFIDAVIT. THEY DON'T CITE TO THE

21    DEPOSITION TESTIMONY. THEY DON'T CITE TO THE REPORT. THE

22    AFFIDAVIT DOESN'T CITE TO THE DEPOSITION TESTIMONY THAT

23    HAPPENED OVER TWO DAYS. IT DOESN'T CITE TO THE REPORT.

24    DOESN'T CITE TO STUDIES.

25         AND SO, THAT IS PART OF ONE OF OUR FUNDAMENTAL PROBLEMS

1    WITH DR. HARRISON IS THAT THE ONLY TIME HE COMES CLOSE TO

2    APPLYING A DIFFERENTIAL METHODOLOGY IN ANY WAY THAT WOULD BE

3    CLOSE TO THE STANDARD OF WHAT THE LAW REQUIRES FROM HIM IS IN

4    RESPONSE TO OUR MOTION.  YOU CAN'T SAY THAT HE RULED OUT A

5    CAUSE WHEN HE NEVER CONSIDERED IT IN THE FIRST PLACE.

6        HIS RULE 26 REPORT, HIS DEPOSITION TESTIMONY, IT'S CLEAR

7    HE DID NOT SERIOUSLY CONSIDER IT.  AND I THINK THE COURT HAS

8    IT RIGHT ON THE MONEY.  THE COURT HAS PLENTY OF AUTHORITY

9    UNDER DAUBERT, UNDER WESTBERRY, UNDER COOPER.  THE COURT DOES

10   NOT NEED TO LOOK TO MILWARD IN THE FIRST CIRCUIT.  IT DOES

11   NOT NEED TO LOOK TO SEE WHAT SCHULTZ IN WISCONSIN IS DOING.

12       THE FOURTH CIRCUIT IN WESTBERRY AND COOPER LAYS OUT

13   WHAT'S REQUIRED IN A DIFFERENTIAL DIAGNOSIS.  SOUTH CAROLINA

14   AND FOURTH CIRCUIT CASE LAW INTERPRETING DAUBERT IS CLEAR ON

15   HOW THE COURT EXERCISES THEIR ROLE AS A GATEKEEPER.  THE

16   COURT HAS ALL THE DISCRETION, ALL THE AUTHORITY THAT IT NEEDS

17   TO LOOK AT WHAT DR. HARRISON DID, AND THE SAME WILL APPLY, OF

18   COURSE, TO DR. STEWART AS WELL, AND TO MAKE A DECISION ON

19   WHETHER OR NOT THAT MEETS THE STANDARD.

20       *THE COURT:*  THANK YOU.  WOULD YOU LIKE TO RESPOND

21   TO THAT CONCERNING THE REAL ANALYSIS ONLY BEING IN THE

22   AFFIDAVIT THAT THEY MOVE TO STRIKE.

23       *MR. JENSEN:*  I DON'T THINK THAT'S RIGHT, YOUR

24   HONOR.  I MEAN, WHAT IS RIGHT ABOUT IT -- THERE'S -- IT'S GOT

25   SOME TRUTH TO IT.  THE LIST OF FACTORS THAT DR. HARRISON WENT

1    THROUGH IN HIS REPORT WITH RESPECT TO POSSIBLE ALTERNATIVE

2    CAUSES IS A SMALLER LIST THAN WHAT HE EVENTUALLY WENT THROUGH

3    IN THE AFFIDAVIT.  IT'S A SMALLER LIST IN FACT THAN WHAT HE

4    WENT THROUGH IN HIS DEPOSITION.

5         BUT TO SAY THAT THAT MEANS THAT HE WASN'T -- HE HADN'T

6    RULED OUT THAT ANY OF THOSE THINGS WERE A SOLE CAUSE IS WRONG

7    FOR A COUPLE OF REASONS.  NUMBER ONE, YOU KNOW, BY RULING IN

8    THE OCCUPATIONAL EXPOSURES TO BENZENE HIMSELF BASED ON

9    EVALUATING THOSE EXPOSURES AND COMPARING THEM AGAINST THE

10   LITERATURE, HE'S RULED OUT SOLE CAUSE FOR ANYTHING ELSE.

11        BUT HAVING SAID THAT, HE TAKES INTO ACCOUNT THESE OTHER

12   FACTORS IN -- TO SOME EXTENT IN HIS REPORT, TO A GREATER

13   EXTENT IN HIS DEPOSITION TESTIMONY, AND HE TAKES IT A STEP

14   FURTHER AND ADDRESSES A COUPLE OF THINGS THAT HE DOESN'T EVEN

15   THINK ARE REALLY RISK FACTORS FOR NON-HODGKIN'S LYMPHOMA THAT

16   HAVE BEEN RAISED BY DEFENDANTS' EXPERTS AND SAYS, WELL, I'M

17   GOING TO RULE THOSE OUT AS SOLE CAUSES, TOO, JUST OUT OF A --

18   SORT OF AN ABUNDANCE OF CAUTION, BUT -- AND THAT'S HOW IT --

19   HOW IT PLAYED OUT.

20        THE COURT:  OKAY.  THANK YOU.  MR. MCGOLDRICK, DO

21   YOU HAVE ANYTHING TO ADD?

22        MR. MCGOLDRICK:  YOUR HONOR, UNLESS YOU HAVE ANY

23   QUESTIONS FOR ME OR COUNSEL HAS ANYTHING ELSE TO ADD, I'M

24   JUST GOING TO LEAVE IT AS IS.

25        THE COURT:  OKAY.  ANYTHING FURTHER FROM ANYONE

```
1    ELSE?  NO?  VERY GOOD.  WELL, IT'S A LITTLE AFTER FIVE.  I

2    WILL STAND DOWN AND LET THE COURT STAFF GO.  WE WILL -- WHAT

3    TIME DO Y'ALL WANT TO START TOMORROW MORNING?  BIG NIGHT

4    TONIGHT, SO WHAT TIME YOU THINK YOU CAN ROLL IN TOMORROW?

5         MRS. BONNEVILLE:  YOUR HONOR, WOULD IT BE POSSIBLE

6    TOMORROW TO START A LITTLE BIT EARLIER?

7         THE COURT:  SURE.  I'M HERE AT EIGHT OR 8:30.

8    COURT STAFF, WHEN DO Y'ALL...

9       (OFF-THE-RECORD DISCUSSION WAS HAD.)

10        MRS. BONNEVILLE:  NINE IS FINE.

11        THE COURT:  NINE GOING ONCE.  GOING TWICE.  YEAH.

12   OKAY.  WE WILL START AT NINE TOMORROW AND THEN SEE -- AND SEE

13   IF WE CAN'T -- CAN'T FINISH UP THE ARGUMENTS.  I DON'T --

14   Y'ALL ARE GOING AT A GOOD CLIP.  I FEEL LIKE EVERYONE HAS

15   DONE A PHENOMENAL JOB IN ARTICULATING AND PRESENTING THE

16   POSITIONS.

17      I WILL, IF YOU ALL DON'T MIND, LIKE TO GET A PRINTOUT OF

18   YOUR NICE POWERPOINTS.  I HAVE THE ONE FROM YOU, MR. JENSEN,

19   THIS MORNING.  I DON'T HAVE YOUR AFTERNOON ONE.  MR.

20   MCGOLDRICK, IF YOU DON'T MIND, THEN THAT WOULD BE REALLY

21   HELPFUL TO ME AND MY LAW CLERK.

22        MR. BOGLE:  E-MAIL THOSE TO YOUR--

23        THE COURT:  ABSOLUTELY.  VAN WILL ACCEPT THOSE

24   WILLINGLY.  AND I THINK THERE'S NOTHING ELSE THAT WE NEED TO

25   TAKE CARE OF ON THE RECORD, SO LET'S GO OFF THE RECORD.
```

1        (WHEREUPON, AN OFF-THE-RECORD DISCUSSION WAS HAD AS

2    COURT ENDED FOR THE DAY.)

3                              ***

4        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6

7        S/KATHLEEN RICHARDSON

8        _____        AUGUST 12, 2015

9        KATHLEEN RICHARDSON, RMR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25