IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION


SUSAN BOYKIN, INDIVIDUALLY  )
AND AS PERSONAL             )
REPRESENTATIVE OF THE ESTATE)
OF PHILIP BOYKIN,           )
                            )
        PLAINTIFF,          )
                            )
    -VERSUS-                )   3:13-CV-00417
                            )   JULY 30, 2015
SPECTRUM LUBRICANTS CORP,   )   COLUMBIA, SC
ET AL,                      )   VOLUME II OF II
                            )
        DEFENDANTS.         )
_____)



BEFORE THE HONORABLE SHIVA V. HODGES
UNITED STATES MAGISTRATE JUDGE, PRESIDING
MOTION HEARING

A P P E A R A N C E S:

FOR THE PLAINTIFF:        STEVE JENSEN, ESQ.
                          ALLEN STEWART PC
                          325 N. SAINT PAUL STREET
                          SUITE 4000
                          DALLAS, TX  75201
                          PRO HAC VICE

                          FREDERICK J. JEKEL, ESQ.
                          JEKEL DOOLITTLE
                          PO BOX 2579
                          MT. PLEASANT, SC  29465

FOR THE DEFENDANT:        LEWIS WALTER TOLLISON, ESQ.
ACUITY                    TOLLISON LAW FIRM
                          24 VARDRY STREET, SUITE 203
                          GREENVILLE, SC  29601

                          JENNIFER B. BONNEVILLE, ESQ.
                          STEPTOE AND JOHNSON
                          633 W. FIFTH STREET, SUITE 700
                          LOS ANGELES, CA  90071
                          PRO HAC VICE

```
 1        FOR THE DEFENDANT:        MICHAEL J. BOGLE, ESQ.
          SAFETY KLEEN              WOMBLE CARLYLE SANDRIDGE
 2                                  AND RICE
                                    PO BOX 10208
 3                                  GREENVILLE, SC  29603

 4                                  AMANDA M. KOCH, ESQ.
                                    JAMES J. MCGOLDRICK, ESQ.
 5                                  WESLEY S. ALOST, ESQ.
                                    JONES CARR MCGOLDRICK
 6                                  5910 N. CENTRAL EXPRESSWAY
                                    SUITE 1700
 7                                  DALLAS, TX  75206
                                    PRO HAC VICE
 8
          FOR THE DEFENDANT:        MORRIS DAWES COOK, JR., ESQ.
 9        BEL-RAY                   BARBARA J. WAGNER, ESQ.
                                    BARNWELL WHALEY PATTERSON AND
10                                  HELMS
                                    PO DRAWER H
11                                  CHARLESTON, SC  29402

12        COURT REPORTER:           KATHLEEN RICHARDSON, RMR, CRR
                                    UNITED STATES COURT REPORTER
13                                  901 RICHLAND STREET
                                    COLUMBIA, SC 29201
14

15              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

16                    *** *** *** ***

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  I HOPE YOU ENJOYED A NICE DINNER IN

2    COLUMBIA AND ARE PREPARED TO MOVE FORWARD ON THE REMAINING

3    COUPLE OF MOTIONS IN THIS MATTER.

4          SO FOR THE RECORD, THIS IS BOYKIN VERSUS SPECTRUM

5    LUBRICANTS CORPORATION, ET AL.  IT'S CIVIL NUMBER 3:13-417.

6    AND THIS IS A CONTINUATION OF THE HEARINGS THAT WE BEGAN

7    YESTERDAY ON VARIOUS MOTIONS TO STRIKE AND TO EXCLUDE

8    TESTIMONY OF EXPERT WITNESSES, DR. HARRISON AND DR. STEWART.

9          ACCORDING TO MY NOTES, WHERE WE PRESENT OURSELVES TODAY

10   IS ADDRESSING THE MOTIONS CONCERNING DR. STEWART'S TESTIMONY,

11   THOSE ARE MOTIONS NUMBER 288 FILED BY ACUITY AND BEL-RAY, AND

12   MOTION NUMBER 291 FILED BY SAFETY KLEEN.

13         COUNSEL AGREE THAT'S WHERE WE ARE?

14         MRS. BONNEVILLE:  YES, YOUR HONOR.

15         THE COURT:  OKAY.  VERY GOOD.  SO WHO WOULD LIKE TO

16   BEGIN?  WOULD ACUITY OR SAFETY KLEEN LIKE TO BEGIN IN THE

17   PRESENTATION?

18         MRS. BONNEVILLE:  GOOD MORNING, YOUR HONOR.

19   JENNIFER BONNEVILLE ON BEHALF OF ACUITY.  I JUST WANT TO

20   START BY THANKING THE COURT AND THE COURT STAFF.  I KNOW THE

21   DOCUMENTS ARE A BIG, BIG PILE, AND WE REALLY DO APPRECIATE

22   YOUR PATIENCE AND YOUR ATTENTION TO THIS.

23         NOW, I HAVE NEVER ACTUALLY GONE THROUGH AND MEASURED THE

24   STACKS, BUT I THINK IF WE WERE TO PRINT OUT STEWART, IT IS

25   PROBABLY THE MOST VOLUMINOUS OF THE MOTIONS.  THE MOTION THAT

1    I'M GOING TO ADDRESS IS 288, WHICH IS THE ACUITY BEL-RAY AND

2    THEN MY COLLEAGUES WITH SAFETY KLEEN ARE GOING TO ADDRESS

3    SOME OF THE SPECIFICS WITH RESPECT TO THEIR MOTION, THEIR

4    ISSUES, AND WE ARE GOING TO BE VERY MINDFUL NOT TO OVERLAP.

5         TAKING A STEP BACK AND LOOKING AT THE BIG PICTURE, WE

6    START WITH DR. STEWART.  DR. STEWART PROVIDES INFORMATION

7    THAT DR. HARRISON THEN USES IN HIS OPINIONS.  SO IF WE WERE

8    TO LOOK AT THIS IN CHRONOLOGY, IT'S ALMOST AS THOUGH DR.

9    STEWART WOULD HAVE COME FIRST.  BUT IT ACTUALLY MADE A LOT OF

10   SENSE TO START WHERE WE DID YESTERDAY WITH THE MOTIONS TO

11   STRIKE AND DR. HARRISON TO THEN REALLY GET TO DR. STEWART

12   BECAUSE IT GIVES US A CONTEXT FOR UNDERSTANDING WHAT HIS

13   OPINIONS ARE, BUT ALSO WHAT THEY MEAN AND HOW THEY IMPACT

14   WHAT DR. HARRISON DID.

15        NOW, IF YOU WERE JUST TO LOOK AT THE STACK OF PAPER THAT

16   WAS SUBMITTED IN CONNECTION WITH THE DR. STEWART MOTION, YOU

17   WOULD PROBABLY THINK THAT THERE'S A LOT OF THINGS THAT THE

18   DEFENDANTS AND THE PLAINTIFFS ARE DISAGREEING ABOUT.  BUT

19   WHEN YOU REALLY DISTILL IT, THERE'S ACTUALLY ONLY A VERY FEW

20   DISCRETE ISSUES WHERE THE PARTIES DIFFER.

21        WHAT DO WE AGREE ON?  LET'S START THERE.  ALL OF THE

22   PARTIES AGREE THAT COMPUTER MODELING AS A TECHNIQUE CAN BE

23   APPROPRIATE.  THERE'S CASE LAW ON THE MATTER.  WE ARE NOT

24   DISPUTING THAT IN AN APPROPRIATE CIRCUMSTANCE AN APPROPRIATE

25   COMPUTER MODEL SIMULATING A SITUATION CAN BE APPROPRIATE.

1    THE DISTINCTION THAT WE ARE MAKING IS THIS MODEL IN THIS

2    SITUATION.    AND THERE'S TWO ARGUMENTS ON THAT.

3         THE FIRST IS THIS MODEL IS NOT DESIGNED OR INTENDED FOR

4    THIS SITUATION, AND EVEN IF THAT MODEL COULD BE MADE TO FIT,

5    WHICH WE SAY IT CANNOT AND WHICH THE LITERATURE SAYS IT

6    CANNOT, THE WAY THAT IT WAS UTILIZED IS NOT SUBSTANTIALLY

7    SIMILAR, AND THAT'S KIND OF THE KEY WORD WE GET FROM THE CASE

8    LAW, TO WHAT IT IS WE ARE TRYING TO RECREATE, WHICH WAS THE

9    WORKING ENVIRONMENT OF MR. BOYKIN.    SO THAT'S -- THAT'S WHERE

10   THE CONTROVERSY IS.    IT'S NOT COMPUTER MODELING AS A CONCEPT.

11   IT'S THIS MODEL IN THIS SITUATION USED IN THIS FASHION.

12   OKAY.

13        WHAT ELSE DO WE AGREE ON?    WELL, WE AGREE AS TO WHAT DR.

14   STEWART DID.    WE AGREE THAT HE USED ART TO ESTIMATE

15   MR. BOYKIN'S CUMULATIVE DOSE OF BENZENE FROM 1987 TO 2009.

16   WE AGREE ON THAT.    WHAT ELSE DO WE AGREE ON?    WE AGREE THAT

17   THE MODEL THAT WAS USED, WHICH IS ART 1.5, IS NOT VALIDATED.

18   AND I'M GOING TO PUT AN ASTERISK BY THAT BECAUSE ALTHOUGH IN

19   THE PAPERS AS I READ THEM, AND I HAVE READ THEM NUMEROUS

20   TIMES, PLAINTIFFS DON'T DISAGREE WITH US THAT IT HASN'T BEEN

21   VALIDATED, BUT THEY -- THERE'S A DIFFERENCE IT SEEMS IN

22   WHAT'S MEANT BY VALIDATED.

23        PLAINTIFFS REFER TO CALIBRATED WHEREAS WE SAY NO,

24   VALIDATED AND CALIBRATED ARE TWO SEPARATE THINGS, AND WE'LL

25   GET TO THAT LATER, SO I PUT AN ASTERISK BESIDE THAT ONE.

1        WHAT ELSE DO WE AGREE ON?  WE AGREE THAT THERE'S NO

2   PUBLISHED DATA NOWHERE IN THE LITERATURE ON BENZENE EXPOSURE

3   OF MOTORCYCLE MECHANICS LIKE MR. BOYKIN AGAINST WHICH THE

4   OUTPUT OF MR -- OF STEWART'S ART 1.5 CAN BE COMPARED AGAINST.

5   WE DON'T HAVE THAT MEASURING STICK.  THAT'S NOT IN DISPUTE.

6        THE OTHER THING THAT WE AGREE ON -- AND THIS IS ACTUALLY

7   FAIRLY SURPRISING -- IS WHEN WE LOOK AT THE SUBSTANTIAL

8   SIMILARITY, IN OUR MOVING PAPERS WE WENT TO GREAT LENGTHS TO

9   POINT OUT TO THE COURT THROUGH REFERENCE TO THE DEPOSITION

10  TESTIMONY TO REFERENCE TO THE ACTUAL ART 1.5 OUTPUTS AND

11  USING THE FACTS AVAILABLE TO SHOW HOW WHAT DR. STEWART DID IS

12  SO FAR REMOVED FROM THE WORKING ENVIRONMENT THAT MR. BOYKIN

13  WORKED AT.  THERE ARE JUST -- A LARGE PORTION OF OUR BRIEF

14  ADDRESSES THAT.

15       INTERESTINGLY WHEN YOU GET TO PLAINTIFFS' OPPOSITION,

16  THEY DON'T ADDRESS THAT.  ON PAGE 32 OF THE BRIEF THEY DEVOTE

17  A PARAGRAPH TO SAY, WELL, WHAT YOU'RE DISAGREEING WITH US IS

18  MORE FACTUAL IN NATURE, IT'S NOT THAT IMPORTANT, AND ONE OF

19  THE INPUTS YOU USED WAS WRONG.  OF COURSE WE DISAGREE WITH

20  THAT AND WE HAVE ATTACHED THAT INFORMATION FOR THE COURT, AND

21  I CERTAINLY DON'T WANT TO GO INTO THE DETAILS OF THAT.

22       BUT SUFFICE IT TO SAY, ALL THE ERRORS WHERE WE POINT

23  OUT, HERE'S REALITY, HERE'S WHERE DR. STEWART'S MODEL IS,

24  PLAINTIFFS NOT CONTENDING THAT WE GOT THAT WRONG.  AND THAT'S

25  REALLY, REALLY IMPORTANT.  OKAY.

1        SO THAT'S WHERE WE AGREE.  THE AREA WHERE WE DISAGREE,

2    TWO SIMPLE ISSUES.  THIS MODEL FOR THIS PURPOSE AND THAT THE

3    WAY THE MODEL WAS USED, THAT IT WAS USED IN A FASHION THAT IS

4    SUBSTANTIALLY SIMILAR TO THE WORKING ENVIRONMENT THAT

5    MR. BOYKIN WAS IN.

6        NOW, BEFORE WE CAN EVEN GET TO THE SUBSTANCE OF THE

7    MOTION, THERE'S A PRELIMINARY ISSUE.  AND I'M NOT GOING TO

8    REPEAT WHAT WE HEARD MY COLLEAGUES DISCUSS YESTERDAY, BUT

9    PLAINTIFFS' OPPOSITION IS COMPLETELY BASED ON DR. STEWART'S

10   AFFIDAVIT.  WHEN YOU LOOK THROUGH THE OPPOSITION, EVERYTHING

11   IS A REFERENCE TO THE AFFIDAVIT.  AND AS WAS DISCUSSED

12   YESTERDAY, WE HAVE MOVED THAT THAT AFFIDAVIT IS IMPROPER, IT

13   WAS UNTIMELY, IT CANNOT BE CONSIDERED.

14       ACCORDINGLY, THE EXTENT THAT THE OPPOSITION IS BASED

15   ENTIRELY ON THAT MOTION, THERE'S JUST NO BEAR THERE.  AND

16   THAT'S JUST A PRELIMINARY MATTER.  BUT LET'S MOVE ON FROM

17   THAT AND LET'S TALK ABOUT THE REAL MEAT OF IT.

18       SO, OUR CHALLENGE IS TO THE VALIDITY OF THE SCIENTIFIC

19   PRINCIPLES AND METHODOLOGY.  IT'S NOT TO THE RESULTS THAT DR.

20   STEWART REACHED.  WE ARE NOT SAYING YOU GOT THE NUMBER WRONG,

21   THIS IS THE NUMBER YOU SHOULD HAVE USED.  WE ARE SAYING YOU

22   DIDN'T FOLLOW SCIENCE.  AND SO WE ARE NOT SURPRISED THE

23   NUMBER YOU GOT WAS WRONG BECAUSE THE METHOD WASN'T

24   SCIENTIFIC.  BUT IT'S NOT YOUR NUMBER WE ARE CONCERNED ABOUT,

25   IT'S HOW YOU GOT THERE.

1        OBVIOUSLY THIS IS UNDER 702.  I DO NOT NEED TO TELL THE

2   COURT ABOUT 702 OR THE COURT'S AUTHORITY UNDER DAUBERT.  BUT

3   SUFFICE IT TO SAY, OUR ARGUMENT IS THAT THIS MODEL IS NOT

4   RELIABLE TO RECONSTRUCT A SPECIFIC INDIVIDUAL'S SPECIFIC

5   EXPOSURE TO BENZENE, OR MORE PRECISELY, YOU CAN'T USE ART 1.5

6   TO SIMULATE WHAT MR. BOYKIN'S EXPOSURE WAS TO BENZENE BETWEEN

7   1987 AND 2009 WHEN HE WAS WORKING AS A MOTORCYCLE MECHANIC.

8        WELL, WHY DO WE SAY THAT?  WELL, WE LOOK TO AND WE

9   PROVIDED THE COURT WITH THE DOCUMENTS REGARDING THE CREATION

10  AND THE DEVELOPMENT OF ART.  WHERE DID THIS COME FROM?  WHAT

11  IS ITS INTENDED USE?  ART IS INTENDED TO BE USED BY

12  REGULATORS AS A SCREENING DEVICE AS PART OF THE EUROPEAN

13  UNION'S CHEMICAL SAFETY ASSESSMENT, AND THAT THERE IS NO

14  DISPUTE.  WE ASKED DR. STEWART IN HIS DEPOSITION.  HE AGREED

15  WITH US.  WE ASKED HIM WERE THERE ANY OTHER USES THAT YOU'RE

16  AWARE OF FOR THE MODEL?  NO.  THAT PART IS NOT IN DISPUTE.

17       WHAT ART IS TRYING TO DO VERSES WHAT DR. STEWART IS

18  TRYING TO DO ARE TWO SEPARATE WORLDS.  ART IS LOOKING AT THE

19  PRECAUTIONARY PRINCIPLE OF REGULATORS.  THEY ARE NOT LOOKING

20  AT AN INDIVIDUAL'S EXPOSURE.  THEY ARE NOT EVEN LOOKING AT

21  THE EXPOSURE OF A PARTICULAR WORK SITE.  THEY ARE LOOKING AT

22  AN EXPOSURE OVER AN INDUSTRY.

23       AND WHEN YOU LOOK AT HOW ART WORKS -- AND I'M NOT GOING

24  TO GET INTO TOO MUCH DETAIL ON THIS BECAUSE THE DETAILS OF

25  THE COMPUTER MODELING ARE FAIRLY SOPHISTICATED.  BUT WHEN YOU

1   LOOK AT HOW ART WORKS, IT MAKES SENSE AS TO WHAT THE INTENDED

2   PURPOSE IS.  ART LOOKS AT A RANGE.  SO, FOR EXAMPLE, YOU'RE

3   NOT GIVING ART A SPECIFIC NUMBER.  YOU'RE GIVING ART A RANGE.

4   AND YOU'LL SEE THAT WE DISCUSS THAT IN TERMS OF WHEN DR.

5   STEWART WAS ESTIMATING AEROSOL SPRAY, YOU'RE LOOKING AT A

6   RANGE.  YOU'RE NOT PICKING A NUMBER.

7       WELL, THE REASON THAT YOU'RE LOOKING AT A RANGE IS

8   BECAUSE YOU'RE NOT CONCERNED WITH THE PRECISE EXPOSURE OF AN

9   INDIVIDUAL.  YOU'RE LOOKING AT THIS FROM A REGULATORY

10  PERSPECTIVE OF HOW ARE WE GOING TO MAKE SURE THAT EVERYTHING

11  IS GOING TO GO THE WAY THAT WE WANT IT TO?  HOW ARE WE GOING

12  TO MAKE SURE THAT IT MEETS THE DIRECTIVES AND THE OBJECTIVES

13  OF REACH, WHICH IS THE REGULATORY FRAMEWORK THAT IT OPERATES

14  UNDERNEATH.

15      AND WHEN YOU LOOK AT HOW THE ART MODEL WORKS, IT DOESN'T

16  TAKE A NUMBER THAT YOU PUT INTO IT AND RUN A CALCULATION.  IT

17  GIVES A NUMBER'S WEIGHT AND IT GIVES YOU A DISTRIBUTION.

18  BECAUSE ONCE AGAIN, IT'S LOOKING AT THIS BROAD IDEA OF THIS

19  IS THE EXPOSURE FOR -- RANGE FOR AN INDUSTRY, NOT FOR AN

20  INDIVIDUAL.  IT'S JUST NOT MADE FOR THAT.  TO USE THE MODEL

21  FOR A RETROSPECTIVE ASSESSMENT OF BENZENE EXPOSURE FOR AN

22  INDIVIDUAL, IT JUST DOESN'T FIT.  IT DOESN'T FIT HOW THE

23  MODEL IS DESIGNED, IT DOESN'T FIT HOW IT WAS DEVELOPED OR HOW

24  IT WAS INTENDED.

25      NOW DR. STEWART, WHEN WE ASKED HIM AT HIS DEPOSITION, HE

1    ADMITTED THAT HE WASN'T AWARE OF THE MODEL BEING USED FOR ANY

2    RETROSPECTIVE EXPOSURE ASSESSMENT, WHICH IS HOW HE USED IT,

3    IN THE LITERATURE.  THERE'S NO LITERATURE THAT SUPPORTS HOW

4    HE USES IT.  AND HIS RESPONSE WAS, WELL, IT DOESN'T SAY YOU

5    CAN'T.  WELL, THAT -- THAT JUST DOESN'T WORK.  THAT JUST

6    DOESN'T CUT IT BECAUSE WHEN YOU LOOK AT WHAT THEY'RE SAYING

7    ABOUT HOW IT'S USED, THEY ARE ACTUALLY TELLING YOU THAT YOU

8    CAN'T USE IT IN THIS WAY.

9        SO HE TELLS US, I'M NOT AWARE OF ANYTHING THAT SAYS THAT

10   YOU CAN -- THAT YOU CAN'T DO IT.  SO WHY ARE WE SO CONCERNED

11   ABOUT THIS MODEL?  WELL, THE REASON WE ARE CONCERNED IS

12   BECAUSE COMPUTER MODELS, LIKE ANY OTHER METHODOLOGY, IT HAS

13   TO BE RELIABLE.  THAT'S WHAT WE'RE LOOKING TO SEE; IS IT

14   RELIABLE.  WE SAY, NO, IT'S NOT RELIABLE.  WELL, WHY DO WE

15   SAY THAT?

16       NOW, THERE'S A NUMBER OF DIFFERENT FACTORS THAT WE LOOK

17   AT UNDER DAUBERT AND ITS PROGENY AS TO THE FACTORS THAT

18   INDICATE RELIABILITY.  WHEN WE GO THROUGH THESE FACTORS --

19   AND WE WENT THROUGH THEM IN DEPTH IN OUR OPENING PAPERS AND

20   WE GO THROUGH THEM AGAIN IN OUR -- OUR RESPONSE BRIEF.  NONE

21   OF THEM FIT.  IN FACT, WHEN WE LOOK AT THE ARTICLES THAT ARE

22   ATTACHED TO THE BRIEF THAT ARE WRITTEN BY SOME OF THE PEOPLE

23   THAT DEVELOPED ART, THEY SAY THIS MODEL IS NOT RELIABLE EVEN

24   FOR WHAT IT WAS INTENDED FOR.

25       WHY IS THAT?  WE KNOW THAT EVERY TIME THAT ART IS RUN --

1    AND WHEN I SAY WE, I MEAN SCIENCE KNOWS THIS, NOT JENNIFER

2    BONNEVILLE, SCIENCE KNOWS THIS.  THE CONCLUSIONS ARE ALWAYS

3    INCORRECT.  IT'S NEVER GIVING YOU THE CORRECT ANSWER.  SO

4    WHEN YOU LOOK AT THE LITERATURE, THEY TALK ABOUT, YOU KNOW,

5    IT'S -- THERE'S A FIVE-FOLD DIFFERENCE, A NINE-FOLD

6    DIFFERENCE.  IT'S NEVER GETTING YOU WHERE YOU WANT TO GO.

7        SO, WHEN WE CONSIDER THESE, THESE FACTORS OF

8    RELIABILITY, CAN IT BE TESTED, HAS IT BEEN PEER REVIEWED,

9    WHAT'S THE ERROR RATE AND WHAT'S THE GENERAL ACCEPTANCE IN

10   THE SCIENTIFIC COMMUNITY?  EACH ANSWER TO THOSE QUESTIONS

11   TELLS US THIS MODEL IS NOT VALID FOR THESE PURPOSES.

12       I WOULD ALSO SUBMIT, BASED ON THE SCIENCE, THAT IT'S

13   PROBABLY NOT -- STRIKE THAT -- NOT PROBABLY -- IT'S NOT VALID

14   FOR THE METHODS, FOR THE PURPOSES IN WHICH IT WAS DESIGNED,

15   AND THAT WE SEE SOME THINGS.  NOW, WELL THAT'S NOT DIRECTLY

16   RELEVANT TO US BECAUSE IF IT WAS RELEVANT FOR ITS INTENDED

17   PURPOSES, IT'S CERTAINLY NOT RELEVANT HERE.  IT JUST KIND OF

18   GIVES YOU AN INDICATION OF THE PEOPLE WHO DESIGNED THIS FOR

19   THE PURPOSES THEY DESIGNED IT FOR.  THEY ARE SAYING, NO,

20   THIS -- THIS JUST DOESN'T CUT IT.

21           THE COURT:  WELL, HOW IS IT THAT THE RELIABILITY OR

22   UNRELIABILITY FOR THE PURPOSE FOR WHICH IT WAS DESIGNED, HOW

23   DOES THAT HAVE A BEARING ON THE PURPOSE FOR WHICH IT'S BEING

24   OFFERED HERE?  I MEAN, IS THERE A -- IS THERE A CONNECTION

25   THERE OR IS THAT JUST SORT OF INTERESTING?

1          MRS. BONNEVILLE:  I THINK IT'S A LITTLE BIT OF

2   BOTH.  ONE OF THE THINGS THAT DR. STEWART TELLS US IS, NO,

3   THIS MODEL, THIS IS -- THIS MODEL IS RELIABLE, YOU KNOW.

4   PLAINTIFFS IN THEIR -- IN THEIR PAPERS, YOU KNOW, THEY

5   REPEATEDLY SAY, YOU KNOW, LOOK AT WHO IT WAS DEVELOPED AND

6   HOW IT WAS DEVELOPED, IT'S SO TRUSTWORTHY.  WELL, OKAY.

7   MAYBE IT IS TRUSTWORTHY, BUT NOT HERE.  BUT EVEN MORE THAN

8   THAT, IT'S NOT TRUSTWORTHY EVEN AS IT WAS DESIGNED.

9          SO WHEN DR. STEWART IS SAYING, OH, IT'S VALID, IT'S

10  RELIABLE, THAT'S JUST NOT SUPPORTED IN EITHER OF THE TWO

11  WORLDS.  SO, I HOPE I HAVE ANSWERED YOUR QUESTION BUT IT'S A

12  --

13          THE COURT:  IT'S FINE.

14          MRS. BONNEVILLE:  -- LITTLE BIT OF BOTH.

15          THE COURT:  RIGHT.  I THINK I UNDERSTAND YOUR

16  ARGUMENT.  I GUESS THE WAY I THINK ABOUT IT IS, FOR EXAMPLE,

17  BOTOX MIGHT HAVE BEEN DEVELOPED FOR SOME REASON FOR LET'S SAY

18  TO -- I DON'T -- I HAVE NEVER HAD BOTOX.  THE WAY THAT I

19  UNDERSTAND THAT IT WORKS IS IT'S SOME BOTULISM THAT FREEZES

20  THE RESPONSE OF THE NERVES AND SO THE WRINKLES DON'T APPEAR.

21  THAT'S MY VERY UNSCIENTIFIC TAKE ON WHAT I UNDERSTAND FROM

22  THE COMMERCIALS.

23          BUT, AND LET'S SAY THAT WAS THE INTENDED PURPOSE FOR THE

24  DEVELOPMENT OF BOTOX.  IT WAS NEVER INTENDED TO BE USED FOR

25  MIGRAINE HEADACHES, BUT AS IT TURNS OUT, IT'S BEEN AN

1    EFFECTIVE TOOL OR MEDICINE FOR DEALING WITH MIGRAINES.

2        NOW, THE FACT THAT THE BOTOX WORKS FOR ITS INTENDED

3    PURPOSE, OR MAYBE IT DOESN'T FOR AS LONG AS IT WAS INTENDED,

4    THAT FAILURE OR UNRELIABILITY FOR ITS INTENDED PURPOSE DOES

5    NOT IN MY MIND NECESSARILY CORRELATE TO ITS EFFECTIVENESS FOR

6    TREATING MIGRAINES.  YOU UNDERSTAND?

7        *MRS. BONNEVILLE:*  UH-HUH.

8        *THE COURT:*  AND SO, I GUESS THAT'S WHAT I'M TRYING

9    TO FIGURE OUT IS THE UNRELIABILITY FOR THIS INTENDED PURPOSE,

10   WHETHER THAT REALLY IS EVEN A CONSIDERATION FOR THE USE IN

11   WHICH THE PLAINTIFFS ARE SUGGESTING ART OR AT LEAST DR.

12   STEWART IS SUGGESTING THAT ART CAN BE USED.

13       *MRS. BONNEVILLE:*  AND YOU KNOW, IT WAS MY FOCUS --

14   I DIDN'T ANSWER YOUR QUESTION FULLY.  SO, BASED ON YOUR BOTOX

15   EXAMPLE, I DO A LITTLE BIT OF MEDICAL DEVICE -- BE AN

16   OFF-LABEL USE KIND OF THE...

17       *THE COURT:*  SURE.

18       *MRS. BONNEVILLE:*  HERE ART DOESN'T WORK TO CURE

19   WRINKLES AND IT DEFINITELY DOESN'T CURE TO WORK HEADACHES.

20   SO, NO, IT WOULD -- IN THAT SENSE IT IS ABSOLUTELY AN ASIDE.

21   IT IS NOT THE FOCUS.

22       *THE COURT:*  OKAY.

23       *MRS. BONNEVILLE:*  HOPE THAT MORE FULLY--

24       *THE COURT:*  NO, NO, NO.  I CAN BUY THAT.

25       *MRS. BONNEVILLE:*  OKAY.  SO WHAT ARE THE PEOPLE WHO

1    DEVELOPED ART, WHAT DO THEY SAY ABOUT IT?  WELL, THEY SAY

2    THAT IT'S NOT VALIDATED.  SORRY.  I DON'T WANT TO REPEAT

3    WHERE I WENT.  SO WE KNOW THAT IT HASN'T BEEN TESTED.  WE

4    KNOW WHAT THE PEER REVIEW PUBLICATIONS SAY ABOUT IT.  NOW OF

5    COURSE, THE PEER REVIEWED PUBLICATIONS ARE DIRECTED TO ITS

6    INTENDED USE.  SO THAT'S WHERE WE WERE.

7        THEN WE GET TO ERROR RATE.  AND HERE I THINK THIS IS ONE

8    OF THE AREAS WHERE THERE'S A MISUNDERSTANDING AS TO WHAT

9    ERROR RATE MEANS.  AS I READ PLAINTIFFS' BRIEF, PLAINTIFFS

10   ARE EQUATING ERROR RATE TO, I KNOW HOW MUCH IT'S WRONG BY, SO

11   IT'S WRONG BY A FACTOR OF TWO, IT'S WRONG BY A FACTOR OF

12   THREE, IT'S WRONG BY A FACTOR OF FIVE, BUT I KNOW HOW WRONG

13   IT IS.  WELL, THAT'S NOT WHAT ERROR RATE MEANS IN THE CONTEXT

14   OF RELIABILITY IN DAUBERT.

15       WHAT ERROR RATE MEANS, IT'S NOT THE MAGNITUDE OF THE

16   ERROR, HOW BIG IT IS BUT HOW FREQUENT THAT ERROR IS.  AND

17   THIS COMES RIGHT OUT OF THE SMITH CASE WHICH DEALT WITH THE

18   PERCENTAGES OF FALSE POSITIVES VERSUS FALSE NEGATIVES.

19   PLAINTIFFS DOESN'T -- THEY DON'T DISPUTE THAT.  THEY DON'T

20   OFFER ANY CASE LAW TO THE CONTRARY ON THAT.  AND WE KNOW IN

21   TERMS OF FREQUENCY ART IS WRONG EVERY SINGLE TIME.  THE ERROR

22   RATE IS A HUNDRED PERCENT.

23       NOW, THE MAGNITUDE OF THAT ERROR RATE IS SOMEWHERE

24   BETWEEN, DEPENDING ON THE LITERATURE, TWO -- I THINK THE

25   HIGHEST POINT WAS SIX-FOLD, SO TIMES.  WE KNOW IT'S ALWAYS

1    WRONG.

2        NOW, WE THEN GET TO THE GENERAL ACCEPTANCE IN THE

3    SCIENTIFIC COMMUNITY.  TO ANSWER THAT QUESTION WE NEED TO

4    DEFINE WHO IS THE RELEVANT SCIENTIFIC COMMUNITY.  THE

5    RELEVANT SCIENTIFIC COMMUNITY IN THIS CASE IS NOT REGULATORS

6    IN EUROPE THAT ARE LOOKING AT ART FOR ITS INTENDED PURPOSES

7    UNDER REACH.  THAT IS NOT THE SCIENTIFIC COMMUNITY THAT WE'RE

8    TALKING ABOUT.

9        WHAT WE ARE LOOKING AT IS IS IT GENERALLY ACCEPTED IN

10    THE SCIENTIFIC COMMUNITY TO USE ART 1.5 IN THIS SITUATION, IN

11    A RETROSPECTIVE EXPOSURE ASSESSMENT.  AND ON THAT QUESTION

12    THE ANSWER IS NO.  DR. STEWART ADMITS THERE WAS NO US

13    GOVERNMENTAL AGENCY THAT GIVES SUCH ACCEPTANCE.  THERE'S NO

14    PEER REVIEW PUBLICATION THAT GIVES SUCH ACCEPTANCE.

15        IN FACT, WHEN WE LOOK AT THE LITERATURE, THE LITERATURE

16    TELLS US THE MODIFICATIONS ARE NEEDED FOR SITE-SPECIFIC

17    ESTIMATES.  YOU NEED TO RESTRUCTURE THE MODEL, AND THAT'S FOR

18    A SITE-SPECIFIC.  THAT'S NOT EVEN AN INDIVIDUAL SPECIFIC

19    MODEL.

20        NOW, DR. STEWART IN HIS AFFIDAVIT SAYS IT IS ACCEPTED.

21    BUT HE DOESN'T ANSWER THE BY-WHOM QUESTION AND FOR-WHAT

22    PURPOSE QUESTION.  THERE'S NO CITE THERE.  THERE'S NO

23    REFERENCE.  IT'S A CIRCULAR BECAUSE-I-SAID-SO ARGUMENT, AND

24    THAT'S WHAT WE SAW YESTERDAY WITH DR. HARRISON.  HE'S NOT

25    REFERRING TO HIS DEPOSITION.  HE'S NOT REFERRING TO HIS

1    REPORT.  JUST PROVIDES AN AFFIDAVIT.  PLAINTIFFS RAN IN

2    OPPOSITION THAT REFERS TO AN AFFIDAVIT, AND IT JUST GOES

3    AROUND AND AROUND.  BUT WHEN WE LOOK AT WHAT HE SAID IN HIS

4    REPORT, WHEN WE LOOK AT WHAT HE SAID IN HIS DEPOSITION, HE'S

5    ADMITTED TO US THAT THIS IS NOT A VALID RELIABLE MODEL.

6        NOW, WHEN WE LOOK AT PLAINTIFFS' ARGUMENT ON

7    RELIABILITY, THEY CITE TO THREE THINGS.  THEY CITE TO SCHULTZ

8    VERSUS GLIDDEN, WHICH IS A 2013 US DISTRICT COURT OF

9    WISCONSIN, EASTERN DISTRICT OF WISCONSIN, IF I'M NOT CORRECT,

10   SCHULTZ VERSUS AKZO NOBEL, WHICH IS A 2013 SEVENTH CIRCUIT

11   COURT OF APPEAL CASE, AND THEY REFER TO MILWARD.

12       NOW, THERE ARE TWO DIFFERENT MILWARDS.  THE MILWARD THAT

13   WE WERE DISCUSSING YESTERDAY IS NOT THE SAME MILWARD THAT

14   THEY REFERRED TO IN THEIR OPPOSITION.  THE MILWARD IN THEIR

15   OPPOSITION IS A US DISTRICT COURT FOR THE DISTRICT OF

16   MASSACHUSETTS CASE 2013.

17       SO, RECOGNIZING THAT THESE ARE ALL NOT BINDING AUTHORITY

18   ON THIS COURT, EVEN IF WE DO GIVE THEM -- EVEN IF WE DO TAKE

19   A LOOK AT THEM, THEY DON'T SUPPORT THE ARGUMENT BEING MADE.

20   SCHULTZ VERSUS GLIDDEN DIDN'T DEAL WITH ART 1.5.  IT DEALT

21   WITH THE MONTE CARLO ANALYSIS.  OUR CHALLENGE HERE IS TO ART

22   1.5.  THERE IS NOTHING IN SCHULTZ THAT'S HELPFUL FOR THESE

23   PURPOSES.

24       SCHULTZ VERSUS AKZO NOBEL.  IT DEALS WITH THE CHALLENGES

25   TO THE OPINIONS OF ANOTHER EXPERT, SOMEONE NAMED DR. GORE.

1    AND THE CONCLUSION THEY MAKE IN SCHULTZ IS THAT THE LOWER

2    COURT HAD ERRED BY EXCLUDING DR. GORE'S TESTIMONY.  THIS

3    ISN'T ABOUT THE ART 1.5 AND DR. STEWART.  THAT'S NOT THE

4    CONCLUSION.  IT'S ABOUT DR. GORE.

5        THEN WE GET TO MILWARD.  OBVIOUSLY IT'S NOT BINDING

6    PRECEDENT ON THIS COURT.  IT AROSE IN A MUCH DIFFERENT

7    FACTUAL SITUATION.  THE CHALLENGES BROUGHT BY THE DEFENSE

8    WERE QUITE DIFFERENT AND THE RECORD BEFORE THE COURT WAS

9    QUITE DIFFERENT.

10        THE OTHER THING THAT'S VERY INTERESTING ABOUT MILWARD IS

11   WHEN YOU LOOK AT THE COURT'S DISCUSSION OF HOW THE FIRST

12   CIRCUIT IS INTERPRETING DAUBERT AND ITS PROGENY, THEY TELL

13   YOU THAT -- AND I'M QUOTING FROM THE CASE HERE AT -- THIS

14   WOULD BE 969 F SUP 2D 101 AT 105.  WHILE A 2000 AMENDMENT TO

15   FEDERAL RULE OF EVIDENCE 702 CODIFIED A RIGOROUS RELIABILITY

16   TEST, THE DAUBERT LINE OF CASES COULD HAVE BEEN READ BY THE

17   FIRST CIRCUIT -- WHICH IS THE CIRCUIT THEY ARE IN -- AND THEN

18   THEY GO ON TO CITE SOME CASE LAW -- AS DEMANDING ONLY THAT

19   THE PROPONENT OF THE EVIDENCE SHOW THAT THE EXCLUSION ARRIVED

20   AT IN A SCIENTIFICALLY--

21            *THE COURT:*  CAN YOU SLOW DOWN?

22            *MRS. BONNEVILLE:*  SORRY.

23            *THE COURT:*  THE COURT REPORTER ALWAYS HAS THE

24   CHALLENGE OF LAWYERS READING A LOT FASTER THAN THEY SPEAK

25   NORMALLY.

1          *MRS. BONNEVILLE:* NO PROBLEM.

2          *THE COURT:* SO, I'M GOING TO EXCUSE IT ON THE -- OR

3    BLAME IT ON THE COURT REPORTER, BUT REALLY I CAN'T PROCESS

4    THAT THAT QUICKLY EITHER. SO IF YOU COULD JUST START BACK

5    AND READ...

6          *MRS. BONNEVILLE:* SURE. I WILL JUST START AGAIN.

7    AS DEMANDING ONLY THAT THE PROPONENT OF THE EVIDENCE SHOW THE

8    EXPERT'S CONCLUSION HAS BEEN ARRIVED AT IN A SCIENTIFICALLY

9    SOUND AND METHODOLOGICALLY-RELIABLE FASHION.

10         WHAT I TAKE FROM THAT, DESPITE THAT THE WORDS -- THAT

11   DESPITE THE METHODOLOGICALLY-RELIABLE FASHION IS THAT THE

12   FIRST CIRCUIT IS TELLING US -- MILWARD IS TELLING US -- WE'VE

13   INTERPRETED DAUBERT, WE ARE WATERING IT DOWN A LITTLE BIT.

14   THAT'S HOW THE FIRST CIRCUIT HAS INTERPRETED DAUBERT. WELL,

15   THAT'S NOT HOW THE FOURTH CIRCUIT HAS INTERPRETED DAUBERT.

16   THAT'S NOT HOW THIS COURT HAS INTERPRETED DAUBERT.

17         SO, YOU KNOW, TO THE EXTENT MILWARD HAD ANY VALUE, WE

18   HAVE TO KEEP IN MIND WHAT STANDARDS THEY WERE USING. BUT

19   WHEN WE LOOK AT WHAT THE COURT CONSIDERED IN MILWARD, IT'S

20   NOWHERE NEAR THE ARGUMENTS AND THE SCIENCE THAT THE COURT HAS

21   BEFORE IT HERE.

22         IN 2013 WHEN THIS CAME -- WHEN THIS WAS PUBLISHED, THE

23   COURT DID NOT HAVE THE BENEFIT OF 2013 AND 2014 SCHINKEL

24   PAPERS, I CERTAINLY HOPE THAT I'VE SAID THAT SCIENTIST'S NAME

25   CORRECTLY BECAUSE I THINK THERE'S A LOT OF WAYS YOU COULD SAY

1    IT, BUT DIDN'T HAVE THAT IN FRONT OF THEM.  WHAT THEY HAD WAS

2    AN OBJECTION BASED ON A STUDY BY HOFSTETTER WHICH COMPARED

3    ART TO A FAR-FIELD NEAR-FIELD MODEL.  AND THE ARGUMENT THE

4    DEFENSE WAS MAKING WAS -- OR THE LEAST THE WAY THE COURT

5    INTERPRETED IT WAS THAT ART WAS OFF BY A FACTOR OF ALMOST

6    THREE FOLD, 2.92.

7          AND ONE OF THE VERY INTERESTING THINGS IN MILWARD IS THE

8    COURT SAYS, WELL, THAT'S OFF BY 2.92 BUT THE FAR-FIELD MODEL

9    IS OFF BY 1.96, WHICH IS THE DEFENSE EXPERT HAVE YOU ASSUME.

10   THAT'S NOT REALLY THAT BIG OF A DEAL.  BUT THAT'S NOT --

11   THAT'S NOT THE POINT AND THAT'S CERTAINLY NOT THE ARGUMENT

12   THAT WE ARE MAKING HERE.

13         OUR CONCERN ISN'T THAT DR. STEWART'S MODEL IS OFF BY

14   2.92 OR FIVE OR SIX.  IT'S NOT THE RIGHT MODEL FOR THIS

15   SITUATION.  THE OTHER THING THAT'S INTERESTING ABOUT THE

16   COURT -- WHEN A COURT LOOKED AT HOFSTETTER WAS THEY DIDN'T

17   LOOK AT -- SO THEY HAD MEASURED DATA, THEY HAD ART AND THEY

18   HAD THE NEAR-FIELD FAR-FIELD.  AND WHEN THEY LOOKED AT -- SO

19   THEY LOOKED AT THE 2.92 AND THEY LOOKED AT THE 1.96, THE

20   FACTORS.

21         BUT WHEN YOU LOOK AT WHERE THE CONFIDENCE INTERVAL FELL,

22   THE STATISTICALLY SIGNIFICANT RANGE FOR THE MEASURED DATA,

23   THE ART MODEL WAS NOWHERE NEAR THAT.  AND I CAN'T TELL IF

24   THAT WASN'T RAISED OR IF THE COURT WASN'T INFORMED OF THAT OR

25   IF SOMEHOW THE COURT HAD MISINTERPRETED IT, BUT THAT'S VERY

1    IMPORTANT, AND THAT'S JUST NOT THERE.

2         THE OTHER THING THAT'S INTERESTING ABOUT MILWARD THAT

3    PLAINTIFFS RELY UPON SO HEAVILY IS THAT THE COURT

4    ACKNOWLEDGES THAT IN MILWARD WHAT WAS AT ISSUE WAS HE WAS A

5    PAINTER, HE USED A BRUSH, AND THERE WAS VERY LITTLE USE OF

6    AEROSOLS.  AND THE COURT COMMENTS WHEN IT'S DISCUSSING

7    HOFSTETTER, AND IT QUOTES FROM HOFSTETTER THAT WHEN YOU MODEL

8    AEROSOLS -- WHICH IS A BIG PORTION OF WHAT DR. STEWART HERE

9    IN TERMS OF ACUITY AND BEL-RAY, THAT'S OUR FOCUS -- THAT HAS

10   BEEN -- AND THIS IS A QUOTE, SO I'M GOING TO TRY AND TALK A

11   LITTLE SLOWER -- HAVE BEEN NOTED TO BE MORE COMPLEX TO MODEL.

12        THE COURT GOES ON TO SAY THAT ALL AGREE THAT ONLY A

13   SMALL PORTION OF MILWARD'S ALLEGED BENZENE EXPOSURE CAME FROM

14   AEROSOLS.  WELL, THAT'S NOT THE CASE HERE.  SO WHEN MILWARD,

15   WHILE THE COURT MAY HAVE BEEN WILLING TO SAY, YOU KNOW, OKAY,

16   YOU'RE AT 2.92, THEN YOUR FAR-FIELD MODEL IS AT -- LET ME SEE

17   IF I CAN KEEP MY NUMBERS STRAIGHT -- 1.96, YOU'RE FAIRLY

18   CLOSE AND, YOU KNOW, THAT DEALS WITH AEROSOLS AND AEROSOLS

19   ARE HARDER TO MODEL, SO WE'RE WILLING TO ACCEPT THAT.

20        THAT'S NOT THE SITUATION HERE AND WE CAN'T ACCEPT THAT.

21   SO, THIS IS NOT A MILWARD SITUATION.  THE FACTS ARE

22   DIFFERENT.  THE LAW IS DIFFERENT.  THERE IS NEW LITERATURE

23   THAT'S AVAILABLE.  I RESPECTFULLY SUBMIT THAT THERE WAS SOME

24   MISINTERPRETATION OF HOFSTETTER.

25        AND THE OTHER LITERATURE THAT THE MILWARD COURT CITED,

1    IT APPEARS THAT THEY DIDN'T FULLY COMPREHEND WHAT THAT

2    LITERATURE WAS SAYING.  THIS IS THE SCHINKEL 2011 PAPER WHICH

3    IS ATTACHED TO OUR BRIEF.  THE COURT REFERENCES SCHINKEL AND

4    THE MILWARD CASES TO SAY, WELL, THAT PAPER DISCUSSES THE USE

5    OF THE MODEL FOR INDIVIDUAL ASSESSMENT.  WELL, THAT'S NOT

6    WHAT SCHINKEL SAYS.  AND WHEN WE LOOK AT SCHINKEL -- AND THIS

7    IS -- THE TITLE OF THE PAPER IS ADVANCED REACH TOOL, AND

8    BRACKETS, ART, CALIBRATION OF THE MECHANISTIC MODEL.

9        AND WE LOOK AT WHERE THE COURT IN MILWARD CITES FROM.

10   THEY CITE FROM PAGE 1379 OF THE ARTICLE.  AND THERE'S A

11   SENTENCE IN HERE THAT SAYS, THE METHOD USED TO ESTIMATE THE

12   VARIABILITY IN EXPOSURES BETWEEN COMPANIES BETWEEN WORKERS

13   AND WITHIN WORKERS ARE DESCRIBED ELSEWHERE.  AND THEN THERE'S

14   A FOOTNOTE.  AND WHEN YOU LOOK AT THAT FOOTNOTE, WHICH IS

15   FOOTNOTE FIVE TO THE PAPER, IT REFERS TO A PAPER BY MCNALLEY,

16   ET AL.  AND THE TITLE TELLS YOU WHAT IT'S ABOUT.  IT'S ABOUT

17   THE DEVELOPMENT OF A BAYESIAN STATISTICAL MODEL.

18       NOW, THE BAYESIAN STATISTICAL MODEL -- AND I'M GOING TO

19   MAKE THIS IN FAIRLY, FAIRLY SIMPLE TERMS MORE FOR MY OWN

20   UNDERSTANDING THAN THE COURT'S BECAUSE I FIND IT -- SOME OF

21   THIS A LITTLE HARD TO GRASP -- IS IT USES -- IT USES A MODEL

22   SET OF DATA, A BUILT-IN SET OF MEASUREMENTS.

23       DR. STEWART DID NOT USE THAT PORTION OF ART.  THERE'S A

24   MECHANISTIC PORTION WHERE YOU'RE INPUTING AND YOU'RE

25   SELECTING AND THEN THERE'S THIS BAYESIAN PORTION OF THE

1    MODEL.  HE DIDN'T USE THAT PORTION.  SO WHEN SCHINKEL SAYS

2    THAT THE METHOD USED TO ESTIMATE THE VARIABILITY IN EXPOSURES

3    BETWEEN COMPANIES, BETWEEN WORKERS AND WITHIN WORKERS ARE

4    DESCRIBED ELSEWHERE AND THEY FOOTNOTE THAT PAPER, THEY'RE

5    REFERRING TO THE BAYESIAN MODEL THAT DR. STEWART DIDN'T USE.

6    AND I HOPE THAT THAT -- THAT THAT IS CLEAR.

7        SO THEN WE GET TO THIS CONCEPT OF WHAT IT MEANS TO

8    VALIDATE A MODEL.  WHEN A MODEL IS VALIDATED, WHAT IT MEANS

9    IS THAT THE PREDICTIONS THE MODEL MAKES, WHEN WE COMPARE THEM

10   TO REAL WORLD DATA, THAT THERE'S SOME TYPE OF REASONABLE

11   RELATIONSHIP.  VALIDATION IS NOT CALIBRATION.

12       CALIBRATION LOOKS AT SOMETHING DIFFERENT.  IT LOOKS AT

13   WHETHER OR NOT YOUR MEASURING TOOL, WHEN IT -- SO FOR

14   EXAMPLE, THE EXAMPLE THAT IMMEDIATELY COMES TO MIND IS WHEN

15   YOU'RE DRIVING YOUR CAR AND THE SPEEDOMETER SAYS 60 MILES AN

16   HOUR, ARE YOU GOING 60 MILES AN HOUR?  IT DOESN'T TELL YOU IF

17   THAT'S THE SPEED LIMIT YOU SHOULD BE GOING.  IT'S SIMPLY A --

18   WHEN I MEASURE IT AND IT SAYS THREE OR IT SAYS FIVE, IS THAT

19   WHERE IT IS.

20       THE REASON WHY ART CAN'T BE VALIDATED IS BECAUSE THERE'S

21   NO -- THERE'S NO REAL-WORLD DATA ACCORDING TO DR. STEWART.

22   NOW, IN THE REAL WORLD WHEN SCIENTISTS LOOK AT EXPOSURE AND

23   THEY LOOK AT WHAT DATA IS AVAILABLE, THERE'S A HIERARCHY OF

24   DATA THAT THEY USE.  THE BEST DATA, OF COURSE, IS ACTUAL

25   MEASURED DATA FROM THAT WORK SITE AT THE TIME.  SO IF YOU

1    HAVE AIR MONITORING STUDIES, THAT'S THE FIRST LEVEL.  THAT'S

2    THE BEST.  THAT'S NOT AVAILABLE IN THIS CASE AND EVERYONE

3    FULLY AGREES WITH THAT.

4        THE NEXT LEVEL IS MEASUREMENTS FROM OTHER COMPARATIVE

5    OCCUPATIONS, WORK SITES.  DR. STEWART SAYS THERE'S NONE.  YOU

6    CAN'T COMPARE MOTORCYCLE MECHANICS TO ANYBODY ELSE.

7    OBVIOUSLY THE DEFENDANTS DISAGREE.  OUR EXPERT, DR. WILLIAMS,

8    SAYS THERE'S A PLETHORA OF LOW TREBS [PH] THAT ARE AUTOMOTIVE

9    MECHANICS, AND THAT'S VERY INFORMATIVE.  AND NOW AN

10   INTERESTING KIND OF A SIDE-NOTE IS DR. HARRISON ACTUALLY

11   AGREES WITH US ON THAT POINT.

12       WHEN WE ASKED DR. HARRISON AT HIS DEPOSITION THIS VERY

13   QUESTION, WHAT WOULD YOU USE?  WHAT WOULD THE COMPARISON BE?

14   HE SAID AUTOMOTIVE MECHANICS.  DR. STEWART SAYS NO.  WHY DOES

15   HE SAY NO?  BECAUSE HE HAS A MOTORCYCLE, SO HE DOESN'T

16   BELIEVE THAT WHEN HE WORKS ON HIS MOTORCYCLE IT'S LIKE A

17   MECHANIC WORKING ON HIS CAR.  THAT'S HIS PERSONAL OPINION.

18   SO HE DID NOT USE ANY OF THE AUTOMOTIVE MECHANIC LITERATURE.

19       NOW, OBVIOUSLY WHEN YOU USE THE AUTOMOTIVE MECHANICAL

20   LITERATURE, AND THIS IS NOT GOING TO SURPRISE ANYONE, YOU

21   DON'T GET NUMBERS LIKE WHAT DR. STEWART GOT.  BUT THAT'S NOT

22   THE POINT.  THE POINT IS THAT HE GOT THE NUMBER WRONG.  IT'S

23   WRONG MODEL, WRONG USE, WRONG INPUTS.

24       SO THEN WE GET TO THE THIRD LEVEL, AND THAT'S MODELING.

25   NOW, I DO WANT TO NOTE FOR THE COURT, AND I -- I MENTIONED A

1    MINUTE AGO, YOU KNOW, THIS IS THIS BAYESIAN COMPONENT OF ART,

2    YOU KNOW, THESE PRE-SET DATA SETS.  DOCTOR ASSERTS, I CAN'T

3    USE ANY OF THEM, I'VE GOT TO START FROM SCRATCH.  SO THAT'S

4    NOT IN PLAY.

5        WITHOUT VALIDATION, YOU CAN'T TELL IF A MODEL IS

6    SUBSTANTIALLY SIMILAR, IF IT'S A RELIABLE SIMULATION OF

7    ACTUAL EVENTS, AND THAT IS WHAT THE CASE LAW ON POINT LOOKS

8    TO.  ONE OF THE CASES, VALENTE, THAT WE OFFERED DISCUSSES

9    COMPUTER MODELING AND SAYS EXACTLY THAT; HAS TO BE VALIDATED.

10   PLAINTIFFS POINT TO SCHINKEL IN 2011, WHICH WE JUST

11   DISCUSSED.

12       SCHINKEL EXPRESSLY STATES ON PAGE SEVEN OF THE ARTICLE,

13   1380 OF THE JOURNAL, THAT THE EXPOSURE MODELS, QUOTE, CLEARLY

14   NEED FURTHER DEVELOPMENT AND AWAIT THE NECESSARY VALIDATION

15   RESEARCH.  YOU CAN'T SAY THAT SCHINKEL 2011 WHICH DEALT WITH

16   CALIBRATION ALSO SERVES TO VALIDATE WHEN THE AUTHORS OF THE

17   ARTICLE EXPLICITLY TELL YOU, NO.  AND THAT RUNS THROUGH THE

18   LITERATURE.  WHEN WE LOOK AT SCHINKEL 2013, 726 OF THAT

19   ARTICLE, THEY SAY THAT THE MODEL, QUOTE UNQUOTE, SHOULD BE

20   VALIDATED TO ENSURE THE SYSTEM PROVIDES ACCURATE ESTIMATES.

21   AND THESE ARE THE PEOPLE THAT DEVELOPED THE MODEL.

22       SCHINKEL IS ONE OF THE DEVELOPERS OF ART, AND SHE'S

23   SAYING IT NEEDS TO BE VALIDATED.  SO THE ONLY PERSON WHO SAYS

24   THAT IT IS VALIDATED IS DR. STEWART.  THE LITERATURE IS NOT

25   SUPPORTING HIM, THE PEOPLE WHO DEVELOPED THE MODEL AREN'T

1    SUPPORTING HIM.  SO THAT'S THE ISSUES WITH THE MODEL.

2        THEN WE GET TO THE SUBSTANTIAL SIMILARITY PORTION, WHICH

3    IS THE WRONGLY USE.  AND I'M ONLY TO GOING TO TAKE A COUPLE

4    MINUTES OF THE COURT'S TIME FOR THIS BECAUSE PLAINTIFFS DON'T

5    REALLY ADDRESS THIS IN THEIR OPPOSITION.  THEY -- YOU KNOW,

6    WE SET FORTH A MULTITUDE OF EXAMPLES, AND THESE ARE NOT

7    EXAMPLES THAT ARE SHOWING, YOU KNOW, DR. STEWART PICKED ONE

8    WHEN HE SHOULD HAVE PICKED TWO.  THESE ARE EXAMPLES THAT SHOW

9    YOU THAT THE WORLD OF DR. STEWART MODELS WAS NOT THE WORLD

10   THAT MR. BOYKIN WORKED AT.

11       SOME OF DR. STEWART'S INPUTS ARE JUST COMPLETELY

12   INCORRECT.  THEY ARE JUST ABSOLUTELY WRONG.  SOME OF THEM ARE

13   UNVERIFIABLE.  AND SOME OF THEM ARE JUST NOT SUPPORTED BY THE

14   TESTIMONY.  THE ONES THAT ARE NOT SUPPORTED BY THE TESTIMONY,

15   FAIRLY STRAIGHT-FORWARD, THEY ARE LAID OUT IN OUR BRIEF.

16   THESE ARE THINGS LIKE THE TIME ESTIMATES THAT ARE USED AND,

17   YOU KNOW, THERE'S THIS EXAMPLE OF, YOU KNOW, A RAG THAT --

18   THERE WAS TESTIMONY THAT, YOU KNOW, HE WOULD USE RAGS VERY

19   STUDIOUS AND WOULD THROW THE RAGS AWAY.  DR. STEWART SAYS,

20   NO, THERE WAS NO TESTIMONY OF THAT.  THINGS LIKE THAT ARE

21   CLEAR.

22       ALL RIGHT.  BUT IN TERMS OF THE BIGGER PICTURE, THE

23   ASSUMPTIONS REGARDING HOW PARTS WERE USED AND THE FREQUENCY

24   WITH WHICH THEY WERE USED.  THAT'S ONE OF THE BIG PROBLEMS.

25   AND WE DID A CALCULATION USING DR. STEWART'S DATA TO SEE,

1   BASED ON WHAT DR. STEWART TOLD US, HOW MUCH PRODUCT

2   MR. BOYKIN WOULD HAVE BEEN USING.  AND WE HAD THE BENEFIT OF

3   COLUMBIA POWER SPORTS' SALES RECORDS.  WE ALSO HAD SALES

4   RECORDS FROM ONE OF THE DEFENDANTS AT THE TIME, WURTH.

5        NOW, THERE IS -- AND YOU CAN KIND OF SEE FROM THE CHART,

6   YOU KNOW, THERE WERE TIMES WHEN WURTH HAD RECORDS THAT WERE

7   DIFFERENT FROM THE TIMES THAT COLUMBIA POWER SPORTS HAVE

8   RECORDS, BUT THERE'S OVERLAPPING YEARS.  IN FACT, IN 2007 THE

9   RECORDS MATCH EXACTLY.  WELL, WE ALSO HAVE THE RECORDS OF

10  WHAT COLUMBIA POWER SPORTS HOLD ON AEROSOL PURCHASES WERE.

11       AND WHEN WE RAN, WE CALCULATED DOCTORS -- BASED ON WHAT

12  DR. STEWART TELLS US, IT GETS MR. BOYKIN TO USING EVERY

13  PRODUCT THAT'S THERE PLUS, AND WE KNOW THAT THAT'S NOT

14  POSSIBLE.  WE KNOW BASED ON THE TESTIMONY THAT OTHER PEOPLE

15  WERE USING PRODUCTS AND THEY WERE USING MORE PRODUCTS THAN HE

16  WAS.

17       PLAINTIFFS' DISPUTE IS WHETHER OR NOT THE SALES NUMBERS

18  WERE CORRECT, AND THAT WE ADDRESS IN THE BRIEF, SO I'M NOT

19  GOING TO GET INTO THAT.  BUT ONE OF THE MOST EGREGIOUS ERRORS

20  THAT REALLY SHOWS YOU HOW UNVERIFIABLE THE INPUTS WERE THAT

21  DR. STEWART USED HAS TO DO WITH THE AEROSOL.  DR. STEWART

22  ADMITS THAT YOU CAN'T TELL HOW MUCH AEROSOL WAS USED BASED ON

23  HIS CALCULATIONS.  WE DON'T KNOW HOW MUCH WAS BEING SPRAYED.

24       WE KNOW THAT EVAPORATION WAS NOT BEING TAKEN INTO

25  ACCOUNT, AND THAT'S IMPORTANT, AND WE KIND OF LAY OUT FOR YOU

1    SO YOU CAN SEE EXACTLY HOW MUCH IT CHANGES THE PICTURE.  ONE

2    OF THE EVEN -- WELL, I COUNT TO ONE OF THE MOST STRIKING

3    PROBLEMS WITH HOW DR. STEWART DID HIS MODEL IS THAT AS PART

4    OF THE INPUTS HE PUT IN, THERE'S A NEAR FIELD WHICH IS, YOU

5    KNOW, THE IMMEDIATE BREATHING SPACE OF THE WORKER, AND THEN

6    THERE'S A FAR FIELD, WHICH IS SOMEONE IN THE SAME ROOM DOING

7    WORK.

8        HE ASSUMES THAT EVERY DAY, EVERY MINUTE OF EVERY DAY

9    THAT MR. BOYKIN IS WORKING THERE'S SOMEBODY IN THAT ROOM AT

10   THE EXACT SAME TIME DOING THE EXACT SAME JOB HUNDRED PERCENT

11   OF THE TIME.  WE KNOW THAT THAT'S NOT TRUE.  WE HAVE

12   DEPOSITION TESTIMONY FROM THE OTHER MECHANICS THAT WORKED

13   WITH MR. BOYKIN THAT NEVER HAPPENED.

14       AND TO MAKE IT WORSE, WHEN MR -- WHEN DR. STEWART

15   CALCULATED THE HOME EXPOSURE, HE CARRIED OVER THAT SAME

16   ASSUMPTION.  SO THAT MEANS THAT WHEN MR. BOYKIN WAS AT HOME

17   IN HIS GARAGE WORKING, THERE WAS SOMEONE ELSE IN THE GARAGE

18   WORKING WITH HIM EVERY SINGLE MINUTE DOING THE EXACT SAME

19   TASK, SPRAYING THE SAME FREQUENCY, EVERYTHING.  THAT'S NOT

20   REALISTIC.  WE KNOW THAT THAT BEARS NO RELATIONSHIP TO WHAT

21   MR. BOYKIN'S EXPOSURES WERE.

22       THIS ISN'T ABOUT BEING WRONG OR RIGHT IN TERMS OF THE

23   NUMBER THAT DR. STEWART GOT AT THE END OF THE DAY.  IT'S

24   ABOUT HOW YOU GET FROM A TO B, IS IT RELIABLE, IS IT

25   VERIFIABLE, IS IT SUBSTANTIALLY SIMILAR, AND THAT IS WHERE

1    DR. STEWART FALLS DOWN.

2        NOW, I DO WANT TO MENTION ONE OTHER THING, AND THIS --

3    THIS IS ABSOLUTELY AN ASIDE.  IN MILWARD, THE MILWARD VERSION

4    THAT I HAVE BEEN TALKING ABOUT THAT PLAINTIFFS CITE IN THEIR

5    BRIEF, I WOULD SUBMIT TO THE COURT THAT THERE'S A PART OF

6    MILWARD THAT THE COURT IS INCLINED TO REVIEW AND CONSIDER.  I

7    WOULD ASK THAT THE COURT TAKE A LOOK AT THE FIRST CIRCUIT'S

8    ANALYSIS OF DR. GORE'S OPINIONS IN THAT CASE, WHICH IS THE

9    SECOND HALF OF THAT CASE.

10       DR. GORE ESSENTIALLY IN MILWARD FULFILLED THE ROLE THAT

11   DR. HARRISON IS FULFILLING HERE; DIFFERENTIAL DIAGNOSIS, AND

12   THE SAME -- EVERY EXPOSURE COUNTS THAT WE DISCUSSED

13   YESTERDAY.  AND THE FIRST CIRCUIT EVEN UNDER THEIR LESSER

14   STANDARD SAID THAT JUST DOESN'T CUT IT.  THAT TO ME IS THE

15   MOST STRIKING PART OF MILWARD.  IT'S NOT THE DISCUSSION OF

16   DR. STEWART'S METHODOLOGY.  IT'S WHAT IT HAD TO SAY ABOUT DR.

17   GORE'S.

18       AND YOUR HONOR, UNLESS YOU HAVE ANY QUESTIONS, I'M GOING

19   TO SIT DOWN.

20           THE COURT:  OKAY.  THANK YOU.  THANK YOU FOR THAT

21   PRESENTATION.  APPRECIATE IT.

22       WHO IS GOING TO SPEAK ON BEHALF OR WOULD YOU LIKE TO

23   RESPOND, MR. JENSEN, IN PART OR YOU WANT TO SAVE IT FOR THE

24   END?

25           MR. JENSEN:  I WILL JUST WAIT FOR THE END, YOUR

1    HONOR.

2         THE COURT:  OKAY.  VERY GOOD.  SO WHO IS GOING TO

3    SPEAK ON BEHALF OF SAFETY KLEEN?

4         MRS. KOCH:  I AM, YOUR HONOR.  AMANDA KOCH.  COULD

5    WE TAKE A QUICK BREAK REAL QUICK?

6         THE COURT:  SURE.  WHY DON'T WE TAKE A 10-MINUTE

7    RECESS AND WE'LL -- WE'LL SEE YOU BACK HERE.

8         MRS. KOCH:  THANK YOU.

9         THE COURT:  THANKS.

10    (WHEREUPON, A BRIEF RECESS WAS HAD.)

11         MRS. KOCH:  THANK YOU, YOUR HONOR.  AS I SAID, MY

12    NAME IS AMANDA KOCH AND I'M HERE ON BEHALF OF SAFETY KLEEN

13    TODAY.  AND I KNOW WE'VE COVERED A LOT OF MATERIAL OVER THE

14    PAST 24 HOURS AND I THINK THE GOOD NEWS IS THIS IS THE HOME

15    STRETCH BECAUSE THIS IS THE LAST MOTION.

16         THE BAD NEWS IS IS THAT SAFETY KLEEN'S MOTION TO EXCLUDE

17    DR. STEWART IS A BIT OF A DOOZY FOR LACK OF A MORE ELOQUENT

18    WORD FOR FEDERAL COURT.  IT COVERS A LOT OF MATERIAL

19    INCLUDING THAT COVERED BY MRS. BONNEVILLE, AND I'M NOT GOING

20    TO GO INTO THAT AGAIN.

21         WHAT I'M GOING TO FOCUS ON IS OUR CHALLENGES TO DR.

22    STEWART'S OPINIONS THAT ARE SAFETY KLEEN SPECIFIC AND THE

23    FUNDAMENTAL FLAWS IN THOSE OPINIONS.  AND WHAT I'M GOING TO

24    TRY TO DO IS HONE YOU IN ON THOSE WHICH WE TAKE THE MOST

25    ISSUE.  AND YOU'RE PROBABLY THINKING, OH GOODNESS, ANOTHER

1    POWERPOINT, BUT I HOPE THAT SOME VISUAL CONTEXT TO THIS MIGHT

2    HELP IN THAT ENDEAVOR.

3            THE COURT:  SO LONG AS YOU PROVIDE ME A COPY OF THE

4    POWERPOINT SO THAT I CAN PAY ATTENTION INSTEAD OF TRYING TO

5    SCRAMBLE THE NOTES DOWN, SO...

6            MRS. KOCH:  CERTAINLY, YOUR HONOR.

7            THE COURT:  I APPRECIATE IT.  I AM A VISUAL

8    LEARNER, SO THE POWER-POINTS HAVE BEEN VERY HELPFUL TO ME.

9            MRS. KOCH:  I THINK THAT WE CAN PROBABLY BOIL DOWN

10   WHAT SAFETY KLEEN IS SAYING WITH REGARD TO DR. STEWART'S

11   OPINIONS REGARDING SAFETY KLEEN INTO THREE KIND OF MAIN

12   AREAS.  AND THE FIRST IS THAT DR. STEWART'S BENZENE CONTENT

13   OPINION FOR SAFETY KLEEN SOLVENTS CONFUSING THE SOLVENTS,

14   IT'S WROUGHT WITH ERRORS IN THAT REGARD, IT IGNORES ALL THE

15   TESTING DATA REGARDING SAFETY KLEEN SOLVENTS, AND INSTEAD IT

16   RELIES UPON SKEWED AND IRRELEVANT CHERRY-PICKED INFORMATION,

17   AND WE DON'T THINK THAT PASSES MUSTER UNDER DAUBERT OR THE

18   FIRST CIRCUIT.

19      THE SECOND KIND OF MAIN POINT IS THAT DR. STEWART'S USE

20   OF THE ART MODEL IS WHOLLY UNRELIABLE AND INAPPROPRIATE GIVEN

21   THE EXTENSIVE REAL-WORLD EXPOSURE TESTING OF SAFETY KLEEN

22   PARTS WASHERS, THE SINK ON THE DRUM PARTS WASHER ESPECIALLY,

23   AND SAFETY KLEEN SOLVENTS.  AND HIS FAILURE TO CONSIDER THAT

24   DATA IS IN DIRECT CONTRADICTION OF BASIC INDUSTRIAL HYGIENE

25   PRINCIPLES AND THEREFORE IS INADMISSIBLE.

1     AND THE THIRD ISSUE IS -- WELL, IT REALLY HINGES ON THE

2     TOP TWO, AND THAT'S THAT HIS WORD, HIS OPINIONS REGARDING THE

3     CONTENTS OF SAFETY KLEEN WARNINGS HINGES ON ONE AND TWO.  AND

4     BECAUSE THOSE ARE UNRELIABLE, HE CAN'T OFFER HIS THIRD; THE

5     THIRD PORTION OF HIS OPINION.

6         SO, CAN WE GO TO SLIDE TWO, PLEASE.  TO GET SOME CONTEXT

7     TO WHAT DR. STEWART IS DOING IN THIS CASE, ESPECIALLY WITH

8     REGARD TO SAFETY KLEEN, LET ME BACK UP A LITTLE BIT.

9     PLAINTIFFS ARE ESSENTIALLY ALLEGING THIS IS A WARNINGS CASE

10    AND THAT SAFETY KLEEN -- OR EXCUSE ME -- THAT SAFETY KLEEN

11    AMONG OTHER DEFENDANTS SHOULD HAVE WARNED THAT THERE WAS

12    BENZENE IN THE PARTS WASHING SOLVENT.

13        AND IF YOU LOOK AT DR. STEWART'S REPORT, THAT BASICALLY

14    GOES BACK TO -- AND WE AGREE WITH HIM -- TO OSHA'S HAZARD

15    COMMUNICATION STANDARD WHICH TELLS YOU THAT MSDS MUST LIST

16    ALL INGREDIENTS DETERMINED TO BE HEALTH HAZARDS IF -- AND

17    THEN THERE ARE SORT OF THREE BASIS FOR WHEN YOU HAVE TO LIST

18    SOMETHING LIKE BENZENE, WHICH IS AN ADMITTED CARCINOGEN.

19        THE FIRST IS IF BENZENE IS PRESENT IN THE PRODUCTS IN

20    CONCENTRATIONS EQUAL TO OR GREATER THAN A THOUSAND PPM.  THE

21    SECOND IS IF THERE IS EVIDENCE THAT THE INGREDIENT BENZENE

22    COULD BE RELEASED FOR THE MIXTURE IN CONCENTRATIONS EXCEEDING

23    SET REGULATORY LIMITS.  AND THAT'S OSHA'S PERMISSIBLE

24    EXPOSURE LIMIT AND ACGIH TLV, THRESHOLD LIMIT VALUES.

25        AND THEN THE THIRD IS IF THERE -- IF IT'S DETERMINED

1    THAT THE AMOUNT PRESENT CAN PRESENT A HEALTH RISK TO

2    EMPLOYEES.

3         SO, REGARDING TWO AND THREE, THE POINT IS EVEN IF

4    THERE'S LESS THAN 1,000 PPM BENZENE IN THE SOLVENT, YOU STILL

5    HAVE TO WARN IF IT MEETS EITHER OF THOSE THRESHOLDS.

6         NOW, SAFETY KLEEN HAS TAKEN STRIDES SINCE THE 70'S TO

7    ENSURE AND MAINTAIN A LOW BENZENE CONTENT IN ITS SOLVENT.

8    AND THE TESTING FOR THE RELEVANT TIME PERIOD FOR 105 SOLVENT

9    SHOWS AN AVERAGE OF 36.5 PPM FOR THE MOST PART AND THEN THE

10   LATER YEARS OF THAT FIRST CHUNK OF TIME THAT DR. STEWART IS

11   LOOKING AT ABOUT 11 PPM BENZENE AVERAGE.  THAT'S 27 TO 90

12   TIMES LOWER THAN THE 1000 PPM LISTING LIMIT.

13        FOR SK 150, SAFETY KLEEN 150, DR. STEWART ALSO REFERS TO

14   IT AS PREMIUM SOLVENT.  THAT'S -- AND SAFETY KLEEN REFERS TO

15   IT AS PREMIUM SOLVENT AS WELL.  AND I'M -- MR. MCGOLDRICK GOT

16   INTO THIS A BIT AND I BELIEVE MR. ALOST DID AS WELL -- IT HAD

17   A SPECIFICATION BASED UPON RCRA REGULATIONS THAT MANDATED

18   THAT ALL SK 150 HAD BELOW .45 PPM, AND THAT WAS TO MEET DOT

19   HAZARDOUS WASTE REGULATION SPECIFICS.

20        AND TESTING ON SK 150 SHOWS THAT IT HAD EITHER LESS THAN

21   .45 PPM BENZENE IN IT OR EVEN LESS, LESS THAN .11 PPM

22   BENZENE, WHICH WAS A DETECTION LIMIT.  SO, TO PUT THAT IN

23   CONTEXT, THAT'S 2,000 TO 9,000 TIMES LOWER THAN THE 1,000 PPM

24   LISTING TRIGGER.

25        NOW, ASIDE FROM THAT, IF YOU'RE THINKING, OKAY, WELL,

1    WHAT ABOUT TWO AND THREE?  AS I MENTIONED, THE SAFETY KLEEN

2    PARTS WASHERS AND SOLVENTS HAVE BEEN TESTED EXTENSIVELY FOR

3    AIR EMISSIONS AS WELL, AND THOSE ALL SHOW THAT -- THAT

4    BENZENE TESTED IN THE AIR WAS ALL BELOW REGULATORY LIMITS.

5    SO, I THINK THE BOTTOM LINE IS IS THAT WHAT SAFETY KLEEN'S

6    NUMBERS -- DR. STEWART CAN'T GET THERE TO SAY WE HAD THE LIST

7    BENZENE.  SO WHAT DID HE DO?  HE MADE UP HIS OWN NUMBERS.

8             THE COURT:  WELL, BEFORE YOU GO TO THE NEXT PAGE,

9    THE THIRD FACTOR, IS THERE ANY QUANTIFICATION OF THAT THIRD

10   FACTOR OR IS IT JUST BASICALLY IT LOOKS LIKE A HEALTH RISK?

11            MRS. KOCH:  WELL, I THINK THAT ACTUALLY WOULD GO

12   INTO THE COMBINATION OF DR. HARRISON'S OPINIONS WITH DR.

13   STEWART'S OPINIONS.  DR. HARRISON NEEDING TO RELY ON DR.

14   STEWART FOR A DOSE ASSESSMENT AND THEN DR. HARRISON DOING

15   WHAT HE SHOULD DO, WHICH IS TAKING THAT DOSE ASSESSMENT AND

16   SETTING FORTH HIS OPINION.  DOES THAT MAKE SENSE WHAT I'M

17   SAYING?

18            THE COURT:  SO YOUR POINT IS THAT THE NUMBERS THAT

19   DR. STEWART RELIED ON WERE INACCURATE OR UNRELIABLE BECAUSE

20   THERE WERE OTHER SOURCES FOR INPUTTING THE ACTUAL NUMBERS

21   THROUGH SAFETY KLEEN'S OWN PRODUCT TESTING THAT HE SHOULD

22   HAVE USED IN THE COMPUTER MODELING, BUT THAT INDEPENDENTLY IF

23   DR. HARRISON HAD LOOKED AT THOSE, THAT INFORMATION, THAT

24   DATA, THEN HE COULDN'T REACH THE THIRD HEALTH RISK TO

25   EMPLOYERS BECAUSE IT NECESSARILY HAS MADE -- OR HIS OPINION

1    NECESSARILY RELIED ON THE DATA THAT DR. STEWART HAD

2    PRESENTED.

3            MRS. KOCH:  EXACTLY, YOUR HONOR.

4            THE COURT:  OKAY.  OKAY.

5            MRS. KOCH:  SLIDE FIVE, PLEASE.  FIVE.  ALL RIGHT.

6    YOUR HONOR, I THINK YOU SAW THIS SLIDE ALREADY IN MR.

7    MCGOLDRICK'S PRESENTATION ON DR. HARRISON, BUT I JUST WANT TO

8    TOUCH ON IT ONE MORE TIME.  ONE, TO POINT OUT THAT WHEN WE'RE

9    TALKING ABOUT A SINK ON A DRUM PARTS WASHER, WE ARE NOT

10   TALKING ABOUT A SINK ON TOP OF AN EMPTY DRUM.  THERE IS A

11   WHOLE -- AS HE WENT THROUGH IN DETAIL YESTERDAY -- A WHOLE

12   PROCESS THAT THIS SOLVENT GOES THROUGH.

13       THE OTHER BIG POINT I WANT TO MAKE IS TO POINT OUT THE

14   DIFFERENCES IN THE 105 SOLVENT AND THE 150 PREMIUM SOLVENT.

15   THE BIGGEST BEING, FOR OUR POINTS IN THIS CASE, IS THAT THE

16   105 SOLVENT, THE FIRST SOLVENT EVER DEVELOPED BY SAFETY

17   KLEEN, OR BY GLENN PALMER, WHICH ULTIMATELY BECAME SAFETY

18   KLEEN LATER ON -- WAS DEVELOPED IN THE 1970'S.  LIKE MR.

19   MCGOLDRICK SAID, IT HAD A 105-DEGREE FLASHPOINT.  IT'S ALSO A

20   CLEAR TRANSLUCENT GREEN LIQUID.

21       NOW, THE 150 PREMIUM SOLVENT -- AND THIS IS AN EXTREMELY

22   IMPORTANT POINT -- WASN'T DEVELOPED UNTIL THE EARLY 1990'S

23   AND NOT PROVIDED TO -- FOR DISTRIBUTION TO CUSTOMERS UNTIL

24   1993 OR 1994.  AND IT'S A CLEAR, COLORLESS, PALE YELLOW

25   LIQUID.

1           GO TO THE NEXT SLIDE.  NOW, AS PART OF SAFETY KLEEN'S

2     SERVICE -- AND LET ME BACK UP A LITTLE BIT.  I THINK WE'VE

3     TOUCHED ON IT A LITTLE BIT, BUT I WANT TO CLARIFY A FEW

4     THINGS IN THAT REGARD.  SAFETY KLEEN ESSENTIALLY GOES TO A

5     CUSTOMER WORK PLACE AND -- WELL, LET'S SEE IF WE CAN BACK UP

6     FURTHER.  WHEN A CUSTOMER SIGNS UP FOR A SAFETY KLEEN

7     SERVICE, THAT MOST OFTEN THE SERVICE INCLUDES A MACHINE, THE

8     SOLVENT, AND THE SERVICE TECH COMING OUT SERVICING THOSE

9     ITEMS.  THE CUSTOMER NEVER OWNS THE SOLVENT.  THE CUSTOMER

10    NEVER OWNS THE MACHINE IN THAT SITUATION.

11          THERE ARE SEPARATE SITUATIONS WHERE A CUSTOMER MAY HAVE

12    THEIR OWN MACHINE AND SAFETY KLEEN COMES OUT AND SERVICES THE

13    CUSTOMER'S MACHINE WITH 105, 150, WHATEVER THE SOLVENT MAY

14    BE, AND PROVIDES THE LABELS AND WHATNOT FOR THAT MACHINE.

15    THAT'S TOTALLY SEPARATE.  THEY HAVE THEIR OWN LABELS, AND THE

16    MSDS'S WOULD BE THE SAME FOR THE MOST PART BECAUSE IT WOULD

17    BE RELATED TO THE SOLVENT.

18          BUT IN THIS CASE WE KNOW THAT FROM THE SERVICE RECORDS

19    THAT COLUMBIA POWER SPORTS OR COLUMBIA YAMAHA SUBSCRIBE TO

20    THE WHOLE PACKAGE.  THEY GOT THE SAFETY KLEEN MACHINE, THE

21    SOLVENT, AND THE SERVICE OF THE TECHS COMING OUT AND TAKING

22    CARE OF THE MACHINE, CLEANING IT, MAKING SURE LABELS WERE

23    LEGIBLE AND WHATNOT.

24          THAT'S IMPORTANT BECAUSE WHEN SAFETY KLEEN'S SERVICE

25    ENDED -- AND I THINK MRS. BUSSEY'S TESTIMONY WAS THAT SHE

1    WANTED TO HAVE A LONGER SERVICE PERIOD, ESSENTIALLY THE TIME

2    WHEN SAFETY KLEEN WOULD COME OUT EVERY -- HONESTLY AS I STAND

3    HERE I CAN'T REMEMBER IF IT WAS EVERY 12 WEEKS, I THINK IT

4    VARIED -- BUT SHE WANTED AN EVEN LONGER PERIOD AND SAFETY

5    KLEEN WOULDN'T DO THAT.  SO, SHE CUT THE SERVICE AND MOVED TO

6    A COMPETITOR.

7         THESE SERVICE RECORDS SHOW THAT THAT SERVICE ENDED AND

8    THE MACHINE WAS PULLED.  AND I JUST WANT TO CLARIFY THAT

9    BECAUSE THERE WAS A LOT OF TALK ABOUT PARTS WASHING MACHINES

10   YESTERDAY AS IF THE PARTS WASHER AT COLUMBIA POWER SPORTS FOR

11   ALL TIME WAS THE SAME PARTS WASHER.  SAFETY KLEEN'S MACHINE

12   WAS OUT OF THERE IN 2004.  AFTER THAT TIME PERIOD, I DON'T --

13   I THINK THE TESTIMONY IS THAT IT WAS DIVERSIFY'S MACHINE.

14   I'M NOT -- I'M NOT EVEN SURE ON THAT, THOUGH.  I DON'T

15   REALLY -- THE POINT IS IS IT WASN'T SAFETY KLEEN'S MACHINE.

16   IT WAS NOT A SAFETY KLEEN PARTS WASHER.

17        *THE COURT:*  IS THE SOLVENT INTERCHANGEABLE OR THE

18   DRUM THAT FITS INTO THE WASHER INTERCHANGEABLE IN THE SENSE

19   THAT, YOU KNOW, IF I HAVE GOT -- IF THEY WERE -- IF THEY KEPT

20   THE WASHER, COULD SOMEBODY ELSE'S SOLVENT GO INTO THAT

21   WASHER?

22        *MRS. KOCH:*  I THINK I UNDERSTAND WHAT YOU'RE

23   SAYING, AND THE ANSWER IS THEY COULDN'T KEEP THE PARTS WASHER

24   BECAUSE IT WAS SAFETY KLEEN'S PARTS WASHER.

25        NOW, IS IT POSSIBLE TO SET THE PARTS WASHER ON ANOTHER

1    DRUM?  I THINK THAT THE ANSWER TO THAT QUESTION IS YES.

2              THE COURT:  OKAY.

3              MRS. KOCH:  BUT I'M -- I'M NOT REALLY SURE.

4              THE COURT:  BUT THERE'S TESTIMONY -- THE EVIDENCE

5    IN THE RECORD IS THAT THE ENTIRE WASHER WAS REMOVED BY 2004.

6              MRS. KOCH:  YES, YOUR HONOR.

7              THE COURT:  OKAY.

8              MRS. KOCH:  AND THE SAFETY KLEEN SOLVENT.

9              THE COURT:  RIGHT.  RIGHT.

10             MRS. KOCH:  SO THAT'S AN IMPORTANT NOTE.  NOW, SO

11   SAFETY KLEEN'S SERVICE RECORDS GIVE YOU A LOT OF INFORMATION

12   ABOUT WHAT WAS GOING ON AT COLUMBIA YAMAHA, COLUMBIA POWER

13   SPORTS; NOTABLY SAFETY KLEEN'S SERVICE RECORDS THAT DR.

14   STEWART SEEMINGLY NEVER BOTHERED TO LOOK AT.

15        THE SERVICE RECORD ON THE LEFT, FOR EXAMPLE, AND

16   SOMETIMES THESE ARE A LITTLE BIT HARD TO READ, BUT THE DATE

17   ON IT IS JULY 31ST, 1992.  AND WE KNOW FROM THIS SERVICE

18   RECORD THAT THE CUSTOMER HAD A MODEL 30 SINK ON A DRUM

19   SERVICE WITH A 105 PARTS WASHING SOLVENT, THAT THERE'S -- TO

20   THE RIGHT ON THAT SAME DOCUMENT THERE ARE -- THERE'S A

21   CATEGORY, A RECTANGLE WITH LITTLE BOXES CHECKED, AND THAT'S

22   WHAT THE SERVICE REP GOES THROUGH AND CHECKS TO MAKE SURE

23   EVERYTHING IS WORKING PROPERLY, THAT MAKES SURE THE LABEL IS

24   LEGIBLE AND CLEAN AND THAT SORT OF THING.

25        THE WASTE IS NOTED ABOUT A LITTLE OVER TWO-THIRDS OF THE

1    WAY DOWN.  THAT WASTE CODE TELLS YOU AGAIN WHAT KIND OF

2    SOLVENT WAS AT ISSUE OR BEING USED THERE.  AND THEN IN THE

3    BOTTOM RIGHT-HAND SIDE CORNER THAT'S THE WORK PLACE.  WHOEVER

4    IS RECEIVING THE SOLVENT, THEIR SIGNATURE THAT'S VERIFYING

5    THAT EVERYTHING ON THAT FORM IS CORRECT.

6         WE KNOW FROM THIS FORM THAT IT WAS 105 SOLVENT AT

7    COLUMBIA POWER SPORTS IN 1992.  WE ALSO KNOW THAT BECAUSE,

8    LIKE I SAID, THERE WAS NO 150 SOLVENT AT -- PROVIDED TO ANY

9    CUSTOMERS IN 1992.  BUT, IF YOU SWITCH TO THE NEXT FORM, AND

10   THIS IS ACTUALLY A FORM SIGNED BY PHIL BOYKIN, YOU CAN SEE --

11   THIS IS DATED JANUARY 29TH, 2002.  SO NOW WE ARE STEPPING

12   INTO DR. STEWART'S SECOND TIME PERIOD, IF YOU WILL, IF YOU

13   TAKE HIS -- HOW HE SPLITS THE PARTS WASHER EXPOSURE IN

14   HALF -- AND THIS TELLS US -- JOHN, CAN YOU HIGHLIGHT UNDER --

15   CAN YOU SEE WHERE I'M POINTING AT ALL?  NO.

16        THE SERVICE PRODUCT SECTION, 30150?  YES, THAT.  THAT

17   TELLS US AGAIN IT'S A SINK ON THE DRUM PARTS WASHER AND NOW

18   IT'S USING A 150 SOLVENT.  SO, ALSO THE DOT WASTE CODE REFERS

19   TO THE 150 SOLVENT AS WELL.

20        NOW, MY POINT IN THIS IS THAT, ONE, THERE IS NO REASON

21   TO DISPUTE THESE SAFETY KLEEN RECORDS.  TWO, THE WORK PLACE

22   CERTIFIED THE INFORMATION IN THESE RECORDS WHEN THESE

23   EMPLOYEES SIGNED IT.

24        SLIDE SEVEN, PLEASE.  SO TO KIND OF GIVE YOU A BROAD

25   PICTURE OF WHAT SERVICES WERE PROVIDED AT COLUMBIA POWER

1    SPORTS AND WHEN, THESE SERVICE RECORDS TELL US THAT BEGINNING

2    IN THE MID 80'S THROUGH DECEMBER 20TH, 1995, THE SAFETY KLEEN

3    105 SOLVENT WAS THERE.  BEGINNING IN DECEMBER 20TH, 1995,

4    COLUMBIA POWER SPORTS SWITCHED TO THE SAFETY KLEEN 150

5    SOLVENT, THE PREMIUM SOLVENT, AND OUR RECORDS SHOW THAT THAT

6    SERVICE, LIKE I SAID, WAS PULLED IN 2004.

7         ANOTHER INTERESTING POINT IS THAT DR. STEWART AND

8    TALKING ABOUT WHAT SAFETY KLEEN SOLVENTS WERE THERE AND IN

9    WHAT PERIOD, HE ENDS IN 2003.  AGAIN, HE CLEARLY DIDN'T LOOK

10   AT THE RECORDS WHICH WOULD BE YOUR FIRST SOURCE FOR CHECKING

11   WHAT PRODUCTS WERE AT A PARTICULAR PLACE.

12        NOW IF YOU WANT TO COMPARE -- CAN YOU GO TO THE NEXT

13   SLIDE, PLEASE -- COMPARE WHAT OUR RECORDS SHOW VERSUS WHAT

14   DR. STEWART SAYS IN TERMS OF WHAT HE ANALYZED FOR HIS

15   EXPOSURE ANALYSIS, I THINK THIS IS A PROVIDE -- I TRIED TO DO

16   IT IN A CLEAR WAY.  I DON'T KNOW IF IT CAME OUT THAT WAY OR

17   NOT.  BUT THE TOP IS WHAT THE SERVICE RECORDS SHOW AND THE

18   BOTTOM, BY COMPARISON, IS THE EXPOSURE ANALYSIS THAT DR.

19   STEWART PERFORMS.

20        SO, HIS ANALYSIS IS 150 SOLVENT.  I'M STILL 1994.  AND

21   YOU WILL NOTE DOWN THERE THAT, AGAIN, NOTES 1993 WHEN 150 WAS

22   AVAILABLE.  SO DESPITE THAT, 150 SOLVENT GOING BACK TO THE

23   80'S, AND THEN HE SAYS, OH, IN 1994 IT SWITCHED TO 105

24   SOLVENT AND THAT ENDED IN 2003.  I'M NOT SURE REALLY WHERE HE

25   GOT THE 2003 FROM.

1      NOW, STEWART REJECTS THE SERVICE RECORDS OR DOESN'T

2    CONSIDER THEM, I'M NOT SURE, BUT -- WE HAVE THE NEXT SLIDE,

3    PLEASE -- HE CLAIMS, OH, IT CAN'T HAVE BEEN 105 SOLVENT FOR

4    THIS FIRST PART OF THE EXPOSURE PERIOD BECAUSE MR. BOYKIN'S

5    CO-WORKERS TESTIFIED THAT THE PARTS WASHER SOLVENT WAS CLEAR.

6    WELL, THAT IS ONE TINY LITTLE SNIPPET OF THE TESTIMONY, AND

7    HE REALLY DIDN'T PROVIDE THE WHOLE PICTURE.

8      ACTUALLY THE CO-WORKERS TESTIFIED THAT THE SOLVENT WAS

9    BROWNISH GREEN, LIGHT GREEN -- I'M SORRY -- LIGHT BROWN, A

10   BROWNISH COLOR.  I THINK IT WAS MR. BUSSEY THAT SAID HE

11   THOUGHT IT WAS A BROWNISH COLOR, AND THEN HE SAID IT'S

12   USUALLY CLEAR WHEN IT'S NEW, BUT I'M COLOR BLIND, SO I'M NOT

13   SURE, IT COULD BE BROWN, IT COULD BE GREEN, I HAVE PROBLEMS

14   WITH COLORS, I'M GOING TO SAY, SINCE MY BROWN IS GREEN, I'M

15   GOING TO SAY IT'S GREEN.  I DON'T REALLY KNOW WHAT THAT

16   MEANS, BUT THE BOTTOM LINE IS THAT IS DEFINITELY NOT SAYING

17   IT'S DEFINITELY CLEAR.  AND THEN THE LAST ONE IS, QUOTE,

18   COLOR OF LIKE GASOLINE, I MEAN, IT'S, YOU KNOW, TRANSPARENT.

19      SO, DR. STEWART TAKES FROM ALL THAT TESTIMONY THAT THE

20   SOLVENT WAS CLEAR.  THAT'S SUSPECT.  BUT MORE IMPORTANTLY,

21   HAD HE LOOKED AT THE MSDS FOR THE 105 SOLVENT -- A SNIPPET OF

22   THAT IS RIGHT HERE IN THE WHITE BOX -- HE WOULD HAVE SEEN

23   THAT THE DESCRIPTION SAYS LIQUID CLEAR GREEN.

24      BUT HONESTLY THE BIGGEST ISSUE I THINK IS THE FACT THAT

25   HE REFUSES TO ACCEPT THAT THERE WAS NO 150 SOLVENT, IT DIDN'T

1    EXIST IN THIS TIME PERIOD WHERE HE'S PROVIDING A SCIENCE --

2    SUPPOSEDLY A SCIENTIFIC EXPOSURE ANALYSIS FOR MR. BOYKIN'S

3    EXPOSURES TO BENZENE.

4        NOW, ALL THE INFO HE NEEDED TO KNOW WHAT SERVICES WERE

5    PROVIDED WHEN WAS AVAILABLE TO HIM.  THERE WERE THESE SERVICE

6    RECORDS.  THIS IS SET FORTH IN SAFETY KLEEN'S REPORTS.  IT'S

7    SET FORTH IN DR. BREECE -- DR. JAMES BREECE'S DEPO, AND HE

8    WAS ONE OF SAFETY KLEEN'S EXPERTS, BUT MOST IMPORTANTLY DR.

9    JAMES BREECE IS THE GUY THAT INVENTED THE 150 SOLVENT.

10       PLAINTIFFS COULD HAVE GONE THROUGH A WHOLE LINE OF

11   QUESTIONING TRYING TO FIGURE OUT -- WELL, THEY DID ASK WHEN

12   IT START -- OR I DON'T KNOW IF THEY ASKED, BUT HE

13   SPECIFICALLY SAID THIS SOLVENT, I CREATED IT IN THE 90'S, IT

14   WAS AVAILABLE IN '93 AND BEYOND.

15       THERE IS NO RATIONAL BASIS, NO RELIABLE BASIS TO DISPUTE

16   THAT TESTIMONY.  THERE'S NO RELIABLE -- FRANKLY, I DON'T KNOW

17   THAT WE HAVE EVER HAD AN EXPOSURE EXPERT CLAIM THAT 150

18   EXISTED BEFORE IT DID.  THIS IS -- THIS IS A NEW ONE.  AND

19   DESPITE THE FACT WE POINTED THIS OUT MULTIPLE TIMES, HE'S

20   STICKING TO HIS GUNS ON THAT.  AND I THINK THAT EITHER HE

21   DIDN'T READ ALL THE EVIDENCE OR HE DIDN'T CARE, I DON'T KNOW

22   WHAT'S WORSE.  BUT THE BOTTOM LINE IS EEOC AND I THINK THE

23   WHOLE STRING OF CASES CITED IN OUR BRIEF SAYS THAT'S NOT

24   OKAY, THAT'S WRONG, THAT IS THE VERY HEART OF HIS OPINION.

25   HE'S LOOKING AT THE WRONG MATERIAL.

1    AND IT'S NOT JUST BENZENE CONTENT THAT'S DIFFERENT AS

2  MR -- I THINK -- I'M NOT SURE IF IT WAS MR. MCGOLDRICK OR

3  MR. ALOST DISCUSSED YESTERDAY -- THE COMPOSITION OF THESE

4  SOLVENTS IS DIFFERENT.  AND BY THE WAY, IT DOESN'T MATTER

5  THAT, OH WELL, HE DID LOOK AT 105 LATER ON.  THAT'S A WHOLE

6  OTHER POINT BECAUSE AS I'M GOING TO DISCUSS IN A MINUTE,

7  BENZENE CONTENT FOR 105 CHANGED OVER TIME.  AND TO LOOK AT

8  THESE SOLVENTS, SWITCH THEM, AND REFUSE TO CONSIDER THE REAL

9  DATA ABOUT THEM, THAT'S NOT -- THAT'S NOT SCIENTIFICALLY

10 RELIABLE.

11   SO LET'S TALK ABOUT HIS BENZENE CONTENT NUMBERS AND WHAT

12 HE DID TO ARRIVE AT THOSE NUMBERS.  AND NEXT SLIDE, PLEASE.

13 NOW, I TRIED TO DO THE SAME THING WITH REGARD TO A COMPARISON

14 OF WHAT OUR NUMBERS SHOW FOR THE TESTING AND WHAT DR. STEWART

15 IS SAYING.

16   NOW, FOR SAFETY KLEEN 105 SOLVENT, LIKE I SAID BEFORE,

17 TESTING SHOWS A RANGE OF 11 TO 36.5 PPM IN THAT EARLY TIME

18 PERIOD.  AND FOR SAFETY KLEEN 150 THE RANGE WAS LESS THAN .11

19 PPM OR NON-DETECT TO LESS THAN .45 PPM FOR THAT LATER TIME

20 PERIOD WHEN 150 EXISTED.

21   IN COMPARISON, DR. STEWART CLAIMS THE 150 SOLVENT IN THE

22 80'S THROUGH THE EARLY 90'S WAS 1,000 TO 5,000 PPM BENZENE; A

23 SOLVENT SPECIFICALLY MANUFACTURED TO HAVE LESS THAN .5 PPM

24 BASED UPON RCRA SO THAT PEOPLE COULD EASE THEIR BURDEN OF --

25 REGULATORY BURDEN IN TERMS OF HAZARDOUS WASTE REPORTING

1    REQUIREMENTS, HE CLAIMS TO HAVE 1,000 TO 5,000 PPM BENZENE.

2    AND THEN IN CONTRAST FOR THE SAFETY KLEEN 105 SOLVENT FOR THE

3    LATTER PART OF THE PERIOD HE CLAIMS TO HAVE 8.65 PPM BENZENE.

4         NOW AGAIN, THIS IS ANOTHER FIRST FOR ME.  I HAVE NEVER

5    SEEN ONE OF THESE CASES WHERE AN INDUSTRIAL HYGIENIST HAS

6    EVER CLAIMED THAT 150 HAS MORE BENZENE IN IT THAN 105; EVER.

7         NEXT SLIDE, PLEASE.  THIS IS A LIST OF SOME OF THE

8    TESTING DATA ON THE SOLVENTS AT ISSUE IN THIS CASE.  AND I

9    DON'T THINK -- AND I'M SURE PLAINTIFFS' COUNSEL WILL CORRECT

10   ME IF I'M WRONG -- I DON'T THINK THEY ARE CONTESTING THAT WE

11   ARE MISREPRESENTING THE VALUES IN OUR DATA YET AT LEAST.  I

12   DON'T KNOW WITH DR. STEWART.  BUT THE BOTTOM LINE IS WE KNOW

13   AND IT'S JUST ACTUALLY FOR THE SOLVENT SPECIFICALLY PROVIDED

14   TO MR. BOYKIN'S WORK PLACE WHICH ACTUALLY CAME FROM DOWN THE

15   ROAD IN LEXINGTON -- SAFETY KLEEN HAS RECYCLE CENTERS SET

16   THROUGHOUT THE COUNTRY, AND ALL OF THE SOLVENT TO COLUMBIA

17   POWER SPORTS WOULD HAVE COME FROM THE LEXINGTON RECYCLE

18   CENTER.

19        AND WE KNOW FROM THAT DATA THAT WE HAD THOSE NUMBERS

20   THAT I JUST TALKED ABOUT ON THE PREVIOUS SCREEN.  ALL THAT'S

21   WHAT'S SHOWN THROUGHOUT THAT DATA.  SO I'M NOT GOING TO GO

22   INTO THAT IN DETAIL UNLESS YOU HAVE QUESTIONS ABOUT IT, YOUR

23   HONOR.

24             THE COURT:  I DON'T HAVE ANY QUESTIONS.

25             MRS. KOCH:  OKAY.  SO, NEXT SLIDE, PLEASE.  WHAT WE

1    KNOW IS DR. STEWART DIDN'T CONSIDER ANY ANALYTICAL DATA FROM

2    SAFETY KLEEN SOLVENTS, HE DIDN'T REQUEST ANY ANALYTICAL DATA

3    FROM SAFETY KLEEN SOLVENTS, HE DIDN'T CONDUCT ANY RESEARCH,

4    HE DIDN'T TEST THE CHEMICAL COMPOSITION OF SAFETY KLEEN

5    SOLVENTS, HE DIDN'T EVEN DETERMINE WHICH SUPPLIERS OF THE

6    SAFETY KLEEN SOLVENT WERE USED IN THIS REGION OF THE COUNTRY.

7    AND TO PUT THAT IN A LITTLE BIT OF CONTEXT, VARIOUS RECYCLE

8    CENTERS -- THAT THERE ARE DIFFERENT SUPPLIERS OF THE BASE

9    MINERAL SPIRITS AND DIFFERENT PARTS OF THE COUNTRY.  HE

10   DIDN'T BOTHER TO LOOK AT THAT.

11        SO WHAT DID HE LOOK AT?  LET'S GO TO THE NEXT SLIDE,

12   PLEASE.  I'M ACTUALLY GOING TO SKIP TO THE SECOND ONE, WHICH

13   IS THE CARPENTER STUDY FIRST.  DR. STEWART, IN HIS REPORT HE

14   LAYS OUT SORT OF THE BASIS FOR HIS 1,000 TO 5,000 PPM BENZENE

15   CONTENT.  AND ONE OF THOSE IS THIS 1975 CARPENTER STUDY.  AND

16   THAT'S IN OUR BRIEF.  IT'S DISCUSSED IN OUR BRIEF.  BUT IN

17   CARPENTER, THE AUTHORS REPORTED A BENZENE LEVEL OF ABOUT -- I

18   THINK IT WAS A THOUSAND PPM IN STODDARD SOLVENT WHICH WAS

19   DESCRIBED AS, QUOTE, TYPICAL OF COMMERCIAL PRODUCTION IN THE

20   UNITED STATES.

21        THAT STUDY IS NOT ABOUT SAFETY KLEEN.  THAT STUDY

22   DOESN'T HAVE ANY INFORMATION ABOUT SAFETY KLEEN SOLVENTS

23   PERIOD.  AND NOTABLY, IT PREDATES MR. BOYKIN'S EXPOSURES BY

24   10 YEARS.

25        HIS SECOND RELIANCE MATERIAL IS KOPSTEIN, AN ARTICLE BY

1    HIM FROM 2006.  NOW, MELVIN KOPSTEIN IS A SELF-ADMITTED

2    CAREER PLAINTIFFS' EXPERT.  AND HIS ARTICLE, AGAIN, DOESN'T

3    HAVE ANY DATA ON SAFETY KLEEN, IT DOESN'T HAVE ANY ANALYTICAL

4    DATA ON ANY SOLVENT FOR THAT MATTER.  AND THE VALUES IN HIS

5    ARTICLE CAN BE TRACED BACK TO THE CARPENTER 1975 STUDY.

6    THAT'S THE BASIS.

7         NOW, PLAINTIFFS' COUNSEL MIGHT SAY, OH WELL, THERE ARE

8    OTHER ARTICLES OR OTHER STUDIES REFERENCED IN KOPSTEIN'S

9    ARTICLE.  BUT THE THING IS IS IF YOU GO TO EACH ONE OF THOSE

10   STUDIES, THEY ALL GO BACK TO CARPENTER.  SO, THAT'S -- WE ARE

11   ESSENTIALLY LOOKING AT THE SAME THINGS IN KOPSTEIN AND

12   CARPENTER.

13        NOW, WE RECENTLY CHALLENGED DR. KOPSTEIN IN THE CASE AND

14   HAD HIM EXCLUDED ESSENTIALLY OFFERING A VERY SIMILAR OPINION

15   TO THE ONE SET FORTH BY DR. STEWART IN THIS CASE.  AND I JUST

16   WANT TO READ TO YOU A BRIEF SNIPPET FROM THAT ORDER OR RULING

17   FROM THE MAGISTRATE JUDGE.  HE SAID, QUOTE, DR. KOPSTEIN

18   ADMITS THAT THE BENZENE CONTENT OF MINERAL SPIRITS CAN VARY

19   BATCH TO BATCH BY VENDOR, DIFFERENT VENDORS CAN PRODUCE

20   MINERAL SPIRITS WITH DIFFERENT BENZENE CONTENTS BASED UPON

21   THE SOURCE OF THE CRUDE OIL OR UPON THE PROCESSING AND HE

22   DOES NOT KNOW WHICH SUPPLIER PROVIDED MINERAL SPIRITS TO

23   SAFETY KLEEN FOR USE BY ITS CUSTOMERS IN THE DETROIT AREA IN

24   THE 1990 TO 1994 TIMEFRAME.  NEVERTHELESS, WITHOUT TESTING

25   ANY BATCH OF SK 105 AND KNOWING THAT THE BENZENE CONTENT IN A

1    PETRO CHEMICAL PRODUCT IS THE MOST IMPORTANT PROPERTY

2    RELATIVE TO BENZENE EXPOSURE, DR. KOPSTEIN OPINED THAT SK 105

3    SOLVENT HENDRIAN USED IN THE 1990'S CONTAINED 1,000 PPM

4    BENZENE BASED ON A STUDY OF MINERAL SPIRITS FROM 1975.  THE

5    CARPENTER STUDY.  QUOTE, THIS GUESSWORK DOES NOT COMPORT WITH

6    DAUBERT, END QUOTE.  AND THAT -- THAT ORDER IN THE DISTRICT

7    COURT'S ORDER OVERRULING THE PLAINTIFF COUNSEL'S OBJECTIONS

8    TO THAT ORDER IS ATTACHED TO OUR BRIEFING.

9        OKAY.  SO THE NEXT TWO SOURCES, THE FIRST ONE -- LET

10   ME -- BEFORE I MOVE ON, YOU WILL NOTE DOWN AT THE BOTTOM

11   THERE IS A STATEMENT FROM IARC, WHICH IS THE INTERNAL

12   ASSOCIATION FOR RESEARCH ON CANCER, AND THIS IS ALSO IN OUR

13   BRIEF, BUT IT NOTES, IN THE PAST 20 TO 30 YEARS, THERE HAS

14   BEEN A PRONOUNCED MOVE FROM NON-HYDROGENATED GRADE TOWARDS

15   HYDROGENATED IE MINERAL [SIC] AROMATICS AND LOW N-HEXANE [PH]

16   LESS THAN 5 PERCENT WEIGHT GRADES.  IT'S ESSENTIALLY NOTING

17   THE CHANGE IN MINERAL SPIRITS OVER TIME.

18       AND I WANTED TO POINT THAT OUT BECAUSE IN DR. STEWART'S

19   REPORT HE SAYS, WELL, THERE'S THIS HUGE DISAGREEMENT BETWEEN

20   INDUSTRY AND EVERYONE ELSE WHO HE SAYS ARE USERS, GOVERNMENT

21   AGENCIES AND NON-GOVERNMENT AGENCIES.  AND WHAT'S FUNNY IS

22   I'M NOT SURE WHICH USER HE IS TALKING ABOUT.  BUT WE HAVE ONE

23   OF THOSE AGENCIES RIGHT HERE, AND IT'S NOTING THE CHANGE IN

24   MINERAL SPIRITS.  AND ALSO IMPORTANTLY IN NONE OF THOSE

25   SOURCES THAT HE CITES OR REFERS TO -- WELL, HE DOESN'T REALLY

1    SPECIFY WHO THEY ARE SPECIFICALLY -- THERE IS NO CITED DATA

2    FOR SAFETY KLEEN SOLVENT.

3         SO ANY WAY, MOVING ON TO THE THIRD SOURCE, THE COAST

4    GUARD COMMANDANT INSTRUCTION.  CAN WE GO TO SLIDE 14, PLEASE.

5    THIS IS AN IMAGE OF THE SECTION THAT DR. STEWART REFERS TO

6    FOR HIS BASIS THAT SAFETY KLEEN 150 SOLVENT HAS BETWEEN 1,000

7    TO 5,000 PPM.  NOW, YOU WILL SEE THAT THERE'S NO REFERENCE TO

8    SAFETY KLEEN SOLVENTS ON HERE LIKE ANYTHING ELSE HE LOOKS AT.

9    BUT IN FACT, THERE'S NO SPECIFIC PRODUCTS LISTED WHATSOEVER.

10        THERE'S NO ANALYTICAL DATA ON HERE.  HE DOESN'T KNOW WHO

11   AUTHORED THIS DOCUMENT.  HE DOESN'T KNOW WHAT THE SOURCES

12   WERE FOR THIS DOCUMENT.  HE ADMITTED ALL OF THIS IN HIS

13   DEPOSITION.  HE DIDN'T KNOW ANYTHING ABOUT IT.  ALL IT IS IS

14   GENERAL REFERENCES TO BROAD CATEGORIES OF MATERIALS.

15        NEXT SLIDE, PLEASE.  NOW, THE FINAL BASIS FOR HIS 1,000

16   TO 5,000 PPM OPINION IS THIS UNSOURCED QUOTE UNQUOTE UNOCAL

17   MATERIAL SAFETY DATA SHEET.  AND YOUR HONOR, DO YOU KNOW WHAT

18   A MATERIAL SAFETY DATA SHEET IS?  OKAY.

19             THE COURT:  YES.

20             MRS. KOCH:  THIS IS A DOCUMENT HE PULLED FROM THE

21   INTERNET.  AND LET ME BE CLEAR.  THIS IS NOT UNOCAL'S MSDS.

22   THIS IS SOMEONE ELSE PURPORTEDLY ENTERING IN UNOCAL'S MSDS

23   INTO SOME KIND OF SYSTEM, ONLINE SYSTEM.  AND IT SAYS AT THE

24   TOP, UNOCAL CHEMICALS DIVISION, UNION OIL COMPANY OF

25   CALIFORNIA, 6605 SAFETY KLEEN PREMIUM SOLVENT, AND THEN

1    THERE'S SOME NUMBERS AFTER THAT.

2        HE LOOKS AT THIS SECTION, WHICH WE HAVE HIGHLIGHTED

3    AT -- OR BROUGHT OUT INTO A LARGER BOX FOR YOU AND WHICH

4    SAYS, COMPOSITION BACK SLASH INFORMATION ON INGREDIENTS.  AND

5    IT SAYS, INGREDIENT OR INGREED NAME, BENZENE, PAREN, SARA,

6    ROMAN NUMERAL THREE, CLOSED PAREN.

7        HE CONCLUDES FROM THAT BOX, QUOTE, THEY ARE TELLING THAT

8    THERE'S BENZENE PRESENT IN THE MATERIAL THEY ARE ORDERING AND

9    IT'S NOT LESS THAN A TENTH PERCENT, WHICH IS 1,000 PPM.  I'LL

10   REPRESENT TO YOU THAT NOWHERE IN THIS DOCUMENT, YOUR HONOR,

11   IS THERE A REFERENCE TO THIS -- IN THIS MSDS TO 1,000 PPM OF

12   BENZENE.  THAT'S THE SOLE SENTENCE OR SECTION THAT HE RELIES

13   ON AND TAKES THAT JUMP TO SAY IT MEANS A THOUSAND PPM.

14       THE BIGGER ISSUE IS HE DOESN'T -- HE'S NEVER SEEN ANY

15   ANALYTICAL DATA FROM THIS DOCUMENT, HE DOESN'T KNOW THE

16   SOURCE, HE DOESN'T KNOW THE AUTHOR, HE DOESN'T KNOW -- HE

17   CAN'T EVEN CONFIRM THAT UNOCAL ACTUALLY PROVIDED THIS

18   DOCUMENT TO SOMEONE.  HE NEVER REFERS TO THE REAL UNOCAL

19   MSDS, AND I'M -- AN EVEN BIGGER ISSUE IS HE DOESN'T EVEN KNOW

20   IF UNOCAL WAS A SUPPLIER OF THE 150 SOLVENT TO THE EAST

21   COAST.  IT'S A CALIFORNIA COMPANY.  AND LIKE I SAID, THERE'S

22   A REGIONAL.  HE DIDN'T PROVIDE ANY EVIDENCE OF THAT.

23       NOW, WE KNOW THEY DIDN'T -- THEY CERTAINLY DIDN'T

24   PROVIDE 150 SOLVENT TO THE EAST COAST IN THIS TIME PERIOD

25   BECAUSE DR. BREECE HADN'T INVENTED IT YET, BUT THE BIGGER

1    PICTURE, HE CAN'T IDENTIFY THE SUPPLIERS OF THE SOLVENT.

2         *THE COURT:*  WHAT IS THE SARA THREE?

3         *MRS. KOCH:*  THAT IS AN EPA-RELATED REGULATION AND

4    IT HAS SPECIFIC -- IT SETS OUT SPECIFIC REQUIREMENTS I THINK

5    FOR LISTING VARIOUS COMPONENTS OF A SOLVENT.  AND HONESTLY,

6    YOUR HONOR, I DON'T KNOW THE SPECIFICS OF THAT AS I STAND

7    HERE TODAY, BUT THAT IS -- IT'S SEPARATE THAN OSHA.

8         *THE COURT:*  DO YOU HAVE THE ACTUAL MSDS FROM

9    UNOCAL?

10        *MRS. KOCH:*  I DON'T HAVE IT WITH ME.  I'M SURE WE

11   CAN FIND IT.

12        *THE COURT:*  I GUESS WHAT I'M TRYING TO FIGURE OUT

13   IS WHAT'S DIFFERENT.

14        *MRS. KOCH:*  WELL, AND I UNDERSTAND WHY YOU WOULD

15   WANT TO KNOW THAT, YOUR HONOR, BUT I THINK THE BIGGER

16   QUESTION IS IS WHY DIDN'T HE PULL THAT MSDS.

17        *THE COURT:*  SURE.  BUT IT'S ALSO THE ISSUE OF IS IT

18   HARMLESS?  IS IT HARMLESS THAT IF HE HAD GONE TO THE UNOCAL

19   AND GOTTEN THE ACTUAL MSDS, THEN WOULD IT HAVE REVEALED THE

20   SAME INFORMATION THAT IS ON THIS REFERENCE THAT HE DOESN'T

21   KNOW THE SOURCE OF?  AND IF THERE IS A DIFFERENCE, THEN IS

22   THAT A LEGITIMATE BASIS FOR CONCERN.

23        *MRS. KOCH:*  AND...

24        *THE COURT:*  I UNDERSTAND THAT'S TO -- ACTUALLY IN

25   YOUR ARGUMENT IT'S AS TO THE METHODOLOGY AND IS NOT -- NOT TO

1    THE UNDERLYING INFORMATION.  BUT FOR ME IT'S METHODOLOGY AS

2    WELL AS -- WELL, AND DOES IT MATTER.  DOES THAT MAKE SENSE?

3            MRS. KOCH:  YES, YOUR HONOR.  I UNDERSTAND AND I --

4    BUT I JUST WANT TO MAKE THE POINT THAT THAT'S HIS BURDEN TO

5    SHOW--

6            THE COURT:  ABSOLUTELY.  ABSOLUTELY.

7            MRS. KOCH:  -- THAT RELIABILITY.  AND IF YOUR HONOR

8    WANTS US TO LOOK FOR IT AND SUBMIT THOSE--

9            THE COURT:  NO.  IF YOU DON'T HAVE IT, THEN YOU

10   KNOW, CERTAINLY I DON'T WANT TO--

11           MRS. KOCH:  I DON'T HAVE IT HERE.  WE MAY HAVE IT

12   AT OUR OFFICE.  I JUST DON'T HAVE IT HERE WITH ME TO SHOW YOU

13   SIDE BY SIDE THE DIFFERENCES.  BUT AGAIN, WE CAN ALSO GO BACK

14   TO THE FACT THAT HE'S TRYING TO SAY THIS SAYS IT HAS 1,000

15   PPM, AND THAT STATEMENT IS NOT ON HERE.

16           THE COURT:  RIGHT.

17           MRS. KOCH:  NOW, AND IF YOU GO TO THE NEXT SLIDE

18   PLEASE, JOHN.  THESE ARE LESSER POINTS, BUT TO HIGHLIGHT --

19   OH, ONE MORE BACK.  THANK YOU.  THAT ALL THE HIGHLIGHTED

20   POINTS ARE JUST VARIOUS TYPOGRAPHICAL ERRORS ON THIS.  THIS

21   IS NOT, AGAIN, A DOCUMENT PROVIDED BY UNOCAL TO REPRESENT ITS

22   PRODUCTS.  THERE'S NO EVIDENCE OF THAT.  THAT'S JUST SOMEONE

23   TYPING SOMETHING IN.

24       AND THERE'S ACTUALLY A DISCLAIMER AT THE BOTTOM THAT

25   NOTES THAT -- I'LL JUST READ IT FOR THE RECORD.  DISCLAIMER.

1    PAREN.  PROVIDED WITH THIS INFORMATION BY THE COMPILING

2    AGENCIES, CLOSED PAREN, COLON, THIS INFORMATION IS FORMULATED

3    FOR USE BY ELEMENTS OF THE DEPARTMENT OF DEFENSE.  PERIOD.

4    THE UNITED STATES OF AMERICA IN NO MANNER WHATSOEVER

5    EXPRESSLY OR IMPLIED, WARRANTS THIS INFORMATION TO BE

6    ACCURATE AND DISCLAIMS ALL LIABILITY FOR ITS USE.  ANY PERSON

7    UTILIZING THIS DOCUMENT SHOULD SEEK COMPETENT PROFESSIONAL

8    ADVICE TO VERIFY AND ASSUME RESPONSIBILITY FOR THE

9    SUITABILITY OF THIS INFORMATION TO THEIR PARTICULAR

10   SITUATION.

11       AND I THINK THAT THIS KIND OF SUMS UP THE ISSUE.  HE'S

12   SUPPOSED TO BE PROVIDING AN EXPOSURE ANALYSIS ON THE CHEMICAL

13   THAT -- IT IS BASED UPON THE CHEMICAL COMPOSITION OF A

14   SOLVENT, AND THIS IS WHAT HE'S LOOKING AT.

15       NEXT SLIDE, PLEASE.  I'LL JUST BRIEFLY COVER THE SECOND

16   HALF OF THE WRONG SOLVENT ISSUE FOR THE SECOND HALF OF HIS

17   EXPOSURE ESTIMATE.  FROM 1994 TO 2003 DR. KOPSTEIN CLAIMS

18   THAT THE 105 SOLVENT HAD ABOUT 8.65 PARTS PER MILLION, AND SO

19   I'M CLEAR AGAIN, AND I THINK THIS IS IMPORTANT BECAUSE WE ARE

20   NOT NECESSARILY CHALLENGING -- WE CAN TEST THE NUMBERS HE

21   ARRIVES AT, BUT OUR FOCUS IS ON WHY HE IS ARRIVING AT THESE

22   NUMBERS.

23       SO, I DON'T WANT IT TO SOUND SILLY THAT I'M SAYING THIS

24   IS WRONG, 105 DOESN'T HAVE 8.65 BENZENE BECAUSE IN THESE

25   PERIODS THAT WOULDN'T BE WAY OFF.  THE POINT IS IS--

1          THE COURT:  IT'S ACTUALLY LESS THAN WHAT YOUR OWN

2    RECORDS PROVIDE.

3          MRS. KOCH:  WELL, THAT WAS THE AVERAGE NUMBER, SO

4    THERE PROBABLY WERE.  THEY COULD HAVE BEEN SAMPLES WHAT

5    THEY--

6          THE COURT:  RIGHT.

7          MRS. KOCH:  BUT THE POINT IS THAT AGAIN IT'S THE

8    WRONG SOLVENT IN THAT TIME PERIOD.  WE ARE TALKING ABOUT A

9    SOLVENT AT THIS POINT THAT HAD LESS THAN HALF POINT -- HALF

10   OF ONE PPM, LESS THAN THAT.  BUT HOW DID HE GET TO THE 8.65

11   NUMBER?  IN HIS DEPOSITION HE SAYS, WHAT I DID THERE WAS --

12   FROM THE SHEEHAN -- I THINK IT WAS THE SHEEHAN ARTICLE WHERE

13   THEY TALKED ABOUT THE NMAS DATA -- THAT'S NMAS -- AND THAT'S

14   THE NUMBER THAT'S IN THERE FOR THE AVERAGE.  IT'S 8.65 PARTS

15   PER MILLION.

16       NOW, THIS -- AGAIN, THIS IS WHEN HE SHOULD HAVE BEEN

17   LOOKING AT 150, SO THIS DATA IS IRRELEVANT.  BUT IF HE'S

18   TALKING ABOUT NMAS, THE NMAS DATA WAS PULLED IN 1991 AND SO

19   THAT WOULD BE IN THE FIRST HALF OF HIS PERIOD -- FIRST

20   EXPOSURE PERIOD WHEN HE'S SAYING 1,000 TO 5,000 PPM, SO

21   THERE'S AN ISSUE.

22       THE SECOND ISSUE IS IF YOU LOOK AT SHEEHAN, IT'S NOT

23   PULLING THE BENZENE CONTENT DATA FROM NMAS.  IT'S PULLING IT

24   FROM SAFETY KLEEN'S TESTING, AND SO HE'S MISINTERPRETING THE

25   STUDY.  BUT ANOTHER ISSUE IS THAT THAT VERY SAME PAPER, THE

1    SHEEHAN PAPER, REFERENCES HISTORICAL BENZENE CONCENTRATIONS

2    IN THE EARLY 90'S FOR THE SAFETY KLEEN SOLVENTS AND TALKS

3    ABOUT -- I THINK IT PROVIDES A NUMBER OF 44.  IT'S IN THE

4    PAPER.  AGAIN, WAY LESS THAN 1,000 TO 5,000.

5        SO, HE'S JUST CHERRY-PICKING HIS WAY THROUGH THIS WHOLE

6    THING.  I MEAN, HE'S NOT INTERPRETING THINGS RIGHT, HE SAYS

7    HE DOESN'T WANT ALL THE SAFETY KLEEN DATA, BUT THEN HE'S

8    PULLING WHAT IS A SAFETY KLEEN DATA POINT FROM A STUDY, BUT

9    HE DOESN'T KNOW THAT.  AND WHY DOESN'T HE KNOW THAT?  BECAUSE

10   HE DIDN'T GO LOOK AT ANY OF THE TESTING.  HE DIDN'T PULL THE

11   TESTING.

12       NEXT SLIDE, PLEASE.  WE DIDN'T REALLY GET INTO SPECIFICS

13   YESTERDAY REGARDING ALL OF THE -- WHAT WE BELIEVE TO BE NEW

14   OPINIONS IN DR. STEWART'S AFFIDAVIT, AND I WANT TO HIGHLIGHT

15   A FEW OF THOSE, BUT I ALSO WANT TO SAY THAT WHILE WE BELIEVE

16   THOSE OPINIONS SHOULD NOT BE PART OF THE -- THEY SHOULD BE

17   STRUCK, FRANKLY IT DOESN'T HELP HIM EITHER WAY, BUT LET'S

18   TAKE A LOOK AT THEM.

19       SO, THE FIRST ONE I WANT TO TALK ABOUT IS HIS NEW

20   OPINION THAT HE HAS REVIEWED SAFETY KLEEN'S ANALYTICAL

21   TESTING DATA.  NOW, ON HIS REPORT THERE'S NO MENTION

22   WHATSOEVER OF SAFETY KLEEN SOLVENT BENZENE CONTENT AND

23   ANALYTICAL DATA.  NO REFERENCE.  PERIOD.

24       IN HIS DEPOSITION HE DISCLAIMS CONSIDERATION OF ANY

25   ANALYTICAL DATA FOR SAFETY KLEEN SOLVENTS.  I CAN TALK ABOUT

1    THIS LATER, BUT HE MAKES REFERENCE TO A REPORT FROM A COMPANY

2    CALLED PHOENIX LABS, BUT IT TALKS ABOUT IN HIS DEPOSITION HE

3    DIDN'T EVEN KNOW WHAT THAT WAS.  HE DIDN'T KNOW WHAT SOLVENT

4    WAS ABOUT.  SO, AND HE SAYS, I DIDN'T LOOK AT ANYTHING ELSE,

5    OH, OTHER THAN NMAS DATA BECAUSE OF THE SHEEHAN PAPER

6    REFERENCE.  SO HE DIDN'T LOOK AT THE DATA.  HE JUST SAW A

7    REFERENCE TO NMAS IN THE SHEEHAN PAPER AND THAT WAS HIS DATA.

8        NOW, IN HIS AFFIDAVIT HE SAYS FOR THE FIRST TIME, IN

9    ADDITION I REVIEWED TESTING DATA FOR SAFETY KLEEN -- FOR SK

10   SOLVENTS, COMMA, AND THE PAPER BY DR. SHEEHAN WHERE SOME OF

11   THE SK DATA WERE USED.  PERIOD.  I REFERENCE BOTH OF THESE IN

12   MY REPORTS.  LIKE I SAID, NO ANALYTICAL DATA IN HIS REPORT.

13       NEXT PAGE, PLEASE.  SOMETHING ELSE NEW HE REFERENCED IN

14   HIS AFFIDAVIT WAS THIS 1989 MATERIAL SAFETY DATA SHEET.  AND

15   HE SAID THAT THIS MATERIAL SAFETY DATA SHEET IS SUPPORT AGAIN

16   FOR HIS 1,000 TO 5,000 PPM BENZENE CONTENT OPINION.  NOW

17   AGAIN, THAT'S WHEN HE CLAIMS THAT ONCE 150, BUT AS YOU CAN

18   SEE, THIS IS THE SAFETY KLEEN 105 MSDS.  SO HE'S

19   CROSS-REFERENCING THESE SOLVENTS, THESE TWO DISTINCT

20   SOLVENTS, AND HE'S -- NOW HE'S SAYING, OH, A BASIS FOR MY 150

21   OPINION IS A 105 MSDS.

22       NOW, WHAT HE'S SAYING IS SUPPORT FOR THE 1,000 PPM

23   BENZENE CONTENT ON THIS DOCUMENT IS THIS BOX WE'VE

24   HIGHLIGHTED WHICH IS TAKEN FROM THE BOTTOM HALF OF THE PAGE

25   WHERE THERE IS A LISTING OF VARIOUS REGULATORY LIMITS FOR

1    DIFFERENT CHEMICALS.  AND YOU CAN SEE THERE HE'S -- HE'S

2    FOCUSING IN ON THIS HANDWRITTEN NOTE THAT APPEARS TO SAY

3    BENZENE C-O-N-C PERIOD, MAYBE A GREATER THAN SIGN, 0.1.  AND

4    HE SAYS, OH, THAT MEANS THERE IS A THOUSAND -- OVER A

5    THOUSAND PPM BENZENE IN THE 150 SOLVENT EVEN THOUGH THIS

6    ISN'T ABOUT 150.

7         SO, HE'S DRAWING -- HE'S TAKING BIG LEAPS FROM SOME

8    HANDWRITTEN NOTES, WHICH WHO -- BY THE WAY, WE DON'T KNOW WHO

9    WROTE THOSE NOTES AND -- OR HE DOESN'T KNOW WHO WROTE THOSE

10   NOTES EITHER.  THEY ARE MOSTLY ILLEGIBLE.  THE ONES AT THE

11   TOP I CAN'T EVEN READ.  AND HE'S SAYING, OH, THAT'S EVIDENCE

12   OF A 1,000 PPM BENZENE CONTENT RATHER THAN, YOU KNOW, YOUR

13   HONOR, THE POSSIBILITY THAT SINCE THEY ARE LISTING THE

14   REGULATORY LIMITS IN THAT COLUMN, SOMEONE IS NOTING A

15   REGULATORY LIMIT OF -- A LISTING, REGULATORY LISTING LIMIT OR

16   TRIGGER FOR BENZENE, WHICH IS THE ANYTHING OVER THAN .1 PPM.

17        THE COURT:  ALL RIGHT.  CAN I JUST ASK A QUICK

18   QUESTION?

19        MRS. KOCH:  SURE.

20        THE COURT:  DOWN AT THE BOTTOM YOU HAVE GOT BOILING

21   POINT, 310 TO 400-DEGREES FAHRENHEIT.  IS THERE A

22   RELATIONSHIP BETWEEN THE BOILING POINT AND THE FLASHPOINT OR

23   ARE THOSE -- I KNOW THE FLASHPOINT IS WHEN IT SORT OF CATCHES

24   FIRE, BUT IS THERE A DIRECT RELATIONSHIP BETWEEN THOSE?

25        MRS. KOCH:  YOU KNOW, YOUR HONOR, I DON'T KNOW THE

1    ANSWER TO THAT QUESTION.  I MEAN, I UNDERSTAND THEM TO BE TWO

2    SEPARATE THINGS, BUT I DON'T REALLY KNOW THE ANSWER TO THAT

3    QUESTION.

4              THE COURT:  OKAY.  MR. MCGOLDRICK, DO YOU KNOW?

5              MR. MCGOLDRICK:  YOUR HONOR, MY UNDERSTANDING IS

6    THAT GENERALLY HAS GOT A HIGHER BOILING THAN A HIGHER

7    FLASHPOINT, SO IT MEANS CORRELATED IN THAT SENSE.  BUT ONE IS

8    DEALING WITH BOILING AND ONE IS DEALING WITH IGNITION OR

9    COMBUSTION.  BUT TO THE EXTENT YOU HAVE A HIGHER ONE, YOU

10   HAVE A HIGHER...

11             THE COURT:  THANK YOU.  I GUESS IN THE BACK OF MY

12   MIND I'M WONDERING IF THE CONFUSION ABOUT THE 150 COULD

13   RELATE TO THAT FLASHPOINT BECAUSE OF THE BOILING POINT THAT'S

14   LISTED HERE IN DR. STEWART'S MIND, BUT IF IT WERE WITHIN THE

15   RANGE THAT WOULD CORRELATE TO A HIGHER OR A LOWER FLASHPOINT

16   THAN THE 150, THAT MAYBE -- MAYBE I'M GIVING TOO MUCH CREDIT,

17   IN FACT, THAT THAT -- MAYBE THAT WOULD HAVE BEEN HIS

18   MISUNDERSTANDING ABOUT WHETHER THIS WAS THE 105 OR THE 150.

19             MRS. KOCH:  YOUR HONOR, I THINK HE HAS MADE CLEAR

20   WHAT HIS BASIS FOR SAYING IT'S 105 -- I MEAN, I'M SORRY --

21   150 IS VERSUS 105 IN HIS TESTIMONY WHICH IS THIS CO-WORKER

22   TESTIMONY WHICH DOESN'T SAY WHAT HE SAYS IT DOES.  BUT

23   ANOTHER -- A BIGGER POINT TO THAT IS I BELIEVE HE HAS A PHD

24   IN CHEMISTRY.  HE -- AND WE ARE NOT CHALLENGING HIS

25   QUALIFICATIONS.  HE SHOULD BE ABLE TO LOOK AT THESE THINGS

1    AND UNDERSTAND THE DIFFERENCES --

2              *THE COURT:* RIGHT.

3              *MRS. KOCH:* -- AS A SCIENTIST. AND I THINK, I

4    DON'T KNOW -- SUPPOSE I DON'T WANT TO GET INTO WHAT I THINK

5    ON WHAT HE MIGHT KNOW. BUT THESE ARE DISTINCTIONS THAT ARE

6    IMPORTANT. AND WHETHER OR NOT THAT MAY BE TRUE, WHICH I KIND

7    OF DOUBT IT IS BECAUSE I THINK WHAT HE'S DOING IS WE

8    CHALLENGED THE BENZENE CONTENT ANALYSIS AND THEY COME BACK

9    TO -- THEY COME BACK IN RESPONSE TO OUR DAUBERT CHALLENGE AND

10   THEY ARE FLOUNDERING TO FIND SUPPORT FOR IT AND THEY'RE LIKE,

11   OH, WELL HERE'S A DOCUMENT AND THERE'S A REFERENCE AND, OH,

12   THAT'S GOT TO BE SUPPORT.

13       SO, THERE IS NO QUESTION THAT WE SAID THESE ARE TWO

14   SEPARATE SOLVENTS. THEY COULD GO -- HE COULD HAVE DONE

15   RESEARCH. I MEAN, THERE'S A TON OF INFORMATION AVAILABLE ON

16   THESE SOLVENTS, AND HE DIDN'T DO ANYTHING LIKE THAT. BUT I

17   JUST -- I FIND IT HIGHLY SUSPECT THAT HE'S GETTING CONFUSED

18   ON BOILING POINTS OR IN MY HUMBLE OPINION, YOUR HONOR.

19       LET'S GO TO THE NEXT SLIDE, 20. THIS IS ANOTHER NEW

20   DOCUMENT THAT DR. STEWART CITES IN HIS OR REFERS TO IN HIS

21   NEW AFFIDAVIT IN RESPONSE TO OUR DAUBERT CHALLENGE. AND HE

22   SAYS THAT THIS MEMO SAYS THAT OUR TECH CENTER WHERE SAFETY

23   KLEEN SOLVENT TESTING WAS DONE FOR A CERTAIN PERIOD OF TIME

24   SAYS THAT, OH, THEY CAN'T EVEN TEST, THEY CAN'T EVEN DETECT

25   BENZENE AT THE LIMITS THEY ARE CLAIMING. AND HE SAYS THAT

1    BECAUSE OF THIS QUOTE WHICH WE HAVE HIGHLIGHTED.  CURRENTLY

2    THE RECYCLED LABS DO NOT HAVE ANALYTICAL HARDWARE WHICH WILL

3    PROVIDE RELIABLE IDENTIFICATION AND QUANTITATION AT LOW

4    LEVELS, PAREN, LESS THAN 1,000 PPM, CLOSED PAREN.

5        THE ISSUE HERE IS WE ARE NOT TALKING ABOUT BENZENE

6    CONTENT TESTING AT RECYCLE CENTERS.  WE ARE TALKING ABOUT

7    BENZENE CONTENT TESTING AT A STATE-OF-THE-ART TECHNICAL LAB

8    THAT WAS LOCATED SOMEWHERE ELSE.  AGAIN, THIS IS

9    CHERRY-PICKING DATA.  AND WE HAVE MADE CLEAR THAT THERE WAS A

10   TESTING CENTER, A TECH CENTER THAT SAFETY KLEEN HAD THAT

11   TESTED THIS INFORMATION.  THAT'S IN THE RECORD.  BUT HE'S

12   SAYING, OH, THEY'RE A RECYCLE CENTER, THEY CAN'T DO IT, SO

13   THAT MEANS THERE MUST BE 1,000 TO 5,000 PPM IN IT.

14       LET'S GO AHEAD AND GO TO THE NEXT SLIDE, PLEASE.

15   ANOTHER NEW OPINION IN HIS AFFIDAVIT.  WE HAVE ALL OF A

16   SUDDEN THIS CRITIQUE OR ATTEMPT SOMEWHAT OF A CRITIQUE OF

17   SAFETY KLEEN'S TESTING.  OH, IT MUST BE WRONG ESSENTIALLY.

18   AND SO, LET'S JUST LOOK AT THE HISTORY OF WHAT HE SAID ABOUT

19   THAT.  IN HIS REPORT, NO MENTION OF OUR LABORATORY PRACTICES,

20   NO MENTION THAT SAFETY KLEEN'S TESTING -- THAT THERE ARE ANY

21   FLAWS IN THE ANALYTICAL TESTING OF THE SOLVENT.

22       DEPOSITION -- AND I WILL JUST READ THIS FOR THE RECORD.

23   AS WE SIT HERE TODAY, COMMA, ARE YOU PREPARED TO OFFER ANY

24   TESTIMONY ABOUT THE VALIDITY OR THE INVALIDITY OF DATA

25   GENERATED BY SAFETY KLEEN'S ANALYTICAL LAB USING ITS INTERNAL

1    METHOD FOR DETECTION OF BENZENE IN A HYDROCARBON SOLVENT?

2    ANSWER, NO.

3        AND THEN WE HAVE IN THE AFFIDAVIT THIS ONE PARAGRAPH

4    CRITIQUE OF SAFETY KLEEN'S LABORATORY PROCEDURES ONCE WE

5    POINT OUT IN OUR DAUBERT CHALLENGE THAT DR. STEWART DIDN'T

6    BOTHER TO LOOK AT ANY OF THE DATA.  SO ALL OF A SUDDEN HE HAS

7    AN EXCUSE FOR NOT LOOKING AT IT.

8        ESSENTIALLY THIS CRITIQUE -- AND I DON'T THINK I'M

9    BOILING IT DOWN TOO MUCH FROM WHAT HE'S ALREADY DONE BECAUSE

10   THIS PARAGRAPH IS ALL THERE IS OF HIS CRITIQUE BY THE WAY.

11   BUT IT'S ESSENTIALLY SAYING THAT BECAUSE OF THE SAMPLING

12   TECHNIQUE THERE'S POTENTIAL FOR BENZENE TO EVAPORATE FROM THE

13   MIXTURE AND THIS RESULTS IN A LOWER MEASUREMENT WHEN YOU PULL

14   THAT DATA THAN WHEN IT WAS FIRST COLLECTED.  THAT'S HIS

15   ARGUMENT.

16       NOW, HE DOESN'T SAY HOW MUCH HE CLAIMS WAS LOST, HOW

17   MUCH BENZENE LEFT THE SOLVENT.  HE DOESN'T PROVIDE ANY

18   DETAILS.  HE DOESN'T PROVIDE ANY TESTING.  HE DOESN'T DISCUSS

19   THE LAB PROCEDURES OR TESTING PROCEDURES.  HE DOESN'T PROVIDE

20   ANY SUPPORT OR CITATION TO THIS LITTLE THEORY HE POSITS RIGHT

21   HERE.  AND HE NEVER EVEN CITES ONE INCORRECT ANALYTICAL DATA

22   POINT FROM SAFETY KLEEN.  HE DOESN'T CITE ONE.  THERE'S NO --

23   HE DOESN'T DO ANYTHING.  HE JUST THROWS THIS OUT THERE AND

24   HOPES IT STICKS.

25       BUT YOU KNOW, I THINK THERE'S CASE LAW THAT SAYS THAT

1    YOU CAN'T JUST EXPECT THE COURT TO FLESH ON THE BONES OF YOUR

2    ARGUMENT.  LIKE, YOU'VE GOT TO PUT IT OUT THERE.  AND HE

3    HASN'T DONE THAT.  AND IT'S ALSO, THIS NEW OPINION IGNORES

4    THE FACT THAT IT'S NOT JUST SAFETY KLEEN THAT'S TESTED ITS

5    SOLVENT.  THERE ARE THIRD PARTIES THAT HAVE TESTED IT.  THERE

6    ARE AGENCIES THAT HAVE TESTED IT.  EVERYONE HAS CONSISTENT

7    RESULTS.

8        AND I TAKE IT THAT DR. STEWART'S OPINION MUST BE THEN

9    THAT EVERYONE'S RESULTS ARE WRONG.  I'M NOT SURE BECAUSE HE

10   DOESN'T REALLY EXPOUND UPON IT.  BUT AGAIN -- SO FRANKLY,

11   YOUR HONOR, EVEN IF THIS NEW AFFIDAVIT COMES IN, EVEN IF THAT

12   OPINION COMES IN, IT DOESN'T MEAN ANYTHING.  DOESN'T MEAN

13   ANYTHING.

14       NEXT SLIDE, PLEASE.  SO TO SUM UP THIS SECTION ONE, THE

15   BENZENE CONTENT ISSUE AND WHAT HE DID TO COME TO A BENZENE

16   CONTENT VALUE, AGAIN I WANT TO MAKE THE POINT THAT IT'S NOT A

17   DAUBERT CHALLENGE TO HIS CONCLUSION, IT'S A DAUBERT CHALLENGE

18   TO ALL THESE THINGS WE HAVE TALKED ABOUT THAT HE DIDN'T DO OR

19   IGNORED OR MISINTERPRETED.  AND THE BIGGEST ONE IN MY MIND

20   BEING THAT HE LOOKED AT THE WRONG MATERIAL, AND I JUST DON'T

21   SEE HOW THAT CAN FORM THE BASIS OF AN EXPOSURE ASSESSMENT

22   WHEN YOU DON'T LOOK AT THE RIGHT SOLVENT.

23       HE ALSO CONFUSES THE SOLVENTS.  THIS IS SUPPOSED TO BE A

24   SCIENTIFICALLY-RELIABLE ANALYSIS, AND HE INTERCHANGEABLY

25   REFERS TO THEM.  HE REFERS TO DOCUMENTS FOR ONE SOLVENT AND

1    CLAIMS IT'S SUPPORT FOR THE OTHER AND VICE VERSA.  AND

2    DESPITE ALL THE TESTING DATA WHICH HE IGNORES, HE LOOKS AT

3    THIS OLD 1970'S REFERENCE.  IT'S NOT EVEN DATA.  IT'S A

4    REFERENCE.  AND THAT'S WHERE -- HOW HE COMES TO AN OPINION.

5         AND I THINK PLAINTIFF WANTS TO SWEEP ALL THESE ISSUES

6    UNDER THE RUG AND SAY, HEY, THAT'S CROSS-EXAMINATION.  BUT

7    I'M PRETTY SURE THAT'S NOT WHAT THE EEOC CASE SAYS AND I'M

8    NOT SURE WHAT A STRING OF CASES SAY ABOUT THAT.  I DON'T

9    THINK THAT THAT'S WHAT THE STRING OF CASES SAY.  I THINK THEY

10   SAY YOU HAVE TO HAVE RELIABLE BASES FOR YOUR OPINION.  YOU

11   CANNOT HAVE ALL THESE FACTUAL INACCURACIES, THESE ERRORS,

12   THESE ASSUMPTIONS WITH NO SUPPORT AND CLAIM THAT'S

13   SCIENTIFICALLY RELIABLE.

14        AND YOU KNOW, I THINK IN THEIR BRIEF IN THE BEGINNING OF

15   THEIR OPPOSITION BRIEF TO OUR MOTION TO DR. STEWART THEY SAY,

16   WELL, CHALLENGING -- YOU CAN'T EXCLUDE AN EXPERT'S OPINIONS

17   BECAUSE THE UNDERPINNING, FACTUAL UNDERPINNINGS ARE WEAK.

18   THIS ISN'T WEAK.  THIS IS JUST PLAIN WRONG, SO THAT'S TWO

19   DIFFERENT THINGS.

20        SO, WITH THAT I'D LIKE TO GET INTO -- UNLESS YOU HAVE

21   ANY MORE QUESTION ABOUT BENZENE CONTENT ISSUES.

22             *THE COURT:*  NO.

23             *MRS. KOCH:*  I'M GOING TO SWITCH GEARS INTO THE

24   SECOND PHASE OF OUR BRIEF, WHICH IS OUR CHALLENGE TO HIS USE

25   OF THE BENZENE CONTENT DATA AND USING THAT IN THIS ART MODEL

1    THAT MRS. BONNEVILLE ALREADY DISCUSSED.

2        NEXT SLIDE, PLEASE.  NOW, THIS IS AN IMAGE OF THE

3    GUIDANCE DOCUMENT FOR THE MODELING TOOL THAT DR. STEWART

4    USED.  AND THAT FIRST PARAGRAPH UP TOP IS ESSENTIALLY A QUOTE

5    FROM THE -- AND IT IS LITERALLY A QUOTE FROM THAT DOCUMENT.

6    BUT WHAT IT ESSENTIALLY SAYS IS THERE IS THIS HIERARCHY OF

7    DATA THAT YOU SHOULD CONSIDER IN INDUSTRIAL HYGIENE SCIENCE

8    WHEN YOU'RE MODELING SOMEONE'S EXPOSURES.

9        THE FIRST ONE BEING MEASURED DATA.  THAT WOULD BE AS IF

10   SOMEONE MEASURED DATA WHILE MR. BOYKIN WAS IN COLUMBIA POWER

11   SPORTS, WHICH OBVIOUSLY WE DON'T HAVE.  THE SECOND ONE IS

12   APPROPRIATE ANALOGOUS REAL-WORLD DATA.  AND THE THIRD, LAST

13   RESORT IF YOU DON'T HAVE EITHER OF THE FIRST TWO, IS MODELED

14   ESTIMATES.

15       NEXT SLIDE, PLEASE.  NOW THIS RIGHT HERE -- I'M SORRY.

16   CAN YOU SKIP TO SLIDE 27, PLEASE?  HERE IS WHAT DR. STEWART

17   DID.  NOW, LIKE I SAID, WE ARE NOT CONTESTING THAT THERE WAS

18   MEASURED AIR MONITORING DATA OF MR. BOYKIN.  THAT'S

19   UNDISPUTED.  SO, HE DIDN'T USE THE TOP TIER, BUT WE ARE NOT

20   CLAIMING HE COULD HAVE.  BUT THE SECOND TIER, SAFETY KLEEN

21   HAS ALL THIS DATA BY SAFETY KLEEN, THIRD PARTIES, OF MEASURED

22   CONCENTRATIONS OF BENZENE IN THE AIR WHILE PEOPLE ARE WORKING

23   AT THE PARTS WASHING MACHINE THAT MR. BOYKIN WAS USING.

24       MR -- DR. STEWART IGNORED THAT DATA.  WHAT DID HE DO?

25   HE USED THE THIRD ONE, WHICH IS MODELING.  SO, LET'S GO BACK

1    TO SLIDE 25 PLEASE ACTUALLY.  THIS SLIDE IS A LIST OF SOME OF

2    THE EXPOSURE MONITORING DATA ON SAFETY KLEEN SOLVENTS AND

3    PARTS WASHERS.  AND AGAIN, I'M NOT GOING TO REALLY GET INTO

4    THE DETAILS OF THAT OTHER THAN TO SAY THAT IN OUR OPINION

5    BASED UPON THIS -- AND WHAT DAUBERT REQUIRES, WE APPLY THE

6    SCIENCE OF WHATEVER FIELD YOU'RE LOOKING AT.  BASED UPON

7    THAT, THIS IS WHAT DR. STEWART SHOULD HAVE LOOKED AT.  THIS

8    IS WHAT HIS ESTIMATE SHOULD HAVE COME FROM.

9        NOW, WHY DIDN'T HE LOOK AT THAT?  HONESTLY -- LET'S GO

10   TO SLIDE 28.  I CAN'T REALLY TELL FROM THE RECORD WHY HE

11   DIDN'T LOOK AT THAT SPECIFIC DATA.  WHAT HE SAYS IN REGARD TO

12   WHY HE DISREGARDED REAL-WORLD MONITORING DATA WAS THERE ARE

13   ONLY AUTOMOTIVE MECHANIC STUDIES OUT THERE AS MRS. BONNEVILLE

14   DISCUSSED, AND THAT'S NOT THE SAME THING AS MOTORCYCLE

15   MECHANICS, SO I AM NOT GOING TO LOOK AT THAT.

16       WELL, LET'S LOOK AT THE BASIS FOR THAT.  HE SAYS THAT

17   THOSE TWO MECHANIC JOBS ARE SO DIFFERENT THAT THEY ARE NOT

18   GOING TO BE SUBSTANTIALLY SIMILAR, WHICH BY THE WAY IS WHAT

19   THE LAW REQUIRES, SUBSTANTIALLY SIMILAR SCENARIO, AND THAT'S

20   BECAUSE -- WELL, ONE, HE SAYS MOTORCYCLES ARE DIFFERENT BASED

21   UPON HIS WORK ON -- OR HE OWNS A MOTORCYCLE -- BUT

22   MOTORCYCLES HAVE DIFFERENT PARTS, MOTORCYCLE MECHANICS ARE

23   WORKING WITHIN A ARM'S LENGTH OF THE PART THEY ARE

24   MANIPULATING, MOTORCYCLE MECHANICS WIPE DOWN A BIKE AFTER

25   SERVICE UNLIKE A CAR MECHANIC, AND THE DRIP PAN IS CLOSER TO

1    MOTORCYCLE MECHANICS.

2        NOW, I THINK IT'S IMPORTANT TO NOTE THAT HE DOESN'T HAVE

3    ANY SUPPORT FOR THIS RATIONALE THAT THESE ARE DIFFERENT.  HE

4    DOESN'T HAVE ANY PEER REVIEWED LITERATURE OF SOMEONE SAYING,

5    OH, THIS IS DIFFERENT FROM THAT, THESE ARE DIFFERENT, THEY

6    ARE -- THEY'RE -- YOU CAN'T USE ONE OF THE SCENARIO IN

7    ANOTHER SCENARIO.  BUT I THINK THE BIGGER POINT IS THAT WE

8    ARE NOT TALKING ABOUT HIM USING A BUCKET OF SAFETY KLEEN

9    SOLVENT AT A MOTORCYCLE OR A CAR.  WE ARE TALKING ABOUT HIS

10   EXPOSURES AT THE PARTS WASHER.

11       SO, IT DOESN'T MATTER IF HE WAS A MOTORCYCLE MECHANIC OR

12   A CAR MECHANIC.  HE IS AT THE PARTS WASHER.  THAT EXCUSE JUST

13   DOESN'T CUT THE MUSTER IN THAT SITUATION.  AND THE OTHER

14   ISSUE IS IS THAT THERE ARE AIR MONITORING STUDIES OF

15   MOTORCYCLE MECHANICS IN THAT DATA.  HE MAY HAVE KNOWN THAT

16   HAD HE BOTHERED TO LOOK AT IT, BUT HE DIDN'T.  HE DIDN'T

17   CONSIDER ANY OF IT.

18       NOW, I THINK PLAINTIFFS' COUNSEL -- WILL YOU FLIP TO THE

19   NEXT SLIDE, PLEASE -- WILL PROBABLY SAY, OH, HE LOOKED AT

20   THIS FEDORUK STUDY.  WELL, LET'S TALK ABOUT THAT FOR A

21   SECOND.  THE FEDORUK STUDY WAS IN FACT OF A SAFETY KLEEN

22   PARTS WASHER, BUT THE DIFFERENCE IS, NOT THE PARTS WASHER AT

23   ISSUE.  IN FACT, WHILE THIS IS A SAFETY KLEEN PARTS WASHER,

24   IT'S A VAT-STYLE PARTS WASHER THAT ACTUALLY IS EVEN MODIFIED

25   FROM HOW SAFETY KLEEN PROVIDES IT TO CUSTOMERS.  IT WAS

1    MODIFIED TO SIMULATE AGGRESSIVE WORKING CONDITIONS, SO

2    THEY -- THEY TOOK OFF PART OF THE COVER, THEY BLEW IN

3    COMPRESSED AIR, THEY SPIKED THE BENZENE, AND THEY SPIKED THE

4    SOLVENT WITH MORE BENZENE, THEY DID ALL THIS STUFF BECAUSE

5    THEY WANTED TO SIMULATE A -- AN AGGRESSIVE PARTS WASHING

6    SCENARIO SO THAT IT -- THEY COULD GET CONSERVATIVE VALUES TO

7    SEE ARE THESE APPROACHING REGULATORY LIMITS.

8         BY THE WAY, THEY DIDN'T EXCEED REGULATORY LIMITS WHEN

9    THEY DID THAT STUDY.

10        BUT THE POINT OF THIS IS THIS HIGHLIGHTS ANOTHER MISTAKE

11   ON DR. STEWART'S PART.  A COUPLE OF THEM.  BUT ONE IS HE

12   DOESN'T KNOW WHAT PARTS WASHER IS AT ISSUE EVIDENTLY BECAUSE

13   IN THE DEPO HE IDENTIFIES I DON'T KNOW WHAT PARTS WASHER

14   MACHINE IT WAS.  IN HIS AFFIDAVIT HE CLAIMS, OH, THE PARTS

15   WASHING MACHINE IS THE SAME ONE AS USED IN FEDORUK.

16        THERE'S NO DISPUTE THAT THE PARTS WASHING MACHINE WAS A

17   SINK ON A DRUM MACHINE, BY THE WAY.  I MEAN, NOT ONLY IS IT

18   IN THE SERVICE RECORDS, BUT THE WITNESSES TALK ABOUT THAT.

19   THEY DESCRIBE THE MACHINE.  AGAIN HE'S NOT LOOKING AT THE

20   FACTS OF THE CASE.

21        BUT HE JUST SAYS, OH, I'M GOING TO PICK THIS STUDY,

22   SURPRISINGLY, THE AGGRESSIVELY SIMULATED PARTS WASHING STUDY,

23   AND SAY, HEY, THIS MAKES -- THE FACT -- MY REFERENCE TO THIS

24   STUDY MAKES IT OKAY THAT I'M USING THE ART MODEL.

25        AND NEXT SLIDE, PLEASE.  JUST TO KIND OF GIVE YOU A

1   VISUAL, THIS COMPARES -- THIS IS A SIDE-BY-SIDE COMPARISON OF

2   THE PARTS WASHER AT MR. BOYKIN'S WORK PLACE AND THE PARTS

3   WASHER BEFORE MODIFICATION IN THE FEDORUK STUDY.  AND THE

4   DIMENSIONS ARE DIFFERENT.  HE DOESN'T EVEN DISCUSS THAT

5   BECAUSE I DON'T THINK HE REALIZES IT.

6        I MEAN, AT ONE POINT HE SAID, OH, I DON'T KNOW WHICH

7   MACHINE IT IS, AND THEN HE'S SAYING, OH YES, IT'S THIS

8   MACHINE.  I DON'T KNOW THAT HE TRULY KNOWS WHICH MACHINE IT

9   IS.  BUT THAT RIGHT THERE IS A PROBLEM.  WHY AREN'T YOU

10  LOOKING AT THAT?  WHY AREN'T YOU FIGURING THAT OUT?

11       ANOTHER ISSUE THAT I WANT TO POINT OUT BECAUSE THIS SORT

12  OF CORRELATES TO HIS NEW OPINION ON THE VOLATILIZATION OF

13  BENZENE FROM OUR SOLVENT TESTING SAMPLES.  NEXT SLIDE,

14  PLEASE.  THE FEDORUK STUDY, ONE OF THE THINGS IT FOUND WAS

15  THAT BENZENE, THE SOLVENT BENZENE, IS APPROXIMATELY HALVED

16  AFTER ABOUT FIVE HOURS OF DEGREASING OPERATION.  SO, WHAT

17  THAT MEANS IS WITH ONE PERSON USING THAT PARTS WASHER AND THE

18  SCENARIO IN FEDORUK, AFTER FIVE HOURS OF USE, THE BENZENE

19  CONTENT OF MINERAL SPIRITS WAS CUT IN HALF AND THEN CONTINUED

20  TO DECREASE.

21       NOW, THAT'S IMPORTANT FOR A COUPLE OF THINGS.  ONE, THE

22  BIGGEST THING IS HIS MODELING DOESN'T TAKE THAT INTO ACCOUNT.

23  HIS MODELINGS ESTIMATE ASSUMES A CONSTANT AMOUNT OF BENZENE

24  FOR THE ENTIRE EXPOSURE ESTIMATE.  SO, NOT ONLY DOES IT

25  CONTRADICT WHAT'S IN THIS STUDY, BUT IT CONTRADICTS HIS NEW

1    OPINION THAT BENZENE CAN VOLATILIZE.  THE INCONSISTENCIES

2    ABOUND.

3        I MEAN, THE OTHER ISSUE IS IS NOT ONLY DOES HE NOT

4    ACCOUNT FOR THIS VOLATILIZATION AND THE MODELING, BUT IN

5    FEDORUK THAT'S WITH ONE PERSON USING THE PARTS WASHER.  WHEN

6    YOU HAVE MORE PEOPLE, IT VOLATILIZES EVEN FASTER BECAUSE THE

7    USE IS INCREASED, SO THAT'S ANOTHER...

8            THE COURT:  SO, TO PUT IT IN TERMS THAT I CAN

9    UNDERSTAND, IS IT LIKE YOU HAVE GOT A 2-LITER BOTTLE OF COKE

10   COLA AND SO THE FIRST PERSON WHO OPENS IT GETS A LOT OF GOOD

11   CAFFEINE BUBBLES AND IF YOU LEAVE IT OUT THERE FOR FIVE HOURS

12   OR 10 OR HOWEVER LONG, THEN THE SECOND PERSON WHO COMES ALONG

13   HAS LESS FIZZ IN THEIR COKE AND THAT OVER TIME THE FIZZ IS

14   GOING TO GO OUT, THE FIZZ BEING BENZENE?

15           MRS. KOCH:  YES.

16           THE COURT:  AND SO, THE ASSUMPTION THAT WAS MADE BY

17   DR. STEWART WAS THAT THERE'S CONSTANT FIZZ IN THE COKE FROM

18   OVER THE 12-WEEK PERIOD OR WHATEVER, HOWEVER LONG THE DRUM

19   WAS THERE.

20           MRS. KOCH:  EXACTLY, YOUR HONOR.

21           THE COURT:  OKAY.  AND SO, THE ASSUMPTION OF THE

22   FIZZ WAS AT THE HIGHEST LEVEL CONSTANTLY OVER THE COURSE OF

23   THE 30 YEARS OR THE -- I GUESS THE TWO BLOCKS, TWO CHUNKS OF

24   TIME, FOR EACH OF THE SOLVENTS.  AND DR. STEWART'S

25   ASSESSMENT -- THAT ASSESSMENT BEING THE HIGHEST LEVEL OF FIZZ

1   THROUGHOUT OR WAS IT SORT OF THE AVERAGE FIZZ?

2          *MRS. KOCH:*  HIGHEST.

3          *THE COURT:*  THE HIGHEST.  AND SO YOU'RE SAYING THAT

4   REALLY IT WAS THE EXPOSURE OR THE DATA YOU'RE SAYING SHOWS

5   THAT IT WAS THE EXPOSURE TO THE FIRST PERSON WHO TURNED ON

6   THE FAUCET, THE PARTS WASHER THE FIRST TIME, THE FIRST DAY

7   DURING THAT 12-WEEK PERIOD, LET'S SAY, AND THEN -- AND IF

8   THAT PERSON HAPPENED TO BE A CO-WORKER, IT WASN'T -- IT

9   WASN'T MR. BOYKIN HIMSELF, THEN THAT'S -- THAT DATA THAT GOES

10  INTO THAT EXPOSURE CALCULATION IS FLAWED.

11     IS THAT YOUR ARGUMENT?

12         *MRS. KOCH:*  I THINK IF I'M THE UNDERSTANDING YOU

13  CORRECTLY, I THINK IT IS.  BUT THE POINT WOULD BE THAT

14  MECHANIC A USES THE PARTS WASHER FOR 10 MINUTES, MECHANIC B

15  MIGHT COME USE IT FOR AN HOUR, MECHANIC C MIGHT COME USE IT

16  FOR ONE MINUTE.  I DON'T KNOW, WHATEVER YOUR SCENARIO.  AFTER

17  THAT PARTS WASHER HAS BEEN USED FOR A CERTAIN AMOUNT OF

18  TIME -- NOW, YEAH AFTER THAT PARTS WASHER HAS BEEN USED FOR A

19  CERTAIN AMOUNT OF TIME, YOU'RE GOING TO KNOW THAT AT SOME

20  POINT THE BENZENE IS CUT IN HALF, SO -- AND THEN CONTINUES TO

21  DECREASE AFTER THAT.  SO, WHETHER ONE PERSON --

22         *THE COURT:*  SURE.  SURE.

23         *MRS. KOCH:*  -- SEE WHERE I'M GOING?

24         *THE COURT:*  RIGHT.  SO IT'S NOT -- IT'S NOT THE

25  FACT THAT ONE PERSON OR MULTIPLE PEOPLE USE IT FOR THAT SET

1    PERIOD OF TIME DURING THE I GUESS HALF-LIFE OR WHATEVER OF

2    THAT BENZENE, THEN THAT'S -- THAT'S NOT THE ISSUE.  THE ISSUE

3    IS THAT THE AMOUNT ASSESSED FOR THE BENZENE CONTENT IS WHAT

4    INITIALLY COMES -- THAT WAS USED IN THE DATA BY DR. STEWART

5    WAS THE AMOUNT THAT INITIALLY COMES OUT OF THE BOTTLE.

6              MRS. KOCH:  RIGHT.

7              THE COURT:  OKAY.

8              MRS. KOCH:  SO I THINK...

9              THE COURT:  BUT THAT'S NOT TO SAY THAT THE SOLVENT

10   IS NOT -- IS NOT GOOD.  IT'S NOT THAT THE MECHANIC DOESN'T

11   KNOW THAT THE PARTS WASHER DOESN'T HAVE ANY MORE BENZENE AND

12   THAT'S WHY IT DOESN'T WASH THE PART ANY MORE.  IT'S JUST JUST

13   ONE ELEMENT.  THE PART, I GUESS THE SOLVENT ITSELF, THE

14   MINERAL SPIRITS STILL DO THE CLEANING JOB AND WHATEVER, IT'S

15   JUST THAT THE -- IT EVENTUALLY GETS DIRTY, IT'S NOT --

16             MRS. KOCH:  RIGHT.

17             THE COURT:  -- YOU'RE NOT SUGGESTING THAT THE

18   MECHANICS KNOW WHEN A SOLVENT IS NOT GOOD ANY MORE BECAUSE

19   THEY KNOW -- THEY REALIZE THAT THE BENZENE IS DONE.

20             MRS. KOCH:  NO, YOUR HONOR.

21             THE COURT:  OKAY.

22             MRS. KOCH:  NEXT SLIDE, PLEASE.  ALL RIGHT.  THIS,

23   THIS CHART IS IN RESPONSE TO ANOTHER NEW OPINION IN DR.

24   STEWART'S AFFIDAVIT WHICH IS THAT HE CLAIMS HE VALIDATED HIS

25   MODELING RESULTS OF ART WITH FEDORUK, THE STUDY WE HAVE JUST

1    BEEN TALKING ABOUT, AND WITH A STUDY BY AN ENTITY CALLED

2    NATLSCO, WHICH IS A 1990 STUDY.  AND HE SAYS, IF YOU LOOK AT

3    THIS, MY NUMBERS COMPORT WITH THOSE NUMBERS.

4        WELL, THE PROBLEM IS HIS STUDY IS AN EIGHT-HOUR

5    TIME-WEIGHTED AVERAGE.  FEDORUK IS ONE-HOUR TIME-WEIGHTED

6    AVERAGE.  NATLSCO IS A THREE-HOUR AVERAGE.  I'M SORRY.

7    FEDORUK IS A ONE-HOUR AVERAGE AND NATLSCO IS THREE-HOUR

8    AVERAGE.  HE DIDN'T CONVERT THE NUMBERS.  SO HE'S COMPARING

9    APPLES TO ORANGES.

10        AND I AM -- I THOUGHT ABOUT TRYING TO CONVERT THEM FOR

11    YOU, BUT THAT MAKES ME A LITTLE UNEASY.  I'M DEFINITELY NOT

12    CLAIMING I'M AN EXPERT IN THIS STUFF.  BUT THAT'S NOT THE

13    SAME THING.  SO--

14            *THE COURT:*  SO HIS MODELING ASSUMES THAT MR. BOYKIN

15    WAS AT THE PARTS WASHER NOT DOING ANYTHING ELSE BUT WASHING

16    AND EXPOSING TO THAT INITIAL AMOUNT OF BENZENE FROM THE FIRST

17    DELIVERY OF THE MINERAL SPIRITS EIGHT HOURS A DAY 40 -- 40

18    HOURS--

19            *MRS. KOCH:*  NO.

20            *THE COURT:*  NO?

21            *MRS. KOCH:*  YOU'RE KIND OF COMBINING THE TWO

22    CONCEPTS.  THE FIRST POINT IS THAT HIS MODELING INPUTS, THAT

23    MODEL CALCULATES A CONSTANT RATE OF THE AMOUNT OF BENZENE THE

24    WHOLE TIME.  SO THAT'S KIND OF A -- I MEAN, IT'S I GUESS

25    RELATIVE IN SOME EXTENT TO THE CONCLUSION, BUT HERE I'M

1    TALKING ABOUT A SEPARATE ISSUE.

2        IN HIS MEASUREMENTS IT'S NOT SAYING THAT HE WORKED -- WE

3    ARE NOT CLAIMING -- WE DON'T BELIEVE DR. STEWART IS CLAIMING

4    THAT MR. BOYKIN STOOD AT A PARTS WASHER FOR EIGHT HOURS

5    STRAIGHT.  NOBODY WOULD BELIEVE THAT AND THEY ARE NOT

6    CLAIMING THAT.

7        WHAT THIS DOES IS CALCULATES HIS EXPOSURES FROM THE

8    PARTS WASHER -- BY THIS I'M TALKING ABOUT DR. STEWART'S

9    MODELING -- AND THEN SPREADS THEM ACROSS AN EIGHT-HOUR TIME

10   PERIOD.  IT'S JUST ONE WAY OF CHARACTERIZING HIS EXPOSURE.

11   THERE'S JUST LIKE -- SO IT'S JUST A DIFFERENT WAY OF DOING

12   IT.  IT'S A DIFFERENT METRIC.

13       YOU CAN DO AN EIGHT-HOUR TIME-WEIGHTED AVERAGE OR YOU

14   CAN SAY WHAT HIS EXPOSURES WERE IN ONE HOUR OR YOU CAN DO

15   THREE-HOUR METRICS THAT NATLSCO DID.  THEY ARE JUST DIFFERENT

16   MEASURES OF THAT --

17           THE COURT:  OKAY.

18           MRS. KOCH:  -- DOES THAT ANSWER YOUR QUESTION?

19           THE COURT:  I THINK I UNDERSTAND THAT.

20           MRS. KOCH:  NEXT SLIDE, PLEASE.  SO, BASICALLY WHAT

21   YOU HAVE GOT IS IF YOU LOOK AT THE IMAGE ON THE RIGHT, THIS

22   IS ALL THE WRONG STUFF THAT WENT INTO THAT MODELING ESTIMATE,

23   THAT WENT IN -- WELL, THAT WENT INTO HIS EXPOSURE ESTIMATE.

24   AND PART OF THE WRONG -- THE WRONG IS HIS -- THE WAY HE USED

25   THE MODEL.

1       BUT, AND OUR POINT I THINK I WANT TO MAKE CLEAR IS THAT

2   THIS IS TOO MUCH TO BE WRONG.  THESE ARE TOO BIG OF ISSUES TO

3   BE WRONG TO MAKE IT -- EXPERTS CAN'T DISAGREE ON IT.  THIS IS

4   BASIC STUFF.  YOU CAN'T MODEL THE WRONG SOLVENT AND CLAIM

5   THAT'S SCIENTIFICALLY RELIABLE.

6       AND WHAT WE HAVE GOT HERE IS, YOU KNOW, DR. STEWART DID

7   THIS ENTIRE EXPOSURE ESTIMATE FOR MR. BOYKIN'S BENZENE

8   EXPOSURES FROM 1987 TO 1994 FROM A SOLVENT THAT DIDN'T EXIST

9   AT THE TIME AND THEN HE DID AN ENTIRE EXPOSURE ESTIMATE FROM

10  1994 TO 2009.  BY THE WAY -- THIS IS A BIG POINT -- FOR A

11  HANDFUL OF SOLVENTS, NOT JUST OUR SOLVENT, SO WE DON'T EVEN

12  KNOW WHAT HE CLAIMS FOR THE 1994 TO 2000 -- HE SAYS 2003 --

13  FOR SAFETY KLEEN SOLVENT.  HE'S LUMPING EVERYBODY IN TOGETHER

14  ON THAT SECOND -- THAT SECOND TIME PERIOD.

15      BUT HE -- HE JUST DOES HIS ASSESSMENT FOR THAT SECOND

16  TIME PERIOD AND AGAIN USES THE WRONG SOLVENT.  AND I THINK

17  THAT IF YOU BOIL IT DOWN TO THE SIMPLEST ISSUES, THE POINT IS

18  IS THAT THERE IS ALL SORTS OF AVAILABLE DATA ON SAFETY KLEEN

19  SOLVENTS.  THERE'S ALL SORTS OF AVAILABLE DATA ON SAFETY

20  KLEEN PARTS WASHERS.  THERE'S ALL SORTS OF AVAILABLE DATA ON

21  THE SERVICES THAT WERE PROVIDED TO COLUMBIA POWER SPORTS, AND

22  HE DIDN'T CONSIDER IT.

23      I MEAN, NO WONDER HE GOT EVERYTHING WRONG.  HE DIDN'T

24  LOOK AT ANYTHING.  AND YOU KNOW, I THINK I CAN KIND OF GO

25  BACK TO MY POINT IN THE BEGINNING.  HE CAN'T GET THE NUMBERS

1    HE WANTS WITH THE REAL DATA, HE CAN'T MAKE THE LEAP THAT WE

2    HAVE BUSTED THESE TRIGGERING LISTING LIMITS UNDER OSHA, HE

3    CAN'T MAKE THE LEAP THAT THESE EXPOSURES EXCEED REGULATORY

4    LIMITS WITH THE DATA, THE ANALYTICAL DATA THAT'S OUT THERE.

5        SO WHAT DID HE DO?  HE WENT OUT AND HE PICKED HIS OWN

6    DATA AND, YOU KNOW, THAT'S NOT SCIENCE.  THAT'S ADVOCACY.

7    AND THAT'S NOT -- THAT'S NOT ACCEPTABLE UNDER DAUBERT, IT'S

8    NOT ACCEPTABLE UNDER ANY OF THE FOURTH CIRCUIT CASE LAW.  AND

9    UNLESS YOU HAVE ANY QUESTIONS, I THINK WITH THAT I WILL TURN

10   OVER THE FLOOR.

11            THE COURT:  THANK YOU.

12            MRS. KOCH:  THANK YOU.

13            THE COURT:  VERY GOOD.  MR. JENSEN, ARE YOU

14   PREPARED TO MOVE -- TO RESPOND?

15            MR. JENSEN:  YES, YOUR HONOR.

16            THE COURT:  DO Y'ALL WANT A BREAK?  EVERYBODY OKAY

17   OR ANYBODY NEED A BREAK?  COURT STAFF?  Y'ALL OKAY?

18            MR. JENSEN:  COUPLE OF MINUTES TO TRANSFER THIS

19   FILE OVER.

20            THE COURT:  SURE.

21            MR. TOLLIVER:  MAYBE TAKE FIVE MINUTES.

22            THE COURT:  YEAH.  SOUNDS GOOD.  WE WILL TAKE A

23   FIVE-MINUTE BREAK.

24        (WHEREUPON, A BRIEF RECESS WAS HAD.)

25            THE COURT:  OKAY.  MR. JENSEN, WE ARE BACK ON THE

1    RECORD.  ARE YOU PREPARED TO MOVE FORWARD WITH YOUR CLIENT'S

2    RESPONSE?  THANKS.

3         MR. JENSEN:  WHERE I WANT TO START, YOUR HONOR, IS

4    WITH THE LEGAL ISSUE ABOUT -- AND IT'S BEEN ALLUDED TO BY

5    COUNSEL THIS MORNING -- BUT WHEN IT COMES TO THE USE OF

6    UNDERLYING FACTS WITH -- BY AN EXPERT WITNESS IN REACHING

7    THEIR OPINION, THE LAW IS PRETTY CLEAR ABOUT HOW THAT PLAYS

8    INTO OR DOESN'T PLAY INTO THE DAUBERT ANALYSIS UNDER 702.

9         AND BASICALLY IF THERE'S A DISPUTED FACTUAL ISSUE, IF

10   THERE'S EVIDENCE SUPPORTING A DISPUTED FACTUAL ISSUE UPON

11   WHICH REASONABLE JURORS COULD REACH DIFFERENT CONCLUSIONS, SO

12   LONG AS THERE'S SOME EVIDENCE, IT'S BASICALLY THE SAME KIND

13   OF STANDARD THAT YOU WOULD APPLY ON SUMMARY JUDGMENT; A

14   NO-EVIDENCE SUMMARY JUDGMENT POINT, IS THERE MORE THAN A

15   SCINTILLA OF EVIDENCE I GUESS IN FEDERAL COURT.

16        THE COURT:  WELL, THAT'S NOT IN SUMMARY JUDGMENT --

17   I'M SORRY -- SUMMARY JUDGMENT STANDARD.  THAT'S A MOTION TO

18   DISMISS STANDARD.  THE SUMMARY JUDGMENT STANDARD IS WHETHER

19   TAKING THE FACTS AND ALL THE REASONABLE INFERENCES THEREFROM

20   IN FAVOR OF THE NON-MOVING PARTY, THEN IS THERE AN ISSUE OF

21   FACT.  IT'S NOT JUST A SCINTILLA.  SO IT'S A HIGHER BURDEN

22   THAN CERTAINLY, I SAW IT SOMEWHERE.

23        MR. JENSEN:  OKAY.  WELL, AND I APOLOGIZE TO THE

24   EXTENT THAT I HAVE MISSTATED THE BURDEN.  BUT I THINK IT'S

25   THAT BURDEN THAT REALLY APPLIES IN TERMS OF THE THRESHOLD

1    NECESSARY TO SAY IF HE'S ASSUMING A FACT TO BE TRUE OR HAS

2    CONCLUDED THAT A FACT IS TRUE FOR WHICH THERE'S NOT

3    SUFFICIENT EVIDENTIARY SUPPORT TO PASS THE SUMMARY JUDGMENT

4    STANDARD, THEN, YOU KNOW, THAT'S A BASIS TO EXCLUDE THE

5    EXPERT'S TESTIMONY ON THAT GROUND ASSUMING ON TOP OF THAT

6    THAT IT WOULD HAVE ALTERED THE OPINIONS IN A MATERIAL

7    FASHION.

8         YOU KNOW, I THINK YOU BASICALLY TALKED ABOUT A HARMLESS

9    ERROR KIND OF AFFECT THIS MORNING WITH COUNSEL.  SO I THINK

10   YOU'D HAVE TO GO THROUGH BOTH LAYERS OF THAT ANALYSIS.  BUT

11   THAT'S REALLY THE STANDARD.  AND IT WAS ARTICULATED IN THE

12   BROOKS CASE HERE WHICH WE'VE CITED IN OUR PAPERS, IT IS NOT

13   PROPER FOR THE COURT TO EXCLUDE EXPERT TESTIMONY MERELY

14   BECAUSE THE FACTUAL BASES FOR AN EXPERT'S OPINION ARE WEAK.

15        AND THEN IN SEVERAL OTHER CIRCUITS, THE FIRST CIRCUIT,

16   THE FEDERAL CIRCUIT COURT AND THE SEVENTH CIRCUIT HAVE ALL

17   USED THIS LANGUAGE TO DESCRIBE THIS ISSUE WHICH IS THE

18   SOUNDNESS OF THE FACTUAL UNDERPINNINGS OF THE EXPERT'S

19   ANALYSIS AND THE CORRECTNESS OF THE EXPERT'S CONCLUSIONS

20   BASED ON THAT ANALYSIS ARE FACTUAL MATTERS TO BE DETERMINED

21   BY THE TRIER OF FACT.

22        NOW, I WILL SAY WITH RESPECT TO THE CHALLENGE TO DR.

23   STEWART'S ANALYSIS, I DON'T DISAGREE WITH MRS. BONNEVILLE'S

24   CHARACTERIZATION OF HER ARGUMENT AS BEING MORE A METHODOLOGY

25   ARGUMENT ABOUT ART AND THE PROPRIETY OR LACK THEREOF OF USING

1    IT IN THIS CONTEXT. THAT'S REALLY A METHODOLOGICAL ARGUMENT

2    THAT DOESN'T GO TO THE ISSUE OF UNDERLYING FACTS.

3         SAFETY KLEEN'S ARGUMENTS I THINK FRONT AND CENTER IS

4    THIS ISSUE OF FACTS AND WHETHER THERE'S SUFFICIENT RECORD

5    HERE TO SUPPORT THE FACTUAL ASSUMPTIONS OR CONCLUSIONS THAT

6    DR. STEWART REACHED AND INPUT INTO HIS MODEL.

7         MRS. BONNEVILLE ALSO MADE A FEW ARGUMENTS ABOUT FACTS AT

8    THE TAIL END OF HER DISCUSSION, BUT CERTAINLY SHE WAS FOCUSED

9    MORE ON WHETHER ART IS AN APPROPRIATE MODEL AND METHODOLOGY

10   IN THE CONTEXT OF WHAT DR. STEWART WAS DOING HERE.

11        SO, THIS POINT GOES MOSTLY TO THE SAFETY KLEEN ARGUMENT.

12   BUT I WANTED TO START WITH IT BECAUSE IT'S A KEY OVERVIEW

13   FRAMEWORK LEGALLY FOR THIS COURT'S -- WHAT THIS COURT HAS GOT

14   TO DO IN THE CONTEXT OF THESE MOTIONS.

15        AND YOU KNOW, JUST TO GO THROUGH HIGHLIGHTING THAT, TO

16   THE EXTENT WE ARE TALKING ABOUT CREDIBILITY DETERMINATIONS AS

17   THEY PLAY OUT IN THE CONTEXT OF FACTUAL DISPUTES, THAT'S

18   OBVIOUSLY FOR THE JURY AND NOT THE COURT. AND AS WE

19   DISCUSSED YESTERDAY IN THE CONTEXT OF DR. HARRISON, THE SAME

20   IS TRUE HERE. UNDER RULE 702 THIS COURT'S JOB IS NOT TO SORT

21   OUT DISAGREEMENTS BETWEEN EXPERTS ON APPLICATION OF

22   SCIENTIFIC JUDGMENT NOR IS IT TO, YOU KNOW, TAKE A CRITIQUE

23   BY COUNSEL OF -- ON WHATEVER BASIS THAT THAT CRITIQUE HAS

24   WITH RESPECT TO AN ISSUE OF SCIENTIFIC JUDGMENT AND RESOLVE

25   THAT AS PART OF -- BY CONCLUDING THAT THE EXPERT'S TESTIMONY

1    IS INADMISSIBLE.

2         EVEN IF THIS COURT THINKS IT'S A VALID POINT, EVEN IF

3    THIS COURT AGREES THAT THE BETTER, YOU KNOW, COURSE OF ACTION

4    WOULD HAVE BEEN FOR DR. STEWART OR ANY OTHER EXPERT TO TAKE A

5    DIFFERENT APPROACH, IF IT'S A MATTER OF SCIENTIFIC JUDGMENT,

6    THAT THAT'S REALLY A CREDIBILITY ASSESSMENT THAT MUST BE

7    RESOLVED BY THE JURY RATHER THAN THE COURT.

8         AND HERE'S A SECOND CIRCUIT QUOTE FROM THE -- AN

9    ASBESTOS CASE BY -- DECISION BY JUDGE WEINBERG.  TRIAL COURTS

10   SHOULD NOT ARROGATE THE JURY'S ROLE IN EVALUATING THE

11   EVIDENCE AND THE CREDIBILITY OF EXPERT WITNESSES BY SIMPLY

12   CHOOSING SIDES IN THE BATTLE OF THE EXPERTS.  AND THAT'S JUST

13   SORT OF A QUOTE THAT SUMMARIZES THE POINT THAT I'M TRYING TO

14   MAKE HERE.

15        NOW I WANT TO START WITH WHERE MRS. BONNEVILLE WENT IN

16   TERMS OF THE DETAILED DISCUSSION OF THE ARGUMENTS.  AND

17   THAT'S THE RELIABILITY OF THE USE OF THE ART MODEL BY DR.

18   STEWART TO DO THE TASK THAT HE WAS DOING HERE, WHICH IS A

19   RETROSPECTIVE INDIVIDUAL EXPOSURE ASSESSMENT FOR MR. BOYKIN.

20        AND FIRST OF ALL, EVEN THOUGH THEY ARE NOT CHALLENGING

21   QUALIFICATIONS HERE, I DO THINK IT'S IMPORTANT FOR THIS COURT

22   TO KEEP AT THE FRONT OF ITS MIND WHAT THE QUALIFICATIONS ARE

23   OF THIS EXPERT BECAUSE HE'S NOT JUST ANY OLD EXPERT WHEN IT

24   COMES TO EXPOSURE ASSESSMENTS.  THIS IS ONE OF THE MOST

25   HIGHLY-QUALIFIED EXPERTS FOR THIS SPECIFIC TYPE OF OPINION IN

1    THE COUNTRY.

2         DR. STEWART TEACHES GRADUATE STUDENTS AT THE HARVARD

3    SCHOOL OF PUBLIC HEALTH REGARDING HOW TO EMPLOY MATHEMATICAL

4    MODELS INCLUDING SPECIFICALLY USE OF ART TO ESTIMATE WORKER

5    EXPOSURES.  SO HE'S TEACHING AT ONE OF THE TOP GRADUATE

6    SCHOOLS IN THE COUNTRY THAT TEACHES INDUSTRIAL HYGIENE AND

7    HE'S TEACHING HIS STUDENTS TO USE THE SAME TYPE OF APPROACH

8    THAT HE EMPLOYED TO DO THE ANALYSIS FOR MR. BOYKIN IN THIS

9    CASE.

10        HE IS CHAIR OF THE AMERICAN INDUSTRIAL HYGIENE

11   ASSOCIATION, AND THAT'S A PROFESSIONAL TRADE ASSOCIATION OF

12   INDUSTRIAL HYGIENISTS THAT IS THE PRIMARY TRADE ASSOCIATION

13   OR PROFESSIONAL ORGANIZATION IS PROBABLY A BETTER WAY TO PUT

14   IT FOR INDUSTRIAL HYGIENISTS IN THE COUNTRY.  AND HE'S CHAIR

15   OF THEIR EXPOSURE ASSESSMENT STRATEGIES COMMITTEE.  AND IN

16   THAT CONTEXT HE BOTH TEACHES ASPECTS OF USING MATHEMATICAL

17   MODELING FOR EXPOSURE ASSESSMENT TO OTHER INDUSTRIAL

18   HYGIENISTS AND SAFETY EXPERTS AND, AS EXPRESSED IN HIS

19   AFFIDAVIT, HE ALSO IN THAT CONTEXT CONDUCTS VALIDATION AND

20   TESTING OF DIFFERENT MATHEMATICAL MODELS THAT ARE PRESENTED

21   OR PROPOSED.

22             *THE COURT:*  DOES HE JUST DO MATHEMATICAL MODELING

23   OR DOES HE DO ANY EXPOSURE ANALYSIS, RETROSPECTIVE EXPOSURE

24   ANALYSIS, ON THE BASIS OF ACTUAL SAMPLING FROM LOWER SIDE OR

25   SIMILARLY SITUATED PLACES?

1          *MR. JENSEN:*  ABSOLUTELY, YOUR HONOR.  THERE'S --

2    AND I THINK THIS IS LAID OUT TO SOME EXTENT IN HIS

3    AFFIDAVIT -- BUT CERTAINLY THERE ARE LOTS OF DIFFERENT

4    METHODS AVAILABLE DEPENDING ON WHAT FACTUAL DATA AND

5    INFORMATION IS AVAILABLE IN THE CIRCUMSTANCE.  LOTS OF

6    DIFFERENT WAYS OF ESTIMATING EXPOSURE.

7          AND THE BEST WAY IS IF YOU DON'T HAVE TO RELY ON

8    ESTIMATES AT ALL, ALTHOUGH BEYOND HOW YOU USE THAT WORD, THE

9    EXPERTS MIGHT QUIBBLE ABOUT WHETHER IT WAS STILL AN ESTIMATE.

10   BUT IF YOU'VE GOT A SITUATION, FOR EXAMPLE, WHERE YOU HAVE

11   GOT OCCUPATIONAL EXPOSURES TO IONIZING RADIATION, OFTEN WHEN

12   WORKERS WORK DAY TO DAY BASIS AROUND IONIZING RADIATION, THEY

13   WILL WEAR A BADGE, WHICH IS A DISSYMMETRY BADGE WHICH

14   ACTUALLY MEASURES ABSORBED AMOUNTS OF RADIATION, YOU KNOW,

15   WHEREVER THE BADGE IS FOR THE TIME PERIOD THAT THE BADGE IS

16   WORN.

17         AND YOU KNOW, THE WORKER IS SUPPOSED TO WEAR IT ALL THE

18   TIME AND TURN IT IN ON A, YOU KNOW, REGULAR BASIS AND HAVE IT

19   ANALYZED.  AND YOU CAN TELL FROM THAT TYPE OF DISSYMMETRY

20   BADGING WHAT THAT INDIVIDUAL'S EXPOSURE HAS BEEN BASED ON

21   MEASUREMENTS FROM THE BADGE.

22         *THE COURT:*  BUT MY QUESTION IS, HAS DR. STEWART

23   DONE THOSE TYPES OF ANALYSES WITH MEASURED DATA OR IS HIS

24   EXPERTISE IN THE MATHEMATICAL MODELING?

25         *MR. JENSEN:*  HE HAS DONE -- HE HAS DONE BASED OF

1    MEASURED DATA AND BASED ON MODELING BOTH EXTENSIVELY.  AND I

2    APOLOGIZE I DIDN'T ANSWER THAT CORRECTLY.  AND AS COUNSEL

3    DISCUSSED AND ALLUDED TO, THERE ARE THREE FEDERAL DECISIONS

4    THAT HAVE EITHER DIRECTLY UPHELD OR INTIMATED IN THE CASE OF

5    THE SEVENTH CIRCUIT DECISION, THAT DR. STEWART'S USE OF

6    MATHEMATICAL MODELING IN THE SPECIFIC CONTEXT OF

7    RETROSPECTIVE ESTIMATES OF BENZENE EXPOSURES WAS APPROPRIATE

8    AND UPHELD IN THE FACE OF A RULE 702 CHALLENGE.

9        AND THOSE ARE -- THOSE THREE CASES COME OUT OF THE --

10   THREE DECISIONS, RATHER, COME OUT OF TWO CASES; THE SCHULTZ

11   CASE AND THE MILWARD CASE.  THE MILWARD DECISION IS A

12   DECISION AFTER REMAND ON THE GENERAL CAUSATION ISSUE FROM THE

13   FIRST CIRCUIT OPINION THAT WE DISCUSSED YESTERDAY.  THAT WAS

14   IN 2013 BY THE DISTRICT COURT OF MASSACHUSETTS, AND THAT --

15   THAT WORK EXPRESSLY OR SPECIFICALLY INVOLVED USE OF THE ART

16   MODEL TO ESTIMATE MR. MILWARD'S BENZENE EXPOSURES.

17       AND YOU WILL RECALL HE WORKED -- MR. MILWARD WORKED AS A

18   REFRIGERATION MECHANIC ON COMMERCIAL REFRIGERATION UNITS FOR

19   ABOUT 30 YEARS AND USED A VARIETY OF SOLVENTS INCLUDING

20   SOLVENTS THAT CONTAINED MINERAL SPIRITS TYPES -- MINERAL

21   SPIRITS SLASH STODDARD SOLVENT, THE SAME KIND OF SOLVENT THAT

22   WE'VE GOT HERE, AND OTHER KINDS OF PETROLEUM ORGANIC

23   SOLVENTS.

24       AND SO HE USED ART.  THERE WAS A CHALLENGE, AS THERE IS

25   IN THIS CASE TO THE USE OF ART, AND THE DISTRICT COURT THERE

1    OVERRULED THAT CHALLENGE.  THAT CASE IS ON APPEAL RIGHT NOW.

2        THEN IN THE SEVENTH CIRCUIT WHAT HAPPENED THERE IN THE

3    SCHULTZ CASE WAS THAT THERE WAS A CHALLENGE TO DR. STEWART'S

4    OPINION IN THE DISTRICT COURT AND ALSO TO THE SPECIFIC

5    CAUSATION EXPERT, DR. GORE, AT THE DISTRICT COURT LEVEL.  THE

6    DISTRICT COURT HAD A BRIEF DISCUSSION OF DR. STEWART'S

7    OPINION IN ITS ORIGINAL OPINION AND ULTIMATELY SAID, I DON'T

8    NEED TO REACH THIS ISSUE BECAUSE I'M GOING TO EXCLUDE DR.

9    GORE AND I'M GOING TO GRANT SUMMARY JUDGMENT BECAUSE THERE'S

10   NO CAUSATION TESTIMONY, SO I'M NOT GOING TO REACH THE ISSUE

11   OF DR. STEWART'S OPINION, ALTHOUGH I NOTE THAT THERE ARE SOME

12   ISSUE -- THERE ARE SOME PROBLEMS HERE THAT HAVE BEEN POINTED

13   OUT.  AND THAT'S WHAT THE ORIGINAL DISTRICT COURT OPINION IN

14   SCHULTZ SAID.

15       WE APPEALED FROM THAT AND THE SEVENTH CIRCUIT REVERSED

16   WITH RESPECT TO THE EXCLUSION OF DR. GORE'S TESTIMONY BUT

17   THEY ALSO -- IN WHAT I GUESS WOULD FORMALLY BE CHARACTERIZED

18   AS DICTA -- EXPRESSED SOME APPROVAL OF THE WORK THAT DR.

19   STEWART HAD DONE.

20           THE COURT:  BUT THAT USED THE MONTE CARLO METHOD,

21   NOT ART, RIGHT, IN SCHULTZ?

22           MR. JENSEN:  WELL, THE ART -- THOSE AREN'T MUTUALLY

23   EXCLUSIVE, BUT YOU'RE CORRECT THAT HE WAS NOT USING ART IN --

24   MONTE CARLO ANALYSIS IS STATISTICAL ANALYSIS THAT CAN BE USED

25   IN CONJUNCTION WITH DIFFERENT MODELING, DIFFERENT MODELS

1    INCLUDING ART.  BUT IN THAT CASE HE USED A NEAR FIELD FAR

2    FIELD MODEL AS OPPOSED TO USING ART.

3            THE COURT:  SO TWO OF THE THREE CASES OR COURTS

4    THAT HAVE, AS YOU SAY, UPHELD DR. STEWART'S MATH MODELING AND

5    THE BENZENE EXPOSURE OF THE PLAINTIFFS USED A DIFFERENT MODEL

6    THAN THE MODEL THAT'S AT ISSUE IN MR. BOYKIN'S CASE.

7            MR. JENSEN:  RIGHT.  AND'S ART SPECIFIC ARGUMENTS

8    THAT MRS. BONNEVILLE IS MAKING ARE NOT ADDRESSED IN THE

9    SCHULTZ CASE, BUT -- AND NOT GERMANE TO THE SCHULTZ CASE IN A

10   DIRECT FASHION ANYHOW, ALTHOUGH CHALLENGES TO THE NEAR FIELD

11   FAR FIELD MODEL HAVE SIMILAR VENT, I WILL SAY, TO THE

12   CHALLENGES TO ART.

13       AND IN FACT, YOU KNOW, AS DR. STEWART'S AFFIDAVIT POINTS

14   OUT, THERE'S A LOT MORE REAL-WORLD COMPARISONS AND TESTING OF

15   THE ART MODEL THAN THERE ARE FOR ANY OF THE OTHER MODELS THAT

16   ARE AVAILABLE TO -- FOR INDUSTRIAL HYGIENISTS TO CONDUCT THIS

17   TYPE OF MODELING EXERCISE INCLUDING THAT NEAR FIELD FAR FIELD

18   MODEL WHICH HAS BEEN USED, FOR EXAMPLE, BY DEFENDANTS'

19   EXPERTS.  AND I DON'T -- I'M NOT SURE ABOUT WHETHER THEY

20   EMPLOYED IT IN THIS CASE, BUT THEY HAVE -- THOSE EXPERTS HAVE

21   EMPLOYED THE NEAR FIELD FAR FIELD MODEL IN OTHER LITIGATION.

22           THE COURT:  BUT THE MILWARD COURT DID ANALYZE THE

23   USE OF THE ART MODEL AND THE COURT UPHELD THAT, I THINK, BUT

24   I THINK THE DEFENDANTS HAVE POINTED OUT THAT THAT COURT

25   RELIED ON -- I THINK THEY CALL IT A WATERED-DOWN DAUBERT

```
 1   ANALYSIS THAN THE FOURTH CIRCUIT USES.

 2       WHAT'S YOUR RESPONSE TO THAT?

 3           MR. JENSEN:  THANK YOU FOR RAISING THAT, YOUR

 4   HONOR.  I DISAGREE WITH THAT CHARACTERIZATION OF THE FIRST

 5   CIRCUIT'S STANDARDS.  SHE READ TO -- MRS. BONNEVILLE READ TO

 6   THE COURT A SUMMARY ARTICULATION OF THE STANDARD BY THE FIRST

 7   CIRCUIT, AND I WILL PARAPHRASE BECAUSE I DON'T HAVE IT

 8   COMMITTED TO MEMORY, BUT SOMETHING TO THE EFFECT OF, THE

 9   STANDARD IS WHETHER OR NOT THE EXPERT EMPLOYED A SOUND

10   METHODOLOGY AND USED PROPER SCIENTIFIC TOOLS OR SOMETHING

11   ALONG THOSE LINES.

12           THE COURT:  I THINK I WROTE DOWN SCIENTIFICALLY

13   SOUND AND METHODOLOGICAL FASHION.

14           MR. JENSEN:  THAT SOUND -- YOU HAVE GOT IT CLOSER

15   THAN I DO.  AND WHAT I WOULD SAY IS THAT THAT'S A SUMMARY

16   STATEMENT OF THE -- HEARD BY A FIRST CIRCUIT COURT OF THE

17   DAUBERT STANDARD, AND I DON'T THINK IT'S AT ALL INCONSISTENT

18   WITH RULE 702 OR SUPREME COURT'S ARTICULATION OR THE FIRST OR

19   FOURTH CIRCUIT'S ARTICULATION OF THE STANDARD.

20       NOW, YOU KNOW, THERE'S MORE DETAIL TO THE STANDARD IN

21   BOTH THE FIRST CIRCUIT AND IN, YOU KNOW, EVERYWHERE ELSE, BUT

22   THAT'S JUST A SUMMARY ARTICULATION.  AND I DON'T THINK IT'S

23   ANY DIFFERENT.  IT'S NOT AN EASIER THRESHOLD TO GET OVER IN

24   THE FIRST CIRCUIT THAN IT IS ANYWHERE ELSE.

25           THE COURT:  OKAY.  BUT IN MILWARD I THINK THEY
```

1    POINTED OUT THAT THE USE OF THE ART MODEL WAS BASED ON THE

2    BAYESIAN MODEL AS OPPOSED TO THE MANUAL ENTRY AS DR. STEWART

3    CHOSE TO DO HERE.  AND SO I GUESS THEY ARE MAKING THE

4    ARGUMENT THAT EVEN THE COURT'S APPROVAL OF THAT ART MODEL IS

5    QUALITATIVELY DIFFERENT THAN THE USE OF DR. STEWART'S USE OF

6    THAT SAME MODEL BECAUSE OF THE MANIPULATION OF THE PARAMETERS

7    OR INPUTS.

8              MR. JENSEN:  I DON'T UNDERSTAND THAT ARGUMENT, YOUR

9    HONOR.  I WILL JUST BE FLAT OUT CANDID WITH YOU.  I JUST -- I

10   DON'T KNOW WHAT THAT MEANS.  AND I DON'T UNDERSTAND THERE TO

11   BE A DIFFERENT APPROACH THAT DOCTOR -- I DON'T UNDERSTAND DR.

12   STEWART TO HAVE TAKEN A DIFFERENT APPROACH HERE QUALITATIVELY

13   THAN HE TOOK IN THE MILWARD CASE.  I DON'T BELIEVE THAT'S

14   CORRECT.

15        AND I DON'T UNDERSTAND BAYESIAN'S STATISTICS, I DON'T

16   UNDERSTAND HOW THE BAYESIAN ANALYSIS PLAYS INTO THE ART MODEL

17   AND HOW THAT WAS EMPLOYED OR NOT EMPLOYED BY DR. STEWART

18   EITHER IN THE MILWARD CASE OR IN THIS CASE, BUT I WILL TELL

19   YOU I DON'T BELIEVE THAT DR. STEWART QUALITATIVELY EMPLOYED A

20   DIFFERENT APPROACH METHODOLOGICALLY IN MILWARD THAN HE DID IN

21   THIS CASE.

22             THE COURT:  OKAY.

23             MR. JENSEN:  NOW, THE ART MODEL, AND THIS IS

24   DISCUSSED BOTH IN DR. STEWART'S DEPOSITION AND LAID OUT IN

25   HIS AFFIDAVITS IN GREATER DETAIL, BUT THERE'S A LOT OF

1    REASONS WHY THE ART MODEL FROM A METHODOLOGICAL STANDPOINT

2    PROVIDES A RELIABLE METHOD THAT SHOULD SURVIVE RULE 702

3    SCRUTINY.

4         FIRST OF ALL, MORE GENERALLY SPEAKING, MATHEMATICAL

5    MODELING OF WORKER EXPOSURES TO CHEMICALS IS A

6    LONG-ESTABLISHED, GENERALLY-ACCEPTED APPROACH IN THE

7    SCIENTIFIC COMMUNITY OF INDUSTRIAL HYGIENE.  COUNSEL HAS

8    ACKNOWLEDGED THAT.  AND WHAT, YOU KNOW, THEIR ARGUMENT IS,

9    WELL, IT -- IT WAS THE WRONG MODEL AND YOU SHOULDN'T HAVE

10   USED MODELING AT ALL IS WHAT I THINK THEY ARE SAYING IN THIS

11   SPECIFIC FACTUAL CIRCUMSTANCE.  BUT AS AN INITIAL POINT FROM

12   A METHODOLOGICAL STANDPOINT, MATHEMATICAL MODELING OF WORKER

13   EXPOSURES IS GENERALLY ACCEPTED.

14        SECONDLY, WITH SPECIFIC REFERENCE TO ART, IT WAS

15   DEVELOPED THROUGH A CONSENSUS PROCESS THAT INVOLVED MEMBERS

16   OF INDUSTRY, GOVERNMENT AND ACADEMIA, AND IT WAS DESIGNED --

17   WHAT IT IS DESIGNED TO DO IS TO ESTIMATE WORKER EXPOSURES TO

18   CHEMICALS AND TO REALISTICALLY ESTIMATE WORKER EXPOSURES TO

19   CHEMICALS.

20        AND WHY I AM EMPHASIZING THAT WORD REALISTICALLY IS THAT

21   IT IS TRUE, AS COUNSEL HAVE ARGUED, THAT ART IS USED BY THE

22   EUROPEAN UNION TO PREDICT BASED ON DIFFERENT WORKING

23   CONDITIONS WHAT EXPOSURES WILL BE TO VARIOUS CHEMICALS IN

24   DIFFERENT JOB ACTIVITIES FOR PURPOSES OF DETERMINING WHETHER

25   THOSE CHEMICALS SHOULD BE USED IN THOSE JOBS.  THAT'S

1    OVER-SIMPLIFICATION, BUT I THINK THAT'S -- IT'S USED FOR

2    REGULATORY PURPOSES UNDER THE REACH REGULATION AND IT'S USED

3    AS A PROSPECTIVE SORT OF APPROACH TO SAY, THIS IS WHAT WE

4    THINK THE WORKERS WOULD BE EXPOSED TO IN THE FUTURE IF THEY

5    DID THIS JOB USING THIS CHEMICAL IN THIS FASHION.

6         BUT WHAT THE ART MODEL ITSELF IS DOING, THAT'S -- THAT'S

7    THE CONTEXT IN WHICH IT GETS USED.  BUT WHAT THE ART MODEL

8    ITSELF IS DESIGNED TO DO AND DOES IS ESTIMATE AS

9    REALISTICALLY AS THE DESIGNERS OF THE MODEL COULD DESIGN IT

10   TO DO SO AND AS ACCURATELY AS THEY COULD DESIGN IT TO DO SO,

11   ESTIMATE WORKER EXPOSURES.

12        AND WHETHER YOU'RE LOOKING FORWARD IN TIME TO

13   PROSPECTIVE FUTURE CONDITIONS OR WHETHER YOU'RE LOOKING

14   BACKWARD IN TIME AT RETROSPECTIVE CONDITIONS, IT DOESN'T MAKE

15   ANY DIFFERENCE TO THE MODEL.  THE MODEL -- THE MODEL IS JUST

16   BASED ON, YOU HAVE TO INPUT THE WORK, THE WORKING CONDITIONS

17   INCLUDING, YOU KNOW, WHAT THE CHEMICAL IS AND THE -- ALL THE

18   DIFFERENT INPUT PARAMETERS THAT THE MODEL ALLOWS FOR -- AND I

19   DON'T PURPORT TO KNOW WHAT THOSE ARE.  BUT YOU HAVE TO --

20   THEY ARE BASED ON THE WORKING CONDITIONS IN THE CHEMICAL

21   BEING USED AND THE CHARACTERISTICS OF THAT CHEMICAL.

22        AND IF YOU INPUT THOSE CONDITIONS BASED ON WHAT HAPPENED

23   IN THE PAST OR WHAT IS LIKELY TO OCCUR IN THE FUTURE, IT

24   DOESN'T MAKE ANY DIFFERENCE TO THE MODEL.  THE MODEL IS JUST

25   GOING TO OUTPUT WHAT THE EXPOSURES OR THE RANGE -- MORE

1    ACCURATELY THE RANGE OF EXPOSURES IS LIKELY TO BE UNDER THOSE

2    WORKING CONDITIONS FOR THOSE WORKERS WHETHER THEY ARE GOING

3    TO DO THAT IN THE FUTURE OR ALREADY HAVE DONE IT IN THE PAST.

4            *THE COURT:*  I THINK THAT THE TROUBLE WITH THAT

5    ARGUMENT IS THAT IF THE DESIGN AND INTENDED USE IS FOR A

6    PREVENTATIVE MEASURE OR SOME SORT OF PROPHYLACTIC ANALYSIS IN

7    ORDER TO CHANGE THE NUMBERS THAT THE EU WOULD ALLOW FOR X, Y

8    AND Z COMPOUND, USE OF ITS CONCERN FOR THE POTENTIAL

9    EXPOSURE, THAT'S ONE THING.

10        BUT WHEN YOU GO TO USE THE SAME MODEL RETROSPECTIVELY,

11    THEN THE RETROSPECTIVE HAS ALREADY OCCURRED.  AND THE

12    INPUTTING OF THE DATA, WHICH YOU I THINK HAVE ARGUED IS A

13    FACTUAL DETERMINATION NOT APPROPRIATE FOR THE COURT'S

14    CONSIDERATION IN THE DAUBERT ANALYSIS, I THINK THE FACTUAL

15    DATA INPUT ON THE RETROSPECTIVE BASIS IS REALLY THE HOOK ON

16    THE METHODOLOGICAL EVALUATION SUCH THAT IT'S NOT A

17    PROSPECTIVE, DON'T DO THIS AND WE NEED TO MAKE SURE THAT WE

18    CAP EXPOSURES AT THIS LEVEL.

19        WHEN YOU LOOK RETROSPECTIVELY, WHAT YOU'RE IN EFFECT

20    TRYING TO DO IS ESTABLISH FACT.  AND THAT CONVERSION OF WHAT

21    HAPPENED AS FACT IS WHOLLY DEPENDENT ON THE SOUNDNESS

22    SCIENTIFICALLY OF A MODEL.  AND IF YOU CAN MANIPULATE THAT ON

23    THE BASIS OF THE DATA THAT'S INPUTTED, THEN THE METHODOLOGY

24    DOES NOT APPEAR TO BE RELIABLE ACCORDING TO THE DEFENDANTS.

25            *MR. JENSEN:*  OKAY.  THERE WAS A LOT FOR ME TO TRY

1    AND UNPACK IN THAT QUESTION OR COMMENT.  BUT LET ME START

2    WITH SOMETHING THAT YOU SAID RIGHT AT THE END, TOWARD THE

3    END, WHICH IS THE RELIABLE -- SOMETHING TO THE EFFECT OF THE

4    RELIABILITY THROUGH USE IN A RETROSPECTIVE CONTEXT IS IT'S

5    DEPENDENT ON THE SOUNDNESS OF THE MODEL, AND THEN YOU -- YOU

6    SEEMED TO CONFLATE THAT AT THE SAME TIME WITH THE UNDERLYING

7    FACTS THAT EXISTED REGARDING THE CONDITIONS THAT ARE INPUT

8    PARAMETERS FOR THE MODEL.

9        AND I WANT TO START WITH THAT BECAUSE THOSE ARE TWO

10   DIFFERENT THINGS THE WAY THAT THE EXPERTS WOULD ORDINARILY

11   USE THE NOMENCLATURE, OKAY?

12       SO, THE SOUNDNESS OF THE MODEL, ANY KIND OF MODELING

13   EXERCISE, ANY KIND OF MATHEMATICAL MODELING EXERCISE, NO

14   MATTER WHAT THE MODEL IS, IS -- IS GOING TO BE SUBJECT TO THE

15   TRUISM SLASH, YOU KNOW, THE -- THE SAME -- GARBAGE-IN,

16   GARBAGE-OUT.  I MEAN, AND THAT'S, YOU KNOW, IT'S DEPENDENT ON

17   THE ACCURACY OF THE INPUT CONDITIONS AND WHETHER THEY WILL

18   MATCH THE REAL WORLD CONDITIONS, WHETHER THOSE CONDITIONS ARE

19   GOING TO OCCUR IN THE FUTURE OR HAVE ALREADY OCCURRED IN THE

20   PAST.  AND SO, THAT'S ALWAYS GOING TO BE AN ISSUE FOR ANY

21   MODEL.

22       BUT WHAT I WOULD SUGGEST TO YOU IT IS JUST -- IT IS

23   EQUALLY APPLICABLE -- THE GARBAGE IN, GARBAGE OUT ISSUE WITH

24   MODELING IS EQUALLY AN ISSUE FOR PROSPECTIVE REGULATORY

25   PURPOSES THAT ART IS ACTUALLY USED FOR AND STILL USED FOR AND

1    APPROVED FOR USE FOR BY THE EUROPEAN UNION. IT'S JUST AS

2    MUCH AS ISSUE THERE.

3        NOW, THERE IS A DIFFERENCE. THE DIFFERENCE IS WE KNOW

4    SOMETHING HAS ACTUALLY OCCURRED AS OPPOSED TO PREDICTING WHAT

5    WILL OCCUR IN THE FUTURE, BUT EVEN WHEN YOU'RE PREDICTING

6    WHAT WILL OCCUR IN THE FUTURE, YOU MAY GET IT QUITE WRONG IF,

7    YOU KNOW, AND IT'S QUITE POSSIBLE WE CAN INPUT THE WRONG

8    EXPOSURE CONDITIONS OR WRONG WORKING CONDITIONS BASED ON

9    MISUNDERSTANDINGS OR MISTAKES OR WHATEVER EVEN FOR A

10   PROSPECTIVE ANALYSIS.

11        *THE COURT:* WELL, BUT I GUESS THAT'S THE ISSUE IS

12   THAT WHAT IT WAS DESIGNED FOR PROSPECTIVELY HAS BEEN TESTED

13   ACCORDING TO THE DEFENDANTS AND HAS BEEN FOUND TO BE

14   100 PERCENT INACCURATE AND UNRELIABLE. SO, IF THE

15   PROSPECTIVE USE OF THE ART MODEL HAS TURNED OUT THROUGH

16   STUDIES AND TESTIMONY OR STUDIES BY ITS OWN DEVELOPERS THAT

17   SAY, WE NEED TO HAVE REAL DATA, WE NEED TO HAVE REAL GOOD

18   DATA BECAUSE IT'S NOT WORKING THE WAY THAT WE HAD THOUGHT IT

19   WAS, THEN --

20        *MR. JENSEN:* OKAY.

21        *THE COURT:* -- AND IF THAT'S THE TESTING THAT HAS

22   OCCURRED FOR THE PROSPECTIVE USE, THEN SHOULDN'T THERE BE

23   SOME CONCERN ABOUT THE RETROSPECTIVE USE OF THE MODEL ITSELF?

24        *MR. JENSEN:* WELL, NO, YOUR HONOR, BECAUSE THAT'S A

25   MISCHARACTERIZATION OF WHAT THAT LITERATURE SAYS IT STANDS

1    FOR AND HOW -- AND IF IN FACT THAT WERE, AS MRS. BONNEVILLE

2    CHARACTERIZED IT, AND THEN IT WOULD NOT BE APPROPRIATE FOR

3    THE EUROPEAN UNION AND THE EUROPEAN CHEMICAL AGENCY TO

4    CONTINUE TO USE ART FOR THE REACH REGULATORY PURPOSES THAT IT

5    DOES, BUT IN FACT THEY DO.  AND HERE'S--

6            *THE COURT:*  WHAT DO THEY DO IN SAY SAUDI ARABIA OR

7    IN THE PHILIPPINES?  DO WE SIT THERE AND SAY, OH WELL, IF

8    THEY USE IT IN RUSSIA, THEN IT MUST BE GOOD, AND IF THEY

9    CONTINUE TO USE IT, THEN THERE MUST BE SOME SCIENTIFICALLY

10   SOUND BASIS.

11       SO, I THINK THAT'S THE PROBLEM.  IF YOU WERE TO TELL ME

12   THAT THE NIH HAS COME UP WITH THIS MODEL, I THINK IT WOULD BE

13   A DIFFERENT DISCUSSION.  I THINK IT WOULD BE A DIFFERENT

14   DISCUSSION.  I DON'T KNOW WHAT THE STANDARDS ARE IN EUROPE.

15   I HAVE BEEN THERE, I VISITED.  THEY DO A LOT OF THINGS A LOT

16   DIFFERENTLY.  THEY DRIVE ON THE WRONG SIDE OF THE ROAD AS FAR

17   AS I'M CONCERNED.

18       I DON'T REALLY -- I'M NOT PERSUADED THAT IF THEY ADOPT A

19   LOCAL STANDARD IN EUROPE, THAT THAT IS NECESSARILY THE GOLD

20   STANDARD OR EVEN A RELIABLE STANDARD FOR OUR USE IN THE

21   UNITED STATES.

22       AND THE NEXT QUESTION IN MY MIND IS, IF IT'S SO GOOD,

23   THEN WHY HASN'T THE UNITED STATES ADOPTED IT AS ITS OWN?  AND

24   IF THEY HAVEN'T, THEN IT'S GOT TO BE A REASON FOR IT, THAT

25   IT'S NOT RELIABLE, THAT IT DOESN'T FIT OUR INDUSTRIES, IT

1    DOESN'T FIT OUR LAWS, AND THAT'S -- THAT'S THE BEEF I KIND OF

2    HAVE WITH DR. STEWART'S USE OF THIS EUROPEAN MODEL FOR A

3    DIFFERENT PURPOSE THAN THAT WHICH WAS INTENDED.

4         *MR. JENSEN:*  OKAY.  WELL, THERE CAN BE A LAG

5    TIME -- THIS IS A FAIRLY RECENT MODEL THAT HAS RELATIVELY

6    RECENTLY IN TERMS OF ITS DEVELOPMENT OF SCIENTIFIC LITERATURE

7    AND STANDARDS AND, YOU KNOW, THERE -- IT TAKES A WHILE FOR

8    THINGS TO GET DONE.  I AM NOT AWARE OF ANY ACADEMIC CRITICISM

9    THAT IS NOT REFLECTED ALREADY IN THIS RECORD OF THE ART MODEL

10   AND THE CONTEXT, FOR EXAMPLE, AS YOU KNOW OF, THE AIHA OR ANY

11   GOVERNMENTAL AGENCY HERE IN THE UNITED STATES RECOMMENDING

12   FOR OR AGAINST ITS USE.  I'M NOT AWARE OF THAT DEBATE

13   OCCURRING.

14        THAT DOESN'T MEAN IT HASN'T OCCURRED, BUT I DON'T KNOW

15   WHETHER IT HAS.  BUT I CAN SAY THAT -- THAT THERE IS

16   TYPICALLY AND ALWAYS GOING TO BE SOME LAG TIME IN IT.  AND IN

17   THE ACADEMIC, SCIENTIFIC COMMUNITIES I THINK IT'S OFTEN A

18   LONG TIME BETWEEN ADOPTION OF A SCIENTIFIC METHOD AND THAT

19   METHOD'S BEING ESTABLISHED AS A RELIABLE ONE BASED ON THE

20   RESEARCH.

21        AND THAT'S WHAT I REALLY WANT TO GO BACK TO BECAUSE, YOU

22   KNOW, IT'S NOT -- WE ARE NOT JUST RELYING ON THE FACT AND DR.

23   STEWART IS NOT JUST RELYING ON THE FACT THAT THE EUROPEAN

24   UNION HAS ADOPTED THIS.  HE THINKS THAT'S IMPORTANT.  HE

25   THINKS THAT BASED ON HIS REVIEW OF WHO WENT IN -- WHO

1    PARTICIPATED IN THE DEVELOPMENT OF THE MODEL, THAT'S AN

2    IMPORTANT FACT, THE FACT THAT THE MODEL WAS THEN SUBJECTED TO

3    PEER REVIEW, PUBLISHED AND ADOPTED BY THE EUROPEAN UNION IS

4    IMPORTANT.

5         BUT ULTIMATELY, YOU KNOW, WHAT THAT ACADEMIC LITERATURE

6    HAS SAID ABOUT WHEN THAT MODEL HAS BEEN TESTED AND COMPARED

7    AGAINST REAL-WORLD MEASURED DATA, WHICH IT HAS BEEN

8    COMPARED -- THAT MODEL HAS HAD FAR MORE REVIEW AND FAR MORE

9    SCRUTINY IN TERMS OF COMPARISONS AGAINST REAL-WORLD MEASURED

10   DATA AND TESTING AGAINST REAL-WORLD MEASURED DATA THAN ANY

11   OTHER COMPARABLE MODEL THAT IS USED BY INDUSTRIAL HYGIENISTS

12   ANYWHERE ELSE.

13        AND JUST BECAUSE THE EUROPEAN UNION HAS -- HAS ADOPTED

14   IT FOR THE REACH REGULATORY EXERCISE IN EUROPE DOESN'T AT ALL

15   PRECLUDE THE FACT THAT, YOU KNOW, OTHER INDUSTRIAL HYGIENISTS

16   BESIDE JAMES STEWART CAN AND DO USE IT HERE.  AND, YOU KNOW,

17   DR. STEWART SAYS HE TEACHES IT AT HARVARD SCHOOL OF PUBLIC

18   HEALTH.  HE TEACHES IT AT THE AIHA, YOU KNOW, CONTINUING

19   EDUCATION KINDS OF CONFERENCES WHERE HE SPEAKS AND TEACHES

20   OTHER INDUSTRIAL HYGIENISTS.

21        SO, DR. STEWART IS BASING HIS ADOPTION OF IT ON THE FACT

22   THAT IN FACT -- INDEED IT HAS BEEN TESTED MORE THAN ANY OTHER

23   MODEL, AND YOU -- YOU -- UNLIKE WITH, FOR EXAMPLE, THE NEAR

24   FIELD FAR FIELD MODEL WHICH HAS MORE COMMONLY BEEN USED HERE

25   IN THE UNITED STATES FOR THIS RETROSPECTIVE EXPOSURE

1    ANALYSIS, YOU ACTUALLY HAVE DATA FROM WHICH YOU CAN GET A

2    SENSE OF WHAT THE ERROR RATE OR RANGE OF EXPOSURES OR THE

3    DIFFERENCE FROM A MEASURED EXPOSURE WOULD BE BASED ON MODEL

4    OUTPUT.  YOU DON'T HAVE NEARLY AS MUCH OF THAT WITH RESPECT

5    TO THE OTHER MODEL, AND SO HE THINKS IT'S BETTER.  AND THAT I

6    WOULD SUBMIT TO THE COURT IS A SCIENTIFIC JUDGMENT FOR AN

7    INDUSTRIAL HYGIENIST TO MAKE AS OPPOSED TO THE COURT.

8         BUT, MRS. BONNEVILLE WANTS TO SAY -- AND THE COURT

9    ALLUDED TO THIS IN ONE OF ITS COMMENTS A MOMENT AGO.

10   MRS. BONNEVILLE WANTS TO SAY, NO, NO, WE'VE GOT ERROR RATE

11   UNDER DAUBERT ALL WRONG AND ERROR RATE IS REALLY REFERRING

12   NOT TO THE MAGNITUDE OF THE ERROR WHICH HAS BEEN MEASURED IN

13   THE CONTEXT OF ART, BUT TO THE FREQUENCY OF ERROR, AND

14   FREQUENCY OF ERROR, WHAT WE KNOW IS THE MODEL ALWAYS GETS IT

15   WRONG.

16        WELL, THAT IS NOT A GOOD ARGUMENT TO PUT IT -- TO PUT IT

17   IN MY VIEW MILDLY.  EVERY ESTIMATE -- IF DR. STEWART WAS ON

18   THE STAND RIGHT NOW, I GUARANTEE YOU THAT HE WOULD TESTIFY

19   THAT EVERY ESTIMATED EXPOSURE OF A WORKER BASED ON CERTAIN

20   WORKING CONDITIONS, THE ONE THING THAT YOU WILL KNOW FOR SURE

21   IS THAT IT'S NOT EXACTLY RIGHT.  IT'S AN ESTIMATE AND THE

22   ESTIMATE -- IT WOULD BE VERY, VERY RARE FOR YOU TO GET IT

23   PRECISELY RIGHT, AND THAT'S THE NATURE OF ESTIMATION IS WHAT

24   DR. STEWART WOULD SAY.  AND ANY MODELING EXERCISE, BUT NOT

25   LIMITED TO MODELING, EVEN IF YOU'RE USING SOME OTHER METHOD

1    THAT INCLUDES BORROWING FROM -- HAVING SOME MEASURED DATA BUT

2    NOT MEASURED DATA THAT'S SPECIFIC TO THAT WORKER, IF YOU'RE

3    ESTIMATING EXPOSURE, YOU'RE NOT GOING TO GET THE EXACT

4    EXPOSURE.

5         AND -- AND WHEN -- THE ONLY WAY IN WHICH

6    MRS. BONNEVILLE'S CHARACTERIZATION OF ART AS BEING A HUNDRED

7    PERCENT WRONG IS TRUE IS IN THE SAME SENSE THAT EVERY

8    ESTIMATE IS A HUNDRED PERCENT WRONG.

9         AND SO, THE QUESTION FOR THE COURT METHODOLOGICALLY

10   ABOUT THE RELIABILITY AND SOUNDNESS OF ART AS AN APPROACH IN

11   THIS CONTEXT SHOULD BE COMPARED TO WHAT?  AND IN DR.

12   STEWART'S SCIENTIFIC JUDGMENT ART IS A SUPERIOR

13   METHODOLOGICAL MODEL OR APPROACH FOR -- IN RETROSPECTIVE

14   EXPOSURE ASSESSMENT OF BENZENE THAN ANY OTHER AVAILABLE

15   MODEL.  AND THERE'S MORE DATA TO, YOU KNOW, DETAIL WHAT ITS

16   RESULTS -- HOW ITS RESULTS COMPARE WITH REAL-WORLD

17   MEASUREMENTS THAN THERE IS FOR ANY OTHER MODEL.  AND SO,

18   RELIABLE COMPARED TO WHAT?

19        NOW, MRS. BONNEVILLE HAD A DISCUSSION ABOUT WHETHER OR

20   NOT THE MODEL HAS BEEN QUOTE VALIDATED.  AND INDEED IN SOME

21   OF THE ARTICLES BY SCHINKEL, AND THERE ARE SEVERAL OF THOSE

22   ARTICLES IN THE RECORD, HE SAYS THAT IT HAS NOT BEEN

23   VALIDATED AND -- BUT IT HAS BEEN CALIBRATED.  THEN I WROTE

24   THIS DOWN.  I MAY NOT HAVE GOTTEN IT EXACTLY CORRECT.  BUT

25   MRS. BONNEVILLE DEFINED VALIDATED IN HER TERMS AS WHEN THE

1    MODEL'S OUTPUT HAS BEEN COMPARED TO A REAL-WORLD DATA AND

2    SHOWS THAT THERE IS A RELATIONSHIP BETWEEN WHAT THE OUTPUT

3    PREDICTS OR WHAT THE OUTPUT IS AND WHAT THE REAL-WORLD

4    MEASURED DATA IS.

5        WELL, WHAT THE SCHINKEL ARTICLES AND THE PUBLISHED

6    ARTICLES HAVE DESCRIBED AS CALIBRATION OF THE ART MODEL FITS

7    MRS. BONNEVILLE'S DEFINITION OF VALIDATION.  WHEN SCHINKEL

8    AND OTHERS USE THE WORD VALIDATION, THEY ARE TALKING ABOUT A

9    SPECIFIC STATISTICAL EXERCISE THAT GOES WELL BEYOND COMPARING

10   THE OUTPUT OF ART TO THE -- TO MEASURED DATA BECAUSE THAT'S

11   EXACTLY WHAT THEY DID IN THE CALIBRATION ARTICLE, THE 2011

12   SCHINKEL ARTICLE WHICH IS FOUND IN OUR OPPOSITION, AND IT'S

13   AT PAGE 1001 OF OUR OPPOSITION PAPERS.

14       IT'S THAT 2011 ARTICLE.  AND IT COMPARED ART OUTPUTS TO

15   MORE THAN 2,000 MEASURED PIECES OF DATA AND FOUND THAT THE

16   ART OUTPUTS WERE IN THE RANGE OF TWO TO SIX TIMES WHAT --

17   BOTH ABOVE AND BELOW, BUT WITHIN TWO TO SIX TIMES WHAT THE

18   REAL-WORLD MEASURED DATA SHOWED, WHICH IS QUITE GOOD FOR A

19   MODEL.

20       BUT, SO I JUST WANT TO BE CLEAR THAT THE RECORD REFLECTS

21   THAT IN THE SENSE THAT MRS. BONNEVILLE'S USING THE TERM,

22   THERE HAVE BEEN MANY, MANY VALIDATIONS OF -- OR MANY, MANY

23   COMPARISONS OF ART OUTPUT TO REAL-WORLD MEASURED DATA TO

24   VALIDATE IN THE SENSE THAT SHE USES THAT TERM AS OPPOSED TO

25   VALIDATING IN SOME MORE TECHNICAL SENSE THE WAY THAT SCHINKEL

1    IS TALKING ABOUT.

2         AND I DON'T PURPORT TO REALLY UNDERSTAND HOW HE'S USING

3    THAT TERM, BUT IT MEANS MORE THAN.  I DO KNOW IT MEANS MORE

4    THAN JUST WHETHER OR NOT THE MODEL IS ACCURATELY OR -- OR

5    PREDICTING MEASUREMENTS AND THEN COMPARING WHETHER THOSE

6    MEASUREMENTS ARE CORRECT OR HOW CLOSE THEY ARE TO THE -- TO

7    THE REAL-WORLD MEASURED DATA.

8              THE COURT:  MRS. BONNEVILLE SAYS THAT SCHINKEL --

9    THE SCHINKEL IN 2013 SAID THAT THE ART MODEL NEEDS VALIDATION

10   DATA.  DID YOU SEE THAT?

11             MR. JENSEN:  YES.  HE DOES SAY THAT, YOUR HONOR.

12   AND AGAIN, WHAT -- WHAT HE MEANS SPECIFICALLY BY VALIDATION

13   IS MORE THAN JUST A COMPARISON WITH MEASURED DATA.  IT'S SOME

14   KIND OF STATISTICAL SPECIFIC -- HIGHLY SPECIFIC STATISTICAL

15   ANALYSIS THAT HE SAYS IS NECESSARY FOR A VALIDATION AS

16   OPPOSED TO WHAT THEY HAVE ALREADY DONE IN THE CONTEXT OF WHAT

17   HE USES THE WORD CALIBRATION, WHICH IS HIS 2011 ARTICLE,

18   WHICH YOU KNOW, IN THAT ARTICLE HE SAYS, YOU KNOW, HERE'S

19   WHAT WE DID, WE HAD 2,000 AND SOME ODD MEASURED PIECES OF

20   DATA AND WE TOOK THE EXPOSURE CONDITIONS THAT APPLIED WITH

21   RESPECT TO THOSE MEASURED DATA AND HAD THEM INPUT INTO ART

22   AND HERE'S WHAT WE GOT AND -- AS A COMPARISON AND WE COMPARED

23   THOSE.

24        THAT -- THAT IS VALIDATION THE WAY MRS. BONNEVILLE EVEN

25   DEFINED THE TERM.  IT'S NOT VALIDATION APPARENTLY THE WAY DR.

1    SCHINKEL OR MR. SCHINKEL, I DON'T KNOW, DEFINES THE TERMS,

2    BUT -- WHICH I THINK HAS TO DO WITH ALL -- I THINK, BUT I'M

3    NOT SURE, HAS TO DO WITH ALSO INCLUDING THE CONCEPT OF

4    INTER-USER VARIABILITY WHEN DIFFERENT SCIENTISTS ARE

5    EMPLOYING ART TO THE SAME KIND OF EXPOSURE CONDITIONS.

6        AND BUT IN ANY EVENT, WHAT DR. STEWART SAYS IN THE

7    RECORD -- THIS IS NOT REBUTTED IN, UNDER THE RECORD -- IS

8    THAT THERE ARE MORE REAL-WORLD COMPARISONS OF THE OUTPUT OF

9    THE ART MODEL THAN THERE ARE REAL-WORLD COMPARISONS TO ANY

10   OTHER AVAILABLE MODEL IN THIS CONTEXT.

11       OKAY.  WE HAVE ALREADY TALKED ABOUT THE GENERAL

12   ACCEPTANCE IN THE CONTEXT AT LEAST OF THE EUROPEAN UNION AND

13   THAT IT'S BEEN SUBJECTED TO PEER REVIEW AND PUBLISHED IN THE

14   SCIENTIFIC LITERATURE ON SEVERAL OCCASIONS AND THAT IT'S BEEN

15   REPEATEDLY TESTED.  BECAUSE OF--

16       *THE COURT:*  BUT THEN GENERALLY IS YOUR ARGUMENT

17   THAT THE THEORY THE ART MODEL HAS BEEN GENERALLY ACCEPTED

18   WITHIN THE AMERICAN COMMUNITY?

19       *MR. JENSEN:*  WELL, MY ARGUMENT WOULD BE THAT

20   THERE'S NO -- THERE'S NO EVIDENCE ON THIS RECORD THAT THERE

21   IS A MATERIAL DIFFERENCE BETWEEN THE SCIENTIFIC STANDARDS

22   EMPLOYED IN THE EUROPEAN SCIENTIFIC COMMUNITY OF INDUSTRIAL

23   HYGIENE THAN THERE ARE HERE.  AND THERE IS A RECORD THAT, YOU

24   KNOW, AT THE HARVARD SCHOOL OF PUBLIC HEALTH, YOU KNOW, ART

25   GETS TAUGHT BY DR. STEWART IN THE -- BY THE AMERICAN

1    INDUSTRIAL HYGIENE ASSOCIATION.  DR. STEWART TEACHES IT HERE

2    IN THE UNITED STATES.

3            THE COURT:  WELL, IT SOUNDS LIKE A REALLY GOOD GIG

4    FOR DR. STEWART, WHICH I GUESS GOES TO THE ISSUE OF

5    RELIABILITY, YOU KNOW, IN A SENSE THAT ONE OF THE DAUBERT

6    FACTORS IS WHETHER THE EXPERT'S OPINION WAS DEVELOPED

7    EXPRESSLY FOR THE PURPOSE OF TESTIFYING OR WHETHER HE'S--

8            MR. JENSEN:  THERE'S NO EVIDENCE AT ALL, YOUR

9    HONOR, THAT HE'S CHOSEN TO USE -- TO TEACH ART EITHER AT THE

10   AIHA OR AT HARVARD FOR ANY REASON HAVING TO DO WITH

11   LITIGATION, AND I TAKE UMBRAGE OF THAT.  IN FACT--

12           THE COURT:  NO, WHAT I'M SAYING IS THAT THE

13   EVIDENCE OR THE ARGUMENT AT LEAST THAT'S BEEN PRESENTED IS

14   THAT DR. STEWART HAS TESTIFIED IN MULTIPLE LITIGATIONS ON

15   BEHALF OF PLAINTIFFS WHO HAVE SOME SORT OF EXPOSURE USING

16   THIS MODEL, AND THEN YOU'RE TELLING ME, AND HE TEACHES AT

17   HARVARD AND HE TEACHES STUDENTS TO USE MATHEMATICAL MODELING

18   USING SPECIFICALLY THE ART MODEL AND HE TEACHES AT NIH FOR

19   OTHER INDUSTRIAL HYGIENISTS TO USE THAT SPECIFIC MODEL.

20       WHAT I WOULD RATHER HEAR, I THINK, OR WHAT I THINK WOULD

21   BE MORE CONVINCING, MUCH MORE CONVINCING IS TO SAY, THIS

22   MODEL IS USED ROUTINELY BY ALL THE INDUSTRIAL HYGIENISTS OR A

23   BUNCH OF THEM OR, HERE, WE HAVE GOT -- WE HAVE GOT 30 OTHER

24   LITIGATION WHERE WE USE EVERYBODY -- ALL THESE INDUSTRIAL

25   HYGIENISTS WHO CONCUR WITH THE LITERATURE THAT SAYS THIS IS

1    THE BEST THING WE HAVE GOT, WE DON'T NEED TO GO MEASURE DATA,

2    YOU KNOW, IN FACT IT'S BETTER THAN GOING AND DOING AN

3    ASSESSMENT OF WHAT MOTORCYCLE OR AUTOMOBILE MECHANICS ACTUAL

4    ENVIRONMENT INCLUDE, AND THAT'S NOT WHAT I'M HEARING FROM

5    YOU.

6        I'M NOT -- I DON'T KNOW DR. STEWART FROM ADAM.  I'M SURE

7    HE'S A FINE GENTLEMAN AND HE -- I DON'T THINK THERE'S ANY

8    CHALLENGE.  I HAVEN'T HEARD ANY CHALLENGE FROM THE DEFENDANTS

9    AS TO HIS QUALIFICATIONS.  MY CONCERN IS DAUBERT.  AND YOU

10   KNOW, I'VE GOT THE LIST OF DAUBERT FACTORS AND PROGENY, AND

11   THAT'S WHAT MY ROLE IS.  I DON'T -- I DON'T REALLY CARE --

12   AND YOU KNOW, YOU SORT OF ALLUDED TO THIS YESTERDAY ABOUT HOW

13   THE COURT MUST RESIST THE URGE TO FIND WHETHER ONE RESULT IS

14   BETTER THAN ANOTHER RESULT, AND THAT'S JUST NOT WHAT WE DO.

15       WHAT THE COURT DOES IN CRIMINAL CONTEXT, WE DON'T CARE

16   WHETHER THE PERSON GETS CONVICTED OR IS ACQUITTED.  WHAT WE

17   DO CARE ABOUT IS DUE PROCESS.  AND IN THE CIVIL CONTEXT, WE

18   DON'T CARE WHO WINS OR LOSES.  WE DON'T CARE WHETHER THE

19   PLAINTIFF RECOVERS.  WE DON'T CARE WHETHER THE DEFENDANT GETS

20   A DEFENSE VERDICT.  BUT WE DO CARE ABOUT THE PROCESS.

21       AND THE PROCESS HERE THAT'S AT ISSUE IS DAUBERT.  AND

22   DAUBERT HAS IDENTIFIED A LIST OF FACTORS THAT THE COURT IS TO

23   CONSIDER, AND THAT'S -- THAT'S MY INTEREST.  EVERY ARGUMENT

24   THAT GOES, I'M TRYING TO FIGURE OUT DOES IT GO TO THE

25   PERSON'S QUALIFICATION, THE PROFFERED WITNESS'S

1    QUALIFICATIONS, DOES IT GO TO AN AREA THAT REQUIRES

2    SCIENTIFIC, TECHNOLOGICAL, OR SPECIALIZED KNOWLEDGE, IT GOES

3    TO WHETHER THE TESTIMONY OF THE EXPERT WILL ASSIST THE TRIER

4    OF FACT, IT GOES TO WHETHER THE MODEL THAT'S BEEN USED HAS

5    BEEN TESTED, CAN IT BE TESTED, HAS IT BEEN TESTED, WHETHER

6    IT'S BEEN SUBJECTED TO PEER REVIEW AND PUBLICATION, WHETHER

7    THERE'S A KNOWN POTENTIAL RATE OF ERROR, WHETHER THE THEORY

8    IS GENERALLY ACCEPTED.

9        AND THEN THE OTHER FACTORS THAT THE COURT IS TO CONSIDER

10   AS ADDITIONAL RELIABILITY FACTORS IS WHETHER THE EXPERT'S

11   OPINION WAS DEVELOPED EXPRESSLY FOR THE PURPOSE OF TESTIFYING

12   AND THUS MORE LIKELY TO BE BIASED TOWARD A PARTICULAR RESULT,

13   WHETHER THE EXPERT EMPLOYED THE ANTITHESIS OF SCIENTIFIC

14   METHODOLOGY BY COMING TO A FIRM CONCLUSION FIRST AND THEN

15   DOING RESEARCH TO SUPPORT IT, WHETHER THE EXPERT HAS

16   UNJUSTIFIABLY EXTRAPOLATED FROM AN ACCEPTED PREMISE TO AN

17   UNFOUNDED CONCLUSION, WHETHER THE EXPERT ADEQUATELY ACCOUNTED

18   FOR AND EXCLUDED ALTERNATIVE EXPLANATIONS, WHETHER

19   EPIDEMIOLOGY, WHETHER -- CONSIDERED THE BEST EVIDENCE OF

20   GENERAL CAUSATION IN A TOXIC TORT CASE WAS AVAILABLE, WAS

21   PROPERLY ADDRESSED BY THE EXPERT, OR WAS IMPROPERLY IGNORED.

22       SO THAT'S MY CHECKLIST.  THAT'S WHAT THE COURTS HAVE

23   TOLD ME IS MY RESPONSIBILITY TO CHECK.  NOW, IF YOU TAKE

24   UMBRAGE TO ME APPLYING THESE BIAS OR CREDIBILITY OR

25   RELIABILITY FACTORS, THEN I THINK YOU HAVE GOT TO TAKE IT UP

1    WITH THE US SUPREME COURT OR THE FOURTH CIRCUIT BECAUSE

2    THAT'S WHAT THEY ARE TELLING ME THAT I NEED TO INQUIRE INTO.

3           *MR. JENSEN:*  WHAT I WAS TAKING UMBRAGE AT, YOUR

4    HONOR, IS THERE'S NO SUGGESTION IN THE EVIDENCE IN THE RECORD

5    IN MY OPINION THAT DR. STEWART HAS CHOSEN FOR SOME REASON

6    RELATED TO LITIGATION AT ALL TO ADOPT ART OR TEACH ART EITHER

7    AT HARVARD SCHOOL OF PUBLIC HEALTH OR THE AIHA NOR -- HIS

8    AFFIDAVIT I THINK MAKES IT CLEAR.  IT'S NOT THAT HE TEACHES

9    JUST TO USE ART.  ART IS AN EXAMPLE OF A MATHEMATICAL MODEL

10   THAT HE USES WHEN HE TEACHES IN BOTH OF THOSE CONTEXT, AND

11   THAT'S -- THAT'S WHAT I TOOK UMBRAGE--

12          *THE COURT:*  WELL, I GUESS THE OTHER -- WOULD YOU

13   ADDRESS THE OTHER FACTORS THAT I JUST REVIEWED THAT HAVE BEEN

14   CHALLENGED BY THE DEFENDANTS?  THAT HE'S NOT USING -- HE'S

15   NOT DEVELOPING HIS TESTIMONY UNTIL HE IS CHALLENGED AND THEN

16   SAYS, OKAY, OH, YEAH, YEAH, YEAH, I WAS, I DID RESEARCH THAT

17   WHEN HE DOESN'T REFER TO IT IN HIS ORIGINAL REPORT.  OH, I

18   DID CONSIDER THOSE STUDIES AND I REJECTED THEM.

19          THE AFFIDAVIT OR THE DISCREPANCIES OR -- REALLY IT'S THE

20   OMISSIONS BECAUSE I THINK THAT IT APPEARS THAT THE EXPERT

21   REPORT WAS SILENT ON SOME THINGS, THE DEPOSITION RAISED SOME

22   ADDITIONAL ISSUES TO WHICH I THINK DR. STEWART WAS SILENT OR

23   HADN'T CONSIDERED, HADN'T EVALUATED, THEN THE AFFIDAVIT TRIES

24   TO CLEAN UP ALL OF THOSE OMISSIONS AS REALLY THE BASIS, THE

25   GROUNDING, THE FOUNDATION FOR HIS OPINION.

1      AND SO, THE QUESTION THERE, WHEN YOU HAVE THAT KIND OF A

2   TIMELINE, IS WHETHER HE CAME UP WITH THE PREMISE AND THEN

3   WENT TO SUPPORT IT, AND THAT GOES TO DAUBERT RELIABILITY, AND

4   THAT IS A -- IS THE COURT'S RESPONSIBILITY.  NOW, I DON'T

5   CARE ABOUT THE FACTS.  I DON'T CARE ABOUT THE RESULT.  I CARE

6   ABOUT THE PROCESS.

7      MR. JENSEN:  OKAY.  WELL, YOUR HONOR, WITH RESPECT

8   TO THE ISSUE OF THE TIMING OF THE AFFIDAVIT AND THE EXTENT TO

9   WHICH THAT CONCERN IS A LEGITIMATE ONE, I THINK THAT THE

10  CONCERN BECOMES MORE LEGITIMATE, FOR LACK OF A BETTER WORD,

11  THAT YOU ARTICULATED TO THE EXTENT THAT -- THAT THERE'S

12  REALLY AN INCONSISTENCY IN THE AFFIDAVIT AND THE APPROACH

13  THAT IS DESCRIBED AND ARTICULATED IN BOTH THE DEPOSITION AND

14  THE REPORT.

15     AND WITH SPECIFIC RESPECT TO ART -- AND I DON'T EVEN

16  THINK THERE'S A CONTENTION THAT ANYTHING THAT DR. STEWART HAD

17  TO SAY ABOUT ART EITHER IN HIS REPORT OR HIS DEPOSITION IS IN

18  ANY WAY INCONSISTENT WITH WHAT HE SAID ABOUT IT IN HIS

19  AFFIDAVIT.

20     NOW, HAS HE IDENTIFIED AND ARTICULATED ADDITIONAL

21  REASONS OR DETAIL AT LEAST AS TO WHY HE THINKS IT WAS

22  PROCEDURALLY AND METHODOLOGICALLY APPROPRIATE TO USE IT?

23  ABSOLUTELY.

24     AND IT'S HARD TO ANTICIPATE EVERY CRITIQUE THAT IS GOING

25  TO BE MADE TO YOUR ANALYSIS.  YOU KNOW, MAYBE HE SHOULD HAVE

```
 1    DONE THAT IN HIS INITIAL REPORT.  BUT AS I TOLD YOU YESTERDAY
 2    AND WAS UNSUCCESSFUL IN CONVINCING YOU, I MEAN, I BELIEVE
 3    IT'S APPROPRIATE UNDER 702 FOR HIM TO PROVIDE THAT ADDITIONAL
 4    DETAIL IN A RESPONSIVE AFFIDAVIT.  BUT ANYHOW, I UNDERSTAND
 5    THE COURT'S CONCERNS.  LET ME GO ON TO SOME OF THE MORE
 6    SPECIFIC ARGUMENTS.
 7         WELL I GUESS BEFORE -- BEFORE WE LEAVE THE ISSUE OF WHAT
 8    MRS. BONNEVILLE ARGUED IN ART, I JUST -- I GUESS I JUST WANT
 9    TO ASK THE COURT IF YOU HAVE ADDITIONAL QUESTIONS THAT -- OR
10    CONCERNS THAT I HAVE NOT -- WE HAVE NOT ALREADY TALKED ABOUT
11    IN THAT CONTEXT.
12         THE COURT:  MY QUESTIONS REMAIN THE SAME.  EACH OF
13    THESE DAUBERT FACTORS, IF YOU LIKEN THEM--
14         MR. JENSEN:  I DON'T WANT YOU TO LIST THEM AGAIN.
15    I THINK IT HAD BEEN TESTED--
16         THE COURT:  I FEEL LIKE I'VE -- THIS IS MAYBE THE
17    THIRD TIME THAT I HAVE GONE THROUGH THE FACTORS INVITING
18    ARGUMENT ON EACH OF THE FACTORS, AND I HAVEN'T HEARD IT YET.
19    BUT IT'S NOT MY -- MY ROLE IS IN THE ADVOCACY ROLE.  MY ROLE
20    IS TO PARSE OUT AND TO DISTINGUISH AND TO TEASE OUT THE
21    ARGUMENTS THAT ARE RELEVANT TO EACH OF THE FACTORS.
22         I'M HAPPY FOR YOU TO GO THROUGH WHATEVER PRESENTATION OR
23    WHATEVER ORDER THAT YOU WISH TO ADDRESS, AND IF IT'S FOR ME
24    TO LATER TRY TO FIGURE OUT WHETHER YOU ADDRESSED OR
25    SATISFACTORILY ADDRESSED EACH OF THOSE FACTORS, THEN I'M
```

1    HAPPY TO DO SO.  BUT I'M NOT -- I'M NOT GOING TO BEG YOU TO

2    DO IT.

3         MR. JENSEN:  WELL, LET ME SUMMARIZE AGAIN WITH

4    RESPECT TO THE FACTORS -- AND I DON'T PRETEND TO HAVE

5    COMMITTED TO MEMORY AS EXHAUSTIVE A LIST AS YOU READ TO ME.

6    BUT IN TERMS OF PEER REVIEW, THE ART MODEL HAS BEEN PEER

7    REVIEWED ON MULTIPLE OCCASIONS.

8         IN TERMS OF GENERAL ACCEPTANCE, I DON'T THINK I HAVE

9    SATISFIED YOU THAT IT'S GENERALLY ACCEPTED IN THE UNITED

10   STATES, BUT I -- MY ARGUMENT THERE IS, YOUR HONOR, THERE'S NO

11   EVIDENCE THAT THE STANDARDS EMPLOYED IN THE SCIENTIFIC

12   COMMUNITY OF INDUSTRIAL HYGIENISTS AND OTHERS WHO ARE

13   CONCERNED ABOUT EXPOSURE ASSESSMENT IN THE EUROPEAN UNION IS

14   ANY DIFFERENT THAN THE STANDARDS EMPLOYED BY THE RELEVANT

15   SCIENTIFIC COMMUNITY HERE IN THE UNITED STATES.  AND I

16   HAVEN'T EVEN HEARD THAT ARGUMENT YET ARTICULATED BY THE

17   DEFENDANT.

18        WITH RESPECT TO THE ISSUE OF TESTING, IT'S BEEN MORE

19   TESTED, THE RECORD REFLECTS, THAN ANY OTHER COMPARABLE

20   AVAILABLE MODEL TO DO THE SAME KIND OF TASK.

21        WITH RESPECT TO THE ISSUE OF ERROR RATE, THERE IS AN

22   AVAILABLE ERROR RATE IN TERMS OF HOW CLOSE DOES THIS MODEL

23   GET WHEN YOU USE IT IN SPECIFIED WORKING EXPOSURE CONDITIONS,

24   HOW CLOSE DO THE RESULTS COME AS COMPARED TO REAL-WORLD

25   MEASURED DATA?  AND IT HAS BEEN TESTED IN THAT REGARD AND A

1    ERROR RATE HAS BEEN DETERMINED IN THAT SENSE.

2         AND IMPORTANTLY, THAT KIND OF COMPARISON USING THOUSANDS

3    OF DATA POINTS HAS NOT BEEN DONE WITH RESPECT TO OTHER

4    AVAILABLE MODELS.  AND THEN ON THE ISSUE OF WHETHER THIS IS A

5    OPINION THAT IS -- OR A METHODOLOGY THAT HAS BEEN EMPLOYED BY

6    DR. STEWART SOLELY ON THE CONTEXT OF LITIGATION, THE RECORD

7    REFLECTS THAT HE HAS EMPLOYED IT OUTSIDE OF THE CONTEXT OF

8    LITIGATION.

9         AND YOU KNOW, I HEAR YOUR CONCERN ABOUT I WANT TO HEAR

10   THAT OTHER INDUSTRIAL HYGIENISTS IN THE UNITED STATES ARE

11   USING IT AND, YOU KNOW, I -- THE RECORD DOESN'T REFLECT THAT

12   ONE WAY OR THE OTHER.  I THINK THAT'S TRUE.  I DON'T THINK IT

13   MATTERS BECAUSE THERE'S NO EVIDENCE THAT THE STANDARD

14   EMPLOYED IN EUROPE IS DIFFERENT IN ANY MEANINGFUL FASHION IN

15   TERMS OF SCIENTIFIC STANDARDS.

16        AND I KNOW I HAVEN'T ADDRESSED ALL OF THEM, I DON'T EVEN

17   RECALL WHAT ALL OF THE OTHERS ARE, BUT MANY OF THE -- MANY OF

18   THE ONES THAT GO BEYOND THE FOUR DAUBERT FACTORS DEAL WITH

19   THIS ISSUE OF -- OF IS IT REALLY FROM LITIGATION, IS THERE

20   REALLY SOME KIND OF BIAS GOING ON?  AND I HEAR YOU ABOUT THE

21   AFFIDAVIT ON THE ISSUE OF ART MODELING.

22        AGAIN, THE AFFIDAVITS CONSISTENT WITH -- THERE'S MORE

23   DETAIL, BUT IT'S CONSISTENT WITH EVERYTHING HE SAID IN HIS

24   REPORT AND IN HIS DEPOSITION.

25             *THE COURT:*  OKAY.  HOW MUCH LONGER DO YOU HAVE ON

1    YOUR ARGUMENT AND REPLY?  IT'S LUNCH TIME AND I'M TRYING TO

2    FIGURE OUT --

3              MR. JENSEN:  RIGHT.

4              THE COURT:  -- HOW TO--

5              MR. JENSEN:  I THINK I CAN GET IT DONE -- AND IT

6    ALWAYS DEPENDS ON QUESTIONS, YOUR HONOR --

7              THE COURT:  SURE.

8              MR. JENSEN:  -- BUT PROBABLY ABOUT 15 TO 20

9    MINUTES.

10             THE COURT:  OKAY.  AND HOW LONG FOR REPLY?

11             MRS. BONNEVILLE:  YOUR HONOR, I PROBABLY HAVE ABOUT

12   10 MINUTES, MAYBE LESS.

13             MRS. KOCH:  I WOULD SAY THE SAME, YOUR HONOR, BUT I

14   DON'T THINK HE'S REALLY GOTTEN INTO THE SAFETY KLEEN STUFF

15   YET, SO...

16             THE COURT:  OKAY.  YEAH.  I THINK WE WILL GO AHEAD

17   AND BREAK FOR LUNCH.  WE HAVE TO TAKE A BREAK ANY WAY FOR THE

18   COURT STAFF BECAUSE WE HAVE BEEN GOING FOR A WHILE.  LET'S GO

19   AHEAD AND BREAK FOR LUNCH AND RE-GROUP AT 2:00.  OKAY?

20        (WHEREUPON, COURT WAS IN RECESS FOR LUNCH.)

21             THE COURT:  WE ARE BACK ON THE RECORD IN BOYKIN

22   VERSUS SPECTRUM ET AL, CIVIL NUMBER 3:13-417.  I THINK WHERE

23   WE LAST LEFT OFF, MR. JENSEN, YOU WERE ADDRESSING THE

24   REMAINING ARGUMENTS IN OPPOSITION TO THE MOTIONS TO STRIKE

25   THE EXPERT TESTIMONY OF DR. STEWART.  SO, PLEASE CONTINUE.

1            MR. JENSEN:  YES, MA'AM.  THANK YOU.  I WANTED TO

2    MOVE TO THE BENZENE CONCENTRATION ISSUE, YOUR HONOR.

3            THE COURT:  OKAY.

4            MR. JENSEN:  AND JUST TO SET THE TABLE ON THAT, THE

5    WAY DR. STEWART APPROACHED THAT -- WELL, BEFORE I EVEN GET TO

6    THE METHODOLOGICAL APPROACH, WHAT HE ENDED UP CONCLUDING AND

7    DOING AND INPUTTING INTO THE MODEL -- I'M NOT SURE THE EXTENT

8    TO WHICH THAT'S CLEAR TO YOU AT THIS POINT -- IS NOT ONLY FOR

9    SAFETY KLEEN BUT FOR THE OTHER MINERAL SPIRITS-BASED SOLVENTS

10   BY THE OTHER DEFENDANTS IN THIS CASE.

11           HE ASSUMED THAT FROM THE TIME PERIOD OF THE STARTING

12   POINT OF 1987 UNTIL 1994 THAT THE RANGE OF BENZENE CONTENT

13   WAS BETWEEN 0.1 TO 0.5 PARTS PER MILLION IN THE LIQUID

14   MINERAL SPIRITS PRODUCTS AND AFTER THAT TIMEFRAME FROM

15   1940 -- EXCUSE ME -- 1994 FORWARD THAT IT WAS MUCH SMALLER.

16   AND I'M FORGETTING WHAT THE -- THE NUMBER IS.

17           BUT THE BASIS FOR HIM GETTING THERE WAS HIS REVIEW

18   HISTORICALLY OF WHAT WAS HAPPENING WITHIN THE INDUSTRY,

19   INDUSTRY-WIDE, WITH RESPECT TO PETROLEUM DISTILLATE SOLVENTS.

20   AND WHAT HE WAS SEEING WAS THAT, A, THERE WERE -- BEFORE 1994

21   THE STANDARD MINERAL SPIRITS AND OTHER ORGANIC SOLVENTS

22   PRODUCTS WERE WHAT WOULD BE LOOSELY CHARACTERIZED AS

23   STRAIGHT-RUN DISTILLATE PRODUCTS.  AND WHAT I'M REFERRING TO

24   BY THAT, YOUR HONOR, IS AS YOU PROBABLY KNOW, ALL PETROLEUM

25   DISTILLATES START FROM CRUDE OIL, AND YOU -- AND I'M GOING TO

1    DESCRIBE THIS AS BEST I CAN AS A LAYPERSON -- BUT THE CRUDE

2    IS AT THE BOTTOM OF A DISTILLATION TOWER THAT HAS A HEAT

3    SOURCE UNDERNEATH.  THE CRUDE IS HEATED UP SO ITS VARIOUS

4    COMPONENTS START BOILING OFF, EVAPORATING INTO THE TOWER.

5    AND AS THEY RISE UP THE TOWER, THOSE VARIOUS COMPONENTS OF

6    THE CRUDE OIL, AND THAT INCLUDES BENZENE AND XYLENE AND THE

7    STUFF THAT'S IN MINERAL SPIRITS AND LOTS OF OTHER

8    PETROLEUM-RELATED PRODUCTS, THEY START MOVING UP AND VAPOR

9    FORM UP THE COLUMN AND THEY START COOLING OFF AS THEY GET

10   HIGHER AND AWAY FROM THE HEAT SOURCE.

11       AND BECAUSE THE DIFFERENT COMPONENTS HAVE DIFFERENT

12   CHEMICAL MAKEUP AND THEY HAVE DIFFERENT BOILING POINTS AND

13   CONDENSATION POINTS, SAME THING, THEY WILL START CONDENSING

14   BACK INTO THE LIQUID FORM AT VARIOUS PLACES IN THAT -- IN

15   THAT TOWER.  AND AS THEY DISTILL BACK INTO LIQUID FORM, THE

16   IDEA IS THE STUFF AS -- AND IT CONDENSES BACK INTO LIQUID

17   FORM, IT GETS PULLED OFF AND PIPED OFF SOME PLACE ELSE AS A

18   PRODUCT THAT, YOU KNOW, IS XYLENE OR TOLUENE OR WHATEVER

19   BECAUSE THAT'S THE BOILING RANGE THAT'S BEEN PULLED OFF THAT

20   STRING.

21       AND THAT PROCESS HAS BEEN GOING ON FOR I THINK HUNDREDS

22   OF YEARS OR CERTAINLY MORE THAN A HUNDRED YEARS AND WORKS --

23   HAS WORKED VERY WELL.  BUT IT'S WELL-ACKNOWLEDGED IN THE

24   SCIENTIFIC LITERATURE AND IN INDUSTRY THAT IT IS AN IMPRECISE

25   PROCESS IN THE SENSE THAT EVEN THOUGH ALL THOSE DIFFERENT

1    COMPONENTS DO HAVE DIFFERENT BOILING POINTS, AND THEREFORE

2    MOSTLY WHEN YOU PULL OFF THE STUFF THAT'S, YOU KNOW, IT --

3    300 DEGREES CELSIUS OR WHATEVER, YOU'RE GOING TO GET 300

4    DEGREE CELSIUS BOILING POINT MATERIAL, YOU WILL ALSO GET

5    OTHER MATERIAL THAT, DESPITE HAVING A LOWER BOILING POINT OR

6    A HIGHER BOILING POINT, WILL BE MIXED IN WITH IT.  AND THAT'S

7    WHY PRODUCTS LIKE MINERAL SPIRITS, LIKE XYLENE, LIKE TOLUENE,

8    LIKE HEPTANE, HEXANE, ALL HAVE MEASURABLE QUANTITIES OF

9    BENZENE IN THEM EVEN THOUGH BENZENE HAS A DIFFERENT --

10   DIFFERENT BOILING RANGE.

11        AND SO WITH THAT, THAT'S SORT OF THE BACK-DROP.  AND

12   THEN AFTER -- AFTER -- THAT'S A STRAIGHT RUN PETROLEUM

13   DISTILLATE.  THERE ARE OTHER METHODS AVAILABLE AND THAT HAVE

14   BEEN AVAILABLE A LONG TIME FOR CONDUCTING FURTHER WORK,

15   FURTHER CHEMICAL CHANGES ON THOSE DISTILLATE PRODUCTS

16   INCLUDING HYDRO-TREATING, WHICH STRIPS OUT, AS I UNDERSTAND

17   IT, MOST OF THE AROMATIC CONTENT OF NON-AROMATIC PETROLEUM

18   DISTILLATES LIKE MINERAL SPIRITS.

19        AND SO, AFTER YOU HAVE DONE THAT INITIAL DISTILLATION,

20   YOU CAN DO SOME HYDRO-TREATMENT AND THAT WILL TAKE OUT

21   PROBABLY NOT ALL BUT MUCH, MOST OF, WHATEVER IS LEFT IN TERMS

22   OF BENZENE CONTENT.  AND SO, WHAT DR. STEWART DID WAS DO THE

23   HISTORICAL REVIEW THAT INDUSTRY-WIDE BY 1994 THIS

24   HYDRO-TREATMENT PROCESS WAS OCCURRING MUCH MORE ROUTINELY AND

25   HE ALSO REVIEWED THE MATERIAL SAFETY DATA SHEETS SPECIFIC TO

1    THE PRODUCTS OF THE DEFENDANTS TO SEE IF HE COULD IDENTIFY

2    BECAUSE MATERIAL SAFETY DATA SHEETS WILL OFTEN SAY IF THE

3    DISTILLATE PRODUCT HAS BEEN HYDRO-TREATED.

4         AND RESPECT TO SAFETY KLEEN AT LEAST HE DID FIND THAT

5    THERE WAS A DIFFERENCE BETWEEN WITH RESPECT TO THE PREMIUM

6    SOLVENT 150, 1993 MSDS, HE FOUND DID NOT INDICATE

7    HYDRO-TREATMENT AND 1994 ONE DID.  AND SO FROM 1994 FORWARD

8    HE'S GOT A VERY SMALL FRACTION OF THE LEVEL OF BENZENE IN

9    THOSE PRODUCTS, AND I BELIEVE--

10        THE COURT:  IS THAT -- SO IS THE DIFFERENCE AT 1994

11   THAT HE'S LOOKING SAFETY KLEEN SOLVENT SPECIFIC AND BEFORE

12   1994 HE'S LOOKING INDUSTRY-WIDE STRAIGHT-RUN PETROLEUM

13   DISTILLATE PRE-HYDRO-TREATMENT?

14        MR. JENSEN:  YEAH.  I THINK THE FAIREST

15   INTERPRETATION OF -- IN MY UNDERSTANDING -- OF WHAT HE

16   INITIALLY DID AND, YOU KNOW, LATER ON HE LOOKED AT SOME MORE

17   SAFETY KLEEN SPECIFIC MATERIALS.  BUT WHAT HE INITIALLY DID I

18   THINK THE FAIREST READING IS HE LOOKED AT THE -- THE

19   INDUSTRY-WIDE STUFF, AND THAT WAS THE STARTING PLACE.  HE

20   KNOWS THAT BEFORE HE'S EVER COME INTO THIS CASE.

21        THE COURT:  RIGHT.

22        MR. JENSEN:  BUT HE ALSO LOOKED AT SOME TESTIMONY

23   FROM CO-WORKERS ABOUT WHAT PRODUCTS WERE BEING USED, HE

24   LOOKED AT THE MATERIAL SAFETY DATA SHEETS FOR SAFETY KLEEN

25   AND THE OTHER DEFENDANTS, AND IN THE CONTEXT OF THAT

1    HISTORICAL INDUSTRY-WIDE INFORMATION THAT HE HAD AVAILABLE TO

2    HIM, HE MADE THE DETERMINATION, A, HE DETERMINED, AS

3    MRS. KOCH SAID, THAT BASED ON COLOR CHARACTERISTICS OF SAFETY

4    KLEEN 105 VERSUS 150, HE THOUGHT THAT 150 WAS THE ONE BEING

5    USED BECAUSE THE CO-WORKER TESTIMONY WAS THAT IT WAS EITHER

6    CLEAR OR GOLDEN BROWN OR BROWN AS OPPOSED TO GREEN.

7        AND MY UNDERSTANDING OF SAFETY KLEEN 105 IS IT'S GREEN

8    AND IT'S GREEN BECAUSE IT'S ACTUALLY DYED GREEN BY SAFETY

9    KLEEN.

10           *THE COURT:*  WELL, WHAT ABOUT THE ISSUE OF THE COLOR

11   BLIND -- THE GUY THAT THEY RELIED ON THAT WAS ADMITTEDLY

12   COLOR BLIND?

13           *MR. JENSEN:*  WELL, THAT WASN'T THE ONLY CO-WORKER

14   WHO TESTIFIED.

15           *THE COURT:*  OKAY.

16           *MR. JENSEN:*  THERE WERE THREE STATEMENTS.  ONE BY

17   CAJUN CAVALIER THAT IT WAS BROWN, ONE WHICH I THINK DR.

18   STEWART INTERPRETED AS GOLDEN BEING, YOU KNOW, SIMILAR TO

19   BROWN.

20           *THE COURT:*  RIGHT.

21           *MR. JENSEN:*  ONE BY KEREN BUSSEY I BELIEVE THAT IT

22   WAS YELLOW OR CLEAR, AND THEN MR. BUSSEY, BUCK, SAID IT WAS

23   BROWN, HE THOUGHT IT WAS BROWN, BUT HE'S COLOR BLIND, IT

24   COULD -- THAT COULD BE GREEN.

25           *THE COURT:*  DO THEY ALL GO TO BROWN EVENTUALLY WHEN

1    IT GETS DIRTY?

2         *MR. JENSEN:*  I DON'T KNOW THE ANSWER TO THAT, YOUR

3    HONOR.  THAT'S MY IMPRESSION FROM THE CO-WORKER TESTIMONY AS

4    A WHOLE, BUT I COULDN'T, YOU KNOW, POINT YOU TO SPECIFIC

5    STATEMENTS THAT--

6         *THE COURT:*  WELL, I GUESS, WHAT ABOUT THIS ARGUMENT

7    BY THE DEFENDANTS THAT IT'S NOT REASONABLE TO HAVE ASSUMED

8    THAT IT'S THE 150 BECAUSE 150 JUST WASN'T IN PRODUCTION

9    DURING THE YEARS THAT DR. STEWART ASSUMES THAT IT WAS BEING

10   USED?

11        *MR. JENSEN:*  RIGHT.  AND YOU KNOW, SHE'S RIGHT.

12   HE'S STICKING TO HIS GUNS.  HE SAYS, YOU KNOW, I'M GOING TO

13   TRUST THE CO-WORKER TESTIMONY HERE AND I --

14        *THE COURT:*  RIGHT.

15        *MR. JENSEN:*  -- IN MY JUDGMENT IF IT WERE THE

16   BRIGHT GREEN THAT I THINK SAFETY KLEEN 105 IS, THEY'D

17   REMEMBER THAT.  AND YOU KNOW, HAVING SAID THAT, YOUR HONOR, I

18   THINK THAT ISSUE, IF YOU ASSUME THAT IT IS A MISTAKE THAT

19   HE'S MADE, A FACTUAL ERROR THAT HE'S MADE ABOUT IDENTIFYING

20   105 DURING CERTAIN TIMEFRAMES AND 150 DURING OTHERS, I THINK

21   IT'S AN ERROR THAT IN THE CONTEXT OF HIS ANALYSIS, ESPECIALLY

22   WHEN VIEWED THE WAY HE DID IT, WHICH IS PUTTING GREAT

23   RELIANCE ON HIS HISTORICAL VIEW OF THE INDUSTRY-WIDE DATA AND

24   WHAT WAS BEING REPORTED BY GOVERNMENTAL AGENCIES ABOUT NOT

25   ONLY MINERAL SPIRITS BUT OTHER PETROLEUM SOLVENTS AND THEIR

1    BENZENE CONTENT AND HOW THAT THERE'S THIS GREAT DEBATE -- NOT

2    GREAT IS THE WRONG WORD -- BUT THERE WAS THIS SIGNIFICANT

3    LONG-STANDING DEBATE THAT GOES BACK TO THE 1970'S THAT HE

4    TALKS ABOUT IN HIS REPORT WHERE INDUSTRY HAS BEEN REPORTING

5    SINCE THEN, YOU KNOW, THAT IT'S -- SINCE AS EARLY AS THE

6    1970'S, YOU KNOW, OUR PETROLEUM-BASED SOLVENTS HAVE LESS THAN

7    A HUNDRED PARTS PER MILLION OF BENZENE IN THEM.

8          AND AT THE SAME TIME HE IS REVIEWING REPORTS BY

9    GOVERNMENTAL AGENCIES AND PUBLISHED REPORTS FOR MINERAL

10   SPIRITS AND OTHER PETROLEUM DISTILLATES THAT SHOW MANY TIMES

11   THAT BEING REPORTED BY THOSE AGENCIES THAT -- THAT DON'T

12   HAVE, YOU KNOW, THEY ARE MORE NEUTRAL.  AND SO BASED ON THAT,

13   HE'S MAKING A JUDGMENT.

14         HE'S PUTTING THE MSDS'S AND THE WORKER TESTIMONY ABOUT

15   THE SPECIFIC PRODUCTS IN THIS CASE INTO THE CONTEXT OF THAT

16   HISTORICAL REVIEW OF WHAT IS HAPPENING INDUSTRY-WIDE AND

17   MAKING A JUDGMENT THAT I DON'T THINK WOULD HAVE BEEN, YOU

18   KNOW, ANY DIFFERENT FOR -- IF HE HAD DETERMINED, WELL, THEY

19   WERE USING 105 AS OPPOSED TO USING 150.

20             *THE COURT:*  I GUESS IT'S NOT WHETHER THEY WERE

21   USING 105 VERSUS 150, BUT IT'S PRE-1994, WHETHER THEY WERE

22   USING 105 INSTEAD OF USING SOMETHING THAT IS EQUIVALENT TO

23   THE INDUSTRY-WIDE STANDARDS I THINK.  THAT'S WHAT -- AM I

24   WRONG?

25         SO AS I UNDERSTAND IT, THE INDUSTRY-WIDE STANDARD DATA

1    HAD A MUCH HIGHER LEVEL OF BENZENE BEING REPORTED THAN SAFETY

2    KLEEN'S OWN TESTING AND THIRD-PARTY TESTING OF SAFETY KLEEN'S

3    105 SOLVENT.

4         MR. JENSEN: WELL, THAT STATEMENT I THINK IS

5    CERTAINLY TRUE. BENZENE -- EXCUSE ME -- SAFETY KLEEN'S OWN

6    INTERNAL TESTING, WHETHER IT'S OF 105 OR 150, REFLECTS MUCH

7    LOWER BENZENE CONCENTRATIONS IN THE LIQUID SOLVENTS THAN THE

8    REPORTS BASED ON GENERAL INDUSTRY REPORTS THAT DR. STEWART

9    RELIED ON. THAT PART IS TRUE.

10        AND SO ONE BIG PIECE OF THEIR ARGUMENT, AS I UNDERSTAND

11   IT, YOUR HONOR, IS HE NEEDED TO RELY ON AND INCORPORATE AND

12   USE THE DATA FROM OUR TESTING THAT SHOWED PRECISELY WHAT WAS

13   IN OUR SOLVENT. THAT'S ONE ARGUMENT. THE ARGUMENT, THOUGH,

14   THAT I WAS TRYING TO ADDRESS RIGHT THEN WAS NOT THAT ARGUMENT

15   YET, BUT RATHER --

16        THE COURT: THE ONE IS THE 150.

17        MR. JENSEN: -- MIXING UP 150 VERSUS 105.

18        THE COURT: I GET THAT. AND THAT MAKES SENSE. AND

19   TRUTHFULLY I DON'T KNOW THAT THAT'S THAT BIG OF A DIFFERENCE,

20   YOU KNOW, ORDERS OF MAGNITUDE-WISE FOR HIS CONCLUSION. BUT

21   THE BIGGER PIECE, I THINK THE MORE INFLUENTIAL DATA POINT

22   THAT RESULTED IN HIS OPINION APPEARS TO BE THIS DISCREPANCY

23   BETWEEN THE INDUSTRY-WIDE NUMBER --

24        MR. JENSEN: ABSOLUTELY.

25        THE COURT: -- AND SAFETY KLEEN'S OWN ASSESSMENT AS

1  WELL AS WHAT THEY SUBMIT ARE THIRD-PARTY TESTING OF AN AGENCY

2  I THINK TESTING OF THAT 105 SOLVENT.  AND SO IT'S NOT THAT

3  THEY LIE ABOUT THEIR NUMBERS, THEY ARE SAYING OUR NUMBERS ARE

4  CONSISTENT WITH THIRD PARTIES COMING IN, THIRD-PARTY

5  LABORATORY COMING IN AND TESTING THAT SAME ACTUAL SOLVENT

6  THAT WAS USED IN THIS MOTORCYCLE SHOP AND WHY IT DOESN'T MAKE

7  SENSE TO NOT HAVE USED THE REAL DATA THAT WAS AVAILABLE

8  INSTEAD OF USING SORT OF THE INDUSTRY-WIDE STANDARD.

9       *MR. JENSEN:*  RIGHT.  AND IT'S CLEAR THAT THEY --

10  THEY ARE ARGUING THAT AND YOU IN FACT I THINK PERFECTLY

11  ARTICULATED THAT.  AND YOU KNOW, OUR RESPONSE OR DR.

12  STEWART'S RESPONSE IS, I MADE A JUDGMENT THAT BASED ON THIS

13  CONTEXT THAT I HAVE, YOU KNOW, SEEN INDUSTRY-WIDE WHERE

14  INDUSTRY SINCE THE EARLY -- OR SINCE THE 1970'S HAS BEEN

15  REPORTING THESE LEVELS OF BENZENE IN THEIR DISTILLATE

16  PRODUCTS THAT ARE, YOU KNOW, ORDERS OF MAGNITUDE FAR APART

17  FROM WHAT NEUTRAL PARTIES ARE REPORTING THAT, YOU KNOW, I'M

18  GOING TO CHOOSE THIS GENERAL DATA OVER THE SPECIFIC DATA IN

19  THE ABSENCE -- AND HE DISCUSSED THIS AT HIS DEPOSITION -- IN

20  THE ABSENCE OF HAVING SPECIFIC QUALITY CONTROL INFORMATION

21  AND OTHER INFORMATION THAT DETAILS THE PROCEDURES, METHODS

22  AND QUALITY CONTROL OF THE SPECIFIC TESTING THAT THEY THINK I

23  SHOULD BE RELYING ON, AND SO THAT'S WHAT HE--

24       *THE COURT:*  WERE THEY SUBMITTED?  I THINK THE

25  SUGGESTION WAS THAT ALL THOSE STUDIES--

1          *MR. JENSEN:*  THEIR TESTING DATA IS AVAILABLE.  THE

2     QUALITY CONTROL DATA THAT I THINK DR. STEWART REFERRED TO IN

3     HIS DEPOSITION TESTIMONY IS MORE DETAILED INFORMATION THAN MY

4     UNDERSTANDING IS -- IS PROVIDED.  BUT HAVING SAID THAT, I

5     COULD BE WRONG ABOUT THAT, NUMBER ONE.  NUMBER TWO, WHAT DR.

6     STEWART SAID IN HIS DEPOSITION WAS, YOU KNOW, I DON'T HAVE

7     THAT INFORMATION THAT -- BUT -- AND I -- THAT WOULD BE

8     NECESSARY IN ORDER FOR ME TO INCORPORATE ANY PARTICULAR

9     MEASUREMENTS OR TESTING DATA AND CHOOSE THOSE AHEAD OF, YOU

10    KNOW, WHAT HAS BEEN REPORTED MORE BROADLY AND GENERALLY IN

11    THE LITERATURE, AND I DON'T HAVE THAT -- NOT AWARE THAT I

12    HAVE THAT AVAILABLE TO ME.

13         AND THEN LATER IN HIS AFFIDAVIT HE ADDS, YOU KNOW, THIS

14    ADDITIONAL LAYER OF REASONING WHICH IS, YOU KNOW, BASED ON MY

15    REVIEW OF THE SHEEHAN PAPER ABOUT HOW THEY -- WHICH HE HAD

16    REVIEWED ALREADY THAT'S -- IT'S CITED IN HIS REPORT -- AND

17    THE SHEEHAN PAPER DISCUSSES INTERNAL SAFETY KLEEN TESTING

18    DATA FOR BENZENE AND DISCUSSES BROADLY-SPEAKING HOW THEY DID

19    IT AND TALKS ABOUT THIS COMPOSITE METHOD AND HE SAYS, YOU

20    KNOW, IT'S A GENERALLY-ACCEPTED PRINCIPLE THAT THAT KIND OF

21    METHOD, WHEN APPLIED TO A VOLATILE MIXTURE LIKE PETROLEUM

22    DISTILLATE IS, YOU KNOW, CREATES AN ISSUE ESPECIALLY WITH

23    RESPECT TO THE MOST VOLATILE COMPONENTS OF THE MIXTURE, WHICH

24    IN THIS INSTANCE BENZENE WOULD BE ONE OF.

25          *THE COURT:*  I GUESS THEN THEIR ARGUMENT IS, WELL,

1    IF HE DID RELY ON SHEEHAN, WHY DIDN'T HE LOOK AT THE SAFETY

2    KLEEN SPECIFIC DATA THAT WAS -- THAT WAS AVAILABLE IN

3    SHEEHAN?

4            MR. JENSEN:  WELL, I THINK HIS ANSWER -- I -- WOULD

5    BE THE SAME, YOUR HONOR, WHICH IS, YOU KNOW, SHEEHAN GIVES ME

6    BROADLY-SPEAKING INFORMATION ABOUT THE SAFETY KLEEN DATA BUT

7    IT DOESN'T GIVE ME ALL THIS DETAILED QUALITY CONTROL

8    INFORMATION THAT I WOULD NEED BEFORE I INCORPORATE THAT INTO

9    A MODEL, AND SO THAT WAS THE CHOICE THAT HE MADE AND, YOU

10   KNOW, I THINK IT PROVIDES SOME EVIDENCE FOR THE JURY TO SORT

11   THAT ISSUE OUT.

12           THE COURT:  OKAY.

13           MR. JENSEN:  ADDITIONALLY, HE DID TAKE A LOOK AT

14   SOME, AS MRS. KOCH DISCUSSED, SPECIFIC SAFETY KLEEN DOCUMENTS

15   FROM THE LATE 80'S AND EARLY 90'S AND ONE 1980 TESTING

16   DOCUMENT FROM A PHOENIX CHEMICAL LAB ALL OF WHICH HE SAID

17   CORROBORATED HIS DECISION TO -- THAT WAS BASED PRIMARILY ON

18   THE INDUSTRY-WIDE DATA TO GO WITH THAT, THOSE LEVELS.

19       AND SO, THOSE ARE ALL SPELLED OUT IN THE BRIEF.  UNLESS

20   THE COURT HAS SPECIFIC QUESTIONS...

21           THE COURT:  NO, I'M FAMILIAR WITH THAT ARGUMENT IN

22   THE BRIEF.

23           MR. JENSEN:  AND I WILL JUST SAY AS ONE SORT OF

24   CLARIFICATION POINT TO SOMETHING MRS. KOCH SAID WITH RESPECT

25   TO THE MSDS'S THAT SHOWED BENZENE AS AN INGREDIENT WITHOUT

1    GIVING A REPORTING ON THEIR FACE WHAT LEVEL BENZENE WAS

2    CONTAINED IN THOSE MATERIAL SAFETY DATA SHEETS.

3         DR. STEWART'S ASSUMPTION, WHICH I THINK HE DESCRIBES

4    THIS IN HIS AFFIDAVIT, BUT HIS ASSUMPTION THAT THERE ARE --

5    OR MAYBE IN HIS REPORT -- HIS ASSUMPTION THAT THERE IS

6    .1 PERCENT OR MORE BENZENE IS BECAUSE IT'S BEING LISTED AS --

7    AS AN INGREDIENT, AND UNDER THE OSHA HAZARDOUS COMMUNICATIONS

8    STANDARD, WHICH MRS. KOCH BEGAN HER PRESENTATION WITH, THAT'S

9    THE LEVEL AT WHICH THAT HAZCOM STANDARD SAYS YOU HAVE TO

10   REPORT IT.

11        NOW, THAT DOESN'T PRECLUDE THAT -- THAT HAZCOM STANDARD

12   DOES NOT PRECLUDE SAFETY KLEEN OR ANYBODY ELSE FROM LISTING

13   BENZENE AS AN INGREDIENT AT LOWER, EVEN THOUGH IT'S

14   CONTAINED, AT LOWER LEVELS, BUT WHAT DR. STEWART SAID AND DID

15   WAS THAT IN MY JUDGMENT IT WAS UNLIKELY IN 1993 THAT SAFETY

16   KLEEN OR ANY OTHER PRODUCER OF PETROLEUM SOLVENT WOULD HAVE

17   LISTED IT AS AN INGREDIENT UNLESS THEY BELIEVED THAT THE

18   HAZCOM STANDARD HAD BEEN TRIGGERED.

19        AND SO WITH RESPECT TO THE UNOCAL MSDS THAT WAS ON THE

20   INTERNET AND WITH RESPECT TO THE 1993 PREMIUM SOLVENT --

21   SAFETY KLEEN PREMIUM SOLVENT MSDS THAT HE LOOKED AT THAT --

22   THAT BOTH HAD IT IN THE INGREDIENT SECTION BUT WITHOUT

23   REPORTING A LEVEL, THAT WAS THE BASIS FOR HIM SAYING IT WAS

24   .1 OR HIGHER.

25             THE COURT:  OKAY.  SO FOR EXAMPLE, I THINK THAT

1    THE -- I DON'T KNOW WHAT THE MINIMUM IS -- BUT ON SOME

2    PACKAGING OF FOOD IT CAN SAY ZERO TRANS FAT, FOR EXAMPLE, OR

3    NO TRANS FAT.

4         *MR. JENSEN:* UH-HUH.

5         *THE COURT:* BUT YOU HAVE TO GET BELOW A CERTAIN

6    AMOUNT TO BE ABLE TO NOT INCLUDE IT AS TRANS FAT.

7         *MR. JENSEN:* FAT FREE.  FREE OF TRANS FAT?  IS THAT

8    WHAT YOU'RE SAYING?

9         *THE COURT:* YES.  AND SO, BUT THERE'S SOME IN

10   THERE, BUT THEY'RE ALWAYS TRYING TO GET IT JUST BELOW WHERE

11   THEY DON'T HAVE TO REPORT IT.  BUT IF YOU HAVE LIKE A REALLY

12   CRUNCHY MANUFACTURER OF FOOD THAT IS SUPER CAREFUL AND LISTS

13   WHATEVER THE LEVEL IS --

14        *MR. JENSEN:* THE MEASURABLE LEVELS ARE.

15        *THE COURT:* -- MEASURABLE LEVELS ARE AND INDICATES

16   THERE IS SOME TRANS FAT, WHAT DR. STEWART IS EXTRAPOLATING

17   FROM THAT IS THAT DISCLOSURE MUST MEET THIS MINIMUM AMOUNT,

18   BUT THERE IS A--

19        *MR. JENSEN:* YEAH.  HE WOULD ACKNOWLEDGE AN

20   UNCERTAINTY ASSOCIATED WITH THAT, YOUR HONOR.  HE WOULD

21   ACKNOWLEDGE THAT SAFETY KLEEN WAS FREE TO MAKE THE DECISION

22   TO SAY, YEAH, THERE'S SOME BENZENE IN HERE, IT'S GOING TO

23   VARY BY BATCH, WE DON'T KNOW HOW MUCH IS IN HERE, BUT WE ARE

24   GOING TO GO AHEAD AND PUT IT ON THERE AND NOT PUT -- THEY ARE

25   FREE TO DO THAT EVEN IF THE LEVEL IS WELL BELOW A THOUSAND

1    PARTS PER MILLION OR .1 PERCENT.  THEY ARE FREE TO DO THAT.

2    HE WOULD ACKNOWLEDGE THAT.

3         WHAT HE WOULD SAY, THOUGH, IS PROBABLY BASED ON MY

4    EXPERIENCE AND WORKING WITH INDUSTRY, THAT WASN'T THEIR

5    DECISION.  AND I HAVE SEEN NOTHING TO, YOU KNOW -- HE WOULD

6    SAY I HAVE SEEN NOTHING TO CONVINCE ME OTHERWISE WITH RESPECT

7    TO SAFETY KLEEN.

8              THE COURT:  BUT HE SAID THAT HE REVIEWED THE DATA,

9    THE TESTING DATA, THAT WOULD CONVINCE HIM OTHERWISE THAT

10   IT'S -- THAT IT'S LESS.

11             MR. JENSEN:  WELL, HE REVIEWED TESTING DATA WHERE

12   THEY ARE REPORTING LOWER LEVELS.  HE DID.  BUT THAT DIDN'T

13   CONVINCE HIM OTHERWISE.

14             THE COURT:  OKAY.

15             MR. JENSEN:  THEN THERE'S THE ISSUE OF PUBLISHED

16   INFORMATION IN EITHER GOVERNMENT REPORTS OR PUBLISHED

17   ARTICLES WHERE AIR CONCENTRATIONS OF BENZENE IN SOME

18   INSTANCES AND IN OTHER INSTANCES AIR CONCENTRATIONS OF

19   SOLVENTS AS A WHOLE OR MINERAL SPIRITS AS A WHOLE HAVE BEEN

20   MEASURED IN -- UNDER -- WITH RESPECT TO SAFETY KLEEN SOLVENTS

21   AND PARTS WASHERS, AND THEY SAY HE IGNORED ALL THAT.

22        AND DR. STEWART SAYS, NO, I REVIEWED IT, I PROVIDED IT

23   AS PART OF THE RELIANCE MATERIALS THAT I INITIALLY PROVIDED

24   AND, YOU KNOW, IT'S SOMETHING THAT I REVIEWED AND CONSIDERED

25   AND I DETERMINED THAT ALL OF THOSE -- THERE'S NINE REPORTS

1    THAT FALL SOMEWHERE INTO THAT CATEGORY THAT ARE LISTED IN DR.

2    SPENCER, THEIR EXPERT'S, REPORT.  AND I REVIEWED ALL THOSE

3    AND I THINK THAT THE WORKING CONDITIONS THAT MR. BOYKIN

4    EXPERIENCED WERE NOT SUFFICIENTLY ANALOGOUS TO THE SITUATIONS

5    THAT WERE MEASURED THERE.

6         AND ONE POINT THAT I -- I DON'T KNOW THAT IS CLEAR FROM

7    THE RECORD THAT I KNOW DR. STEWART WOULD WANT TO EMPHASIZE TO

8    YOU IF HE WERE HERE RIGHT NOW, WHICH IS HIS EVALUATION OF

9    EXPOSURES TO MR. BOYKIN DURING THE PART -- IN THE PARTS --

10   WHAT HE CALLS THE PARTS WASHING ACTIVITY, WORK ACTIVITY,

11   INCLUDE NOT ONLY THOSE EXPOSURES TO BENZENE FROM BEING AT THE

12   PARTS WASHER WHILE THIS -- THE PARTS ARE BEING WASHED, BUT

13   ALSO EXPOSURE THAT OCCURS AFTER YOU TAKE THE CLEANED PART

14   THAT NOW HAS, YOU KNOW, IS WET WITH SOLVENT AND YOU, YOU

15   KNOW, TAKE AWAY AND YOU WORK WITH IT.

16        AND THOSE PUBLISHED REPORTS AREN'T ATTEMPTING TO MEASURE

17   THAT KIND OF ADDITIONAL ACTIVITY THAT THE MECHANIC IS HAVING

18   ALONG WITH THE PARTS WASHING ACTIVITY ITSELF.

19        *THE COURT:*  NOW, IS THAT THE PORTION THAT THE

20   DEFENDANTS CITE TO AS INCONSISTENT WITH THE VOLATILITY

21   ASSUMPTIONS?

22        *MR. JENSEN:*  YEAH.  WELL, THE PARTS WASHING

23   ACTIVITY THAT WAS -- MADE UP A PORTION OF THE MODELED

24   EXPOSURE OF MR. BOYKIN IS THE PORTION THAT SAFETY KLEEN IS

25   NOW ARGUING, LOOK, MR -- OR DR. STEWART'S ANALYSIS DOESN'T

1    ACCOUNT FOR THE FACT THAT BENZENE PREFERENTIALLY VOLATILIZES

2    OUT OF THIS -- THIS MINERAL SPIRITS AND, YOU KNOW, AFTER SOME

3    PERIOD OF TIME IT'S GOING TO BE GONE OR MOSTLY GONE OR

4    WHATEVER AND SO THAT THE LEVELS ARE GOING TO GO DOWN OVER

5    TIME, AND HE DOESN'T ACCOUNT FOR THAT.

6        AND DR. STEWART'S REPLY TO THAT IS THAT THE ART MODEL

7    ITSELF BUILDS THAT IN.  I DON'T CANDIDLY, YOUR HONOR,

8    UNDERSTAND HOW THAT WORKS.  BUT HE SAYS IN THE CALIBRATION

9    AND DESIGN OF THE ART MODEL ITSELF THAT THAT KIND OF

10   VOLATILIZATION PROCESS IS ACCOUNTED FOR.

11        THE COURT:  OKAY.

12        MR. JENSEN:  THE LAST POINT I WANT TO MAKE, YOUR

13   HONOR, AND THEN I WILL BE DONE ABSENT ANY FURTHER QUESTIONS

14   FROM YOU IS WITH RESPECT TO THE DIFFERENCE BETWEEN

15   MOTORCYCLE VERSUS AUTOMOBILE MECHANIC WORK.  DR. STEWART'S

16   TESTIMONY IS THAT NOT ONLY IS HE BASING THAT ON HIS OWN

17   EXPERIENCE AND UNDERSTANDING FROM HAVING MOTORCYCLES AND

18   WORKING ON THEM AND COMPARING THAT WITH HIS KNOWLEDGE OF HOW

19   AUTOMOBILE MECHANICS WORK, BUT HE SAYS THAT THAT VIEW AN

20   OPINION IS CORROBORATED BY THE TESTIMONY OF THE CO-WORKERS

21   THEMSELVES ABOUT, YOU KNOW, THE DIFFERENCES BETWEEN THOSE TWO

22   ACTIVITIES.  SO...

23        THE COURT:  OKAY.  VERY GOOD.  THANK YOU.  I

24   APPRECIATE YOUR ARGUMENT.  YOU HAVE CLARIFIED A LOT OF

25   QUESTIONS IN MY MIND AND CONVINCED ME ON SOME OF THEM.  I

1    GUESS, WHO ARE -- WHO WOULD LIKE TO SPEAK FIRST?

2          *MRS. BONNEVILLE:*  THAT WOULD BE ME, YOUR HONOR.

3    AND I'M GOING TO BE BRIEFER THAN I ESTIMATED EVEN PRIOR TO

4    LUNCH.  THERE'S REALLY ONLY THREE THINGS THAT I JUST WANT TO

5    QUICKLY HIGHLIGHT FOR YOU.  AND I WANT TO MAKE SURE THAT THIS

6    WAS CLEAR.  I HAD HOPED IT WAS FROM THIS MORNING.

7          I DIDN'T SPEND A LOT OF TIME TODAY TALKING ABOUT OUR

8    CONCERNS AND OUR ISSUES REGARDING HOW DR. STEWART USED THE

9    MODEL BECAUSE WE SPENT A LOT OF TIME IN OUR BRIEFING DOING

10    THAT AND PLAINTIFFS DIDN'T OPPOSE THAT.  SO, IT'S NOT THAT

11    IT'S NOT AN IMPORTANT ISSUE TO US.  IT VERY MUCH IS BECAUSE

12    THIS IS NOT A SITUATION WHERE THERE'S WEAK EVIDENCE OR

13    THERE'S FACTUAL EVIDENCE.  THIS IS A SITUATION WHERE THERE'S

14    ABSOLUTELY NO EVIDENCE OR THE ONLY EVIDENCE THAT THERE IS IS

15    COMPLETELY CONTRADICTORY.

16          SO, THE BREVITY WITH WHICH I HAD TRIED TO ADDRESS THAT

17    ARGUMENT IS SIMPLY BECAUSE NOWHERE IN THEIR OPPOSITION ARE

18    THEY DEBATING THAT.  SO, YOU KNOW, I KIND OF FEEL LIKE I WAS

19    ARGUING WITH MYSELF, WHICH I TRY NOT TO DO.

20          *THE COURT:*  I DO IT ALL THE TIME, SO DON'T FEEL

21    BAD.

22          *MRS. BONNEVILLE:*  I NEVER WIN, THOUGH.

23          THE SECOND POINT GOES TO THE RELIABILITY OF ART.

24    COUNSEL IS SAYING THAT IT'S PEER REVIEWED AND IT'S TESTED.

25    WELL, THE PROBLEM WITH THAT IS THE PEER REVIEWING HAS TO BE

1    FAVORABLE.  IF YOU GET PEER REVIEWED AND THEY SAY IT JUST

2    DON'T PASS MUSTER, THAT DOESN'T COUNT AS PEER REVIEWING FOR

3    THE PURPOSES OF DAUBERT.

4        THE PEER REVIEWING ON ART IS NOT FAVORABLE.  THE TESTING

5    ON ART IS NOT FAVORABLE AND THE PEER REVIEWING AND THE

6    TESTING FOR THE PURPOSE THAT DR. STEWART USED ART ISN'T

7    THERE.

8        AND THEN WE GET TO THIS IDEA OF GENERAL ACCEPTANCE,

9    WHICH IS ONE OF THE OTHER FACTORS.  AND I THINK YOU ASKED A

10   GOOD QUESTION EARLIER ABOUT WHAT ARE INDUSTRIAL HYGIENISTS IN

11   THE UNITED STATES DOING, ARE THEY USING ART?  THE ANSWER TO

12   THAT IS NO.  THE REASON THAT THEY ARE NOT USING ART IS

13   BECAUSE -- AND DR. STEWART ADMITTED THIS IN HIS DEPOSITION --

14   OSHA DOESN'T PERMIT THE USE OF MODELING TO SHOW THAT YOU --

15   THAT YOU'RE SATISFYING THE STANDARDS.

16       YOU CAN'T TAKE THE MODEL AND USE THAT TO SHOW THE

17   GOVERNMENT, LOOK, I'M DOING WHAT I'M SUPPOSED TO DO.  SO REAL

18   INDUSTRIAL HYGIENISTS THAT ARE OUT THERE TRYING TO SHOW WHAT

19   EXPOSURES ARE THAT THEY ARE MEETING, THE OSHA CRITERIA, THEY

20   ARE NOT USING ART BECAUSE THEY CAN'T USE ART.

21       NOW, IT'S TRUE THAT IN EUROPE UNDER THE AUSPICES OF

22   REACH THAT ART IS USED, BUT IT'S USED FOR A PARTICULAR

23   PURPOSE.  AND PART OF UNDERSTANDING THAT IS IT -- WHAT ARE

24   THE CONSEQUENCES UNDER REACH IF YOU USE ART AND YOU DON'T --

25   YOU DON'T MEET THE STANDARD?  IT'S NOT THAT YOUR PRODUCT IS

1    BANNED IN EUROPE.  IT'S THAT IF YOU RUN ART AND YOU DON'T HIT

2    THE LEVELS, THEN THEY SAY, OKAY, GO GET US SOME REAL DATA.

3         THAT'S NOT THE SITUATION WE ARE IN HERE.  WE NEED THE

4    REAL DATA.  WE NEED TO KNOW NOT WHAT THE EXPOSURE WAS OVER AN

5    INDUSTRY, WHICH IS WHAT ART IS DOING, THAT'S THE POINT OF

6    ART.  IT GIVES YOU A DISTRIBUTION.  IT'S AN ALGORITHM THAT

7    WEIGHTS VARIABLES AND GIVES YOU A DISTRIBUTION.  IT DOESN'T

8    POP OUT A NUMBER.

9         OUR SITUATION IS MUCH DIFFERENT.  SINGLE INDIVIDUAL, WE

10   ARE LOOKING AT HIS EXPOSURE.  NOW, WE ARE NOT ASKING DR.

11   STEWART TO GIVE US A NUMBER.  YOU KNOW, WE DIDN'T SAY, WELL,

12   YOUR NUMBER IS WRONG.  THE PROBLEM IS THAT YOUR DISTRIBUTION,

13   YOUR WHOLE RANGE, THAT'S -- THAT'S NOT VALID, AND THAT WAS

14   WHAT WE SAW IN THE HOFSTETTER ARTICLE.

15        MY FINAL POINT WAS I JUST WANTED TO CLARIFY ONE THING

16   ABOUT WHAT I WAS SAYING ABOUT MILWARD.  IN MILWARD DR.

17   STEWART DID USE THE SAME MODEL, THE SAME METHODOLOGY HE USED

18   HERE.  HE USED ART 1.5.  THE POINT THAT I WAS TRYING TO MAKE

19   WAS WHEN THE COURT WAS LOOKING TO SEE WHETHER OR NOT ART 1.5

20   WAS VALID, IT REFERRED TO SCHINKEL, AND I MISREAD I BELIEVE

21   WHAT SCHINKEL SAID.

22        IT TOOK FROM SCHINKEL THAT YOU COULD USE ART FOR

23   INDIVIDUAL EXPOSURE BECAUSE OF WHAT WAS ON A PARTICULAR PAGE

24   OF THE ARTICLE, WHICH WAS PAGE 1379.  AND THAT SENTENCE WHICH

25   I HAD READ THIS MORNING, IT DOESN'T SAY THAT.  WHAT THAT

1    SENTENCE REFERS TO IS IT SAYS, THE METHODS FOR DOING -- AND

2    IT'S NOT INDIVIDUAL.  IT'S, YOU KNOW, WITHIN A WORK SITE, AND

3    IT REFERENCES ANOTHER ARTICLE THAT TALKS ABOUT THE BAYESIAN

4    MODEL.

5        AND JUST ONE QUICK THING ON THIS, THE VALIDATION POINT.

6    I'M NOT A SCIENTIST.  AND PRIOR TO THIS CASE IF YOU HAD ASKED

7    ME WHAT VALIDATION MEANT IN A SCIENTIFIC SENSE, I COULDN'T

8    HAVE GIVEN YOU AN ANSWER.  MY DEFINITION OF VALIDATION COMES

9    FROM SCHINKEL 2014.  THAT WAS A QUOTE FROM THE ARTICLE AND

10    THAT'S ON -- IT'S PAGE TWO OF THE DOCKET BUT IT IS PAGE 451.

11    THE AUTHORS DEFINE VALIDATION.  I'M SIMPLY USING WHAT

12    SCHINKEL, WHO IS ONE OF THE CREATORS OF ART, WHAT HE OR

13    SHE -- AND I'M NOT CLEAR FROM THEIR NAME IF IT'S A MAN OR A

14    WOMAN -- HOW THEY DEFINE VALIDATION.  THAT'S THEIR

15    DEFINITION, NOT MINE.

16        NOW, MR. JENSEN WANTS TO SAY THAT SCHINKEL 2011, THE

17    CALIBRATION ARTICLE, THAT THAT'S ABOUT VALIDATION.  BUT IT'S

18    NOT ABOUT VALIDATION BECAUSE SCHINKEL SAYS IT'S NOT ABOUT

19    VALIDATION.  IT'S NOT WHAT I THINK.  SCHINKEL SAYS THE

20    CURRENT MODEL AND FRAMEWORK OF LOWER AND HIGHER TIER MODELS

21    IS USEFUL AND NECESSARY TO EVALUATE LARGE AMOUNTS OF

22    CHEMICALS.  HOWEVER, THE EXPOSURE MODELS CLEARLY NEED FURTHER

23    DEVELOPMENT AND AWAIT THE NECESSARY VALIDATION RESEARCH.

24        IF WHAT SCHINKEL WAS DOING IN 2011 WAS A VALIDATION

25    STUDY, HE OR SHE WOULDN'T BE SAYING WE NEED TO DO VALIDATION

1    RESEARCH.  THEY WEREN'T DOING VALIDATION.  THEY WERE DOING

2    CALIBRATION.  AND THEY MADE THE DEFINITIONS OF CALIBRATION

3    AND VALIDATION.  THOSE AREN'T MINE.  THOSE AREN'T AN

4    ATTORNEY'S INTERPRETATION.  THAT'S WHAT SCIENCE IS SAYING.

5    AND WITH THAT, YOUR HONOR, I WILL SIT DOWN.

6            *THE COURT:*  OKAY.  THANK YOU VERY MUCH.

7        MRS. KOCH?

8            *MRS. KOCH:*  THANK YOU, YOUR HONOR.  LET ME START

9    WITH ADDRESSING SOME OF THE BENZENE CONTENT ISSUES.  I HEARD

10   MR. JENSEN TALK ABOUT QUOTE UNQUOTE THE CHOICES HE MADE

11   REFERRING TO DR. STEWART, AND I THINK THAT'S REALLY THE

12   BOTTOM LINE OF WHAT WE ARE LOOKING AT, WHETHER THOSE CHOICES

13   WERE OKAY OR NOT UNDER DAUBERT.

14       AND I UNDERSTAND YOUR COMMENT BEFORE THAT YOU WEREN'T

15   SURE OF WHAT DIFFERENCE IT MADE ON THIS, WHETHER IT WAS THE

16   WRONG SOLVENT OR NOT, BUT I WANT TO EMPHASIZE TO YOU, YOUR

17   HONOR, THAT IT MAKES A HUGE DIFFERENCE BECAUSE HE'S LOOKING

18   AT TWO DIFFERENT SOLVENTS THAT AREN'T THE SAME THING.  IN

19   FACT, THEY PERFORM DIFFERENTLY.  THEY ARE NOT THE SAME

20   SOLVENT.  AND HE'S CONDUCTING AN EXPOSURE ASSESSMENT BASED

21   UPON THE CHEMICAL COMPOSITION OF THOSE SOLVENTS BUT APPLYING

22   THE WRONG SOLVENT INFORMATION TO IT.  AND THAT'S THE HEART OF

23   EVERY OPINION HE PROVIDES WITH REGARD TO MY CLIENT IN THIS

24   CASE.

25       AND YOU KNOW, WE -- MR. JENSEN SAID THAT DR. STEWART'S

1    PUTTING I THINK QUOTE UNQUOTE GREAT RELIANCE ON AGENCIES AND

2    REPORTS.  I HEAR THAT WAS PLURAL.  WHERE ARE THEY?  THE ONLY

3    THING WE HAVE GOT FOR THIS INDUSTRY-WIDE STANDARD WHICH HE'S

4    REFERRED TO IS THE 1975 CARPENTER STUDY.  THAT'S IT.  HOW

5    DOES THAT EQUATE TO AGENCIES' REPORTS, PLURAL?

6        AND THERE ARE SOME SPECIFIC POINTS I WANT TO RESPOND TO,

7    AND I'M GOING TO TRY NOT TO JUMP AROUND, BUT I'M GOING TO TRY

8    TO BE SUCCINCT, TOO.  SO, HE WAS REFERRING TO THE 150 SOLVENT

9    IN TALKING ABOUT HOW KEPT -- MR. JENSEN KIND OF WENT THROUGH

10   THE PROCESS OF DISTILLATION TECHNIQUES AND HISTORICALLY AND

11   WHATNOT AND PROVIDED SOME ADDITIONAL INFORMATION TO WHAT DR.

12   STEWART DID.

13       BUT IT'S -- THERE ARE OTHER METHODS AVAILABLE FOR

14   DISTILLING PETROLEUM SOLVENT OTHER THAN HYDRO-TREATMENT OR TO

15   DECREASE BENZENE OR OTHER METHODS AVAILABLE.  DR. STEWART

16   DOESN'T TALK ABOUT ANY OF THAT.  AND HE ASSUMES BASICALLY

17   BASED UPON A STATEMENT ON A MSDS WHERE HE USED THE WORD

18   HYDRO-TREATMENT THAT THAT'S INDICATIVE OF WHEN A COMPANY

19   STARTED DOING SOMETHING VERSUS WHEN IT WASN'T.

20       MSDS'S DON'T NECESSARILY -- WELL, THEY DON'T CONTAIN A

21   LOT OF ANALYTICAL DATA.  THEY ARE -- THEY ARE FOR USERS TO

22   KNOW WHAT'S IN A PRODUCT AND HOW TO USE IT SAFELY, AND THEY

23   DON'T NECESSARILY HAVE ALL THE BACKGROUND DATA.  WHY DID HE

24   STOP THERE?  WHY DIDN'T HE GO PULL THE REAL DATA?

25       NOW, MR. JENSEN SAYS, OH WELL, HE LOOKED AT THE PHOENIX

1    CHEMICAL LABS SAMPLE.  WELL, IN HIS DEPOSITION HE SAID HE

2    DIDN'T KNOW WHAT THAT SAMPLE WAS.  AND NOW HE DOES?  AND HE'S

3    ALSO AWARE OF THAT ONE SAMPLE THAT IT'S BEEN QUESTIONED AND

4    RE-TESTED, EVEN THOUGH HE DIDN'T KNOW WHAT IT WAS, BUT HE

5    DIDN'T KNOW THE SPECIFICS OF THAT.  WELL, DID HE LOOK INTO

6    IT?

7        IF YOU TAKE A STEP BACK, THE PROBLEM IS IS HE DIDN'T

8    LOOK INTO THIS AT A LEVEL THAT AN EXPERT WITNESS SHOULD DO.

9    IF WE TALK ABOUT -- I FEEL LIKE HE WAS -- MR. JENSEN WAS KIND

10   OF MINIMIZING DR. STEWART'S RELIANCE ON THE CO-WORKER

11   TESTIMONY.  AND I THINK THAT'S VERY IMPORTANT.  IT'S

12   INDICATIVE BECAUSE WHO DID DR. STEWART RELY ON ON THE

13   CO-WORKER TESTIMONY?  THE ONE PERSON THAT DIDN'T USE THE

14   PARTS WASHER.  THAT'S THE ONE PERSON THAT DIDN'T DESCRIBE ANY

15   COLOR DESCRIPTION WITH REGARD TO THE SOLVENT.  SHE SAID

16   TRANSPARENT, WHICH IS CLEAR, WHICH WE KNOW THE 105 SOLVENT

17   DESCRIBES CLEAR GREEN.

18       AND TO BE CLEAR, WHEN I'M -- WHEN YOU -- IF YOU WERE TO

19   LOOK AT THE 105 SOLVENT, IT HAS A GREEN HUE, BUT IT IS CLEAR.

20   IT'S TRANSLUCENT.  THE 150 SOLVENT, PALE YELLOW, TRANSLUCENT.

21          THE COURT:  SO IT'S LIKE MELLOW YELLOW AND MOUNTAIN

22   DEW OR SOMETHING?

23          MRS. KOCH:  YEAH.  I MEAN, IT'S THICKER THAN THAT A

24   LITTLE BIT, BUT BOTH ARE CLEAR.  AND THESE ARE THINGS THAT HE

25   SHOULD KNOW.  THIS IS NOT, OH, IS THERE A DISPUTABLE FACT?

1    HE SHOULD HAVE LOOKED AT THE EVIDENCE, YOU KNOW.  TO ME

2    THIS -- WE NEED TO THINK, OKAY, DID HE CONSIDER ALL THE

3    EVIDENCE?  NO, I DON'T THINK HE LOOKED AT ANYTHING OTHER THAN

4    WHAT HE WANTED TO LOOK AT TO COME UP WITH THIS ENLARGED

5    BENZENE CONTENT OPINION.

6         DID HE -- ARE THERE FACTUAL INACCURACIES IN WHAT HE

7    SAID?  TONS.  TONS.  I MEAN, HE DIDN'T EVEN GET THE CHEMICAL

8    RIGHT AT ISSUE.  ARE THERE UNSUPPORTED ASSUMPTIONS?  TONS.

9    THIS ASSUMPTION THAT THIS FAKE UNOCAL OR REPRINTED UNOCAL

10   MSDS SAYS THAT THAT PREMIUM SOLVENT HAS A THOUSAND PPM.

11   THAT'S A HUGE ASSUMPTION FOR HIM TO MAKE, OH, ESPECIALLY

12   SINCE IT DOESN'T SAY OSHA IN THE PARENTHESIS NEXT TO THE WORD

13   BENZENE, IT SAYS SARA TITLE THREE.  ANOTHER REGULATION.  NOT

14   OSHA.

15        MY POINT IS IS, ONE, I DO THINK IT IS A BIG DIFFERENCE.

16   I DO THINK IT MAKES A MATERIAL DIFFERENCE ON WHICH SOLVENT

17   HE'S USING BECAUSE BENZENE CONTENT IS ESSENTIAL TO AN

18   EXPOSURE -- YOU'RE DOING AN EXPOSURE ANALYSIS OF BENZENE

19   EMISSION, SO THE BENZENE CONTENT NUMBER IS IMPORTANT.

20        SO, YES, IF HE'S TALKING ABOUT SOMETHING THAT CONTAINS

21   5,000 PPM OF BENZENE VERSUS THE REALITY OF IT CONTAINING .45

22   PPM BENZENE OR BELOW, THAT IS A DRASTIC DIFFERENCE.  THAT

23   COMPLETELY ALTERS YOUR END RESULT.  AND I'M NOT CONTESTING --

24   I'M NOT SUGGESTING THAT THIS COURT SHOULD LOOK AT HIS END

25   RESULT, BUT WE SHOULD LOOK AT HOW HE GOT THERE.  AND...

```
 1            THE COURT:  I GUESS MY POINT ON THAT WAS -- AND

 2    PERHAPS I WASN'T -- I DIDN'T ARTICULATE IT WELL -- THE

 3    RELATIVE DISCREPANCY BETWEEN THE 105 AND 150 SOLVENT SEEMS

 4    MINISCULE COMPARED TO THE NUMBER THAT DR. STEWART RELIED ON

 5    PRE-1994 WITH THE INDUSTRY STANDARDS OF BENZENE.  NO?

 6            MRS. KOCH:  I MEAN, LET ME REPEAT WHAT I THINK

 7    YOU'RE SAYING AND TELL ME IF I GOT IT RIGHT.  ARE YOU SAYING

 8    THAT WHAT WE BELIEVE THE BENZENE CONTENT NUMBER SHOULD BE FOR

 9    THE PRE-1994 TIME PERIOD ISN'T THAT DIFFERENT FROM HIS?

10            THE COURT:  IT'S VERY DIFFICULT FROM HIS.

11            MRS. KOCH:  OKAY.

12            THE COURT:  BUT IT'S NOT THE -- YOU SAY IT SHOULD

13    BE THE SK 105 SOLVENT.  HE SAYS THAT IT WAS -- IT WAS THE

14    150.  BUT WHAT I THINK I UNDERSTOOD IS THE NUMBER THAT HE

15    ACTUALLY USED PRIOR TO 1994 WAS THE INDUSTRY-WIDE STANDARD

16    NUMBER, NOT ONE FROM THE ACTUAL SK 105 OR 150.

17       DOES ANYBODY IN THE ROOM KNOW WHAT I'M TALKING ABOUT?

18            MRS. KOCH:  I UNDERSTAND WHAT YOU'RE SAYING, YOUR

19    HONOR.  AND MY FIRST POINT WOULD BE THAT THEY -- HE DIDN'T

20    PROVE THAT THAT WAS AN INDUSTRY-WIDE STANDARD IN 1985, '86,

21    '87.  HE DIDN'T PROVE -- HE DOESN'T SHOWN ANYTHING.  IT'S NOT

22    THAT HE DIDN'T PROVE IT, HE DIDN'T PROVIDE A SINGLE BIT OF

23    EVIDENCE FOR THAT.  AND I GUESS WHAT YOU'RE SAYING IS FOR OUR

24    PURPOSES REGARDLESS OF WHETHER HE WAS SAYING IT WAS 150 OR

25    105, IT DOESN'T MATTER IN TERMS OF--
```

1           *THE COURT:*  I UNDERSTAND IT DOES MATTER, BUT AN

2     ORDER OF MAGNITUDE MORE MATTERS -- THE OTHER HUGE NUMBER, THE

3     INDUSTRY-WIDE STANDARD NUMBER THAT HE USED, THAT HE USED, I

4     THINK.  BUT IT'S SORT OF A -- IT'S A LITTLE ACADEMIC.  I'M

5     GETTING IN THE WEEDS NOW.

6           *MRS. KOCH:*  AND I'LL MOVE ON FROM THAT, YOUR HONOR,

7     BUT I JUST -- THE BOTTOM LINE IS HE'S SETTING HIMSELF OUT AS

8     AN EXPERT IN INDUSTRIAL HYGIENE AND PURPORTING TO HAVE THIS

9     GREAT WEALTH OF KNOWLEDGE ABOUT CONDUCTING THESE EXPOSURE

10    ASSESSMENTS.  SHOULDN'T HE BE ABLE TO GET THE SOLVENT RIGHT

11    THAT HE'S ANALYZING?  AND THAT GOES TO -- THAT GOES TO

12    RELIABILITY.  THAT GOES TO EVERY ONE OF THE OPINIONS.  I

13    MEAN, LET ME MOVE ON.  BUT...

14          *THE COURT:*  I GUESS WHAT I'M HEARING IS YOU FEEL

15    THAT DR. STEWART IS AN EXPERT IN HIS FIELD AND IS

16    WELL-RESPECTED THERE, BUT THE NATURE OF WHAT HE IS INTERESTED

17    IN DOING IN HIS WHEELHOUSE IS ON ASSESSING EXPOSURES SORT OF

18    INDUSTRY-WIDE OR TASK-SPECIFIC PERHAPS, AND IT WAS NOT

19    DESIGNED -- THE MODELING WAS NOT DESIGNED TO ASSESS THIS

20    PARTICULAR SOLVENT THAT WAS USED BY THIS PARTICULAR PLAINTIFF

21    WITHIN HIS PARTICULAR WORK ENVIRONMENT, AND THAT BECAUSE IT'S

22    NOT THAT SPECIFIC TO HIM, THAT IT CREATES UNRELIABILITY IN

23    THE METHODOLOGY AND ULTIMATELY IN THE RESULT.

24          *MRS. KOCH:*  AMONG OTHER THINGS, YES.

25          *THE COURT:*  OKAY.  AND I GUESS FROM MAYBE THE

1    PLAINTIFFS' PERSPECTIVE, THEY HAVE -- THEY HAVE LOST

2    MR. BOYKIN, THEY HAVE AN OPINION THAT SAYS THAT MR. BOYKIN'S

3    ULTIMATE DEATH WAS CAUSED BY THESE PULMONARY EMBOLI THAT WERE

4    CREATED THAT FORMED AFTER HE DEVELOPED NON-HODGKIN'S LYMPHOMA

5    AS A RESULT OF BENZENE EXPOSURE, AND THAT'S ALL WE KNOW.

6    BASICALLY HE WAS EXPOSED TO BENZENE, WE CAN'T TELL YOU WHERE

7    THE BENZENE CAME FROM, BUT HERE ARE THE POSSIBLE SOURCES OF

8    THE BENZENE IN ALL THESE DIFFERENT TYPES OF CHEMICALS, AND

9    THOSE ARE KIND OF TWO DIFFERENT PERSPECTIVES ON THE SAME

10   ISSUE.

11       YOU WANT HIS EXPERT TO IDENTIFY, ALL RIGHT, WELL, TELL

12   ME WHAT MY PRODUCT DID, I'M ENTITLED TO KNOW WHAT MY PRODUCT

13   YOU ALLEGE DID, AND THEY ARE SAYING, WE DON'T NECESSARILY

14   KNOW WHAT YOUR PRODUCT DID, BUT IT ALONG WITH THESE OTHER

15   PRODUCTS THAT CONTAINED BENZENE HAD THIS CUMULATIVE EFFECT

16   AND POTENTIALLY SOLELY OR IN CONJUNCTION WITH ONE ANOTHER HAD

17   A REASONABLE PROBABILITY OF CAUSING THE NON-HODGKIN'S

18   LYMPHOMA.

19       IS THAT A FAIR ASSESSMENT, MR. JENSEN?

20           MR. JENSEN:  I THINK MOSTLY, YOUR HONOR.  I COULD

21   QUIBBLE, BUT I DON'T THINK I SHOULD.

22           THE COURT:  I JUST WANT TO MAKE SURE I UNDERSTAND

23   SORT OF THE BIG PICTURE.  I THINK I UNDERSTAND A LOT OF THE

24   LITTLE ISSUES, AND BUT I JUST DON'T WANT TO LOSE -- LOSE THE

25   BIG PICTURE.  AND AS I UNDERSTAND, WE ARE JUST TALKING ABOUT

1    THE PARTS WASHING SOLVENTS FOR TODAY.

2        BUT I ASSUME OR I HEARD HINTED AT THAT THERE IS -- THERE

3    ARE OTHER CLAIMS AGAINST THE AEROSOL SPRAY MANUFACTURERS AND

4    PERHAPS SOME OVERLAP HERE WITH THESE DEFENDANTS, BUT THAT

5    MR. BOYKIN'S EXPOSURE TO A BUNCH OF DIFFERENT CHEMICALS,

6    WHETHER IN LIQUID FORM OR IN AEROSOL SPRAY, LED TO THE

7    NON-HODGKIN'S LYMPHOMA.

8        MR. JENSEN:  THAT'S TRUE.

9        THE COURT:  OKAY.  OKAY.

10       MRS. KOCH:  AND ALONG THOSE BIG PICTURE LINES, LET

11   ME PUT THIS SOLVENT ISSUE TO YOU THIS WAY.  DR. STEWART IS

12   CLAIMING THAT OUR 150 PREMIUM SOLVENT SHOULD HAVE HAD A

13   BENZENE LISTING IN THAT INGREDIENT SECTION.  SO, HIS ANALYSIS

14   ISN'T REALLY IMPORTANT THAT HE -- IT'S IMPORTANT THAT HE

15   LOOKS AT THE PRODUCT ITSELF TO COME TO THAT CONCLUSION.

16       BUT WHAT WE HAVE GOT IS HE LOOKED AT ANOTHER PRODUCT --

17   OR I DON'T KNOW WHAT, HE DIDN'T -- WE DON'T KNOW, BUT

18   SUPPOSED INDUSTRY STODDARD SOLVENT, AND HE'S USING THAT AS A

19   BASIS TO SAY OUR SOLVENT NEEDED A WARNING, A BENZENE WARNING?

20   THAT'S THE BIG ISSUE ACTUALLY.  HE'S USING SOMETHING ELSE TO

21   PROVIDE A WARNINGS OPINION FOR OUR SPECIFIC SOLVENT.  AND THE

22   SAME THING APPLIES TO THE 150 WHEN HE SWITCHES THAT AROUND --

23   I MEAN, I'M SORRY -- TO THE 105.  MAYBE THAT IS A BETTER WAY

24   OF SAYING IT.

25       THE COURT:  WELL, THAT -- THAT'S A BETTER ARGUMENT

1    I THINK ON THE FAILURE TO WARN.  IT TIES IT UP MORE

2    SPECIFICALLY FOR ME.

3         *MRS. KOCH:*  AND TO BE CLEAR, THAT'S -- ALL OF THEIR

4    CLAIMS ARE FAILURE TO WARN CLAIMS, SO THAT IS CENTRAL TO THIS

5    CASE.  I WANT TO TALK A LITTLE BIT ABOUT -- MR. JENSEN SPOKE

6    TO THESE RELIANCE MATERIALS THAT DR. STEWART SUBMITTED, WHICH

7    TO BE CLEAR IN HIS DEPOSITION HE MADE CLEAR THAT THESE ARE

8    JUST MATERIALS PLAINTIFF PROVIDED TO HIM.  IT'S NOT LIKE --

9    HE DIDN'T GO OUT -- HE TOLD US IN THE DEPOSITION HE DIDN'T GO

10   OUT AND DO ANY INDEPENDENT RESEARCH.  THAT MIGHT BE A BIG

11   ISSUE RIGHT THERE, TOO.

12        BUT THIS -- HE SAID THE EXPOSURE STUDIES ARE NOT

13   SUFFICIENTLY ANALOGOUS BECAUSE THEY ARE TALKING ABOUT -- THEY

14   ARE TALKING ABOUT WHEN MR. BOYKIN USED THE PARTS WASHER AND

15   WALKED AWAY.  WELL, MR -- DR. STEWART WOULD HAVE KNOWN THAT

16   THE EXPOSURE SETTINGS ACCOUNT FOR THAT BECAUSE -- IF HE WOULD

17   HAVE READ THEM -- BECAUSE THE USERS WEAR -- I'M NOT SAYING IN

18   ALL OF THE STUDIES -- BUT THERE ARE EXPOSURE STUDIES WHERE

19   THE USERS WEAR THE MONITORING DEVICE ON THEIR LAPEL.

20        SO, IF A MECHANIC WAS USING THE PARTS WASHER, THAT

21   MONITORING DEVICE WAS STILL WITH HIM THROUGHOUT HIS DAY.  THE

22   NIOSH HEALTH HAZARD EXAMINATION WILL BE AN EXAMPLE OF THOSE

23   STUDIES.  AND THE NMAS STUDY IS ANOTHER EXAMPLE.  SO, THAT'S

24   NOT COMPLETELY ACCURATE TO SUGGEST THAT THE AIR MONITORING

25   STUDIES JUST MEASURE THE AIR ABOVE THE MACHINE, NOWHERE ELSE.

1        I ALSO WANT TO CORRECT ANOTHER STATEMENT MR. JENSEN

2    MADE.  HE SAID THAT DR. STEWART SAYS, OH, THE ART MODEL

3    ACCOUNTED FOR THE CHANGE IN BENZENE.  WELL, IN HIS DEPOSITION

4    HE TESTIFIED TO THE BENZENE OR -- BEING THE INPUT IN THE ART

5    MODEL THAT IT MAINTAINS BENZENE IN A STEADY STATE.  SO...

6        THE COURT:  OKAY.  SO THE COMMENT ABOUT THE ART

7    MODEL ACCOUNTING FOR THE VOLATILITY, YOU'RE CHALLENGING THAT.

8        MRS. KOCH:  I AM.  PER HIS DEPOSITION WE ARE.  AND

9    WE ARE LOOKING AT PAGES -- PAGE 186 THROUGH 187 FOR YOUR

10   REFERENCE, YOUR HONOR.

11       THE COURT:  OKAY.

12       MRS. KOCH:  AND LASTLY, YOUR HONOR, I JUST WANT

13   TO -- WE HAVE TALKED ABOUT MILWARD A LOT.  AND AGAIN, I'M NOT

14   GOING TO GET INTO THE GENERAL ACCEPTANCE OF THE ART MODEL.

15   BUT I DO WANT TO POINT OUT THAT TO THE EXTENT THE COURT IS

16   INCLINED TO THINK THAT BECAUSE THIS MODEL WAS ACCEPTED IN

17   MILWARD IT'S OKAY HERE.  I DON'T THINK THAT -- I THINK THAT

18   STOPS A STEP SHORT.  AND DR. STEWART DIDN'T DO ANYTHING TO

19   SHOW THAT IT'S SPECIFICALLY APPLICABLE TO THIS CASE.

20       MILWARD DIDN'T INVOLVE PARTS WASHERS, SO IT WAS NEVER

21   ANALYZED IN THAT RESPECT.  SO, I DON'T KNOW TO WHAT EXTENT

22   REAL-WORLD AIR MONITORING DATA WAS AVAILABLE.  ANOTHER POINT

23   I WANT TO MAKE IS WE ARE NOT CONTENDING THAT MODELING IS

24   NEVER APPROPRIATE, AND THAT -- THAT'S NOT OUR POSITION.  OUR

25   POSITION IS WHEN YOU HAVE THE REAL DATA, YOU'VE GOT TO USE

```
 1   IT.  AND IF YOU'RE NOT GOING TO USE IT, YOU NEED TO TELL US

 2   WHY.  AND HE DIDN'T DO THAT.

 3       I THINK THAT'S EVERYTHING I HAVE, YOUR HONOR.  THANK YOU

 4   FOR YOUR TIME.

 5            THE COURT:  THANK YOU.

 6            MRS. KOCH:  YOUR HONOR, ONE MORE THING.  DO YOU

 7   WANT THE DEPOSITION TESTIMONY REGARDING THE ISSUE OF THE

 8   VOLATILIZATION OF BENZENE--

 9            THE COURT:  I HAVE TAKEN THE NOTE ON WHERE IT IS,

10   186 TO 187 OF DR. STEWART'S DEPOSITION.  IS THAT VOLUME ONE I

11   ASSUME?

12            MRS. KOCH:  YES, YOUR HONOR.  THANK YOU.

13            THE COURT:  I DON'T WANT ANY MORE PAPERS THAN I

14   HAVE TO HAVE BACK IN MY OFFICE.

15       (WHEREUPON, THERE WAS A PAUSE.)

16            MR. TOLLISON:  YOUR HONOR, I JUST WANTED TO MAKE

17   SURE THAT WHEN AMANDA SPOKE, THAT I THINK I'M CORRECT THAT

18   THIS CASE HAS BEEN -- IS NOW DOWN JUST TO THE FAILURE TO WARN

19   CLAIMS WITH RESPECT TO EVERYBODY.  AND WHEN WE ORIGINALLY

20   BRIEFED OUR MOTION TO EXCLUDE THE MEMO IN SUPPORT, THOSE

21   CLAIMS HAD NOT BEEN ABANDONED.

22       SO WHEN YOU'RE READING OUR INITIAL BRIEFING, IT WAS THE

23   BROADNESS OF WHICH ALL CAUSES OF ACTION WERE STILL ON THE

24   TABLE AND NOW JUST--

25            THE COURT:  OKAY.  WELL, THAT MAKES A LOT MORE
```

1    SENSE.  I THOUGHT I HAD MISSED A BRIEF OR TWO SOMEWHERE IN

2    THERE AND NEEDED TO GO BACK AND READ EVERYTHING.  BUT I

3    APPRECIATE THAT, MR. TOLLISON.

4        I JUST WANT TO FOLLOW-UP, MRS. KOCH, ON SOMETHING THAT

5    YOU ENDED WITH THAT MADE ME THINK MAYBE I MISUNDERSTOOD SOME

6    OF THE PRESENTATION EARLIER ON THAT TRIANGLE THAT YOU ALL HAD

7    ABOUT THE POSSIBLE METHODS OF DOING AN EXPOSURE ANALYSIS

8    INCLUDE -- BOY, JOHNNY ON THE SPOT.

9        SO, THIS IS THE POTENTIAL HIERARCHY.  AND SO, THE

10   PREFERRED, CERTAINLY, IS THE MEASURED DATA OF THE INDIVIDUALS

11   --

12            MRS. KOCH:  YES, MA'AM.

13            THE COURT:  -- WORK SITE AND I GUESS THE INDIVIDUAL

14   EXPOSURE WHEN YOU DON'T HAVE THAT.  AND I SUPPOSE WHEN THE

15   DECEDENT IS NOT AVAILABLE, I GUESS THERE DOES THE ABSENCE OF

16   THE DECEDENT MEAN THAT YOU STILL CAN'T TAKE MEASURED DATA

17   FROM HIS WORK SITE?

18            MRS. KOCH:  WELL, YOU COULD, BUT THEN THAT WOULD I

19   THINK -- IN MY OPINION THAT WOULD THEN KNOCK IT DOWN INTO

20   ANALOGOUS DATA BECAUSE IT WOULD BE A DIFFERENT -- I GUESS

21   MAYBE IF IT WAS THE NEXT DAY.  BUT YOU KNOW, IT WOULDN'T BE

22   THE SAME THING AS WHAT HE WAS DOING DAILY IN HIS --

23            THE COURT:  DURING THE TIME PERIOD.

24            MRS. KOCH:  -- IT MAY -- CAN'T CONFIRM IT'S THE

25   EXACT SAME AS THE TASK THAT PERHAPS HE WAS...

 1              *THE COURT:*  OKAY.  SO THEN, IF YOU WERE TO EVEN

 2   EVALUATE THAT SAME WORK SITE AFTER THE DECEDENT'S DEATH, THEN

 3   THAT WOULD STILL BE IN THE SECOND ANALOGOUS REAL-WORLD DATA

 4   AND THAT BAND WOULD ALSO INCLUDE SAY OTHER MOTORCYCLE REPAIR

 5   SHOPS OR SIMILARLY SITUATED MOTORCYCLE MECHANICS AND THEIR

 6   MAYBE EXPERIENCE IF THEY WORKED SAY -- AND I DON'T KNOW, I

 7   ASSUME YAMAHA IS HUGE AND HAS THOUSANDS OF MOTORCYCLES

 8   MECHANICS.

 9         SO, WHETHER IT WAS THE SAME SHOP OR A SIMILAR SHOP OR A

10   SIMILAR MOTORCYCLE MECHANIC SOMEWHERE ELSE, THAT'S WHERE YOU

11   REFER TO THE APPROPRIATE ANALOGOUS REAL-WORLD DATA.  AND THEN

12   YOU GET TO THE COMPUTER MODELING.  YOUR -- I THINK EARLIER I

13   HEARD FROM MRS. BONNEVILLE THAT YOU DON'T HAVE A BEEF WITH

14   THE PLAINTIFF USING COMPUTER MODELING.  YOU HAVE A BEEF WITH

15   THE MODEL THAT HE CHOSE AND THE METHODOLOGY HE EMPLOYED IN

16   THAT MODEL.

17         AND I THINK I HEARD, MRS. KOCH, YOU JUST END WITH, HE

18   SHOULDN'T HAVE USED THE MODEL IN THE FIRST PLACE.

19              *MRS. KOCH:*  I THINK THAT BECAUSE THERE ARE SOME --

20   BASED ON THIS HIERARCHY -- AND BY THE WAY, DR. STEWART AGREES

21   WITH THIS HIERARCHY.  I DON'T THINK -- WITH THIS HIERARCHY.

22   I DON'T THINK THAT THEY WOULD CONTEST THAT.  HE -- NOW, HE

23   DISAGREES THAT MODELING WASN'T APPROPRIATE IN THIS CASE.  I

24   MEAN, I'M SORRY.  HE DISAGREES WITH US THAT MODELING WASN'T

25   APPROPRIATE IN THIS CASE, BUT HE ACKNOWLEDGE IN HIS DEPO THAT

1    THIS IS THE HIERARCHY OF INDUSTRIAL HYGIENE.

2        THERE IS SO MUCH DATA ON THIS PARTS WASHER THAT, YES,

3    IT'S OUR POSITION THAT TIER TWO RIGHT THERE, THE SECOND TIER,

4    APPROPRIATE ANALOGOUS REAL-WORLD DATA, THAT'S WHAT THEY

5    SHOULD HAVE USED.  BUT BEYOND THAT, IF HE'S NOT GOING TO USE

6    IT, THEY NEEDED TO TELL US WHY.  HE NEEDED TO PROVIDE A BASIS

7    FOR NOT USING IT, AND HE DIDN'T, AND HE CAN'T BECAUSE HE

8    HASN'T GONE THROUGH ALL THE DATA.  AND THAT AGAIN GOES TO

9    WHAT DID HE LOOK AT.

10        *THE COURT:*  OKAY.  I THINK I HAVE UNDERSTOOD YOUR

11    REPLY, MRS. KOCH AND MRS. BONNEVILLE.  THANK YOU FOR THOSE.

12        MR. JENSEN, DO YOU HAVE ANY COMMENTS ON ANY ISSUES THAT

13    WERE RAISED?

14        *MR. JENSEN:*  ONE ISSUE BECAUSE I DID NOT TOUCH ON

15    THIS WHEN I STOOD UP EARLIER ON THE WARNINGS PIECE AND THE

16    CONFUSION BETWEEN 105 VERSUS 150.  I WOULD MAKE TWO POINTS

17    ABOUT THAT.  FIRST OF ALL, TO THE EXTENT THAT DR. STEWART'S

18    VIEW IS BOTH 105 AND 150 LIKELY HAD 1,000 TO 5,000 PARTS PER

19    MILLION, A .1 TO .5 PERCENT DURING THE TIMEFRAME 1987 TO 1994

20    BEFORE HYDRO-TREATMENT KICKS IN, THEN THAT WOULD -- THAT --

21    TO THE EXTENT HE'S MAKING A MISTAKE SWITCHING THEM UP, IT'S

22    NOT GOING TO MAKE ANY DIFFERENCE TO EITHER THE EXPOSURE

23    ASSESSMENT FROM HIM OR TO THE ISSUE OF WHETHER THEY SHOULD

24    HAVE HAD A WARNING.

25        THE SECOND POINT I WOULD MAKE IS A LEGAL ONE, WHICH IS I

1    JUST WANT TO MAKE SURE THE COURT UNDERSTANDS THAT ALTHOUGH I

2    DO BELIEVE DR. STEWART'S OPINIONS ABOUT WARNINGS WERE BASED

3    ON THE .1 PERCENT OR HIGHER CONCENTRATION THAT IS AN OSHA

4    HAZARD COMMUNICATION REQUIREMENT, FROM A LEGAL STANDPOINT THE

5    JURY CAN AND SHOULD BE ALLOWED TO DETERMINE WHETHER A WARNING

6    SHOULD HAVE BEEN GIVEN ABOUT BENZENE IN THESE PRODUCTS EVEN

7    AT A LOWER LEVEL AND THAT THE HAZARDOUS COMMUNICATION

8    STANDARD IS NOT PREEMPTIVE, IT IS A FLOOR, NOT A CEILING FOR

9    STATE LAW.

10            THE COURT:  OKAY.  THANK YOU.

11            MRS. KOCH:  YOUR HONOR, MAY I MAKE ONE MORE POINT?

12            THE COURT:  SURE.

13            MRS. KOCH:  MR. JENSEN'S STATEMENT JUST NOW THAT

14   BOTH 105 AND 150 HAD A THOUSAND TO 5,000 PPM IN IT IS THE

15   FIRST THAT I HAVE HEARD THAT THAT'S DR. STEWART'S OPINION.

16   HE HASN'T TALKED ABOUT 105 IN THE FIRST PART OF THE TIME

17   PERIOD.  NOW WE HAVE GOT SOMETHING NEW.

18        AND TO THE EXTENT WE ARE SAYING WHETHER IT NOT -- IT

19   MATTERS WHICH ONE IS WHICH, WELL AGAIN, BECAUSE THEY ARE TWO

20   DIFFERENT PRODUCTS, THEY NEED TO BE EVALUATED DIFFERENTLY.

21   AND TO JUST THROW THEM ALL TOGETHER, I -- IT'S KIND OF

22   ANOTHER EXAMPLE OF IT.  I MEAN, WE CAN'T EVEN KEEP UP WITH

23   WHICH ONES THEY ARE TALKING ABOUT.

24        BUT TO BE CLEAR, DR. STEWART HAS NOT OFFERED AN OPINION

25   ABOUT 105 AND THE FIRST -- IN HIS FIRST -- PART ONE OF HIS

1    EXPOSURE ASSESSMENT.  SO, THAT'S -- JUST WANT TO BE CLEAR ON

2    THE RECORD ON THAT, YOUR HONOR.

3              THE COURT:  OKAY.

4         MRS. KOCH:  THANK YOU.

5         THE COURT:  I THINK THAT ONE OF THE FINAL QUESTIONS

6    I HAVE JUST FROM MY NOTES IS DR. STEWART'S ANALYSIS APPEARS

7    TO END IN 2003 AND THERE WAS SOME QUESTION ABOUT WHY; WHY THE

8    ANALYSIS ENDED THERE.

9         MR. JENSEN:  THE ANALYSIS OF SAFETY KLEEN, NOT

10   ANALYSIS OVERALL.

11            THE COURT:  RIGHT.

12        MR. JENSEN:  AND I DON'T KNOW WITH A HUNDRED

13   PERCENT CERTAINTY, YOUR HONOR, BUT MY BELIEF IS THAT HE

14   INTERPRETED THE TESTIMONY AND OR WORK RECORDS SUCH THAT HE

15   THOUGHT SAFETY KLEEN WAS NOT SUPPLYING THE PARTS WASHER AFTER

16   2003, AND THAT COULD HAVE BEEN WRONG BY ONE YEAR OFF ABOUT

17   THAT.

18            THE COURT:  OKAY.  I GUESS YESTERDAY, MR. TOLLISON,

19   I THINK YOU INDICATED THAT SAFETY KLEEN WAS SOMEWHERE 2003,

20   2004 AND THEN IT WAS 2004 UNTIL 2007 OR EIGHT THAT PROVIDENCE

21   ENVIRONMENTAL SERVICED; RIGHT?

22            MR. TOLLISON:  YES, MA'AM.

23        MRS. BONNEVILLE:  AND YOUR HONOR, I CAN PROBABLY

24   CLARIFY THAT FOR YOU.  IF YOU LOOK AT PAGES 10, 11 OF DR.

25   STEWART'S REPORT HE IDENTIFIES THE TIME PERIOD FOR SAFETY

1    KLEEN AND THEN HE TALKS ABOUT WHAT HE USED -- THE NUMBERS HE

2    USES THROUGH THE 2009 PERIOD.  AND IF YOU LOOK AT THE TOP

3    PAGE OF 11, PAGE 11 HE TALKS ABOUT POST-SAFETY KLEEN.  HE

4    CONTINUES TO USE THAT NUMBER, THE NUMBER THAT HE HAD DECIDED,

5    FOR THE REST OF THE PERIOD.

6        AND THAT WAS ONE OF OUR CONCERNS WAS THAT, YOU KNOW,

7    YOU'RE SAYING THAT NOW THAT WE ARE IN HERE, BUT WHEN YOU DID

8    YOUR CALCULATION, YOU WERE USING NUMBERS THAT YOU SAID THAT

9    YOU TOOK OFF OF YOUR CALCULATIONS FOR SAFETY KLEEN WHICH,

10   YOUR HONOR, MRS. KOCH HAS DISCUSSED THE ISSUES WITH THOSE.

11   SO THAT MIGHT BE PART OF THE UNCLARITY IS --

12           THE COURT:  OKAY.

13           MRS. BONNEVILLE:  -- COMES FROM THAT.

14           THE COURT:  OKAY.  WELL, I THINK I HAVE -- I HAVE

15   TAKEN A LOT OF NOTES.  I HOPE THAT THEY ARE LEGIBLE WHEN I GO

16   BACK TO CHAMBERS.  BUT MERCIFULLY WE HAVE THE BENEFIT OF A

17   TRANSCRIPT FROM THIS HEARING, TOO, THAT I'LL BE ABLE TO

18   CONSULT AND COMPARE WITH MY OWN NOTES AND HELP ELUCIDATE THE

19   ARGUMENTS FURTHER IN MY MIND.

20       I WANT TO -- BEFORE WE BREAK, I JUST WANT TO COMMEND

21   EACH OF THE ATTORNEYS AND LAW FIRMS ON EACH OF YOUR

22   PRESENTATIONS BOTH IN WRITING AND YOUR ORAL ADVOCACY.  IT'S

23   DELIGHTFUL TO -- AND I MAY LEAD A VERY SAD LIFE WHEN I GET MY

24   KICKS FROM READING THESE KINDS OF BRIEFS, BUT I MUST SAY THAT

25   IT'S JUST DELIGHTFUL TO HAVE WELL-WRITTEN BRIEFS THAT ARE

1    ORGANIZED, THAT ARE SUPPLEMENTED WITH EXHIBITS AND ADVOCACY

2    THAT IS OF THE LEVEL THAT I HAVE HEARD TODAY AND YESTERDAY.

3         SO, YOU SHOULD BE COMMENDED ON ALL SIDES FOR THE

4    ARGUMENTS THAT ARE BEING -- THAT HAVE BEEN MADE.  AND I AM

5    NOT SURE, Y'ALL MAY DO THIS ALL OVER THE COUNTRY AND SEE ONE

6    ANOTHER ALL THE TIME.  IT'S MY FIRST TIME DEALING WITH THIS

7    MATTER.  AND I'M NOT SAYING THAT I COULD -- I COULD DO IT

8    OVER AND OVER AND OVER AGAIN, BUT YOU CERTAINLY HAVE

9    DEVELOPED A COMFORT WITH VERY TECHNICAL SUBJECT MATTER AND

10   HAVE ELUCIDATED THOSE MATTERS IN A WAY THAT EVEN A COUNTRY

11   GIRL FROM COLUMBIA, SOUTH CAROLINA CAN UNDERSTAND.

12        SO I HOPE THAT YOU WILL TAKE MY COMMENDATION ON ALL

13   FRONTS FOR THE BRIEFING AS WELL AS THE ADVOCACY AND IN THE

14   PRESENTATIONS AS WELL.  WITH THAT, I SHOULD PROBABLY TELL YOU

15   THAT I ASK A LOT OF QUESTIONS AND SOMETIMES THOSE QUESTIONS

16   ARE TO HELP ME GET TO WHERE I WANT TO GO AND SOMETIMES THEY

17   ARE DESIGNED TO HELP ME GO WHERE I THINK I NEED TO GO, AND

18   OFTEN TIMES I AM -- I ASK MORE QUESTIONS OF A SIDE THAT I MAY

19   END UP GOING WITH RATHER THAN THE SIDE THAT MAY BE SITTING

20   BACK THANKING GOD THAT I'M NOT ASKING THEM THOSE QUESTIONS.

21        SO, I DON'T WANT ANYONE TO READ ANYTHING OUT OF THE

22   NUMBER OR PARTICULARITY OF THE QUESTIONS THAT I ASK OF ANY

23   ONE ENTITY OR ANY ONE LAWYER.  MY GOAL IN ASKING THE

24   QUESTIONS IS TO MAKE SURE THAT I FOLLOW YOU AND THAT I FOLLOW

25   THE ARGUMENT AND I FOLLOW THE CHALLENGES TO YOUR ARGUMENT.

1        SO WITH THAT, I THINK WE'LL GO OFF THE RECORD BRIEFLY.

2        (WHEREUPON, AN OFF-THE-RECORD DISCUSSION WAS HAD AND THE

3    HEARING CONCLUDED.)

4                            ***

5        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8        S/KATHLEEN RICHARDSON

9        _____        AUGUST 12, 2015

10       KATHLEEN RICHARDSON, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25